UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENE SAMIT, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CBS CORPORATION, LESLIE MOONVES, and JOSEPH R. IANNIELLO,<br><br>Defendants. | )<br>)<br>)  Case No.<br>)<br>)<br>)<br>)  <u>CLASS ACTION COMPLAINT</u><br>)<br>)  <u>JURY TRIAL DEMANDED</u><br>)<br>)<br>)<br>) |

Plaintiff Gene Samit ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CBS Corporation ("CBS" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired CBS securities between February 14, 2014 through July 27, 2018, both dates inclusive (the "Class Period"), seeking to

recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      CBS is a mass media company with operations in the entertainment, cable networks, publishing, and local media segments. The Company's voting Class A Common Stock and non-voting Class B Common Stock are listed and traded on the New York Stock Exchange ("NYSE") under the symbols "CBS.A" and "CBS", respectively.

3.      At all relevant times, the Company has purported to maintain "standards for ethical conduct that are expected of ***all directors and employees of the Company***." (emphasis added.)

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) CBS executives, including the Company's Chairman and Chief Executive Officer ("CEO"), Defendant Leslie "Les" Moonves, had engaged in widespread workplace sexual harassment at CBS; (ii) CBS's enforcement of its own purported policies was inadequate to prevent the foregoing conduct; (iii) the foregoing conduct, when revealed, would foreseeably subject CBS to heightened legal liability and impede the ability of key CBS personnel to execute the Company's business strategy; and (iv) as a result, CBS's public statements were materially false and misleading at all relevant times.

5.     On July 27, 2018, various media outlets reported that *The New Yorker* would shortly publish an article, discussing an investigative report detailing allegations of sexual misconduct by Moonves and other executives at the Company.

6.     On this news, CBS's stock price fell $3.52, or 6.12%, to close at $54.01 on July 27, 2018.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as CBS's principal executive offices are located within this Judicial District.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

**PARTIES**

12.     Plaintiff, as set forth in the attached Certification, acquired CBS securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant CBS is incorporated in Delaware, with principal executive offices located at 51 West 52nd Street, New York, New York 10019. CBS's Class A and Class B Common Stock are traded on the NYSE, under the symbols "CBS.A" and "CBS", respectively.

14.     Defendant Moonves has served at all relevant times as the Company's President and CEO and Chairman.

15.     Defendant Joseph R. Ianniello ("Ianniello") has served at all relevant times as the Company's Chief Operating Officer.

16.     The Defendants referenced above in ¶¶ 14-15 are sometimes referred to herein as the "Individual Defendants."

17.     The Individual Defendants possessed the power and authority to control the contents of CBS SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

4

## SUBSTANTIVE ALLEGATIONS

### Background

18.    CBS is a mass media company with operations in the entertainment, cable networks, publishing, and local media segments. The Company's voting Class A Common Stock and non-voting Class B Common Stock are listed and traded on the NYSE under the symbols "CBS.A" and "CBS", respectively.

### Materially False and Misleading Statements Issued During the Class Period

19.    The Class Period begins on February 14, 2014, when the Company filed its Form 10-K for the fiscal year ended December 31, 2013 (the "2013 10-K"). In the 2013 10-K, CBS stated in relevant part:

> ***The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenues***
>
> The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities. The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

20.    The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the 2013 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

21.    On April 11, 2014, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2014 Proxy"), which stated in relevant part, "The Company's Business

Conduct Statement ('BCS') sets forth the Company's standards for ethical conduct that are expected of ***all directors and employees of the Company***." (emphasis added.) The 2014 Proxy further stated:

> As part of the Company's compliance and ethics program, directors and full-time employees are required to certify as to their compliance with the BCS and, on an ongoing basis, must disclose any potential conflicts of interest. The Company has also implemented an online BCS training program. The BCS addresses, among other things, topics such as:
>
> • Compliance with laws, rules and regulations, including the Foreign Corrupt Practices Act;
> • Conflicts of interest, including the disclosure of potential conflicts to the Company;
> • Confidentiality, insider information and trading, and fair disclosure;
> • Financial accounting and improper payments;
> • The Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment;
> • Fair dealing and relations with competitors, customers and suppliers;
> • Health, safety and the environment; and
> • Political contributions and payments.
>
> The BCS provides numerous avenues for employees to report violations of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee. These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers. The BCS also provides that the Company will protect anyone who makes a good faith report of a violation of the BCS and that retaliation against an employee who makes a good faith report will not be tolerated.

22.    A letter to all employees and directors incorporated into the BCS, authored by Defendant Moonves, stated:[1]

> CBS is known for the quality of its people, the content it creates and distributes around the globe and the integrity of its business practices. We are committed to maintaining the highest standards in everything we do, be it creating programming or how we operate in business. Guiding our Company is a strong and established ethical code.

---

[1] Based on information and belief, the BCS was last amended in 2016 (*available at*: https://www.cbscorporation.com/wp-content/uploads/2018/03/2016_CBS_Corporation_BCS.pdf), and was identical in sum and substance throughout the Class Period.

The CBS Corporation Business Conduct Statement reflects our Company values and outlines our critical policies and guidelines. As CBS employees, we all have a responsibility to uphold the highest standards of ethical and appropriate business actions.

That said, our Statement cannot anticipate every business situation you may encounter in this rapidly changing world. We rely on you, and every member of the CBS family, to use good judgement, to consider what is right and prudent and to make sure that all business is carried out in accordance with this Statement. There will be times when you have concerns about an issue or the ways in which this Statement impacts a particular situation. In those occasions, our Compliance Officers are here to help.

Please read the Statement carefully. Once you fully understand the terms outlined in the Statement, please complete the Employee, Officer and Director Certification form. A company is only as good as its people. We trust that you'll continue to deliver results with honor and integrity. Thank you for your cooperation in making CBS great.

23.     Section VI of the BCS provided:

**VI. HARASSMENT-FREE WORKPLACE ENVIRONMENT**

***CBS has a "zero tolerance" policy for sexual harassment*** or harassment based on race, color, national origin, religion, sex, age, physical disability, mental disability, medical condition, ancestry, alienage or citizenship status, marital status, creed, genetic information, height or weight, sexual orientation, military or veteran's status, gender, gender identity, gender expression, transgender status or any other characteristic protected by law. ***Discriminatory treatment, including sexual harassment and harassment based on a person's race, age or other protected status, is strictly prohibited. CBS will take all steps necessary and appropriate to stop such acts of harassment or discrimination of which it becomes aware.*** Unlawful harassment may occur not only as a result of conduct by supervisors, but also due to conduct by directors and/or fellow employees, and, under some circumstances, conduct by customers, vendors, consultants, visitors and independent contractors. Unlawful harassment can take place in the office or in work-related settings outside the workplace, such as during business trips, business meetings and business-related social events. This Statement applies with equal force to conduct in all such settings. Sexual harassment may exist where compensation or other employment benefits are conditioned on granting sexual favors. Sexual harassment also may exist where there is a hostile work environment caused by a pattern of unwanted sexual advances or unwanted visual, verbal or physical conduct of a sexual nature.

Unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature are sexual harassment when:

■ Submission to the conduct is made, either explicitly or implicitly, a term or condition of the individual's employment.

■ Submission to or rejection of the conduct by an individual is used as the basis for employment decisions affecting the individual (such as a promotion or a bonus).

■ Or the conduct has the purpose or effect of unreasonably interfering with the individual's work performance or creating an intimidating, hostile, or offensive working environment.

CBS also believes in an environment that is free from workplace bullying and abusive conduct, regardless of whether the person is in a protected category. Bullying or abusive conduct is conduct with malice that a reasonable person would find hostile or offensive. Examples of what constitutes abusive or bullying conduct includes repeated use of insults, derogatory remarks and epithets; threatening, intimidating or humiliating verbal or physical conduct; and the gratuitous sabotage of a person's work performance. It does not include a single act unless it is especially severe and egregious, but CBS strongly discourages such behavior at any time.

(Emphases added.)

24.     On February 13, 2015, CBS filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). In the 2014 10-K, the Company stated in part:

***The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenues***

The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities. The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

25.     The 2014 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the 2014 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

26.     On April 10, 2015, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2015 Proxy"), which stated in relevant part, "The Company's Business Conduct Statement ('BCS') sets forth the Company's standards for ethical conduct that are expected of **all directors and employees of the Company**." (emphasis added.) The 2015 Proxy further stated:

> As part of the Company's compliance and ethics program, directors and full-time employees are required to certify as to their compliance with the BCS and, on an ongoing basis, must disclose any potential conflicts of interest. The Company has also implemented an online BCS training program. The BCS addresses, among other things, topics such as:
>
> • Compliance with laws, rules and regulations, including the Foreign Corrupt Practices Act;
> • Conflicts of interest, including the disclosure of potential conflicts to the Company;
> • Confidentiality, insider information and trading, and fair disclosure;
> • Financial accounting and improper payments;
> • The Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment;
> • Fair dealing and relations with competitors, customers and suppliers;
> • Health, safety and the environment; and
> • Political contributions and payments.
>
> The BCS provides numerous avenues for employees to report violations of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee. These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers. The BCS also provides that the Company will protect anyone who makes a good faith report of a violation of the BCS and that retaliation against an employee who makes a good faith report will not be tolerated.

27.     Upon information and belief, CBS's BCS contained the representations described supra at ¶¶ 22-23.

28.     On February 13, 2015, CBS filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2014 (the "2014 10-K"). In the 2014 10-K, the Company stated in part:

> ***The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenues***
>
> The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities. The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

29.     The 2014 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the 2014 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

30.     On April 15, 2016, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2016 Proxy"), which stated in relevant part, "The Company's Business Conduct Statement ('BCS') sets forth the Company's standards for ethical conduct that are expected of ***all directors and employees of the Company***." (emphasis added.) The 2016 Proxy further stated:

> As part of the Company's compliance and ethics program, directors and full-time employees are required to certify as to their compliance with the BCS and, on an ongoing basis, must disclose any potential conflicts of interest. The Company has also implemented an online BCS training program. The BCS addresses, among other things, topics such as:
>
> • Compliance with laws, rules and regulations, including the Foreign Corrupt Practices Act;

• Conflicts of interest, including the disclosure of potential conflicts to the Company;
• Confidentiality, insider information and trading, and fair disclosure;
• Financial accounting and improper payments;
• The Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment;
• Fair dealing and relations with competitors, customers and suppliers;
• Health, safety and the environment; and
• Political contributions and payments.

The BCS provides numerous avenues for employees to report violations of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee. These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers. The BCS also provides that the Company will protect anyone who makes a good faith report of a violation of the BCS and that retaliation against an employee who makes a good faith report will not be tolerated.

31.     Upon information and belief, CBS's BCS contained the representations described supra at ¶¶ 22-23.

32.     On February 16, 2016, CBS filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 10-K"). In the 2015 10-K, the Company stated in part:

*The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenues*

The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities. The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

33.     The 2015 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the 2015 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

34.     On April 15, 2016, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2016 Proxy"), which stated in relevant part, "The Company's Business Conduct Statement ('BCS') sets forth the Company's standards for ethical conduct that are expected of *all directors and employees of the Company*." (emphasis added.) The 2016 Proxy further stated:

> As part of the Company's compliance and ethics program, directors and full-time employees are required to certify as to their compliance with the BCS and, on an ongoing basis, must disclose any potential conflicts of interest. The Company has also implemented an online BCS training program. The BCS addresses, among other things, topics such as:
>
> • Compliance with laws, rules and regulations, including the Foreign Corrupt Practices Act;
> • Conflicts of interest, including the disclosure of potential conflicts to the Company;
> • Confidentiality, insider information and trading, and fair disclosure;
> • Financial accounting and improper payments;
> • The Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment;
> • Fair dealing and relations with competitors, customers and suppliers;
> • Health, safety and the environment; and
> • Political contributions and payments.
>
> The BCS provides numerous avenues for employees to report violations of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee. These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers. The BCS also provides that the Company will protect anyone who makes a good faith report of a violation of the BCS and that retaliation against an employee who makes a good faith report will not be tolerated.

35.     Upon information and belief, CBS's BCS contained the representations described supra at ¶¶ 22-23.

36.     On February 17, 2017, CBS filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2016 (the "2016 10-K"). In the 2016 10-K, the Company stated in part:

> ***The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenues***
>
> The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities. The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

37.     The 2016 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the 2016 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

38.     On April 7, 2017, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2017 Proxy"), which stated in relevant part, "The Company's Business Conduct Statement ('BCS') sets forth the Company's standards for ethical conduct that are expected of ***all directors and employees of the Company***." (emphasis added.) The 2017 Proxy further stated:

> As part of the Company's compliance and ethics program, directors and full-time employees are required to certify as to their compliance with the BCS and, on an ongoing basis, must disclose any potential conflicts of interest. The Company has also implemented an online BCS training program. The BCS addresses, among other things, topics such as:
>
> • Compliance with laws, rules and regulations, including the Foreign Corrupt Practices Act;

• Conflicts of interest, including the disclosure of potential conflicts to the Company;
• Confidentiality, insider information and trading, and fair disclosure;
• Financial accounting and improper payments;
• The Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment;
• Fair dealing and relations with competitors, customers and suppliers;
• Health, safety and the environment; and
• Political contributions and payments.

The BCS provides numerous avenues for employees to report violations of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee. These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers. The BCS also provides that the Company will protect anyone who makes a good faith report of a violation of the BCS and that retaliation against an employee who makes a good faith report will not be tolerated.

39.     Upon information and belief, CBS's BCS contained the representations described supra at ¶¶ 22-23.

40.     On February 20, 2018, CBS filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 10-K"). In the 2017 10-K, the Company stated in part:

***The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenues***

The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities. The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

41.     The 2017 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the 2017 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

42.     On April 6, 2018, the Company filed with the SEC a Definitive Proxy Statement on Schedule 14A (the "2018 Proxy"), which stated in relevant part, "The Company's Business Conduct Statement ('BCS') sets forth the Company's standards for ethical conduct that are expected of **all directors and employees of the Company**." (emphasis added.) The 2018 Proxy further stated:

> As part of the Company's compliance and ethics program, directors and full-time employees are required to certify as to their compliance with the BCS and, on an ongoing basis, must disclose any potential conflicts of interest. The Company has also implemented an online BCS training program. The BCS addresses, among other things, topics such as:
>
> • Compliance with laws, rules and regulations, including the Foreign Corrupt Practices Act;
> • Conflicts of interest, including the disclosure of potential conflicts to the Company;
> • Confidentiality, insider information and trading, and fair disclosure;
> • Financial accounting and improper payments;
> • The Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment;
> • Fair dealing and relations with competitors, customers and suppliers;
> • Health, safety and the environment; and
> • Political contributions and payments.
>
> The BCS provides numerous avenues for employees to report violations of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee. These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers. The BCS also provides that the Company will protect anyone who makes a good faith report of a violation of the BCS and that retaliation against an employee who makes a good faith report will not be tolerated.

43.     Upon information and belief, CBS's BCS contained the representations described supra at ¶¶ 22-23.

44.     The statements referenced in ¶¶ 19-43 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) CBS executives, including the Company's CEO, Defendant Moonves, had engaged in widespread workplace sexual harassment at CBS; (ii) CBS's enforcement of its own purported policies was inadequate to prevent the foregoing conduct; (iii) the foregoing conduct, when revealed, would foreseeably subject CBS to heightened legal liability and impede the ability of key CBS personnel to execute the Company's business strategy; and (iv) as a result, CBS's public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

45.     On July 27, 2018, media outlets reported that *The New Yorker* would shortly publish an article detailing allegations of sexual misconduct by CBS chairman and chief executive officer Leslie Moonves and other executives at the Company.  *The New York Times*, for one, published an article entitled "Les Moonves, CBS Chief, Faces Inquiry Over Misconduct Allegations", dated July 27, 2018, which reported, in part:

> The article, written by the investigative journalist Ronan Farrow, describes sexual harassment alleged by six women in the entertainment business against Mr. Moonves. It links the accusations to a broader culture of sexual harassment at CBS, with a special focus on CBS News.
>
> Four women spoke to Mr. Farrow on the record, including the film and television actress Illeana Douglas. Ms. Douglas described a meeting with Mr. Moonves in 1997 during which, she said, he was "violently kissing" her while holding her down. "The physicality of it was horrendous," she told The New Yorker.
>
> ***
>
> In addition to Ms. Douglas, the women who made on-the-record accusations were the writer Janet Jones and the producers Christine Peters and Dinah Kirgo. All of

the women said Mr. Moonves had insisted on sexual favors and retaliated against them when they turned him down. The earliest allegations in the article date to the mid-1980s, and the most recent to 2006.

In a statement that CBS had earlier shared with *The New Yorker*, Mr. Moonves said: "I recognize that there were times decades ago when I may have made some women uncomfortable by making advances. Those were mistakes, and I regret them immensely. But I always understood and respected — and abided by the principle — that 'no' means 'no,' and I have never misused my position to harm or hinder anyone's career."

CBS, in a separate statement, said it "is very mindful of all workplace issues and takes each report of misconduct very seriously."

*** 

The *New Yorker* piece also outlines allegations of sexual harassment by several women against a number of CBS News executives, including Jeffrey Fager, the former head of the news division and the current producer of "60 Minutes." The story said CBS News executives were still promoted even after allegations of misconduct. The division had paid settlements to some of these women, the article said.

In November, CBS fired the anchor Charlie Rose after *The Washington Post* published an article in which multiple women accused him of sexual misconduct. Mr. Rose had been a host of the CBS morning show since 2012. He joined the network's "60 Minutes II" as a correspondent in 1999. After that show was canceled, he joined "60 Minutes" in 2008. (PBS also cut its longtime ties with Mr. Rose.)

Three of the women who made the accusations against Mr. Rose have since sued him and CBS, saying that they were sexually harassed while working for him and that the network did not do anything to stop it. CBS has said it was not aware of any allegations regarding Mr. Rose's behavior until The Post published its article.

At the time, Mr. Rose expressed "embarrassment" for pursuing what he believed to be "shared feelings" with women who had accused him.

CBS News has retained law firm Proskauer Rose to conduct a separate investigation into claims of misconduct and said in a statement that "anyone raising a complaint is assured that he or she will be protected from retaliation."

CBS News said that its investigation was continuing and that it was examining allegations made in the *New Yorker* article.

46.     On this news, CBS's stock price fell $3.52, or 6.12%, to close at $54.01 on July 27, 2018.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CBS securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CBS securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CBS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CBS;

- whether the Individual Defendants caused CBS to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CBS securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

53.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- CBS securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold CBS securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

54.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

56.     Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

57.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did:   (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CBS securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CBS securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

59.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CBS securities.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CBS finances and business prospects.

60.      By virtue of their positions at CBS , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

61.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of CBS, the Individual Defendants had knowledge of the details of CBS internal affairs.

62.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CBS.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CBS businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CBS securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning CBS business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired CBS securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

63.    During the Class Period, CBS securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CBS securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of CBS securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of CBS securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

64.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

66.    Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.     During the Class Period, the Individual Defendants participated in the operation and management of CBS, and conducted and participated, directly and indirectly, in the conduct of CBS business affairs.  Because of their senior positions, they knew the adverse non-public information about CBS misstatement of income and expenses and false financial statements.

68.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CBS financial condition and results of operations, and to correct promptly any public statements issued by CBS which had become materially false or misleading.

69.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CBS disseminated in the marketplace during the Class Period concerning CBS results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CBS to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CBS within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CBS securities.

70.     Each of the Individual Defendants, therefore, acted as a controlling person of CBS.  By reason of their senior management positions and/or being directors of CBS, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CBS to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of CBS and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

71.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CBS.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 27, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*