UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

GENE SAMIT and JOHN LANTZ,
Individually and on Behalf of All Others
Similarly Situated,

                     Plaintiffs,

    vs.

CBS CORPORATION, LESLIE MOONVES,
JOSEPH R. IANNIELLO, LAWRENCE
LIDING, DAVID RHODES, DAVID R.
ANDELMAN, JOSEPH A. CALIFANO, JR.,
WILLIAM S. COHEN, GARY L.
COUNTRYMAN, CHARLES K. GIFFORD,
LEONARD GOLDBERG, BRUCE S.
GORDON, LINDA M. GRIEGO, ROBERT N.
KLIEGER, MARTHA L. MINOW, DOUG
MORRIS and SHARI REDSTONE,

                     Defendants.

———————————————————— x

: Civil Action No. 1:18-cv-07796-VEC
: **(Consolidated)**
:
: CLASS ACTION
:
:
:
:
:
:
: AMENDED COMPLAINT FOR
: VIOLATIONS OF THE FEDERAL
: SECURITIES LAWS
:
:
:
:
:
:
:
:
:
: DEMAND FOR JURY TRIAL
:
:
:
:

Lead Plaintiff Construction Laborers Pension Trust for Southern California ("Plaintiff") alleges the following based upon personal knowledge as to itself and its own acts, and upon an investigation conducted by and through its attorneys, which included a review of Securities and Exchange Commission ("SEC") filings by CBS Corporation ("CBS" or the "Company"), media and analyst reports about the Company, Company press releases, Defendants' (defined below) public statements and other information available via the internet and obtained from individuals with knowledge about the events discussed herein.   Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of CBS Class A and Class B common stock between September 26, 2016 and December 4, 2018, inclusive (the "Class Period") against CBS, certain of its senior executives and certain current and former members of CBS's Board of Directors asserting violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder.

2.     Defendant CBS is a mass media company with operations in entertainment, cable networks, publishing and local media.  The Company operates businesses that span the media and entertainment industries, including the CBS Television Network, cable networks, content production and distribution, television stations, internet-based businesses and consumer publishing.  Advertising revenue accounts for over 40% of CBS's revenue.  This case concerns Defendants' failure to disclose that CBS was beset by a company-wide pattern and practice of sexual harassment, creating a "culture of fear" and hostile work environment that exposed the Company to significant

reputational risk and the potential loss of key executives, including most notably, CEO, President and Chairman of the Board, defendant Leslie Moonves ("Moonves").

3.       For years, CBS has been one of the most successful businesses in the media industry. Its financial stability and success has largely been attributed to its veteran leader, Moonves. Moonves is widely considered a titan of the entertainment industry, and is a "famously involved" corporate executive.  Moonves has been praised by Wall Street for both his savvy business prowess and shrewd selection of hit programming for prime-time audiences.  Moonves steered the Company for twenty-four (24) years in various roles, serving as its CEO for fifteen (15) years.  During his tenure, Moonves was principally seen as having resurrected what was at the time a moribund CBS, taking the Company from last to first in the ratings and its stock from $5 a share a decade ago to nearly $70 per share during the Class Period.

4.       Throughout the Class Period, CBS represented, among other things, that it maintained "the highest standards of ethical and appropriate business actions."  Such standards included a ***"zero tolerance" policy for sexual harassment*** or "harassment based on . . . sex . . . [or] gender," and proclamation that "[d]iscriminatory treatment, including sexual harassment . . . is strictly prohibited."[1]  CBS represented that it "will take ***all steps necessary and appropriate*** to stop such acts of harassment or discrimination of which it becomes aware."  The Company further stated that it "will protect anyone who makes a good faith report of a violation of [its Business Conduct Code] and that ***retaliation against an employee who makes a good faith report will not be tolerated***."

---

[1]       All italicized emphasis is added unless otherwise noted.

5.     In truth and in fact, however, CBS and its executives, led by its long-time CEO Moonves, engaged in and fostered a company-wide pattern and practice of sexual harassment, creating a "culture of fear" and hostile work environment that was diametrically opposed to Defendants' public statements.  By the beginning of the Class Period, CBS was steeped in a culture of sexual harassment, intimidation and retaliation.  The culture emanated from Moonves, who was later revealed to have engaged in systemic sexual misconduct both before and during his tenure at CBS, including numerous allegations of sexual assault.

6.     Moreover, CBS's pervasive culture of sexual harassment exposed the Company to the undisclosed risk that Moonves would have to leave his positions at the Company.  Prior to and during the Class Period, CBS stated that the "Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees" and that it "believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company."  Yet, Defendants did not disclose the true risks that Moonves and others would be forced to leave the Company due to their misconduct and mistreatment of CBS employees.

7.     In October 2017, following the sexual harassment controversy at Fox News that resulted in the ousting of Roger Ailes and Bill O'Reilly, Ronan Farrow ("Farrow") published his groundbreaking article in *The New Yorker* revealing extensive sexual misconduct by film producer Harvey Weinstein.  The article is commonly believed to have ignited what is now known as the #MeToo movement.  The #MeToo movement was credited with ending the careers of several prominent celebrities, politicians, businessmen and media executives, including former U.S. Senator Al Franken, actor Kevin Spacey and Chairman and CEO of Wynn Resorts Steve Wynn.  CBS was not spared from #MeToo revelations.  The first widely-publicized allegations tying a high-profile

individual at CBS to the #MeToo movement came in November 2017, when CBS was forced to fire its lauded "CBS This Morning" host and "60 Minutes" correspondent Charlie Rose ("Rose") after *The Washington Post* published an article in which multiple women accused him of sexual misconduct.  Thirty-five women eventually alleged that Rose harassed them, with three of the women suing Rose and the Company, and CBS since settling claims that it failed to protect them from Rose for an undisclosed amount.

8.      Recognizing the #MeToo movement's power, as well as its potential threat, defendant Moonves quickly moved to publicly align himself with its cause.  On November 29, 2017, Moonves told an audience at *Variety*'s Innovate Summit that the #MeToo movement was "'a watershed moment'" and that "'I think ***it's important that a company's culture will not allow for this***.  And that's the thing that's far-reaching.  There's a lot we're learning.  ***There's a lot we didn't know***.'"  Moonves continued his posturing as an ally of the #MeToo movement when, in December 2017, he helped found the Commission on Eliminating Sexual Harassment and Advancing Equality in the Workplace.

9.      On July 27, 2018, media outlets began reporting that Farrow would be publishing an article in *The New Yorker* detailing allegations by six women of a disturbing pattern of sexual harassment by Moonves and describing a culture of rampant sexual harassment at CBS.  After the Weinstein exposé, Farrow began an extensive investigation into decades of alleged sexual harassment by defendant Moonves and the environment engendered by Moonves that reportedly facilitated ongoing sexual harassment at CBS.  As revealed in a July 29, 2018 interview, Farrow said that sources about Moonves and the hostile culture at CBS "began coming to [him] immediately after the Harvey Weinstein story" was published on October 10, 2017.

- 4 -

10.     Upon the news of *The New Yorker's* July 27, 2018 exposé, CBS's Class A and Class B stock prices fell over 6% on unusually heavy volume, the largest one-day decline since 2011.  In a statement to *The New Yorker*, Moonves said of the allegations, "[t]hose were mistakes, and I regret them immensely . . . But I always understood and respected – and abided by the principle – that 'no' means 'no,' and I have never misused my position to harm or hinder anyone's career."  The market, however, disagreed with Moonves's assessment.  When trading resumed on Monday, July 30, 2018, CBS's stock continued its decline.  By the close of market that day, CBS's Class A and Class B stock prices had lost an additional 4.6% and 5%, respectively, on unusually heavy trading volume.

11.     On August 6, 2018, *The New Yorker* published its exposé entitled "Les Moonves and CBS Face Allegations of Sexual Misconduct."  The article detailed allegations of years of sexual assault against Moonves by his co-workers at CBS and others and described how, under his leadership, CBS had facilitated the sexual harassment of scores more women, including company-sanctioned retaliation against victims who spoke up.  In the exposé, Farrow stated that "[s]ix women who had professional dealings with [Moonves] told me that, between the nineteen-eighties and the late aughts, Moonves sexually harassed them," with "[f]our describ[ing] forcible touching or kissing during business meetings, in what they said appeared to be a ***practiced routine***," and "[t]wo [telling] me that Moonves physically intimidated them or threatened to derail their careers."  The exposé also explained how harassment extended to other key parts of the Company, including CBS News and "60 Minutes," CBS's flagship news show and one of the network's most lauded programs.

12.     Over the ensuing months, media outlets would expose further details about the extent of misconduct by Moonves and others at CBS.  For example, on August 2, 2018, the *Los Angeles Times* reported that a woman filed a criminal complaint with the Los Angeles Police Department ("LAPD") in November 2017 claiming that Moonves had forced her to perform oral sex on him, and separately, exposed himself and assaulted her in the 1980s.  Then, on September 9, 2018, *The New Yorker* published a second exposé by Farrow outlining, in even more harrowing detail than the first article, additional sexual harassment and assault allegations against Moonves and further describing CBS's widespread culture of sexual harassment.  Within hours of the story's publication, CBS announced that Moonves would be stepping down as the Company's Chairman and CEO.

13.     As *The New Yorker* exposés and later reports would reveal, the misconduct at the Company was well known within the ranks of CBS and had created a hostile work environment for female employees for years.  For example, *The New Yorker* said it had "reviewed three six-figure settlements with '60 Minutes' employees who have filed complaints of sexual harassment or discrimination," and that, according to many former CBS employees, "men accused of misconduct were promoted, even after the company was made aware of those allegations."  According to *The New Yorker*:

> **Nineteen** current and former employees told me that Jeff Fager [("Fager")], the former chairman of CBS News and the current executive producer of "60 Minutes," allowed harassment in the division.  "It's **top down**, this culture of older men who have all this power and you are nothing," one veteran producer told me.  "**The company is shielding lots of bad behavior**."
>
> \*          \*          \*
>
> Former employees told me that there were few avenues for them to register confidential complaints about discrimination and misconduct.  "People say, 'You could call H.R.' Honestly, I've never met a single person from H.R.," one producer said.  "**There's no oversight**."  Some said that they had **witnessed retaliation** against those who did attempt to speak out.  At CBS News, "there was **no one to turn to**," one former producer told me, saying  that she had reported Charlie Rose's behavior,

- 6 -

and that the complaint resulted in no repercussions for Rose.  ***"If it's just behavior from the top, tolerated at the top, and there's no one to talk to, what do you do?"*** she said.

14.     On September 12, 2018, CBS ousted Fager, the long-time "60 Minutes" chief who had also headed the CBS News division for several years and reported directly to Moonves, for sending a threatening text message to a CBS reporter investigating allegations that he had fostered a culture of harassment at the Company.  Later that day, a *New York Times* article revealed that Moonves had actively concealed the LAPD's November 2017 criminal sexual assault investigation. Even worse, the article revealed that, at the time that one of Moonves's accusers was threatening to go public, Moonves was actively trying to find the woman a job at CBS to ensure her silence.

15.     As more details of the culture of sexual harassment, and in particular Moonves's past misconduct, were revealed, the extent of the systemic problem at CBS, and widespread knowledge of it at the highest levels, further crystalized.  For example, recent media reports have confirmed that Moonves knew about the LAPD criminal investigation as early as November 2017, while several CBS board members, including Shari Redstone ("Redstone") (president of CBS's controlling shareholder, National Amusements, Inc. ("NAI")), knew by January 2018 – months before these facts were revealed to investors.  Further, as reported by *The New York Times* on July 31, 2018, "**CBS's board knew – or should have known – about potential problems**" with Moonves soon after Farrow's first exposé broke in October 2017, as "[r]umors had proliferated almost immediately after *The New York Times* and *The New Yorker* published their prizewinning exposés . . . in October"; those rumors only intensified in November 2017 after Rose was fired from CBS; and "[b]y December [2017], CBS executives had been told that reporters for The Times and The Wall Street Journal were asking around about sexual-harassment allegations involving Mr. Moonves."  And as the *Los Angeles Times* reported on August 2, 2018, "CBS board members were aware late last year

that multiple news organizations were looking into Moonves' conduct in the wake of the Harvey Weinstein scandal, which exploded in October."

16.     Moreover, a source close with Moonves and in frequent communication with him at the time revealed in a declaration obtained by Plaintiff's counsel that by December 4, 2017, Moonves "believed that an article about him would be published ***imminently***." By this time – at the very latest – Moonves was undoubtedly living on borrowed time in his position as CEO of the company. Despite the fact that Defendants knew of these serious allegations and the increasing threat to Moonves's tenure at CBS during the Class Period, the Company's risk disclosures remained the same, leaving investors completely unaware of the looming leadership crisis at CBS until late July 2018.

17.     On September 28, 2018, CBS disclosed that it had "received subpoenas from the New York County District Attorney's Office and the New York City Commission on Human Rights" regarding "the allegations in recent press reports about CBS's former Chairman and Chief Executive Officer, CBS News and cultural issues at all levels of CBS," and that the "New York State Attorney General's Office ha[d] also requested information about these matters."

18.     CBS launched an external investigation into Moonves and cultural issues at CBS shortly after *The New Yorker* published its exposé in July. The investigation, which was conducted by two law firms and included interviews with more than 350 people, found that, "[w]hen faced with instances of wrongdoing, ***the company had a tendency to protect itself, at the expense of victims***," according to *The New York Times*. On December 17, 2018, the CBS board formally announced the completion of the investigation, stating with respect to Moonves that it had "determined that there

are grounds to terminate for cause, including ***willful and material misfeasance***, violation of Company policies and breach of his employment contract, as well as his willful failure to cooperate fully with the Company's investigation."  The board's statement also said that "investigators learned of past incidents of improper and unprofessional conduct, and concluded that ***the Company's historical policies, practices and structures have not reflected a high institutional priority on preventing harassment and retaliation***."  Further, the statement revealed that the investigation found that "the resources devoted to the company's human resources function, to training and development, and to diversity and inclusion initiatives have been ***inadequate***."

19.     The July 27, 2018 exposé was the first of two disclosures that revealed to the market the falsity of Defendants' misstatements and omissions.  While CBS stock recovered slightly in the months following the exposé, mainly due to the resolution of contentious litigation with Redstone and controlling shareholder NAI that would delay a possible merger with Viacom widely viewed as detrimental to CBS shareholders, those gains were eradicated on December 4, 2018.  On that day, *The New York Times* disclosed the details of a fifty-nine (59) page draft report from the Company's external investigation into Moonves's conduct and CBS's culture in a trio of articles entitled, "'Disaster for CBS Shareholders': Damning Report on Moonves Reveals Total Failure at Top," "'Transactional' Sex and a Secret Resignation Letter: Takeaways From a Report on Les Moonves" and "Les Moonves Obstructed Investigation Into Misconduct Claims, Report Says."

20.     According to the draft report, as reported by *The New York Times*: (1) Moonves "***repeatedly lied to investigators*** about his behavior" and "***destroyed evidence*** and misled investigators in an attempt to preserve his reputation and save a lucrative severance deal"; (2) a long-time board member was informed about one of Moonves's sexual assaults in ***2007***, shortly before he joined the board, but discarded it as "trivial"; (3) the long-time head of communications at CBS, Gil

Schwartz ("Schwartz"),[2] had known about sexual assault allegations in November 2017 and drafted a resignation letter for Moonves in August 2018 after he learned of an additional allegation that month; (4) defendant board members Charles Gifford and Bruce Gordon spoke to Moonves about #MeToo problems and the fact that the law firm Weil, Gotshal & Manges would be looking into the matter; (5) "'a number of employees' knew that Mr. Moonves was *routinely* receiving oral sex from a CBS employee and 'believed that the woman was protected from discipline or termination as a result'"; and (6) "'Moonves received oral sex from at least 4 CBS employees under circumstances that sound transactional and improper to the extent that there was no hint of any relationship, romance, or reciprocity.'"

21.     In response to this news, the prices of CBS Class A and Class B stock declined from $53.45 per share to $51.34 per share and from $53.51 per share to $51.35, respectively, on heavy trading volume.

22.     As set forth in further detail below, before the disclosures about the Company's sexual harassment and hostile work environment problems were revealed to the market, defendant Moonves and other CBS executives, including certain of the Individual Defendants (defined below), collectively sold over 3.4 million shares of CBS stock during the Class Period, totaling over *$200 million* in proceeds, to the unsuspecting investing public, thereby profiting from their failure to disclose the truth to the market.

23.     The following stock chart summarizes the precipitous declines in CBS Class B (non-voting) common stock during the Class Period as the truth became known to the market:

---

[2]     Schwartz left the company at the end of September 2018.



**JURISDICTION AND VENUE**

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§1331 and Section 27 of the 1934 Act (15 U.S.C. §78aa), as the claims asserted herein arise under

and pursuant to Sections 10(b) and 20(a) of the 1934 Act (15 U.S.C. §78j(b) and §78t(a)) and SEC

Rule 10b-5 (17 C.F.R. §240.10b-5).

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the

1934 Act, as CBS is headquartered in this District, certain Defendants reside in this District, and

Defendants' wrongful acts occurred in this District.

26.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## PARTIES

27.     Plaintiff Construction Laborers Pension Trust for Southern California purchased CBS common stock (Class B) during the Class Period, as set forth in the certification attached hereto, and suffered damage as a result.

28.     Defendant CBS Corporation is a mass media company headquartered in New York, New York with operations in entertainment, cable networks, publishing and local media.  The Company has two classes of publicly traded common stock listed and widely traded on the New York Stock Exchange ("NYSE"), an efficient market: voting Class A common stock (entitled to one vote per share), which trades under the ticker "CBS-A"; and non-voting Class B common stock, which trades under the ticker "CBS".  As of August 2, 2018, CBS had more than 37.5 million shares of Class A common stock and approximately 338.5 million shares of Class B common stock issued and outstanding.  In 2000, CBS was acquired by Viacom Inc. in a deal that made Viacom the second largest entertainment company in the world.  In 2005, Viacom split into two separately operated but commonly controlled entities, CBS and Viacom.  National Amusements, Inc. was then and remains the controlling stockholder of both CBS and Viacom.  Sumner Redstone, NAI's controlling stockholder, chairman of the board and CEO, is the Chairman Emeritus of CBS and the Chairman Emeritus of Viacom.  Defendant Shari Redstone, Sumner Redstone's daughter, is the President and a director of NAI and the Vice Chair of the Board of Directors of CBS and Viacom.  Defendant David R. Andelman was a director of CBS until September 9, 2018, and also served as a director of NAI.  As of March 31, 2018, NAI directly or indirectly owned approximately 79.7% of CBS Class A

common stock and approximately 10.3% of Class A common stock and non-voting Class B common stock on a combined basis.

29.     Defendant Leslie Moonves was CBS's President, CEO and the Chairman of its Board until CBS announced on September 9, 2018 that Moonves had left the company following a second exposé in *The New Yorker* detailing further allegations of sexual harassment against him.  As CEO and Chairman, defendant Moonves regularly spoke on CBS's behalf in releases, conference calls and SEC filings.  Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, defendant Moonves certified the Company's Forms 10-Q and signed and certified the Forms 10-K filed with the SEC as discussed in further detail below.

30.     Defendant Joseph R. Ianniello ("Ianniello") was CBS's Chief Operating Officer until the CBS board named Ianniello as President and Acting Chief Executive Officer of CBS. Defendant Ianniello regularly spoke on CBS's behalf in releases, conference calls and SEC filings. Defendant Ianniello signed and certified the Company's Forms 10-Q and 10-K filed with the SEC as discussed in further detail below.

31.     Defendant Lawrence Liding ("Liding") was, at all relevant times, CBS's Executive Vice President, Controller and Chief Accounting Officer.  In this capacity, defendant Liding regularly spoke on CBS's behalf in releases, conference calls and SEC filings.  Defendant Liding signed the Company's Forms 10-Q and 10-K filed with the SEC as discussed in further detail below.

32.     Defendant David Rhodes ("Rhodes") is and was, at all relevant times, the President of CBS News.  In this role, defendant Rhodes regularly spoke on CBS's behalf.  On January 7, 2019, CBS announced that Rhodes would step down from his position as President of CBS News and be replaced by Susan Zirinsky, a long-time CBS News veteran and senior executive producer of "48 Hours" who also oversees CBS News breaking news specials.

33.     Defendants David R. Andelman, Joseph A. Califano, Jr., William S. Cohen, Gary L. Countryman, Charles K. Gifford, Leonard Goldberg, Bruce S. Gordon, Linda M. Griego, Robert N. Klieger, Martha L. Minow, Doug Morris and Shari Redstone are or were members of the CBS board. As CBS directors, these defendants made decisions on CBS's behalf during the Class Period and signed the Company's Forms 10-K as discussed in further detail below.

34.     The defendants named in ¶¶29-33 are sometimes referred to herein as the "Individual Defendants."   CBS and the Individual Defendants are collectively referred to herein as "Defendants."

35.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of CBS, were in possession of confidential, proprietary information concerning the Company and its operations.  By reason of their positions within the Company, the Individual Defendants obtained, had access to and/or were in possession of material adverse nonpublic information concerning CBS via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof), and via reports, presentations and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

36.     As senior executive officers and controlling persons of a publicly traded company whose common stock was and is registered with the SEC pursuant to the 1934 Act, and was and is traded on NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding CBS's operations and business, and to correct any previously issued statements that had become materially misleading or

untrue, so that the market price of CBS common stock would be based upon truthful and accurate information.   Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

## SUBSTANTIVE ALLEGATIONS

**Les Moonves and His Pivotal Role in the Success of CBS**

37.     Defendant Moonves began his career as an actor in New York before transitioning to the business side of the entertainment world.   He was Vice President of movies and mini-series and ran first-run syndication and pay/cable programming at 20th Century Fox Television early in his career.   He joined Lorimar Television in 1985, where he became head of creative affairs and later President.   Ultimately Moonves became President of Warner Bros. Television when it combined operations with Lorimar in 1993 and oversaw a television division that generated the highest number of programs to network television for nine consecutive years.   Moonves produced shows such as "Full House" in the 1980s and blockbuster hits "ER" and "Friends" in the 1990s.

38.     Moonves was hired as President of CBS Entertainment in 1995 to resurrect a moribund CBS.   At the time, the Company had lost its NFL contract to FOX and had fallen behind in the ratings.   Moonves, who would become the chief executive officer at CBS Television in 1998, was successful in beginning to turn the Company around by the late 1990s with hits such as "Everybody Loves Raymond," "Survivor" and "CSI: Crime Scene Investigation."   Moonves was promoted to CEO of CBS and Chairman of the Board in 2003, and his success continued with the "CSI" spinoffs, the Emmy Award-winning "The Amazing Race" and sitcoms such as "How I Met Your Mother" and "Two and a Half Men."   Moonves's efforts turned CBS into the most-watched network for the past decade, going from last to first in the ratings under his leadership, and he was widely seen as the driving force behind boosting CBS's profits.   Moonves repeatedly cited his acting

and creative background as central to his ability to successfully select CBS's programming lineup each season, which would not be set without his approval.

39.     During his reign as CEO, the price of CBS stock climbed from $5 a share a decade ago to nearly $70 during the Class Period.  While CBS's network rivals had revolving doors of executives over the years, Moonves steered CBS steadily for twenty four (24) years.  As *The New Yorker* recently wrote:

> For more than twenty years, Leslie Moonves has been one of the most powerful media executives in America.  As the chairman and C.E.O. of CBS Corporation, he oversees shows ranging from "60 Minutes" to "The Big Bang Theory."  His portfolio includes the premium cable channel Showtime, the publishing house Simon & Schuster, and a streaming service, CBS All Access.  Moonves, who is sixty-eight, has a reputation for canny hiring and project selection.  The *Wall Street Journal* recently called him a "TV programming wizard"; the *Hollywood Reporter* dubbed him a "Wall Street Hero."  In the tumultuous field of network television, he has enjoyed rare longevity as a leader.  Last year, according to filings with the Securities and Exchange Commission, he earned nearly seventy million dollars, making him one of the highest-paid corporate executives in the world.

40.     For these reasons, CBS's "secret weapon" was recognized in the industry as "the stability of core management under the leadership of Leslie Moonves."  The *Los Angeles Times* has reported that "Wall Street has long considered Moonves key to the company's success."  In other words, as one media analyst with Bernstein Research recently said, "'[t]he market value of CBS is tied closely to its management.'"  Despite the success, the majority of CBS's board, including Moonves, had been fending off a small faction, led by controlling shareholder and board member Redstone, that had become critical of management and that had pressed for a merger with Viacom Inc., which Redstone's family controls.  CBS, Moonves and members of the board's special committee, which was created on February 1, 2018 to explore a merger with Viacom, eventually filed suit in Delaware Chancery Court against Redstone and NAI to reduce their voting power, alleging Redstone jeopardized the Company by trying to force a merger with Viacom and undermine the management team.  Faced with this reality, the Bernstein Research analyst questioned, "'[w]hat

would be the value of CBS, without the current management? . . . If CBS loses its CEO, it increases the probability CBS gets sold.'"

41.     Other analysts universally agreed that Moonves was central to CBS's success. Morningstar's Neil Macker reported in February 2018 that "[s]ince Moonves took over as CEO after the Viacom split in 2006, the CBS broadcast network has been consistently generating the highest audience ratings among its peers."  Macker also stated that Moonves "is well respected within the industry and by investors."  Similarly, a J.P. Morgan analyst wrote in July 2018 that Moonves was "a key part of CBS long-term thesis," stating that "an ***unquantified premium was historically built into the stock***, reflective of: 1) Moonves' still hands on involvement in guiding creative decisions at CBS; 2) his key relationships, including with sports executives and content producers; 3) a strong track record of capital allocation and strategic actions; and 4) as a capable communicator to the Street."  CBS's media peers concurred.  Chris Albrecht, currently CEO and President of Starz, commented when he was Chairman and CEO of HBO that "'CBS is back because Les has done a great job.'"

42.     As CBS, Moonves and the members of the board's special committee alleged in the Amended Verified Complaint in the contentious Delaware litigation, "CBS's management team, led by Leslie Moonves . . . is one of the most accomplished and successful in the media business.  In a demanding and rapidly changing marketplace, the Moonves-led team articulated a strategic plan, executed on that plan, and consistently delivered superior results."  The complaint further described how CBS flourished for a decade under the leadership of Moonves and his team, highlighting many of the Company's recent financial successes directly attributable to management:

> The Company's strategic success has translated into record financial results year after year, with 2017 marking the company's eighth straight year of earnings per share ("EPS") growth, and the company achieving significant returns for stockholders and positioning CBS for further long-term success. CBS had an

"exceptional" 2016, and "achieved a record level of revenue" in 2017.  (CBS Schedules 14A, Apr. 7, 2017, Apr. 6, 2018.)  *Both years' proxy filings attributed these banner results to the continued leadership of Mr. Moonves and the senior management team*.  This success continued in the most recent earnings report, when CBS posted EPS growth of 26% in the first quarter of 2018, marking the Company's *33rd consecutive quarter of EPS growth*.

43.     The success of CBS under Moonves, however, did not come without a cost. Moonves, while at times charismatic, was notorious at CBS for his mood swings, forceful personality, incessant micro-managing, vindictiveness to those he felt crossed him and hair-trigger temper. *The Wall Street Journal* reported that "some executives who fell out of favor with him said they were blackballed in the entertainment business."  A former CBS programming executive, Andy Hill, stated that "'Les told me I wouldn't work in Hollywood again,'" and described Moonves as "'the most vengeful vindictive man in a vengeful vindictive town.'"  Moonves's temperament "made the already high-stakes atmosphere of running a television network even more fraught."  But apart from his well-known toughness and volatility, Moonves kept another, darker side, hidden from the public view.  As soon-to-be-reported information would reveal, this side of Moonves, which also shaped a deeply troubling culture at CBS, would soon be exposed, causing the value of CBS stock to plummet.

**The #MeToo Movement Launches Following the Fox News Harassment Controversy and Drastically Alters the Landscape Surrounding Sexual Misconduct in the Workplace**

44.     The first signs of what we now know as the #MeToo movement arose in July 2016, when former Fox News host Gretchen Carlson filed suit against Roger Ailes, who had led Fox News for two decades.  Once her claims were corroborated by Megyn Kelly, one of the network's biggest stars, Roger Ailes was forced to resign from Fox News.  In September 2016, Fox News' parent corporation, 21st Century Fox, paid more than $1 million to Laurie Dhue, an anchor from 2000 to 2008, to settle harassment claims against network mainstay Bill O'Reilly and his boss Roger Ailes. Several other former Fox News hosts, including Andrea Tantaros and Juliet Huddy, also alleged

sexual harassment (and retaliation, in Tantaros's case) against Roger Ailes and Bill O'Reilly.  Ms. Carlson's case was subsequently settled in September 2016 for $20 million.  Thereafter, the U.S. Department of Justice began a formal investigation into whether 21st Century Fox had concealed past sexual harassment settlements from investors, and various investigative exposés in *The New York Times* revealed that Bill O'Reilly had paid half a dozen women nearly $50 million to settle various sexual harassment lawsuits, leading to O'Reilly's termination.  Like defendant Moonves was to CBS, Roger Ailes and Bill O'Reilly were crucial to Fox News' brand and value.

45.    The #MeToo movement began as an umbrella of solidarity on Twitter, helping to empower countless women to share their experiences of surviving sexual harassment or assault.  The #MeToo movement quickly gained momentum online with the help of various celebrities, and within a matter of days, an avalanche of accusations swept through the entertainment industry.

46.    The movement's impact on the entertainment industry crystalized on October 10, 2017, when investigative reporter and lawyer Farrow published an explosive exposé in *The New Yorker* detailing decades' worth of sexual abuse allegations by numerous women at the hands of former media mogul Harvey Weinstein.  The Pulitzer Prize-winning article described how Weinstein lured women – often young actresses – into hotel bars and rooms to harass or assault them.  After the allegations came to light, Weinstein was swiftly ousted from The Weinstein Company and charged with rape and other offenses in New York City.

47.    Over the ensuing months (and continuing until today), the #MeToo movement was responsible for ending the careers of a host of businessmen, news anchors, celebrities and politicians, as well as the filing of numerous legal complaints and charges, as a result of sexual harassment allegations, including the head of Amazon Studios (Roy Price), an Olympic team doctor (Lawrence G. Nassar), a well-known actor (Kevin Spacey), a candidate for the U.S. Senate (Roy Moore), a

Today show co-host (Matt Lauer), a casino magnate (Steve Wynn), a record label founder (Russell Simmons), a U.S. Senator (Al Franken), a celebrity chef (Mario Batali) and an opera conductor at the N.Y. Metropolitan Opera (James Levine).  Farrow also published an online exposé detailing abuse accusations against former New York Attorney General Eric Schneiderman that resulted in Schneiderman resigning three hours later and the exposé never appearing in print.  Farrow's reporting has largely been credited with significantly advancing, if not starting, the #MeToo movement.

48.     CBS was not spared by the #MeToo movement, as several senior executives and key on-air talent at CBS were about to have #MeToo moments of their own.

**Moonves Engaged in Systemic Sexual Harassment, Intimidation and Retaliation**

49.     On July 27, 2018, media outlets began reporting that *The New Yorker* would soon publish an exposé by Farrow detailing allegations of years of sexual assault against defendant Moonves by his co-workers at CBS and describing how, under his leadership, CBS had facilitated the sexual harassment of scores more women, including company-sanctioned retaliation against victims who spoke up.  In the exposé, later published online on August 6, 2018, Farrow stated that "[s]ix women who had professional dealings with [Moonves] told me that, between the nineteen-eighties and the late aughts, Moonves sexually harassed them," with "[f]our describ[ing] forcible touching or kissing during business meetings, in what they said appeared to be a ***practiced routine***," and "[t]wo [telling] me that Moonves physically intimidated them or threatened to derail their careers."  According to the exposé, "[a]ll [of the women] said that he became cold or hostile after they rejected his advances, and that they believed their careers suffered as a result."

50.     For example, one of the accusers, actress Illeana Douglas ("Douglas"), who had appeared in films such as "Cape Fear" and "Goodfellas," described a meeting with Moonves while he was President of CBS Entertainment and after she had signed a holding deal with CBS in which

- 20 -

he grabbed her and "'violently kiss[ed]'" her while holding her down. Douglas described the "'physicality of it'" as "'horrendous,'" explaining that "'[i]t has stayed with me the rest of my life, that terror.'" Immediately after the meeting, she learned from her manager that Moonves had called and said that the two "had a great meeting," at which point Douglas thought, "'Oh, my God, he's covered his tracks.'" Despite this apparent attempted reconciliation, Moonves later berated Douglas after a rehearsal and subsequently called her at home, telling her, "'You make me f*cking sick,'" and that "she would 'never work at this network again.'"

51.      In addition to Douglas, writer Janet Jones ("Jones") and producers Christine Peters ("Peters") and Dinah Kirgo ("Kirgo") made similar on-the-record accusations against Moonves. Jones alleged that within an hour of meeting Moonves on her first day of work "she had to shove Moonves off her after he forcibly kissed her at a working meeting," and that he later called her to warn her to stay silent. She recounted the phone call as follows:

> Not long afterward, Jones received a call from Moonves's assistant, who said that she had Moonves on the line. "My heart went into my feet," Jones recalled. Moonves began shouting at her. "'***People's reputations are important***. ***Do you understand?***'" she remembered him saying. "'I'm warning you. ***I will ruin your career***. You will never get a writing job. ***No one will hire you***. Do you understand what I'm saying to you?' "Jones hung up the phone, then threw up. "I was just absolutely mortified. Does this mean he'll be putting me on a list somewhere and I'll never get a job?" she recalled thinking. "This person could stop me from doing this passion, this career I had spent my whole life putting together. It's kind of hard to fathom that one person could do that, but he could."

> Jones told me that ***she found the threats more scarring than the original incident***. She said, "The revenge behavior, the 'I'll get you for not kissing me, I'll get you for not doing what the hell I want you to do'—it never quite leaves you." Years later, she saw him at an industry event and, she said, "I almost fainted. I was still terrified."

52.      Peters, who was an industry veteran herself when she first encountered Moonves, having produced "How to Lose a Guy in Ten Days" in 2003, met with Moonves in 2006 at his office to discuss the prospect of overseeing a proposed film studio, CBS Films. During her pitch she said

Moonves "'just put a hand up my skirt,'" touching her underwear.  Peters was shocked at Moonves's

conduct given both her status in the industry and, in particular, her close relationship with Sumner

Redstone, the founder of Viacom (which acquired CBS in 1999 and later sold it), which she thought

would have put Moonves on guard.

53.     Another prominent actress on a long-running CBS program described how Moonves

"grabbed her and forcibly kissed her" at a business meeting in his private dining room at CBS – "'He

shoved his tongue down my throat.  I mean shoved,'" she stated.  She cried as she left and recounted

that she "'found [the incident] sickening."  When the woman recounted the incident to a CBS

showrunner not long afterwards, the showrunner said she was "'not surprised.'"  "'I had already had

to deal with misogynist bullying from him myself,'" she told *The New Yorker*.  Other women

identified in Farrow's article "rebuffed unwanted advances form Moonves in professional settings"

and "believed career opportunities disappeared as a result," including Emmy winning writer Kirgo.

54.     On September 9, 2018, *The New Yorker* published a second exposé by Farrow

outlining in harrowing detail additional allegations of sexual harassment and assault against

defendant Moonves from *six additional women*.  The incidents include claims that "Moonves forced

them to perform oral sex on him, that he exposed himself to them without their consent, and that he

used physical violence and intimidation against them."  The exposé further stated that "[a] number of

the women also said that Moonves retaliated after they rebuffed him, damaging their careers."

55.     Additionally, the article detailed the account of Phyllis Golden-Gottlieb ("Golden-

Gottlieb"), who was an industry veteran when she first interacted with Moonves.  Golden-Gottlieb

filed a criminal complaint in late 2017 with the LAPD, "accusing Moonves of physically restraining

her and forcing her to perform oral sex on him, and of exposing himself to her and violently

throwing her against a wall in later incidents."[3]  After Golden-Gottlieb rebuffed Moonves, he "retaliated against her professionally," which she attributed to his influence at Lorimar and CBS, explaining that "'[h]e absolutely ruined my career."  Law-enforcement sources told Farrow that they found Golden-Gottlieb's allegations, which occurred in the late 1980s while the two were at Lorimar, "credible and consistent but prosecutors declined to pursue charges because the statutes of limitations for the crimes had expired."

56.      The second *The New Yorker* exposé further stated that another woman assigned to apply Moonves's makeup in the early 2000s ahead of a promotional video shoot, Deborah Green, alleged that when she returned to Moonves's office to remove his makeup, he "forcefully grabbed her, kissing her hard" and "'st[icking] his tongue down [her] throat.'"  Another victim, writer Jessica Pallingston, described how Moonves "coerced her into performing oral sex on him when she worked as his temporary assistant, in the nineties, and that, after she repelled subsequent sexual advances, he became hostile, at one point calling her a 'c*nt.'"  The article detailed additional accounts of allegations of sexual misconduct against Moonves, including unwanted touching, kissing, exposure and other conduct, along with retaliatory acts against women that caused their careers to suffer.

57.      On November 28, 2018, *The New York Times* ran an article entitled "'If Bobbie Talks, I'm Finished': How Les Moonves Tried to Silence an Accuser," reporting further disturbing allegations against Moonves when he was the president of Warner Bros. and married with three children, just before beginning his tenure at CBS.  The article described how actress Bobbie Phillips ("Phillips") arrived at Moonves's studio the afternoon of March 7, 1995 when he exposed himself, asked her to be his girlfriend in exchange for helping her career and "pushed her to her knees and

---

[3]      The incident was first reported by the *Los Angeles Times* on August 2, 2018 but did not identify the victim as Golden-Gottlieb.

forced his penis into her mouth."  The incident deeply disturbed Phillips, whose career never took off and who retired from acting in 2003 and eventually moved to Toronto with her family.

58.     After a reporter for *The New York Times* reached out to Phillips's former manager in November 2017, Marv Dauer ("Dauer"), who had set up the meeting between her and Moonves, Dauer "immediately thought of Bobbie Phillips" and then contacted Moonves, with whom he "discussed the possibility of getting Ms. Phillips an acting gig to keep her happy."  Over the ensuing months, text messages and a declaration from Dauer obtained by counsel for Plaintiff as part of their investigation into the facts underlying this action, revealed that Moonves attempted to find work at CBS for Phillips and another client of Dauer's in efforts to ensure Phillips's silence.

59.     Shortly after Farrow's original July 27, 2018 exposé broke, the CBS board disclosed it had hired two law firms to investigate the sexual harassment allegations against Moonves, Covington & Burling ("Covington") and Debevoise & Plimpton ("Debevoise"), led by Covington's Nancy Kestenbaum and Debevoise's Mary Jo White, the former Chair of the SEC.  While some perceived that the investigation could be tainted as biased given the amount of work the firms have otherwise done for CBS and the fact that Moonves would not be stepping down as CEO during the investigation, a draft of the firms' report obtained by *The New York Times* confirmed that Moonves "'engaged in multiple acts of serious nonconsensual sexual misconduct in and outside of the workplace, both before and after he came to CBS in 1995.'"

60.     The draft report also revealed additional previously undisclosed reports of sexual misconduct by Moonves, including "'multiple reports' about a network employee who was 'on call' to perform oral sex on Mr. Moonves."  "'Moonves ***admitted*** to receiving oral sex from this woman, his subordinate, in his office, but described it as consensual,'" *The New York Times* reported. Further, the draft report revealed that Moonves "received oral sex from at least 4 CBS employees

under circumstances that sound transactional and improper to the extent that there was no hint of any relationship, romance, or reciprocity (especially given what we know about his history of more or less forced oral sex with women with whom he has no ongoing relationship)."  The investigators wrote that this "'pattern arguably constitutes *willful misfeasance and violation of the company's sexual harassment policy*.'"

61.    Additionally, the draft report detailed a case whereby Dr. Anne Peters (not to be confused with Christine Peters, another Moonves victim) told the attorneys that Moonves "tried to kiss her and masturbated in front of her" at a consultation in 1999.  It also confirmed Phillips's accusation that Moonves forced her to perform oral sex.  As to the allegations by Dr. Peters, which were first reported in a September 9, 2018 *Vanity Fair* article, *The New York Times* stated:

> Dr. Peters told the CBS lawyers that in 1999 Mr. Moonves grabbed her, grinded against her with an erect penis and had a look on his face that she described as that of a "monster."  After she pushed him away, Mr. Moonves went to the corner of the room and masturbated, then left without saying anything, Dr. Peters told the lawyers, according to their report.

62.    The misconduct uncovered in media reports and CBS's external investigation, however, was not limited to Moonves.  The reports also revealed a culture at CBS marked by pervasive sexual misconduct that reached far beyond the Company's chief executive.

**Moonves Fostered a "Culture of Fear" at CBS that Allowed Unrestrained Sexual Harassment to Permeate the Company**

63.    The sexual misconduct that Moonves endeavored to conceal was not the only misconduct that permeated the halls and studios of CBS.  Farrow's July 27, 2018 exposé linked the allegations against Moonves "to a broader culture of sexual harassment at CBS" and CBS News.  As Farrow wrote, "[t]hirty current and former employees of CBS told me that such behavior extended from Moonves to important parts of the corporation, including CBS News and '60 Minutes,' one of the network's most esteemed programs."  One former CBS executive described the problem at CBS

as a "a culture of fear" that, while emanating from Moonves, reports have confirmed encompassed rampant sexual misconduct and entitlement that bled down throughout the organization and included little, if any, accountability.  As *The Wall Street Journal* reported, even the consensual "romantic" relationships that Moonves had with senior and junior CBS staffers "made other executives uncomfortable and led some women to feel the company had a misogynistic culture," according to former executives.

64.     The widespread sexual misconduct at CBS is rooted in inappropriate and unlawful behavior from decades ago – not only by Moonves, but other executives as well.  For example, the draft external report from the investigation into the workplace culture at CBS revealed that Don Hewitt ("Hewitt"), the creator and executive producer of "60 Minutes" until 2004, was alleged to have "sexually assaulted [a woman] on repeated occasions and destroyed her career."  The incidents, which occurred over a period of years, resulted in a settlement in the 1990s by which CBS has paid out more than $5 million to the former employee.  The settlement has since been amended six times, with CBS agreeing each time to pay additional money in exchange for the woman's silence, and includes annual payments of $75,000 for the rest of her life.  Further, it was reported that seven female employees who worked for CBS on the show "Nightwatch," anchored by Charlie Rose, filed a lawsuit against CBS in 1986 in District of Columbia Superior Court, alleging sexual harassment by the executive producer John Huddy and other managerial employees.

65.     This behavior paved the way for others at CBS.  In addition to breaking the stunning allegations against Moonves, Farrow's initial exposé detailed the ongoing impact at CBS of the widespread misconduct that permeated the Company, with many former CBS employees revealing that "men accused of misconduct were promoted, even after the company was made aware of those allegations."  "60 Minutes," CBS News's flagship program that Moonves has said "'defines the

greatness of CBS,'" was a "focal point" of the allegations in the article.  While *The New Yorker* said

it "reviewed three six-figure settlements with '60 Minutes' employees who have filed complaints of

sexual harassment or discrimination," much of the allegations centered around conduct that stemmed

from the show's boss, Jeff Fager.  *The Wall Street Journal* has described Fager as "one of the most

powerful figures in television news."  Fager took over as the Executive Producer of "60 Minutes" in

2004 and was also appointed by Moonves as the Chairman of CBS News in 2011, a position he held

until 2015 while he continued in his roll at "60 Minutes."  According to the initial *The New Yorker*

exposé:

> **Nineteen** current and former employees told me that Jeff Fager, the former chairman
> of CBS News and the current executive producer of "60 Minutes," allowed
> harassment in the division.  "It's **top down**, this culture of older men who have all
> this power and you are nothing," one veteran producer told me.  "**The company is
> shielding lots of bad behavior**."

66.     The article further explained that a half-dozen former employees said that "while

inebriated at company parties, [Fager] would touch employees in ways that made them

uncomfortable."  Another producer told Farrow that Fager "made drunken advances to an associate

producer, commenting on her breasts and becoming belligerent when she rebuffed him."

Additionally, the article described the disturbing reality at "60 Minutes" under Fager stating, in

pertinent part, as follows:

> Sophie Gayter, a "60 Minutes" employee who alleged to the *Post* that Charlie Rose
> had groped her, told me that Fager "**enabled the other men on the floor to do
> whatever the heck they wanted.**"  Fager, one network executive said, "would let
> people know he communicated with Les directly," adding that "**people took that to
> mean Les supported him completely**."

> CBS, one former associate producer said, "is an old network.  Everything in there
> feels old: the people, the furniture, the culture, the mores."  Many of the women
> described the atmosphere at CBS News specifically as a "**frat house**."  One former
> employee said, "I had **several producers and editors over the age of sixty who would
> greet me by kissing me on the mouth**. I had people touch my butt a couple times."
> She added, "Fager seemed to encourage that climate. It wasn't even that he turned a
> blind eye toward it."  Katie Couric, who was an anchor at the network and a

contributing correspondent for "60 Minutes" from 2006 to 2011, when Fager helped force her out, told me that it "felt like a *boys' club*, where a number of talented women seemed to be marginalized and undervalued."

*      *      *

A former journalist at "60 Minutes" named Habiba Nosheen told me that she had complained to management that Ira Rosen [("Rosen")], a producer on the program, had subjected her to numerous sexual comments and suggested that she flirt with sources. Two other women told me that they had experienced similar conduct from Rosen. (In a statement, Rosen said that "CBS extensively investigated these complaints and found them to be false, misleading, and unsubstantiated." He said, "I have always and continue to deny these allegations.").

When Nosheen filed a written complaint and met with Fager about the allegations against Rosen, she said, he told her not to worry about the possibility that other women might be harassed by Rosen. She told me that Fager is "an enabler of this *'Mad Men' culture* at '60 Minutes.'" "Afterward, there appeared to be no repercussions for Rosen, and she was frozen out of assignments. Days after she made her complaint to Fager, he and two of his deputies called Nosheen into a meeting to go over criticisms of her work performance which she found specious. One involved a tense exchange with a co-worker that had happened a year earlier. The format of the meeting, she said, was highly unusual. "It was so obvious to me that they began to implement a *strategy of retaliation*," she told me.

67.     The exposé also detailed how Michael Radutzky ("Radutzky"), a senior producer on "60 Minutes," created a hostile work environment at the show. In one incident, another senior producer, Viki Gordon ("Gordon"), alleged that Radutzky "threatened to throw furniture at her and twisted her arm behind her back, causing her to scream." Sources told Farrow that Fager instructed Gordon not to inform human resources and asked Gordon, *not* Radutzky, to apologize in order "to mitigate conflict in the office." David Gelber, a former "60 Minutes" producer, told Farrow that "[i]t was common knowledge at '60 Minutes' that Michael Radutzky was an *out-of-control guy*, especially but not exclusively toward women. We all saw it, *almost on a daily basis*." Even so, Radutzky remained in his position for several years after the incident. In fact, "'Fager not only tolerated [Radutzky] – he elevated him to a position of leadership, even after Fager knew perfectly well how abusive he was.'"

- 28 -

68.    The sweeping allegations uncovered in *The New Yorker* story matched others that had already began to trickle out into media reports.  Most notably, on November 20, 2017, *The Washington Post* first reported that eight women said that CBS's revered "CBS This Morning" host and "60 Minutes" correspondent Charlie Rose sexually harassed them with nudity, groping and lewd calls.  CBS fired Rose shortly after the report ran.  Thereafter, PBS canceled distribution of his self-titled nightly interview program.  As *The New York Times* reported:

> David Rhodes, the president of CBS News, told staff members in an internal email that Mr. Rose, a host of "CBS This Morning" and a "60 Minutes" correspondent, had been let go after allegations were raised "of ***extremely disturbing and intolerable behavior*** said to have revolved around his PBS program."

69.    Rose was brought on at "60 Minutes" in 2008 as a contributing correspondent by Fager, who also tapped him to co-host "CBS This Morning" in 2011 when Fager was the CBS News chairman.  *The Washington Post* has since reported, based on interviews with ***107*** current and former CBS News employees, that a total of ***35 women*** have now accused Rose of sexual harassment, including ***14 CBS News employees***, and that managers were made aware of the allegations on at least three occasions, as early as 1986 and as recently as April 2017.  In one incident shortly after he joined "CBS This Morning," Rose forcibly kissed one of the show's employees at a holiday gathering.  Two women, in separate incidents in 2012 and 2013 at "CBS This Morning" and "60 Minutes," respectively, said Rose groped their buttocks at CBS.  Three women sued Rose and CBS in May 2018 over the misconduct and harassment, and CBS confirmed in December that it reached a settlement with the women, the financial terms of which are confidential.

70.    In December 2017, CBS confirmed that the showrunner and executive producer of "NCIS: New Orleans," Brad Kern ("Kern"), was the subject of two separate HR investigations launched within a year of Kern taking the helm of the show centering on allegations of sexual-

harassment and discrimination against women.  According to human resources documents obtained by *Variety*, Kern was accused of making "'inappropriate comments related to women'" and deploying "'gender-based and racial stereotypes.'"  Interviews with show members revealed Kern was a "'gender bully,'" with one source stating he "discriminates against women, against working mothers, against anyone he can't control – especially women.'" He was also alleged to have given massages to women without their permission and mocked a nursing mother in front of her colleagues.  The first investigation was launched after a former writer for the show, Zach Strauss, said he "could not tolerate the insensitive remarks that were constantly made" in such a "'toxic environment.'"  *Variety* reported that nine women left or were fired in less than two years after Kern came to the show, including the nursing mother who was fired after she lodged a formal complaint with HR – circumstances that one source said "'***seemed like retaliation***'" – and Zoe McLellan, an original cast member who Kern allegedly wrote off the show because, according to multiple sources, he "didn't finder her "'f—kable.'"  Kern remained with CBS until he was fired on October 1, 2018, after *The New Yorker* exposés ran and Moonves was ousted, and after CBS launched the ***third*** investigation into Kern's conduct since 2016, this time headed by the law firm Drinker Biddle.

71.    At CBS News, a fifteen-year CBS employee, Erin Gee, filed a lawsuit in the summer of 2017 against an executive director at "CBS Evening News," alleging he "urged her to have sex with a co-worker with whom she was having difficulties in order to 'break the ice,' and that she was demoted after complaining about gender discrimination."  In another case, in early 2018, Leslie Isaacs, a vice-president at Pop, a channel jointly operated by CBS and Lionsgate, "filed a lawsuit alleging that CBS was aware of a hostile workplace at the channel."  Andrew Kreisberg ("Kreisberg"), executive producer on several shows on the broadcast network CW, another joint venture that CBS owns with Warner Bros., was suspended in November 2017 after 19 co-workers

alleged he "engaged in a pattern of alleged sexual harassment and inappropriate physical contact

over a period of years."  And actress Pauley Perrette of "NCIS" disclosed in May 2018, shortly after

she left the show, that she endured "multiple physical assaults" during her tenure, referring to a

"machine" that was keeping her silent.

72.    *The New Yorker's* follow-up exposé on September 9, 2018 provided even more detail

about Fager and 60 Minutes.  In one account, Sarah Johansen, a producer who was an intern at CBS

in the late 2000s and described CBS as "'one of the most sexist places I've ever worked,'" alleged

that Fager groped her at a work party:

> Johansen said that she had contact with Fager on only two occasions.  The first, she
> said, was at a work party at a bar near the CBS News offices in Manhattan.  She was
> in a group of co-workers when, "all of a sudden, I felt a hand on my ass," she said.
> "The hand belonged to an arm which belonged to Jeff Fager."  Another producer told
> her it was colloquially referred to by women on the team as "the Fager arm," which
> several said they were mindful to avoid at parties.  "I was shocked," Johansen said.
> "His hand should not be anywhere near his intern's ass."  She said the contact was
> "more like a stroke.  It wasn't just a 'Hey, what's up?'  "She didn't think Fager was
> propositioning her, and interpreted the move as "a power trip."  She told me, "When
> he grabbed my ass, it was just, like, 'Welcome to "60 Minutes."  You're one of us
> now.' "She recalled making eye contact with Fager, laughing and walking away
> quickly.  But she was troubled enough by the incident that, shortly afterward, she
> told a male producer, who corroborated her story.

73.    The widespread harassment that pervaded CBS, however, was not limited to Moonves

and the CBS News division.  As mentioned above, harassment and misconduct allegations reached

the set of "NCIS: New Orleans," the joint venture Pop cable network (formerly TVGN and the TV

Guide Network) and CW executive producer Kreisberg.  They also reached the vice president of

talent for CBS Television Studios, Vincent Favale ("Favale"), who served as a senior programming

executive for "The Late Show with David Letterman" and "The Late Show with Stephen Colbert."

*CNN* reported that nine current and former CBS employees described instances in "Late Show"

meetings and rehearsals between 2015 and 2018 "where Favale used sexual innuendo, made

homophobic comments and allegedly said derogatory remarks about the appearances of female

guests."  For example, one female former CBS executive said Favale told her "'he got four erections while watching Jennifer Hudson rehearse.'"  Favale made it known that he "'had a direct line to Moonves,'" which is unsurprising given that even Stephen Colbert said that "'[i]t seemed like someone was protecting this guy."  Eventually Colbert and others "'convinced the network to make a change,'" and Favale was placed on administrative leave in October 2018.

74.     Further, on December 13, 2018, *The New York Times* reported that the investigation lead by Covington and Debevoise uncovered another incident with an actress that resulted in a $9.5 million settlement and revealed larger cultural issues at CBS – namely, the Company's tendency to protect itself at the expense of victims.  Specifically, the article reported:

> In March 2017, Eliza Dushku, an actress known for her work on "Buffy the Vampire Slayer," signed on to play a major role in three episodes of the CBS prime-time drama "Bull," and there were plans to make her a full-time cast member.

> Her time on the set began promisingly.  The show's star, Michael Weatherly [("Weatherly")] — a mainstay of CBS's prime-time lineup for 15 years — seemed friendly.  And a producer and writer on "Bull," Glenn Gordon Caron, told Ms. Dushku she would be more than a love interest.

> Then came a series of comments that made Ms. Dushku uncomfortable. In front of the cast and crew, Mr. Weatherly remarked on her appearance, and made a rape joke and a comment about a threesome.  Shortly after Ms. Dushku confronted the star about his behavior, she was written off the show.  She believed her time on "Bull" came to a sudden end as a result of retaliation.

> After she went through mediation with CBS, the company agreed to a confidential settlement that would pay her $9.5 million, roughly the equivalent of what Ms. Dushku would have earned if she had stayed on as a cast member for four seasons.

**Defendants Knew About the Pervasive Sexual Harassment at the Company, Including Moonves's Conduct, But Failed to Protect Female Employees**

75.     By the beginning of the Class Period, CBS was steeped in a culture marked by sexual misconduct, harassment, discrimination and retaliation.  As the extensive reports and external investigation have revealed, CBS's troubling culture was known throughout the Company at this time and was in fact tolerated and fostered by executives at the highest levels of the Company,

including defendant Moonves. Employees lodged complaints with management and CBS's human resources and legal departments, and CBS entered into numerous confidential settlements with women that ensured their silence.

76.     Additionally, Moonves knew, at least as early as October 2017, that the allegations later revealed by, and related to, *The New Yorker's* July 27, 2018 exposé, would invariably be disclosed publicly. This is evident by the fact that rumors about Moonves's past behavior "had proliferated almost immediately after" the publication of the prizewinning Weinstein exposé, and intensified after CBS fired Charlie Rose in November 2017, as reported by *The New York Times*. And "[b]y December, CBS executives had been told that reporters for The Times and The Wall Street Journal were asking around about sexual-harassment allegations involving Mr. Moonves."

77.     Moreover, as reported by *The New York Times* on July 31, 2018, "***CBS's board knew – or should have known*** – about potential problems" with Moonves soon after Farrow's Weinstein exposé broke in October 2017 given that rumors percolated immediately after the story broke and intensified with the Charlie Rose firing, as noted above. And as the *Los Angeles Times* reported on August 2, 2018, "CBS board members were aware late [in 2017] that multiple news organizations were looking into Moonves' conduct in the wake of the Harvey Weinstein scandal, which exploded in October." According to that report, as "[w]omen came forward with their stories of past abuse, and reporters at multiple outlets began chasing tips about various Hollywood figures . . . CBS learned of such reporting efforts after journalists reached out to female executives and asked about their experiences with Moonves . . ."

78.     As detailed in a September 10, 2018 story in *The Wall Street Journal*, defendant Redstone, the CBS director and president of CBS's controlling shareholder of NAI, "phoned fellow directors on CBS Corp.'s board [in January 2018] to ask about rumors that . . . Moonves[] was about

to have a #MeToo moment." She even called Moonves making a similar inquiry. Around this time, Moonves informed some members of CBS's nomination and governance committee about the criminal complaint lodged against him with the LAPD claiming Moonves forced a woman to perform oral sex on him in the 1980s. Also by this time (January 2018), Redstone had urged CBS directors and defendants Martha Minow and Bruce Gordon to investigate Moonves's past. *The Wall Street Journal* article further explained that:

> By April, the rumors about a forthcoming New Yorker story detailing allegations against Mr. Moonves reached such a fever pitch that the CBS board called an emergency meeting on a Sunday to plot out what they would do if the allegations were serious enough to merit suspending him, the people said. When CBS discovered that Mr. Moonves wasn't in fact the subject of that particular New Yorker article, the meeting was canceled.

79. On September 12, 2018, *The New York Times* published a story, entitled "Threats and Deception: Why CBS's Board Turned Against Leslie Moonves," in which it revealed that defendant Moonves knew but had concealed that the LAPD had begun investigating him for sexual assault in November 2017, at the same time Moonves began pledging solidarity with the #MeToo movement. Rather than disclose the allegations and subsequent investigation – as well as the risk that the allegations would impair his ability to continue as CEO – defendant Moonves, in exchange for continued silence, had attempted to find a job at the Company for one of his accusers who was threatening to go public. The article also revealed, based on interviews with directors and other people familiar with the board's deliberations, that various CBS insiders were aware of the allegations against defendant Moonves well before the initial July 27, 2018 disclosure:

> Mr. Moonves's eventual unraveling started in January [2018], when Ms. Redstone repeatedly told two independent directors, Bruce Gordon and Martha Minow . . . that she had heard that journalists – including *The New Yorker*'s Ronan Farrow – were working on stories about sexual harassment allegations against him. Mr. Gordon, the former head of the National Association for the Advancement of Colored People, and Ms. Minow enlisted Michael J. Aiello, a partner at Weil, Gotshal & Manges, to look into the matter. Mr. Aiello questioned Mr. Moonves by phone in late January, with other Weil Gotshal lawyers listening to the call.

*      *      *

On Aug. 2, the *Los Angeles Times* reported that an unnamed woman, later identified by *The New Yorker* as Phyllis Golden-Gottlieb, had filed a complaint against Mr. Moonves with the Los Angeles police in late 2017, just weeks before Mr. Aiello had questioned Mr. Moonves on the board's behalf . . . .  Mr. Moonves was aware of that complaint at the time of Mr. Aiello's interview, but it wasn't mentioned in his report to Mr. Gordon and Ms. Minow.

*      *      *

Pressed by directors for an explanation after the *Los Angeles Times* story, Mr. Moonves insisted he'd told Mr. Aiello about the matter in January.  And in any event, he argued that the incident was so old that he viewed it as a "personal matter" that had no bearing on his tenure at CBS.

80.    Moonves's knowledge of an impending public disclosure was also documented in the November 28, 2018 article in *The New York Times* about Phillips and Dauer, and substantiated by a declaration and text messages Plaintiff's counsel obtained as part of their investigation of this matter.  The article, as mentioned above, reported on the extensive communications between Dauer and Moonves following media inquiries Dauer received about Moonves and sexual misconduct beginning in November 2017.  In the declaration, Dauer revealed that Moonves told him in a December 4, 2017 conversation "that **he believed that an article about [Moonves] would be published imminently**," and that, "'I think I'll be ok.  But if Bobbie talks, I'm done.'"  Over the ensuing months, Moonves and Dauer communicated over text about media inquiries, Phillips and securing Phillips work at CBS, with Moonves explaining at one point that he felt "sick all the time" in response to one of Dauer's text referencing Phillips.  Shortly before *The New Yorker* published the July 27, 2018 exposé on Moonves and CBS, Moonves called Dauer and asked him to delete their text messages, a request Moonves had asked of all his other friends.

81.    One of the most egregious examples of CBS's knowledge of Moonves's past sexual misconduct was revealed in the draft report of the external investigation being conducted by Convington and Debevoise.  As *The New York Times* reported, Dr. Anne Peters, the woman who

- 35 -

accused Moonves of a disturbing assault in 1999, gave her friend Arnold Kopelson ("Kopelson"), the Oscar-winning producer of "Platoon," "a detailed account of the episode *in 2007*, when Mr. Kopelson was thinking about joining the CBS board."  Kopelson, in turn, "responded that it was a trivial incident, adding that '*we all did that*.'"  Kopelson did in fact join the CBS board in 2007 and remained a board member throughout the Class Period until September 2018, just weeks before he passed away.

82.     Kopelson, however, never disclosed the incident, according to *The New York Times* article, even after rumors about Moonves percolated in early 2018, and even after certain board members became aware of other incidents of harassment by Moonves.  Rather, Kopelson expressed his unwavering support for Moonves, apparently at the expense of his duties as a CBS board member, when he told CBS's board: "'I don't care if 30 more women come forward and allege this kind of stuff . . . Les is our leader and it wouldn't change my opinion of him.'"  One expert in corporate governance at the University of Delaware, Charles M. Elson ("Elson"), *The New York Times* wrote, stated that Kopelson "'***clearly had a duty to disclose*** the incident to the full board.'"  Elson also noted Kopelson's longtime friendship with Sumner Redstone, the former controlling shareholder of CBS (before ceding control to his daughter, Shari Redstone), who Elson said "'fostered this environment.'"

83.     The draft report leaked to *The New York Times* provided further details about Defendants' knowledge of Moonves's harassment issues.  For example, the report revealed that the longtime head of communications at CBS, Schwartz, had known about sexual assault allegations in November 2017 and drafted a resignation letter for Moonves in August 2018 after he learned of an additional allegation that month.  Moonves, however, never signed the letter.  It also found that defendant board members Charles Gifford and Bruce Gordon spoke to Moonves about #MeToo

problems and about the fact that the law firm Weil, Gotshal & Manges would be looking into the matter.  And the report said that "the lawyers who conducted the inquiry wrote that they had spoken to Moonves four times and found him to be '*evasive and untruthful* at times and to have *deliberately lied* about and minimized the extent of his sexual misconduct.'"  Indeed, investigators discovered that Moonves "had deleted many of his hundreds of texts with Mr. Dauer, and handed over his son's iPad instead of his own."

84.     Other instances of Company knowledge of the widespread sexual harassment culture at CBS include the repeated disclosures of incidents of sexual misconduct – whether by Moonves, Rose, Fager, Rosen, Weatherly, Kern, Kreisberg, Favale or others – to executives, managers or members of HR discussed above, to little or no avail.  Habiba Nosheen, the "60 Minutes" journalist who filed a complaint with the Equal Employment Opportunity Commission in June 2016, received an email from a CBS attorney threatening to enforce a non-compete clause in her contract "unless she withdrew her E.E.O.C. complaint and signed a nondisclosure agreement," according to *The New Yorker*.  Another woman told *The New Yorker* she spoke with "CBS's legal department about Rosen's and Fager's behavior [and] 'was shocked by the lack of seriousness and regard that CBS legal showed my story.'"

85.     Similarly, the plethora of lawsuits, settlements and other formal complaints by women who accused CBS executives of engaging in sexual misconduct, many of which have only recently been disclosed, further demonstrate the Company's knowledge of the misconduct.  These include the multiple six-figure settlements with "60 Minutes" employees reviewed by *The New Yorker*, the settlement resolving allegations against Hewitt resulting in over $5 million in payments and the $9.5 million settlement with actress Elizabeth Dushku, all in efforts to silence victims while often protecting and promoting the accused.  Other women who made allegations against CBS News

- 37 -

have declined to speak on the record, citing non-disclosure agreements, according to *The New Yorker*.

86.     The repeated and largely unanswered attempts to inform CBS management of the widespread culture of harassment at the Company resulted in the following problem according to the Convington and Debevoise investigators, as reported by *The New York Times*: "When faced with instances of wrongdoing, *the company had a tendency to protect itself, at the expense of victims*." As "60 Minutes" employee Sophie Gayter ("Gayter") told *The New Yorker*, Fager "'enabled other men on the floor to do whatever the heck they wanted.'"  Gayter and another female employee also said that "their bosses asked [many assistants] to complete the company's mandatory online sexual-harassment training programs for them."

87.     *The New Yorker's* CBS exposé further shed light on the truth about the Company's policies for reporting sexual harassment as follows:

> Former employees told me that there were few avenues for them to register confidential complaints about discrimination and misconduct.  "People say, 'You could call H.R.'  Honestly, I've never met a single person from H.R.," one producer said.  "*There's no oversight*."  Some said that they had *witnessed retaliation* against those who did attempt to speak out.  At CBS News, "there was *no one to turn to*," one former producer told me, saying that she had reported Charlie Rose's behavior, and that the complaint resulted in no repercussions for Rose.  "*If it's just behavior from the top, tolerated at the top, and there's no one to talk to, what do you do?*" she said.

88.     Upon completion of the Company's external investigation of Moonves and cultural issues at CBS conducted by Convington and Debevoise, the CBS board "determined that there are grounds to terminate for cause, including [Moonves's] *willful and material misfeasance*, violation of Company policies and breach of his employment contract, as well as his willful failure to cooperate fully with the Company's investigation," according to a December 17, 2018 Company statement.  Accordingly, the Company stated that Moonves would not receive any severance payment.

89.     CBS's board also stated that "investigators learned of past incidents of improper and unprofessional conduct, and concluded that ***the Company's historical policies, practices and structures have not reflected a high institutional priority on preventing harassment and retaliation***." The investigation further found, according to the board, that "the resources devoted to the company's human resources function, to training and development, and to diversity and inclusion initiatives have been ***inadequate***, given the size and complexity of CBS' businesses. Employees also cited past incidents in which HR and the Company did not hold high performers accountable for their conduct and protect employees from retaliation."

90.     CBS's failed policies and procedures not only allowed sexual misconduct and harassment to become ingrained in the corporate cultural fabric, but they resulted in the protection and promotion of those who engaged in the inappropriate behavior, at the expense of those who needed the most help – the victims themselves. They, unfortunately, were left to fend for themselves.

**Defendant Moonves and Other CBS Executives Sold Over $200 Million Worth of CBS Stock During the Class Period While in Possession of Material Non-public Information About CBS's Company-wide Harassment Problem**

91.     Before the disclosures about the Company's sexual harassment and hostile work environment problems were revealed to the market, defendant Moonves and other CBS executives, including defendants Ianniello and Liding and Chief Communications Officer Schwartz, collectively sold over 3.4 million shares of CBS stock, totaling over $200 million in proceeds, to the unsuspecting investing public while in possession of material non-public information, thereby profiting from their failure to disclose the truth to the market, as set forth below:

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| **Joseph Ianniello**<br>Chief Operating Officer | 17-Jan-17 | $62.19 | 68,000 | $4,228,920 |
| | 21-Feb-17 | $66.16 | 3,900 | $258,024 |
| | 21-Feb-17 | $67.41 | 50,205 | $3,384,319 |
| | 21-Feb-17 | $67.68 | 14,764 | $999,228 |
| | 16-Jan-18 | $60.20 | 500 | $30,100 |
| | 16-Jan-18 | $60.00 | 10 | $600 |
| | 17-Jan-18 | $60.13 | 2,400 | $144,312 |
| | 18-Jan-18 | $60.34 | 196,860 | $11,878,532 |
| | 18-Jan-18 | $61.17 | 34,421 | $2,105,533 |
| | 19-Jan-18 | $60.00 | 2,263 | $135,780 |
| | 25-Jan-18 | $60.03 | 1,250 | $75,038 |
| | 26-Jan-18 | $60.01 | 46,621 | $2,797,726 |
| | 18-Jun-18 | $56.47 | 50,000 | $2,823,500 |
| | | | **471,194** | **$28,861,611** |
| **Lawrence Liding**<br>Executive Vice President, Controller and Chief Accounting Officer | 24-Feb-17 | $66.93 | 8,482 | $567,700 |
| | 1-Mar-17 | $67.47 | 26,291 | $1,773,854 |
| | | | **34,773** | **$2,341,554** |
| **Leslie Moonves**<br>Chief Executive Officer, President and Chairman of the Board | 30-Jun-17 | $63.84 | 200,000 | $12,768,000 |
| | 30-Jun-17 | $63.84 | 20,000 | $1,276,800 |
| | 12-Jul-17 | $64.31 | 5,200 | $334,412 |
| | 12-Jul-17 | $63.78 | 194,800 | $12,424,344 |
| | 12-Jul-17 | $64.35 | 300 | $19,305 |
| | 12-Jul-17 | $63.77 | 17,700 | $1,128,729 |
| | 13-Jul-17 | $63.83 | 7,600 | $485,108 |
| | 13-Jul-17 | $63.29 | 192,400 | $12,176,996 |
| | 13-Jul-17 | $63.86 | 400 | $25,544 |
| | 13-Jul-17 | $63.29 | 17,600 | $1,113,904 |
| | 22-Aug-17 | $65.90 | 4,600 | $303,140 |
| | 22-Aug-17 | $65.50 | 145,400 | $9,523,700 |
| | 22-Aug-17 | $65.51 | 13,700 | $897,487 |
| | 22-Aug-17 | $65.91 | 300 | $19,773 |
| | 23-Aug-17 | $64.68 | 150,000 | $9,702,000 |
| | 23-Aug-17 | $64.68 | 14,000 | $905,520 |
| | 19-Sep-17 | $58.73 | 82,616 | $4,852,038 |
| | 19-Sep-17 | $57.79 | 67,384 | $3,894,121 |
| | 19-Sep-17 | $57.81 | 6,400 | $369,984 |
| | 19-Sep-17 | $58.74 | 7,600 | $446,424 |
| | 20-Sep-17 | $59.04 | 150,000 | $8,856,000 |
| | 20-Sep-17 | $59.04 | 14,000 | $826,560 |
| | 10-Oct-17 | $57.54 | 132,360 | $7,615,994 |

| Filer Name | Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|---|
| | 10-Oct-17 | $58.26 | 17,640 | $1,027,706 |
| | 10-Oct-17 | $57.54 | 12,500 | $719,250 |
| | 10-Oct-17 | $58.27 | 1,500 | $87,405 |
| | 11-Oct-17 | $56.69 | 150,000 | $8,503,500 |
| | 11-Oct-17 | $56.69 | 14,000 | $793,660 |
| | 12-Dec-17 | $57.85 | 85,000 | $4,917,250 |
| | 13-Dec-17 | $57.54 | 85,000 | $4,890,900 |
| | 17-Jan-18 | $59.28 | 48,500 | $2,875,080 |
| | 17-Jan-18 | $58.79 | 36,500 | $2,145,835 |
| | 18-Jan-18 | $60.74 | 62,072 | $3,770,253 |
| | 18-Jan-18 | $60.02 | 21,428 | $1,286,109 |
| | 18-Jan-18 | $61.40 | 1,500 | $92,100 |
| | 27-Feb-18 | $54.90 | 65,500 | $3,595,950 |
| | 27-Feb-18 | $55.70 | 19,500 | $1,086,150 |
| | 28-Feb-18 | $54.05 | 25 | $1,351 |
| | 28-Feb-18 | $54.21 | 100 | $5,421 |
| | 28-Feb-18 | $53.48 | 84,875 | $4,539,115 |
| | 20-Mar-18 | $50.46 | 85,000 | $4,289,100 |
| | 21-Mar-18 | $50.91 | 85,000 | $4,327,350 |
| | 11-Apr-18 | $51.33 | 29,700 | $1,524,501 |
| | 11-Apr-18 | $50.90 | 55,300 | $2,814,770 |
| | 12-Apr-18 | $50.31 | 85,000 | $4,276,350 |
| | 9-May-18 | $51.53 | 75,000 | $3,864,750 |
| | 10-May-18 | $52.36 | 1,600 | $83,776 |
| | 10-May-18 | $52.00 | 73,400 | $3,816,800 |
| | | | **2,640,000** | **$155,300,316** |
| **Gil Schwartz** Chief Communications Officer | 17-Feb-17 | $64.05 | 5,572 | $356,887 |
| | 17-Feb-17 | $65.46 | 27,559 | $1,804,012 |
| | 22-Jun-17 | $62.27 | 5,270 | $328,163 |
| | 5-Jul-17 | $64.08 | 5,270 | $337,702 |
| | 2-Aug-17 | $65.40 | 5,270 | $344,658 |
| | 11-Sep-17 | $58.40 | 54,131 | $3,161,250 |
| | 14-Jun-18 | $55.08 | 160,709 | $8,851,852 |
| | | | **263,781** | **$15,184,523** |
| **Grand Total** | | | **3,409,748** | **$201,688,005** |

92.     The timing and amount of the Class Period CBS stock sales by these executives were unusual and suspicious, and further demonstrate defendants Moonves, Ianniello and Liding's motive to commit fraud.  For example, Moonves was reported to have known about the LAPD criminal investigation into sexual assault allegations as early as November 2017, and believed by early

December 2017 "that an article about him would be published imminently" that could detail accusations of sexual misconduct and assault. Yet Moonves sold over *$53 million* worth of stock between mid-December 2017 and May 2018, even as inquiries into his past continued to percolate and after the board scheduled an emergency Sunday meeting in April 2018 to discuss what it believed was a forthcoming article detailing allegations against Moonves.

93.    Further, defendant Ianniello sold over $19 million worth of stock between January and June 2018, despite reports that "[b]y December [2017], CBS executives had been told that reporters for The Times and The Wall Street Journal were asking around about sexual-harassment allegations involving Mr. Moonves." And while *The New York Times* reported that Schwartz had known about certain sexual assault allegations against Moonves in November 2017, he unloaded over 160 million shares on June 14, 2018, shortly before *The New Yorker* published its exposé on Moonves and CBS in July, earning proceeds of over $8.8 million.

94.    Taken collectively, these insider sales support an inference of scienter because they were timed to capitalize on CBS's inflated stock price before defendant Moonves's misconduct and the pervasive sexual harassment that permeated the Company was revealed to the market.

### MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED PRIOR TO THE CLASS PERIOD THAT REMAINED EXTANT AND UNCORRECTED

95.    On February 16, 2016, CBS filed an annual report on Form 10-K for the fiscal year ended December 31, 2015, with the SEC (the "2015 10-K") which was signed by the Individual Defendants (except defendants Rhodes, Klieger and Minow). The 2015 10-K purported to warn about the loss of key personnel and the impact it could have on the Company stating in pertinent part as follow:

**The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenues**

The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities. The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

96.    On May 4, 2016, CBS filed a quarterly report on Form 10-Q for the period ended March 31, 2016 ("1Q16 10-Q") with the SEC that was signed by defendants Ianniello and Liding and incorporated by reference the risk factor set forth above in ¶95.

97.    On July 28, 2016, CBS filed a quarterly report on Form 10-Q for the period ended June 30, 2016 ("2Q16 10-Q") with the SEC that was signed by defendants Ianniello and Liding and incorporated by reference the risk factor set forth above in ¶95.

98.    The statements referenced above in ¶¶95-97 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because they failed to disclose the following adverse information that was known to Defendants or recklessly disregarded by them as follows:

(a)    that CBS executives and senior management, including its CEO, defendant Moonves, had engaged in and/or fostered widespread workplace sexual harassment at CBS that created a hostile work environment;

(b)    that Moonves was the driving force behind the Company's culture of sexual harassment, intimidation, retaliation and inappropriate behavior and had repeatedly and regularly engaged in sexual harassment of CBS subordinates and others;

- 43 -

(c)     that the Company's senior executives, management and directors, and CBS's human resources and legal departments, received numerous reports of sexual harassment and/or were otherwise aware of the harassment and misconduct given its pervasiveness;

(d)     that CBS failed to enforce its stated anti-harassment policies and instead acted to silence those who brought sexual harassment allegations to the attention of CBS; and

(e)     that, as a result of the foregoing, there was a substantial risk that Moonves would be forced to leave the Company and that the Company would suffer declining advertising revenue should this conduct come to light.

99.     On April 15, 2016, the Company filed a Definitive Proxy Statement on Schedule 14A (the "2016 Proxy") with the SEC.  The 2016 Proxy described Moonves as a "critical link to management's perspective" and having a "unique institutional knowledge of the Company."  The 2016 Proxy stated in pertinent part as follows:

> As the Company's Chairman of the Board, President and Chief Executive Officer, **Mr. Moonves provides a critical link to management's perspective** in Board discussions regarding the businesses and strategic direction of the Company.  With his experience in all aspects of the Company's global businesses, having served in executive positions with the Company for the past 23 years, coupled with his service on the Board for over 12 years, he provides the Board with unique institutional knowledge of the Company.

100.     The 2016 Proxy incorporated the Company's Business Conduct Statement ("BCS"), stating that the BCS "sets forth the Company's standards for ethical conduct that are expected of **all directors and employees of the Company**.  The BCS is available on the Company's website at www.cbscorporation.com and on the Company's intranet sites and also has been distributed to the Company's employees and directors."  The 2016 Proxy further stated directors and full-time employees are "required to certify as to their compliance with the BCS" and "must disclose any potential conflicts of interest."  According to the 2016 Proxy, "[t]he BCS addresses, among other

things, topics such as . . . [t]he Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment."

101.    The 2016 Proxy represented that the Company was vigorously enforcing the anti-retaliation provisions of the BCS to ensure effective enforcement, stating in pertinent part as follows:

> The BCS provides **numerous avenues for employees to report violations** of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee.  These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers.  The BCS also provides that **the Company will protect anyone who makes a good faith report of a violation of the BCS** and that **retaliation against an employee who makes a good faith report will not be tolerated**.

102.    A letter to all employees and directors incorporated into the BCS, authored and signed by defendant Moonves, as "Chairman of the Board, President and Chief Executive Officer of CBS Corporation," stated:

> CBS is known for the quality of its people, the content it creates and distributes around the globe and the integrity of its business practices.  **We are committed to maintaining the highest standards in everything we do**, be it creating programming or how we operate in business.  **Guiding our Company is a strong and established ethical code**.
>
> The CBS Corporation Business Conduct Statement reflects our Company values and outlines our critical policies and guidelines.  As CBS employees, **we all have a responsibility to uphold the highest standards of ethical and appropriate business actions**.
>
>               *       *       *
>
> A company is only as good as its people.  We trust that you'll continue to deliver results with honor and integrity.  Thank you for your cooperation in making CBS great.

103.    Section VI of the BCS, entitled "**HARASSMENT-FREE WORKPLACE ENVIRONMENT**," provided in pertinent part:

> **CBS has a "zero tolerance" policy for sexual harassment** or harassment based on race, color, national origin, religion, sex, age, physical disability, mental disability, medical condition, ancestry, alienage or citizenship status, marital status, creed, genetic information, height or weight, sexual orientation, military or veteran's status,

gender, gender identity, gender expression, transgender status or any other characteristic protected by law. Discriminatory treatment, including *sexual harassment* and harassment based on a person's race, age or other protected status, *is strictly prohibited. CBS will take all steps necessary and appropriate to stop such acts of harassment or discrimination of which it becomes aware.*

*   *   *

CBS also believes in an environment that is free from workplace bullying and abusive conduct, regardless of whether the person is in a protected category. Bullying or abusive conduct is conduct with malice that a reasonable person would find hostile or offensive. Examples of what constitutes abusive or bullying conduct includes repeated use of insults, derogatory remarks and epithets; threatening, intimidating or humiliating verbal or physical conduct; and the gratuitous sabotage of a person's work performance. It does not include a single act unless it is especially severe and egregious, but CBS strongly discourages such behavior at any time.

*   *   *

If a consenting romantic or sexual relationship between a supervisor and a direct or indirect subordinate should develop, *CBS requires the supervisor to disclose this information to his or her Company's Human Resources Department* to ensure that there are no issues of actual or apparent favoritism, conflict of interest, sexual harassment or any other negative impact on others in the work environment.

*Upon being informed or learning of the existence of such a relationship, CBS will take steps that it deems appropriate to protect the workplace environment*.

*   *   *

*CBS fairly, completely and timely investigates all complaints about conduct that violates this harassment-free workplace environment policy and will not tolerate retaliation against any person who makes a good faith report of misconduct*. If you believe you are being retaliated against for reporting or cooperating in an investigation involving discrimination or harassment, you also should immediately report any suspected retaliation.

*If it is determined that harassment or retaliation has occurred, effective remedial action will be taken* in accordance with the circumstances involved. Any employee determined to be responsible for harassment or retaliation in violation of this policy will be subject to appropriate disciplinary action, up to and including termination. *Because a hostile-free work environment is so important, CBS may take disciplinary action against an employee who exhibits poor judgment or engages in inappropriate behavior, including sexually inappropriate conduct, even if it falls short of being severe or pervasive*. . . .

- 46 -

104.    A separate section of the BCS entitled, "Implementation of the CBS Business Conduct Statement," provided, in part:

> If you have experienced any conduct you believe violates any policy in this Statement or if you know of a violation or possible violation of a policy in this Statement or any other policy or applicable law, rule or regulation, you are required to report such information promptly using the reporting procedures described below. ***Your failure to use these procedures to report a violation could result in disciplinary action***, including possible termination, and/ or could affect your legal rights.
>
> *        *        *
>
> . . . we strongly urge you to report complaints or concerns as soon as possible so that the appropriate rapid and constructive action can be taken.
>
> *        *        *
>
> We will take reports of violation or suspected violation of these policies very seriously.
>
> *        *        *
>
> Because it allows for a more effective and efficient investigation and resolution of a violation or suspected violation, we prefer that you give your name and other pertinent information when making a report.  However, you are not required to do so and may make a report anonymously if you prefer.   If you choose to report anonymously, you should give a sufficiently detailed description of the factual basis for the allegations to allow an appropriate investigation.
>
> ***There are several different methods for making an anonymous report***.
>
> *        *        *
>
> ***CBS will promptly and thoroughly investigate any allegation of conduct that may violate the policies in this Statement***.
>
> *        *        *
>
> ***You will not be retaliated against because of a good faith report or because you cooperate with an investigation of a suspected violation***.  Any such retaliation would be a separate violation of this Statement.  Retaliation includes discharging, demoting, suspending, harassing or in any manner discriminating against any employee in the terms and conditions of employment as a result of such employee's lawful reporting of a complaint. Information that is disclosed or discovered during the course of an investigation may be considered with regard to possible disciplinary or corrective action . . .

*       *       *

CBS also expects employees, officers and directors to comport themselves at all times in a professional manner.

105.    The 2016 Proxy also assured the market of the Company's ongoing purportedly rigorous compliance with its "Supplemental Code of Ethics for Senior Financial Officers" (the "Ethics Code"), "which is available on the Company's website at www.cbscorporation.com."  The 2016 Proxy stated in pertinent part that the Ethics Code was "applicable to the Company's Chief Executive Officer" and that it "addresse[d] . . . a general obligation to promote honest and ethical conduct within the Company."  The Ethics Code, in turn, stated that "Senior Financial Officers," including the CEO, are required to: (1) "bring to the attention of the CBS Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by CBS in its public filings . . ."; (2) "bring to the attention of the CBS Chief Legal Officer (the "CLO") and the COO any information he or she may have concerning significant deficiencies in the design or operation of internal control over financial reporting . . ."; and (3) "bring to the attention of the CLO any information he or she may have concerning any violation of CBS's Business Conduct Statement."

106.    The statements referenced above in ¶¶99-105 were materially false and misleading at the time they were made for the reasons stated above in ¶98.  Additionally, the statements referenced above in ¶102 contained in the letter by Moonves to all employees and directors incorporated into the BCS that "[w]e are committed to maintaining the highest standards in everything we do," "[g]uiding our Company is a strong and established ethical code" and "we all have a responsibility to uphold the highest standards of ethical and appropriate business actions" were materially false and misleading because CBS and its executives, including defendant Moonves, engaged in and fostered a company-wide pattern and practice of sexual harassment, creating a "culture of fear" and hostile

work environment at the Company.  Moreover, these statements were false and misleading because the Company's external investigation into Moonves, CBS News and cultural issues at CBS found that "the company had a tendency to protect itself, at the expense of victims."  Further, the CBS board itself acknowledged in a December 17, 2018 Company press release that: (1) "investigators learned of past incidents of improper and unprofessional conduct, and concluded that the Company's historical policies, practices and structures have not reflected a high institutional priority on preventing harassment and retaliation"; (2) "[t]he investigation determined that the resources devoted to the Company's Human Resources function [and] to training and development . . . have been inadequate"; and (3) "the Company did not hold high performers accountable for their conduct and protect employees from retaliation."

107.    The statements referenced above in ¶103 contained in section VI of the BCS that "CBS has a 'zero tolerance' policy for sexual harassment," "sexual harassment . . . is strictly prohibited" and "CBS will take all steps necessary and appropriate to stop such acts of harassment or discrimination of which it becomes aware" were also materially false and misleading because CBS and its executives, including defendant Moonves, engaged in and fostered a company-wide pattern and practice of sexual harassment, creating a "culture of fear" and hostile work environment at the Company.  Moreover, these statements were false and misleading because the Company's external investigation into Moonves, CBS News and cultural issues at CBS found that "the company had a tendency to protect itself, at the expense of victims."  Further, the CBS board itself acknowledged in a December 17, 2018 Company press release that: (1) "investigators learned of past incidents of improper and unprofessional conduct, and concluded that the Company's historical policies, practices and structures have not reflected a high institutional priority on preventing harassment and retaliation"; (2) "[t]he investigation determined that the resources devoted to the Company's Human

Resources function [and] to training and development . . . have been inadequate"; and (3) "the Company did not hold high performers accountable for their conduct and protect employees from retaliation."

108.    The statement referenced above in ¶103 contained in section VI of the BCS that "CBS also believes in an environment that is free from workplace bullying and abusive conduct" was also materially false and misleading because CBS and its executives, including defendant Moonves, engaged in and fostered a company-wide pattern and practice of sexual harassment, creating a "culture of fear" and hostile work environment at the Company.  Indeed, the CBS workplace was *not* "free from workplace bullying and abusive conduct" because CBS employees have specifically described "'misogynist bullying'" and "'gender bully[ing]'" by senior CBS executives, including defendant Moonves.  Additionally, the CBS board itself acknowledged that "investigators learned of past incidents of improper and unprofessional conduct."

109.    The statements referenced above in ¶103 contained in section VI of the BCS that "CBS requires the supervisor to disclose [a consenting romantic or sexual relationship between a supervisor and a direct or indirect subordinate] to his or her Company's Human Resources Department" and "[u]pon being informed or learning of the existence of such a relationship, CBS will take steps that it deems appropriate to protect the workplace environment" were also materially false and misleading because supervisors at CBS did *not* disclose even consenting relationships with subordinates to Human Resources.  To the extent such relationships were reported, CBS failed to prevent "issues of actual or apparent favoritism, conflict of interest, sexual harassment" and "other negative impact on others in the work environment," as required by the BCS.  And CBS did not take steps "to protect the workplace environment" as the Company's external investigation into Moonves, CBS News and cultural issues at CBS found that "the company had a tendency to protect

- 50 -

itself, at the expense of victims." Further, the CBS board itself acknowledged in a December 17, 2018 Company press release that: (1) "investigators learned of past incidents of improper and unprofessional conduct, and concluded that the Company's historical policies, practices and structures have not reflected a high institutional priority on preventing harassment and retaliation"; (2) "[t]he investigation determined that the resources devoted to the Company's Human Resources function [and] to training and development . . . have been inadequate"; and (3) "the Company did not hold high performers accountable for their conduct and protect employees from retaliation."

110.    The statements referenced above in ¶103 contained in section VI of the BCS that "CBS fairly, completely and timely investigates all complaints" about harassment, "will not tolerate retaliation," will take "effective remedial action" when harassment or retaliation occurs and "may take disciplinary action against an employee who exhibits poor judgment or engages in inappropriate behavior, including sexually inappropriate conduct, even if it falls short of being severe or pervasive" were also materially false and misleading because:

(a)    CBS failed to completely and timely investigate complaints of harassment, as evidenced by the repeated unanswered complaints of harassment by CBS employees to Company executives, human resources and legal personnel and, for example, by the Company's failure to even begin conducting a thorough investigation of defendant Moonves's misconduct until after *The New Yorker* exposé in late July 2018, despite the Company's knowledge of a criminal complaint filed against Moonves, at least one sexual assault that Moonves committed and endless rumors from reporters inquiring about misconduct; and

(b)    CBS did *not* take "effective remedial action" or adequate "disciplinary action" as the Company did in fact tolerate harassment and retaliation at the highest levels, and "men accused of misconduct were promoted, even after the company was made aware of those

allegations." Further, that CBS did in fact tolerate retaliation is evidenced by the dozens of instances of retaliation discussed herein, and because the CBS board found that, based on the external investigation into Moonves, CBS News and cultural issues at CBS, "the Company did not hold high performers accountable for their conduct and protect employees from retaliation" and that investigators "concluded that the Company's historical policies, practices and structures have not reflected a high institutional priority on preventing harassment and retaliation."

111.    The statements referenced above in ¶104 contained in the section of the BCS entitled "Implementation of the CBS Business Conduct Statement" that "[y]our failure to use these procedures to report a violation could result in disciplinary action," "[t]here are several different methods for making an anonymous report," "CBS will promptly and thoroughly investigate any allegation of conduct that may violate the policies in this Statement" and "[y]ou will not be retaliated against because of a good faith report or because you cooperate with an investigation of a suspected violation" were also materially false and misleading because CBS and senior executives urged victims of harassment *not* to report violations of the BCS, and in fact those who did report violations were routinely retaliated against, as discussed herein; thus any purported methods of making anonymous reports to CBS were illusory. Further, CBS failed to properly investigate complaints of harassment, as evidenced by the repeated unanswered complaints of harassment by CBS employees to Company executives, human resources and legal personnel and, for example, the Company's failure to even begin conducting a thorough investigation of defendant Moonves's misconduct until after *The New Yorker* exposé in late July 2018, despite the Company's knowledge of a criminal complaint filed against Moonves, at least one sexual assault that Moonves committed and endless rumors from reporters inquiring about misconduct.

112.     The statements referenced above in ¶¶95-97 and ¶¶99-105 above remained alive and uncorrected in the market throughout the Class Period.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

113.     The Class Period starts on September 26, 2016.  On that date, the prices of CBS Class A and Class B stock traded as high as $51.61 per share and $52.70 per share, respectively.

114.     On November 3, 2016, CBS filed a Form 10-Q for the period ended September 30, 2016 ("3Q16 10-Q") with the SEC which was signed by defendants Ianniello and Liding.  The 3Q16 10-Q incorporated the risk factor quoted above in the 2015 10-K in ¶95, which stated in pertinent part as follows:

> **The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenues**
>
> The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities.  The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

115.     On February 17, 2017, CBS filed a Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC which was signed by the Individual Defendants (except defendants Rhodes, Klieger and Minow).  The 2016 10-K incorporated the risk factor quoted above in ¶114.

116.     On May 4, 2017, CBS filed a Form 10-Q for the period ended March 31, 2017 ("1Q17 10-Q") with the SEC which was signed by Ianniello and Liding.  The 1Q17 10-Q incorporated by reference the risk factor quoted above in ¶114.

117.   On August 7, 2017, CBS filed a Form 10-Q for the period ended June 30, 2017 ("2Q17 10-Q") with the SEC which was signed by Ianniello and Liding.   The 2Q17 10-Q incorporated by reference the risk factor quoted above in ¶114.

118.   On April 7, 2017, the Company filed a Definitive Proxy Statement on Schedule 14A (the "2017 Proxy") with the SEC.   The 2017 Proxy described Moonves as a "critical link to management's perspective" and having a "unique institutional knowledge of the Company."   The 2017 Proxy stated in pertinent part as follows:

> As the Company's Chairman of the Board, President and Chief Executive Officer, **Mr. Moonves provides a critical link to management's perspective** in Board discussions regarding the businesses and strategic direction of the Company.   With his experience in all aspects of the Company's global businesses, having served in executive positions with the Company for the past 23 years, coupled with his service on the Board for over 12 years, he provides the Board with unique institutional knowledge of the Company.

119.   The 2017 Proxy incorporated the Company's BCS, including the statements in ¶¶102-104, stating that the BCS "sets forth the Company's standards for ethical conduct that are expected of **all directors and employees of the Company**.   The BCS is available on the Company's website at www.cbscorporation.com and on the Company's intranet sites and also has been distributed to the Company's employees and directors."   The 2017 Proxy further stated directors and full-time employees are "required to certify as to their compliance with the BCS" and "must disclose any potential conflicts of interest."   According to the 2017 Proxy, "[t]he BCS addresses, among other things, topics such as . . . [t[he Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment."

120.   The 2017 Proxy also expressly assured investors that the Company was vigorously enforcing the anti-retaliation provisions of the BCS to ensure effective enforcement, stating in pertinent part as follows:

The BCS provides **numerous avenues for employees to report violations** of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee.  These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers.  The BCS also provides that **the Company will protect anyone who makes a good faith report of a violation of the BCS** and that **retaliation against an employee who makes a good faith report will not be tolerated**.

121.     Additionally, the 2017 Proxy assured the market of the Company's ongoing purportedly rigorous compliance with its Ethics Code, "which is available on the Company's website at www.cbscorporation.com."  The 2017 Proxy stated in pertinent part that the Ethics Code was "applicable to the Company's Chief Executive Officer" and that it "addresse[d] . . . a general obligation to promote honest and ethical conduct within the Company."  The Ethics Code, in turn, contained the representations described *supra* at ¶105.

122.     On November 6, 2017, CBS filed a quarterly report on Form 10-Q for the period ended September 30, 2017 ("3Q17 10-Q") that did not identify any specific risk factors other than incorporating the risk factor included in the 2016 10-K and stating the following:

> These risks, uncertainties and other factors include, among others: . . . other factors described in the Company's filings made under the securities laws, including, among others, those set forth under "Item 1A.  Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2016 and in our Quarterly Reports on Form 10-Q . . . There may be additional risks, uncertainties and factors that the Company does not currently view as material or that are not necessarily known.

123.     The statements referenced above in ¶¶114-122 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because they failed to disclose the following adverse information that was known to Defendants or recklessly disregarded by them as follows:

(a)     that CBS executives and senior management, including its CEO, defendant Moonves, had engaged in and/or fostered widespread workplace sexual harassment at CBS that created a hostile work environment;

      (b)     that Moonves was the driving force behind the Company's culture of sexual harassment, intimidation, retaliation and inappropriate behavior and had repeatedly and regularly engaged in sexual harassment of CBS subordinates and others;

      (c)     that the Company's senior executives, management and directors, and CBS's human resources and legal departments, received numerous reports of sexual harassment and/or were otherwise aware of the harassment and misconduct given its pervasiveness;

      (d)     that CBS failed to enforce its stated anti-harassment policies and instead acted to silence those who brought sexual harassment allegations to the attention of CBS; and

      (e)     that, as a result of the foregoing, there was a substantial risk that Moonves would be forced to leave the Company and that the Company would suffer declining advertising revenue should this conduct come to light.

124.     Additionally, the statements contained in the BCS incorporated by reference into the 2017 Proxy were materially false and misleading at the time they were made for the reasons set forth in ¶¶106-111.

125.     On November 29, 2017, defendant Moonves presented for CBS at the *Variety* Innovate Summit.  Asked about the #MeToo movement and its potential impact on CBS, Moonves stated in pertinent part that: "'It's a watershed moment . . .  It's important that a company's culture will not allow for this.  And that's the thing that's far-reaching.  There's a lot we're learning. There's a lot we didn't know.'"

126.     On February 15, 2018, CBS issued a press release announcing its financial results for the 2017 fourth quarter and fiscal year, ended December 31, 2017.  Defendant Moonves commented on the results stating in pertinent part as follows:

> I'm very pleased to report that CBS turned in outstanding fourth-quarter results, including double-digit revenue growth and our 32nd consecutive quarter of EPS

growth, capping off a very strong year in 2017. . . .   The CBS Corporation produces many of the most-valuable programming franchises in the world, reaching more viewers than anyone else.   This gives us a tremendous advantage as streaming becomes more central to our distribution strategy.   As a result, we now have nearly five million subscribers at *CBS All Access* and Showtime OTT combined.   When you add this to our retrans and skinny bundle subscribers, our total subscriber base continues to grow at an accelerated pace.   With the backdrop of this changing business model, and the completed separation of our radio business during the fourth quarter, we now have even greater visibility into our operations.   Specifically, we expect 2018 to be another strong year for the CBS Corporation, with revenue growth in the high-single digits and EPS growth in the high teens from the record $4.40 we're reporting to you today.   So we feel very good about the growth path before us, and we continue to have great confidence in our ability to deliver for our shareholders.

127.     On February 20, 2018, CBS filed a Form 10-K for the fiscal year ended December 31, 2016 (the "2017 10-K") with the SEC which was signed by the Individual Defendants (except defendant Rhodes).  The 2017 10-K repeated, verbatim, the same risk factor included in the 2016 Form 10-K as follows:

> **The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenues**
>
> The Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees and entertainment personalities.  The Company believes that the unique combination of skills and experience possessed by its executive officers would be difficult to replace, and that the loss of its executive officers could have a material adverse effect on the Company, including the impairment of the Company's ability to execute its business strategy.

128.     The 2017 10-K also contained two sections titled "Item 3. *Legal Proceedings*" and "Legal Matters," which primarily disclosed asbestos liability risks.

129.     The statements referenced above in ¶¶125-128 were materially false and misleading at the time they were made for the reasons set forth in ¶¶98 and 123.

130.     In a statement in March 2018, as recounted in the May 3, 2018 *The Washington Post* article about Rose, defendant Rhodes, CBS News's President, said, "'I was not aware of harassment by Charlie Rose at CBS.'"  On March 8, 2018, Rhodes talked about the need to take "'misconduct

and harassment'" out of the workplace as he accepted the First Amendment Service Award from The Radio Television Digital News Foundation in Washington.  As reported by *Broadcasting & Cable* on March 9, 2018, Rhodes stated the following:

> Some of the changes that you are seeing borne out in our workplaces, in standards of behavior, in more modern management, is a natural result of including more voices . . .  We are only partway through that process.  Taking out the misconduct and harassment.  Being more thorough about who gets opportunities and what they do with them.  ***These are all part of hearing from more people inside and outside our news organization, getting the facts out, encouraging speech, drawing out the truth--revealing, not concealing***.  Our prescriptions as management will not be the same in every case and will sometimes not be popular.  This is going to be, at times, a painful process that some would rather not go through, but our work is getting better and better for it . . .

131.    The May 3, 2018 article in *The Washington Post* also reported that at a forum in April 2018 at George Washington University, when asked "whether CBS News had protected Rose or known about his behavior, Rhodes responded, 'Just to be really clear, ***there was not knowledge***.'"

132.    On April 6, 2018, CBS filed its Proxy Statement on Form DEF 14A with the SEC (the "2018 Proxy").  The 2018 Proxy advised the market that CBS's 2018 annual general meeting of shareholders (the "2018 annual meeting") would be held in New York City on Friday, May 18, 2018. Among other things that shareholders would be asked to approve at the 2018 annual meeting, the 2018 Proxy advised that the CBS Board would seek its reelection, including Moonves.  The 2016 Proxy described Moonves as a "critical link to management's perspective" and having a "unique institutional knowledge of the Company."  The 2018 Proxy stated in pertinent part as follows:

> As the Company's Chairman of the Board, President and Chief Executive Officer, ***Mr. Moonves provides a critical link to management's perspective*** in Board discussions regarding the businesses and strategic direction of the Company.  With his experience in all aspects of the Company's global businesses, having served in executive positions with the Company for the past 23 years, coupled with his service on the Board for over 12 years, he provides the Board with unique institutional knowledge of the Company.

133.     Highlighting the strength of CBS's "Corporate Governance," the 2018 Proxy assured investors not only that "CBS Corporation's corporate governance practices [were] . . . established and monitored by its Board" and that the "Board, with assistance from its Nominating and Governance Committee, regularly assesse[d] CBS Corporation's governance practices in light of legal requirements and governance best practices," it also stated that, "[i]n several areas, CBS Corporation's practices [went] beyond the requirements of the NYSE corporate governance listing standards."

134.     The 2018 Proxy incorporated the Company's BCS, including the statements in ¶¶102-104, stating that the BCS "sets forth the Company's standards for ethical conduct that are expected of **all directors and employees of the Company**.  The BCS is available on the Company's website at www.cbscorporation.com and on the Company's intranet sites and also has been distributed to the Company's employees and directors."  The 2018 Proxy further stated directors and full-time employees are "required to certify as to their compliance with the BCS" and "must disclose any potential conflicts of interest."  According to the 2018 Proxy, "[t]he BCS addresses, among other things, topics such as . . . [t[he Company's commitment to providing equal employment opportunities and a bias-free and harassment-free workplace environment."

135.     The 2018 Proxy also expressly represented that the Company was vigorously enforcing the anti-retaliation provisions of the BCS to ensure effective enforcement, stating in pertinent part as follows:

> The BCS provides **numerous avenues for employees to report violations** of the BCS or matters of concern, whether anonymously or with attribution, to the appropriate officers of the Company and/or the Audit Committee.  These avenues include a telephone hotline, email contacts or direct communication with the Company's compliance officers.  The BCS also provides that **the Company will protect anyone who makes a good faith report of a violation of the BCS** and that **retaliation against an employee who makes a good faith report will not be tolerated**.

136.    The 2018 Proxy also assured the market of the Company's ongoing purportedly rigorous compliance with its Ethics Code, "which is available on the Company's website at www.cbscorporation.com."  The 2018 Proxy stated in pertinent part that the Ethics Code was "applicable to the Company's Chief Executive Officer" and that it "addresse[d] . . . a general obligation to promote honest and ethical conduct within the Company."  The Ethics Code, in turn, contained the representations described *supra* at ¶105.

137.    Emphasizing the purported strength of the CBS Board's then-present "Board Risk Oversight" capabilities, the 2018 Proxy assured the market that the CBS Board was enforcing rigorous reporting and oversight standards that were then in place to bring any inherent risks to the Company's reputation and operations to the Board's attention and to facilitate the Board's effective handling of them, stating in pertinent part as follows:

> The Company's Board of Directors has overall responsibility for the oversight of the Company's risk management process.   The Board carries out its oversight responsibility directly and through the delegation to its Committees of responsibilities related to the oversight of certain risks, as follows:
>
> •    The Audit Committee, as part of its internal audit and independent auditor oversight, is responsible for reviewing the Company's risk assessment and risk management practices and discusses risks as they relate to its review of the Company's financial statements, the evaluation of the effectiveness of internal control over financial reporting, compliance with legal and regulatory requirements, and the performance of the internal audit function, among other responsibilities set forth in the Committee's charter.
>
> •    The Compensation Committee monitors risks associated with the design and administration of the Company's compensation programs, including its performance-based compensation programs, to promote an environment which does not encourage unnecessary and excessive risk-taking by the Company's employees.  The Committee also reviews risks related to management resources, including the depth of the Company's senior management.   In view of this oversight and based on management's assessment, the Company does not believe that its employee compensation policies and practices create risks that are reasonably likely to have a material adverse effect on the Company.

- The Nominating and Governance Committee oversees risk as it relates to monitoring developments in law and practice with respect to the Company's corporate governance processes and in reviewing related person transactions. The Committee also is responsible for the periodic review of the following risk management processes at the Company: disaster recovery, crisis management and theft of intellectual property.

Each of these Committees reports regularly to the Board on these risk-related matters, among other items within its purview.  On an annual basis, the Board conducts strategy sessions, which include presentations from economic, political and industry experts, among others, on matters affecting the Company, to assist the Board and management in preparing and implementing strategic initiatives, including risk management.  In addition, the Board and Committees receive regular reports from management that include matters affecting the Company's risk profile, including, among others, operations reports from the Chief Executive Officer and from division heads, all of which include strategic and operational risks; reports from the Chief Operating Officer and Chief Accounting Officer on credit and liquidity risks and on the integrity of internal controls over financial reporting; reports from the Chief Legal Officer on legal risks and material litigation; and reports on internal audit activities from the Senior Vice President, Internal Audit.  The Audit Committee also receives periodic reports from the Company's Chief Compliance Officer on the Company's compliance program; Chief Information Security Officer on the Company's information security program and the management of cybersecurity risk; and Senior Vice President, Internal Audit on the Company's internal audit plan for the upcoming fiscal year, the scope of which is to determine the adequacy and function of the Company's risk management, control and governance processes. Outside of formal meetings, Board members have regular access to executives, including the Chief Executive Officer, the Chief Operating Officer, the Chief Accounting Officer, the Chief Legal Officer and the Chief Administrative Officer and Chief Human Resources Officer.  The Committee and management reports, strategy sessions and real-time management access collectively provide the Board with integrated insight on the Company's management of its risks.

138.    On May 3, 2018, responding to *The Washington Post's* report that Rose had been accused of sexual harassment by an additional 27 women, a representative for CBS News stated in an official Company statement:

Since we terminated Charlie Rose, we've worked to strengthen existing systems to ensure a safe environment where everyone can do their best work . . . Some of the actions we have taken have been reported publicly, some have not.  We offer employees discretion and fairness, and *we take swift action when we learn of unacceptable behavior*.

That said, we cannot corroborate or confirm many of the situations described.

- 61 -

139.   On May 4, 2018, CBS filed a Form 10-Q for the period ended March 31, 2018 ("1Q18 10-Q") with the SEC which was signed by defendants Ianniello and Liding.  The 1Q18 10-Q incorporated the risk factor included in the 2017 10-K and stating the following:

> These risks, uncertainties and other factors include, among others: . . . other factors described in the Company's filings made under the securities laws, including, among others, those set forth under "Item 1A.  Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017 and in our Quarterly Reports on Form 10-Q . . . There may be additional risks, uncertainties and factors that the Company does not currently view as material or that are not necessarily known.

140.   The statements referenced above in ¶¶130-139 were materially false and misleading at the time they were made for the reasons set forth in ¶¶98 and 123.  Additionally, the statements contained in the BCS incorporated by reference into the 2018 Proxy were materially false and misleading at the time they were made for the reasons set forth in ¶¶106-111.

141.   On July 19, 2018, *The Hollywood Reporter* published an interview with Rhodes during which he discussed Rose's firing and the impact the #MeToo movement was then having on the news media industry in general and on CBS in particular.  According to *The Hollywood Reporter*, Rhodes stated that the "revelations" that resulted in "Charlie Rose's November exit from *CBS This Morning* after allegations of misconduct" had "forced CBS News to confront a widespread retrograde culture where misconduct was whispered about for years but tolerated."  According to Rhodes, "[i]n the wake of Rose's departure, CBS News instituted mandatory in-person harassment training for its approximately 1,200 permanent employees and affirmed a focus on pay parity, which began before the current wave of misconduct disclosures."  In reality though, as Farrow would disclose in his soon-to-be-published exposé citing named sources, many CBS senior executives were simply asking their staff "to complete the company's mandatory online sexual-harassment training programs for them."

142.     In discussing the impact the #MeToo movement, and Rose's termination in particular, had on CBS's culture with regard to sexual harassment, Rhodes assured the market that CBS had mitigated any known risks of sexual harassment damaging its reputation and standing, stating in pertinent part that a "really important part of getting #MeToo right is having the right people in the room making decisions," and that one thing he was "really proud of [was having] gotten to a place where the management team is at least half female and about a third diverse," stating "you really need those gender and diversity perspectives when you're making decisions," "[o]therwise you're more prone to make bad ones."

143.     During *The Hollywood Reporter* interview, Rhodes also credited defendant Moonves with having actually strengthened CBS's oversight of sexual harassment misconduct, including personally overseeing Rose's termination, and refuted the notion that Moonves's positions were in jeopardy.  When the interviewer asked: "Your boss, Leslie Moonves, is in a very public skirmish with Shari Redstone, the major shareholder of CBS Corp," leading "[m]any [to] speculate[] that if he loses this battle, he'll have no choice but to leave the network.  So what is CBS without Les?[,]" Rhodes responded, in pertinent part, that CBS "couldn't have done any of the things you see us doing without not just his support but also his engagement.  And that includes the talent, where he always has not just an opinion but an important role in working through these decisions with management," adding that Moonves was "really good" at managing the oversight of sexual harassment claims.

144.     The statements identified in ¶¶141-143 were materially false and misleading at the time they were made, and omitted material information required to be disclosed, because they failed to disclose adverse information that was known to Defendants or recklessly disregarded by them, for the reasons set forth in ¶¶98 and 123.

145. Then, on July 27, 2018 reports began circulating that *The New Yorker* would shortly publish an article describing a pattern of sexual harassment alleged by six women against defendant Moonves.  Moonves responded, "'I recognize that there were times decades ago when I may have made some women uncomfortable by making advances . . . Those were mistakes, and I regret them immensely.  But I always understood and respected – and abided by the principle – that 'no' means 'no,' and I have never misused my position to harm or hinder anyone's career.'"  Later that day, the CBS Board announced that it would investigate the allegations of misconduct, stating the claims would be "taken seriously" and that "[u]pon the conclusion of that investigation, which involve[d] recently reported allegations that go back several decades, the board [would] promptly review the findings and take appropriate action."

146. In response to this news, the prices of CBS Class A and Class B stock declined from $57.85 per share to $54.27 per share and from $57.53 per share to $54.01 per share, respectively, on unusually heavy trading volume.  Then, the next trading day the prices of CBS Class A and Class B stock continued to decline falling to $51.76 and $51.28 per share, respectively.

147. On Sunday July 29, 2018, following the publication of first *The New Yorker* exposé, *The New York Times* reported that the CBS Board had subsequently "spent most of the weekend discussing what immediate actions it should take involving Les Moonves, the company's chief executive, after a published report that included allegations of sexual misconduct from six women."  Critically, the article disclosed that "[a]t least two of the board's 14 members ha[d] questioned whether Mr. Moonves should continue to run the company during an internal investigation," citing "two people familiar with the conversations who asked not to be named because the matter was confidential."

148.     On July 30, 2018, shortly after the publication of *The New Yorker* exposé, an analyst

for J.P. Morgan wrote about the "increased strategic uncertainty" facing the Company in the wake of

the allegations surrounding Moonves, and Moonves's key role in the performance of CBS's stock:

> **Moonves a key part of CBS long-term thesis**.  Relative to most stocks in our
> coverage space, we believe Moonves had an outsize influence on the long-term
> investment thesis for CBS.  The company has strong assets and other management
> which should allow it endure a change of leadership, but we do believe ***an
> unquantified premium was historically built into the stock***, reflective of:
> 1) Moonves' still hands on involvement in guiding creative decisions at CBS; 2) his
> key relationships, including with sports executives and content producers; 3) a strong
> track record of capital allocation and strategic actions; and 4) as a capable
> communicator to the Street.

149.     In response to Farrow's September 9, 2018 follow-up exposé, Moonves said that

"'Untrue allegations from decades ago are now being made against me that are not consistent with

who I am. . . .'"  He further stated:

> "The appalling accusations in this article are untrue.  What is true is that I had
> consensual relations with three of the women some 25 years ago before I came to
> CBS.  And I have never used my position to hinder the advancement or careers of
> women . . ."

>       *   *   *

> "In my 40 years of work, I have never before heard of such disturbing accusations.  I
> can only surmise they are surfacing now for the first time, decades later, as part of a
> concerted effort by others to destroy my name, my reputation, and my career."

150.     Later that evening, the *Los Angeles Times* reported that defendant Moonves would

be leaving the Company.  He had been CEO since 2003.  Defendant COO Joe Ianniello was

thereafter named acting CEO and President.  Also on September 9, 2018, CBS announced that

Moonves and CBS would donate $20 million to the #MeToo movement that would be deducted

from any severance benefits owed to Moonves, if any.

151.     Following the September 9, 2018 *The New Yorker* exposé, Fager sent a text message

to a colleague, CBS News correspondent Jericka Duncan, that was interpreted as threatening.  Fager

wrote, "[b]e careful . . .  There are people who lost their jobs trying to harm me and if you pass on these damaging claims without your own reporting to back them up that will become a serious problem."  By September 12, 2018, CBS had fired Fager, stating that he "'violated company policy and it is our commitment to uphold those policies at every level.'"

152.    On September 10, 2018, before Fager's firing, an analyst with Cowen wrote that, "[g]iven that the allegations extend to the overall culture of the company, we continue to see some risk to company operations if further executives are forced out."  The analyst further wrote, "[t]he added overhang of the independent investigation of uncertain length with an uncertain outcome could make share outperformance difficult."

153.    On November 6, 2018, an analyst for *Argus* recognized the further negative effect that Moonves's departure could have on CBS shareholders, writing:

> While the resignation of CEO Les Moonves and other top executives has helped CBS to deflect attention from the sexual harassment scandal, the outcome of the board's current investigations remains to be seen.  Meanwhile, with the settlement of the NAI litigation, we believe it is only a matter of time before Shari Redstone again seeks to combine Viacom with CBS; however, this time the board is likely to fully accede to Ms. Redstone's wishes.  This could be a negative for minority shareholders.

154.    On December 4, 2018, *The New York Times* ran three stories detailing previously undisclosed allegations of sexual misconduct against Moonves and Defendants' knowledge of the misconduct as contained in a 59 page draft report from the Company's external investigation into Moonves's conduct and CBS's culture.  The draft report also found that Moonves lied to attorneys about whether he tried to get work for anyone else connected with Moonves accuser Bobbie Phillips.  Additionally, Moonves did not disclose that he had used CBS resources to find work for Phillips.  According to *The New York Times*, "[i]nvestigators also discovered that Mr. Moonves had deleted many of his hundreds of texts with Mr. Dauer, and handed over his son's iPad instead of his own."

155.    As reported in *The New York Times* articles, the draft report further found that: (1) Moonves "***repeatedly lied to investigators*** about his behavior" and "***destroyed evidence*** and misled investigators in an attempt to preserve his reputation and save a lucrative severance deal"; (2) a long-time board member was informed about one of Moonves's sexual assaults in ***2007***, shortly before he joined the board, but discarded it as "trivial"; (3) the long-time head of communications at CBS, Gil Schwartz, had known about sexual assault allegations in November 2017 and drafted a resignation letter for Moonves in August 2018 after he learned of an additional allegation that month; (4) defendant board members Charles Gifford and Bruce Gordon spoke to Moonves about #MeToo problems and the fact that the law firm Weil, Gotshal & Manges would be looking into the matter; (5) "'a number of employees' knew that Mr. Moonves was routinely receiving oral sex from a CBS employee and 'believed that the woman was protected from discipline or termination as a result'"; and (6) "Moonves 'received oral sex from at least 4 CBS employees under circumstances that sound transactional and improper to the extent that there was no hint of any relationship, romance, or reciprocity.'"

156.    In response to this news, the prices of CBS Class A and Class B stock declined from $53.45 per share to $51.34 per share and from $53.51 per share to $51.35 per share, respectively, on heavy trading volume.

157.    After reviewing the findings of the outside investigation conducted by Convington and Debevoise, which included interviews with more than 350 people, on December 18, 2018, the Board "'determined that there are grounds to terminate [Moonves] for cause, including his ***willful and material misfeasance***, violation of company policies and breach of his employment contract, as well as his willful failure to cooperate fully with the company's investigation." Accordingly, the board decided Moonves would not receive his expected $120 million exit payout. Notwithstanding

the board's determination, *The New York Times* reported on January 17, 2019 that Moonves plans to fight the decision by the board denying him his severance payment.

158.     On January 6, 2019, CBS revealed that defendant David Rhodes, who took over for Fager as President of CBS News in 2015, would be stepping down from his role as of March 2, 2019.  Rhodes would continue to work for the Company as a senior adviser.

**ITEM 303 OF SEC REGULATION S-K REQUIRED DISCLOSURE
OF THE RISKS AND UNCERTAINTIES TO CBS'S BUSINESS FROM
THE SEXUAL HARASSMENT ISSUES THAT PERVADED THE COMPANY**

159.     The SEC has specific rules governing the content of disclosures made by public companies like CBS in their filings with the SEC.  Specifically, SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain a section called "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303.  The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

160.     Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

- "Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations."

- "Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in

costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed."

161.    Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

162.    Pursuant to Item 303, and the SEC's related interpretive releases thereto, an issuer is required to disclose known trends, uncertainties or risks that have had, or are reasonably likely to have, a materially adverse impact on net sales or revenues or income from continuing operations. Such disclosure is required by an issuer in the MD&A section of Forms 10-K and Forms 10-Q.

163.    In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

*       *       *

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

164.    Furthermore, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)     Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)     If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on

- 69 -

the assumption that it will come to fruition.  Disclosure is then required unless
management determines that a material effect on the registrant's financial condition
or results of operations is not reasonably likely to occur.

165.    As alleged herein, prior to and during the Class Period, Defendants knew that CBS

was beset by a company-wide pattern and practice of sexual harassment, creating a "culture of fear"

and hostile work environment.  This uncertainty increased the likelihood that CBS would suffer

reputational harm that could negatively impact its advertising revenues.  More importantly, the

Company's culture of sexual harassment and, in particular, defendant Moonves's behavior, subjected

the Company to the increased risk that defendant Moonves and others would be forced to leave the

Company thereby negatively impacting the Company and its continuing operations.

166.    Accordingly, Item 303 required disclosure of these known trends and uncertainties

in the Forms 10-Q and Forms 10-K filed during the Class Period.  These SEC filings, however,

failed to mention and describe the risks or uncertainties to the Company's business from the sexual

harassment issues at the Company.  The omission of this information violated the disclosure

obligation imposed by Item 303.

167.    Moreover, as alleged herein, by late 2017, Defendants were aware that Farrow was

investigating and writing an article on CBS, defendant Moonves and the Company's culture of

sexual harassment.  Defendants knew that the publication of this article could have a negative impact

on the Company and its continuing operations yet they failed to disclose it in their SEC filings.

## ADDITIONAL SCIENTER ALLEGATIONS

168.    As alleged herein, Defendants acted with scienter in that they knew and/or recklessly

disregarded that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading; knew that such statements or documents would be

issued or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of

the federal securities laws.  As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CBS, their control over, and/or receipt and/or modification of CBS's materially misleading statements and/or their associations with the Company, participated in the fraudulent scheme alleged herein.  Moonves and other top Company executives were also principally involved in the sexual misconduct and hostile work environment alleged herein, including the allegations revealed for the first time in the July 27, 2018 *The New Yorker* exposé and December 4, 2018 articles in *The New York Times*.

169.    Further, the harassment was open, notorious and widespread.  Among other things, the harassment regularly occurred at Company offices, studios and gatherings.  And as confirmed by the Company's own external investigators, the harassment involved defendant Moonves and other senior executives.  Given Defendants' knowledge of the widespread conduct, they knew that their statements contained in and incorporated by reference into their SEC filings regarding the Company's sexual harassment policies, as well as their statements discussing allegations of sexual harassment and the #MeToo movement in general, were materially misleading at best.

170.    Additionally, the information revealed in and related to *The New Yorker* exposés and *The New York Times* articles regarding Moonves was repeatedly discussed at the highest levels of CBS, including by Moonves himself and other board members.

171.    Moreover, Defendants possessed substantial motives for failing to disclose Moonves's misconduct and the pervasive sexual harassment at the Company.  During the Class Period, before the disclosures about the Company's sexual harassment and hostile work environment problems were revealed to the market, defendant Moonves and other CBS executives, including defendants Ianniello and Liding and Chief Communications Officer Schwartz, collectively sold over 3.4 million shares of CBS stock, totaling over *$200* million, to the unsuspecting investing public

while in possession of material non-public information, thereby profiting from their failure to disclose the truth to the market.

172.   The timing of the Class Period CBS stock sales by these executives were unusual and suspicious.  For example, Moonves was reported to have known about the LAPD criminal investigation into sexual assault allegations as early as November 2017, and believed by early December 2017 "that an article about him would be published imminently" that could detail accusations of sexual misconduct and assault.  Yet Moonves sold over ***$53 million*** worth of stock between mid-December 2017 and May 2018, even as inquiries into his past continued to percolate and after the board scheduled an emergency Sunday meeting in April 2018 to discuss what it believed was a forthcoming article detailing allegations against Moonves.

173.   Further, defendant Ianniello sold over $19 million worth of stock between January and June 2018, despite reports that "[b]y December [2017], CBS executives had been told that reporters for The Times and The Wall Street Journal were asking around about sexual-harassment allegations involving Mr. Moonves."  And while *The New York Times* reported that Schwartz had known about certain sexual assault allegations against Moonves in November 2017, he unloaded over 160 million shares on June 14, 2018, shortly before *The New Yorker* published its exposé on Moonves and CBS in July, earning proceeds of over $8.8 million.

174.   Taken collectively, these insider sales support an inference of scienter because they were timed to capitalize on CBS's inflated stock price before defendant Moonves's misconduct and the pervasive sexual harassment that permeated the Company was revealed to the market.

175.   In short, Defendants were well aware of the pervasive sexual harassment at CBS, and Moonves's misconduct in particular.

## LOSS CAUSATION

176.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of CBS common stock and operated as a fraud or deceit on Class Period purchasers of CBS common stock by misrepresenting the Company's business, operations and prospects.  Later, as the falsity of Defendants' statements began to be revealed to investors, the price of CBS common stock fell as the artificial inflation dissipated.  As a result of their purchases of CBS common stock during the Class Period, Plaintiff and other Class members suffered economic loss, *i.e*., damages, under the federal securities laws.

177.    The market for CBS common stock was open, well developed and efficient at all relevant times.  As a result of the materially misleading statements and failure to disclose the true state of the Company's business, operations and prospects, CBS common stock traded at artificially inflated prices.  Plaintiff and other Class members purchased CBS common stock relying upon the integrity of the market for CBS common stock and suffered economic loss as a result thereof.

178.    Defendants' false or misleading statements had the intended effect and caused CBS common stock to trade at artificially inflated levels.

179.    The declines in the price of CBS common stock at the end of the Class Period were the direct result of the nature and extent of Defendants' prior false statements and material omissions being revealed to and/or leaking into the market.  The timing and magnitude of the price declines in CBS common stock negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

180.    The economic loss Plaintiff and other members of the Class suffered was caused by Defendants' fraudulent scheme to artificially inflate the price of CBS common stock and maintain

that price at artificially inflated levels, as was revealed by the subsequent and significant declines in the value of CBS stock when Defendants' earlier misrepresentations and omissions became publicly available.

## PRESUMPTION OF RELIANCE

181.    Plaintiff and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for CBS common stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    CBS stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    CBS stock traded on large weekly volumes and millions of shares were available for arbitrage activity;

(c)    CBS was qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, for well-established and largely capitalized issuers for whom less scrutiny is required;

(d)    As a regulated issuer, CBS filed periodic public reports with the SEC and NYSE;

(e)    CBS regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)    CBS was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace; and

(g)     Unexpected material news about CBS was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

182.    As a result of the foregoing, the market for CBS common stock promptly incorporated current information regarding CBS from publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all those who transacted in CBS common stock during the Class Period suffered similar injury through their transactions in CBS stock at artificially inflated prices and a presumption of reliance applies.

183.    Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## NO SAFE HARBOR

184.    Defendants' false and misleading statements during the Class Period were not forward-looking statements ("FLS") and/or identified as such by Defendants, and thus did not fall within any "Safe Harbor."

185.    To the extent any false and misleading statements are determined to be FLS, CBS's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

186.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CBS who knew that the FLS was false.

187.    None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or

forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

188.   This is a class action on behalf of all purchasers of CBS Class A and Class B common stock during the Class Period, who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their immediate families, the Company's officers and directors at all relevant times, as well as their immediate families, Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

189.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  CBS common stock was actively traded on the NYSE.  Record owners and other members of the Class may be identified from records maintained by CBS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  While the exact number of Class members is unknown to plaintiff at this time, CBS reported that over 37.5 million shares of Class A common stock and 338.5 million shares of Class B common stock were outstanding as of August 2, 2018.  Accordingly, Plaintiff reasonably believes there are thousands of members in the proposed Class.

190.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

191.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

192.     Common legal and factual questions exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the 1934 Act was violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CBS;

(c)     whether the price of CBS common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

193.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

194.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

195.     Defendants are liable for making false statements and failing to disclose adverse facts known to them about CBS.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CBS common stock was a success, as it: (i) deceived the investing public regarding CBS's business, operations and prospects; (ii) artificially inflated the price of CBS

common stock; and (iii) caused Plaintiff and other members of the Class to purchase CBS common stock at inflated prices.

196.     During the Class Period, Defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

197.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of CBS common stock during the Class Period.

198.     Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about CBS's business, operations and prospects as specified herein.

199.     The Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for

the purpose and effect of concealing adverse information regarding CBS's business, operations and prospects from the investing public and supporting the artificially inflated price of its common stock.

200.    As a result of Defendants' dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of CBS common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in Defendants' public statements during the Class Period, Plaintiff and the other Class members acquired CBS common stock during the Class Period at artificially high prices and were ultimately damaged thereby.

201.    At the time of said misrepresentations and omissions, Plaintiff and other Class members were ignorant of their falsity, and believed them to be true.  Had Plaintiff and other Class members and the marketplace known the truth regarding the problems that CBS was experiencing, which Defendants did not disclose, Plaintiff and other Class members would not have purchased their CBS common stock, or, if they had purchased CBS stock during the Class Period, would not have done so at the artificially inflated prices they paid.

202.    In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the investing public, Defendants had a duty to promptly disseminate truthful information with respect to CBS's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC so that the market price of the Company's common stock would be based on truthful, complete and

accurate information.   SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

203.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5.

204.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their Class Period purchases of CBS common stock.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

205.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

206.    The Individual Defendants and CBS acted as controlling persons of CBS within the meaning of §20(a) of the 1934 Act.   By reason of their positions with the Company, and their ownership of CBS stock, the Individual Defendants had the power and authority to cause CBS to engage in the wrongful conduct complained of herein.   CBS controlled the Individual Defendants and all of its employees.

207.    By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining and certifying that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative and Plaintiff's counsel as Lead Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

- 80 -

B.     Awarding compensatory damages in favor of Plaintiff and the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.     Awarding Plaintiff and the Class their reasonable attorneys' fees, costs, and expenses incurred in this action; and

D.     Such equitable/injunctive or other relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 11, 2019          ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                   SAMUEL H. RUDMAN
                                   DAVID A. ROSENFELD
                                   VINCENT M. SERRA


                                   */s/ Samuel H. Rudman*
                                   SAMUEL H. RUDMAN

                                   58 South Service Road, Suite 200
                                   Melville, NY  11747
                                   Telephone:  631/367-7100
                                   631/367-1173 (fax)
                                   srudman@rgrdlaw.com
                                   drosenfeld@rgrdlaw.com
                                   vserra@rgrdlaw.com

                                   *Lead Counsel for Plaintiff*

- 81 -

**CERTIFICATE OF SERVICE**

I, Samuel H. Rudman, hereby certify that on February 11, 2019, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


SAMUEL H. RUDMAN

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5. (a) Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Purple Mountain Trust v. Wells Fargo & Company, et al.*, No. 3:18-cv-039458 (N.D. Cal.)

(b) Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Lu v. Align Technology, Inc., et al.*, No. 5:18-cv-06720 (N.D. Cal.)
*McGrath v. Marriott International, Inc., et al.*, No. 1:18-cv-06845 (E.D.N.Y.)

(c) Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Bucks County Employees Retirement Fund v. Newell Brands Inc., et al.*, No. 2:18-cv-10878 (D.N.J.)

CBS

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of February, 2019.

CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA

By: _____
Robert O. Glaza, Administrator

- 2 -

CBS

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Common Stock (Class B)**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 10/27/2016 | 3,231 | $56.32 |
| 10/28/2016 | 170 | $56.71 |
| 05/17/2017 | 600 | $60.99 |
| 06/05/2017 | 600 | $60.37 |
| 06/28/2017 | 2,315 | $64.87 |
| 06/28/2017 | 10,026 | $65.05 |
| 07/17/2018 | 16,434 | $57.98 |
| 07/18/2018 | 17,827 | $58.19 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 12/23/2016 | 825 | $64.59 |
| 02/23/2017 | 4,879 | $66.54 |
| 04/11/2017 | 331 | $67.94 |
| 04/12/2017 | 5,410 | $67.44 |
| 04/24/2017 | 942 | $65.87 |
| 08/01/2017 | 7,048 | $66.11 |
| 08/02/2017 | 307 | $64.41 |
| 08/09/2017 | 1,200 | $64.91 |
| 11/17/2017[B] | 3,043 | $56.74 |
| 02/12/2018 | 10,966 | $53.31 |
| 02/12/2018 | 15,326 | $53.27 |
| 07/27/2018 | 34,261 | $54.19 |

*Opening position of 33,335 shares for common stock (Class B).

[B]Shares that were delivered out.