**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
GENE SAMIT and JOHN LANTZ, Individually :
and On Behalf of All Others Similarly Situated, :
 :
     Plaintiff, : Consolidated Action No. 1:18-cv-7796
 :
     v. : **ORAL ARGUMENT REQUESTED**
 :
CBS CORPORATION, et al., :
 :
     Defendants. :
 :
-------------------------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF CBS CORPORATION AND CERTAIN INDIVIDUAL DEFENDANTS TO DISMISS THE AMENDED COMPLAINT

April 12, 2019

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. *iii*

TABLE OF ABBREVIATIONS ........................................................................................ *xii*

PRELIMINARY STATEMENT ............................................................................................ 1

THE PARTIES ........................................................................................................................ 3

THE ALLEGATIONS OF THE AMENDED COMPLAINT .......................................... 4

    A.    CBS Terminates Charlie Rose Amidst Allegations of Sexual Impropriety .................. 5

    B.    Unsubstantiated Public Rumors Begin To Surface That Mr. Moonves Is About To Experience A "#MeToo Moment." ................................................................ 6

    C.    The Board Investigates The Sexual Misconduct Allegations Against Mr. Moonves ........................................................................................................ 7

    D.    Mr. Moonves Separates From CBS ........................................................................ 8

    E.    The CBS Board Terminates Mr. Moonves For Cause ........................................... 9

    F.    The Challenged Statements .................................................................................. 10

LEGAL STANDARD .......................................................................................................... 11

ARGUMENT ........................................................................................................................ 11

I.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 10(b) AND RULE 10(b)–5 ............................................. 11

    A.    Defendants Were Not All "Makers" Of The Challenged Statements .......................... 12

    B.    Plaintiff Fails To Adequately Plead A Material Misstatement Or Omission .............. 12

        1.    Plaintiff Improperly Deploys "Puzzle Pleading." ............................................. 13

        2.    Non-Disclosure Of The Sexual Misconduct Allegations Is Not Actionable ................................................................................................ 13

            a.    Item 303 Of Regulation S-K Does Not Apply ..................................... 14

            b.    CBS Had No Duty To Disclose Rumors Or Allegations Of Sexual Misconduct ................................................................................ 16

            c.    Non-Disclosure Of The Sexual Misconduct Allegations Did Not Render The Challenged Statements False Or Misleading .......... 18

        3.    CBS Had No Obligation To "Correct" The Challenged Statements ............. 29

    C.    Plaintiff Fails To Plead Particularized Facts Giving Rise To A Strong Inference Of Scienter ........................................................................................................... 31

        1.    Scienter As To The Individual Defendants Has Not Been Adequately Pled ........................................................................................................... 32

          a.     Plaintiff Fails To Plead, Either Adequately Or At All, That The Individual Defendants Had Any Motive To Defraud ........................32

          b.     Plaintiff Fails To Plead, Either Adequately Or At All, That The Individual Defendants Knew The Alleged Misstatements Were False Or That They Acted Recklessly ....................................36

     2.     Scienter As To CBS Has Not Been Adequately Pled ......................................44

  D.     Plaintiff Fails To Adequately Plead Loss Causation........................................45

II.     THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF SECTION 20(a) ........................................................................................................47

CONCLUSION.......................................................................................................................50

## TABLE OF AUTHORITIES

Case                                                                 Page(s)

*Acito v. IMCERA Grp., Inc.,*
    47 F.3d 47 (2d Cir. 1995) ................................................................................................. 35

*In re Advanced Battery Techs., Inc.,*
    781 F.3d 638 (2d Cir. 2015) .............................................................................................. 32

*In re Alcatel Sec. Litig.,*
    382 F. Supp. 2d 513 (S.D.N.Y. 2005) ............................................................................... 13

*Aldridge v. A.T. Cross Corp.,*
    284 F.3d 72 (1st Cir. 2002) ............................................................................................... 49

*In re Alstom SA,*
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................................... 48

*Altayyar v. Etsy, Inc.,*
    731 F. App'x 35 (2d Cir. 2018) ......................................................................................... 11

*In re Aratana Therapeutics Inc. Sec. Litig.,*
    315 F. Supp. 3d 737 (S.D.N.Y. 2018) ............................................................................... 36

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................... 11, 37, 38

*In re AstraZeneca Sec. Litig.,*
    559 F. Supp. 2d 453 (S.D.N.Y. 2008) ............................................................................... 38

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ............................................................................... 32, 47, 48, 50

*Barrett v. PJT Partners Inc.,*
    No. 16-cv-2841, 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ................................. *passim*

*In re Banco Bradesco S.A. Sec. Litig.,*
    277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................................................... 12

*In re Bank of Am. AIG Disclosure Sec. Litig.,*
    980 F. Supp. 2d 564 (S.D.N.Y. 2013) ............................................................................... 16

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) .......................................................................................................... 13

*In re Bernard L. Madoff Inv. Sec. LLC,*
    721 F.3d 54 (2d Cir. 2013) ................................................................................................ 45

*Bettis v. Aixtron SE,*
    No. 16-cv-00025, 2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) ................................................39

*In re BISYS Sec. Litig.,*
    397 F. Supp. 2d 430 (S.D.N.Y. 2005).................................................................................35

*City of Brockton Ret. Sys. v. Avon Products, Inc.,*
    No. 11-cv-4665, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)........................................ 38, 41

*Boca Raton Firefighters & Police Pension Fund v. Bahash,*
    506 F. App'x 32 (2d Cir. 2012) .......................................................................................... 13, 17

*Boguslavsky v. Kaplan,*
    159 F.3d 715 (2d Cir. 1998) ..................................................................................................49

*In re Braskem S.A. Sec. Litig.,*
    246 F. Supp. 3d 731 (S.D.N.Y. 2017)...................................................................................23

*In re Canandaigua Sec. Litig.,*
    944 F. Supp. 1202 (S.D.N.Y. 1996) .....................................................................................15

*In re Cannavest Corp. Sec. Litig.,*
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)............................................................................... 49, 50

*C.D.T.S. v. UBS AG,*
    No. 12-cv-4924, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013),
    *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG,* 604 F. App'x 5 (2d Cir. 2015)......37

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.,*
    543 F. App'x 72 (2d Cir. 2013) ............................................................................................47

*Chill v. Gen. Elec. Co.,*
    101 F.3d 263 (2d Cir. 1996) ..................................................................................................40

*In re Citigroup, Inc. Sec. Litig.,*
    330 F. Supp. 2d 367, 77 (S.D.N.Y. 2004),
    *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.,* 165 F. App'x 928 (2d Cir. 2006) .............. 17, 20

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
    752 F.3d 173 (2d Cir. 2014) ..................................................................................................23

*In re Coty Inc. Sec. Litig.,*
    No. 14-cv-919, 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ..............................................16

*Cox v. Perfect Bldg. Maint. Corp.,*
    No. 16-cv-7474, 2017 WL 3049547 (S.D.N.Y. July 18, 2017)..............................................11

*In re CRM Holdings, Ltd. Sec. Litig.,*
    No. 10-cv-975, 2012 WL 1646888 (S.D.N.Y. May 10, 2012) ...............................................38

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..................................................................... 17, 36

*In re Deutsche Bank AG Sec. Litig.*,
    No. 09-cv-1714, 2016 WL 4083429 (S.D.N.Y. July 25, 2016) ................................. 16

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    No. 16-cv-3495, 2017 WL 4049253 (S.D.N.Y. June 28, 2017),
    *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) ......... 13

*Doubline Capital LP v. Odebrecht Fin. Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018) ..................................................................... 47, 49

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ...................................................................................... 47

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) .............................................................. 31, 42, 43

*In re eSpeed Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ...................................................................... 34

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
    No. 16-cv-7840, 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ............................... 43

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
    690 F. Supp. 256 (S.D.N.Y. 1988),
    *aff'd*, 869 F.2d 175 (2d Cir. 1989) ........................................................................... 44

*Fishbaum v. Liz Claiborne, Inc.*,
    No. 98-cv-9396, 1999 WL 568023 (2d Cir. July 27, 1999) ..................................... 35

*Fogel v. Vega*,
    No. 18-cv-650, 2018 WL 6753799 (2d Cir. Dec. 26, 2018) ............................ 21, 24, 27

*Fries v. N. Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018) ...................................................................... 20

*Furlong Fund LLC v. VBI Vaccine's, Inc.*,
    No. 14-cv-9435, 2016 WL 1181710 (S.D.N.Y. Mar. 25, 2016) ............................... 49

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...................................................................... 34

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) ................................................................. 33, 34

*In re Glenayre Techs., Inc. Sec. Litig.*,
    No. 96-cv-8252, 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) ................................. 35

*In re Global Crossing Ltd. Sec. Litig.*,
    No. 02-cv-910, 2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005) ....................................................49

*Gruber v. Gilbertson*,
    No. 16-cv-9727, 2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) .............................................17

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015).................................................................17, 45, 48

*In re Hi–Crush Partners L.P. Sec. Litig.*,
    No. 12-cv-8557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ....................................................16

*Higginbotham v. Baxter Int'l Inc.*,
    495 F.3d 753 (7th Cir. 2007)................................................................................. 31, 42

*Holbrook v. Trivago N.V.*, No. 17-cv-8348,
    2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) ................................................................14

*In re IAC/InteractiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)........................................................................34

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund*,
    783 F.3d 383 (2d Cir. 2015) .......................................................................................27

*In re IBM Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998) .......................................................................................30

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012).................................................................18, 20, 21

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)....................................................................................................12

*Kalnit v. Eucgker*,
    264 F.3d 131 (2d Cir. 2001) ................................................................................. 33, 36

*Kinra v. Chi. Bridge & Iron Co.*,
    No. 17-cv-4251, 2018 WL 2371030 (S.D.N.Y. May 24, 2018)............................................38, 39

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011) .......................................................................................40

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)........................................................................50

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2015) .......................................................................................45

*Leykin v. AT&T Corp.,*
    423 F. Supp. 2d 229 (S.D.N.Y. 2006) ................................................................45

*In re Lions Gate Enter. Corp. Sec. Litig.,*
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...................................................................20

*In re Livent, Inc. Noteholders Sec. Litig.,*
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................................................................5

*In re Livent, Inc. Sec. Litig.,*
    78 F. Supp. 2d 194 (S.D.N.Y. 1999) ................................................................39

*Livingston v. Cablevision Sys. Corp.,*
    966 F. Supp. 2d 208 (E.D.N.Y. 2013) ..............................................................35

*Lopez v. CTPartners Exec. Search Inc.,*
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ...........................................................*passim*

*Luck v. Westchester Med. Ctr.,* No. 17-cv-9110,
    2019 WL 416333 (S.D.N.Y. Feb. 1, 2019) ......................................................40

*In re Lululemon Sec. Litig.,*
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................25, 34, 35

*In re Manulife Fin. Corp. Sec. Litig.,*
    276 F.R.D. 87 (S.D.N.Y. 2011) ........................................................................46

*Markewich v. Adikes,*
    422 F. Supp. 1144 (E.D.N.Y. 1976) ................................................................19

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) ................................................................5

*Monroe Cty. Emps.' Ret. Sys. v. YPF Sociedad Anonima,*
    15 F. Supp. 3d 336 (S.D.N.Y. 2014) ..........................................................37, 39

*In re Moody's Corp. Sec. Litig.,*
    274 F.R.D. 480 (S.D.N.Y. 2011) ......................................................................47

*Nguyen v. New Link Genetics Corp.,*
    297 F. Supp. 3d 472 (S.D.N.Y. 2018) ..............................................................34

*Nielsen v. Rabin,*
    746 F.3d 58 (2d Cir. 2014) ...............................................................................11

*NLRB v. Local Union No. 46, Metallic Lathers & Reinforcing Iron Workers,*
    727 F.2d 234 (2d Cir. 1984) .............................................................................44

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ........................................................................ 36

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018) ........................................................ 44

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ........................................................................ 46

*Ong v. Chipotle Mexican Grill, Inc.*,
   No. 16-cv-141, 2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) ........................ 13

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018) ........................................................ 27

*In re Optionable Sec. Litig.*,
   577 F. Supp. 2d 681 (S.D.N.Y. 2008) ........................................................ 38

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008) ........................................................ 20

*Patel v. L-3 Commc'n Holdings, Inc.*,
   No. 14-cv-6038, 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ............... *passim*

*In re PetroChina Co. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015),
   *aff'd*, No. 15-cv-2528 (2d Cir. Mar. 21, 2016) ........................................ 24

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
   No. 15-cv-5999, 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017) ................. 30

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010) ........................................................ 39

*In re Pretium Res. Inc. Sec. Litig.*,
   256 F. Supp. 3d 459 (S.D.N.Y. 2017) .................................................... 31, 43

*Primavera Familienstiftung v. Askin*,
   No. 95-cv-8905, 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996) ................... 49

*Progressive Credit Union v. City of New York*,
   889 F.3d 40 (2d Cir. 2018) ........................................................................ 11

*Reese v. McGraw-Hill Cos.*,
   293 F.R.D. 617 (S.D.N.Y. 2013),
   *aff'd*, 574 F. App'x 21 (2d Cir. 2014) ...................................................... 25

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ................................................................ *passim*

*In re Rockwell Med. Inc. Sec. Litig.*,
    No. 16-cv-1691, 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ....................................................43

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) .....................................................................................................47

*Ross v. Lloyds Banking Grp., PLC*,
    No. 11-cv-8530, 2012 WL 4891759 (S.D.N.Y. Oct. 16, 2012),
    *aff'd*, 546 F. App'x 5 (2d Cir. 2013) ........................................................................................36

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011) .....................................................................................35

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011) .....................................................................................30

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015),
    *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016) ...............................................36

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016) .....................................................................................43

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) .................................................................................................................17

*Schwab v. E*Trade Fin. Corp.*,
    285 F. Supp. 3d 745 (S.D.N.Y. 2018),
    *aff'd*, 752 F. App'x 56 (2d Cir. 2018) ......................................................................................50

*Sfiraiala v. Deutsche Bank Aktiengesellschaft*,
    729 F. App'x 55 (2d Cir. 2018) ...............................................................................................44

*In re Signet Jewelers Ltd. Sec. Litig.*,
    No. 16-cv-6728, 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ..............................................26

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d. Cir. 2019) ............................................................................................. 23, 27

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010) .....................................................................................................40

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014) .......................................................................................49

*State Teachers Ret. Bd. v. Fluor Corp.*,
    654 F.2d 843 (2d Cir. 1981) .....................................................................................................31

*Stoneridge Inv. Partners, LLC v. Scientific-Atl., Inc.,*
    552 U.S. 148 (2008) ................................................................................11

*Stratte-McClure v. Morgan Stanley,*
    776 F.3d 94 (2d Cir. 2015) ..............................................................13, 14, 18

*In re SunEdison, Inc. Sec. Litig.,*
    300 F. Supp. 3d 444 (S.D.N.Y. 2018) ..........................................................49

*In re Supercom Inc. Sec. Litig.,*
    No. 15-cv-9650, 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) .................... 38, 39

*In re Take-Two Interactive Sec. Litig.,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..........................................................34

*Tamar v. Mind C.T.I., Ltd.,*
    723 F. Supp. 2d 546 (S.D.N.Y. 2010) ..........................................................43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ................................................................................ 31, 32

*In re Time Warner Inc. Sec. Litig.,*
    9 F.3d 259 (2d Cir. 1993) ........................................................................14

*In re Travelzoo Inc. Sec. Litig.,*
    No. 11-cv-5531, 2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) ......................34

*In re Tremont Sec. Law, State Law & Ins. Litig.,*
    No. 08-cv-11117, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013) ...................41

*In re UBS AG Sec. Litig.,*
    No. 07-cv-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ................ 17, 30

*In re Veon Ltd. Sec. Litig.,*
    No. 15-cv-08672, 2018 WL 4168958 (S.D.N.Y. Sept. 30, 2018) ...................48

*Villella v. Chem. & Mining Co. of Chile Inc.,*
    No. 15-cv-2106, 2017 WL 1169629 (S.D.N.Y Mar. 28, 2017) .................... 23, 25

*Zucker v. Sasaki,*
    963 F. Supp. 301 (S.D.N.Y. 1997) ..............................................................28

## Statutes and Rules

17 C.F.R. § 229.103 (2019) ........................................................................ 15, 20

17 C.F.R. § 229.303 (2019) ........................................................................14

17 C.F.R. § 229.503 (2019) ........................................................................15

17 C.F.R. § 240.10b-5 (2019)...................................................................................................*passim*

17 C.F.R. § 240.12b–23(a)-(b) (2019)......................................................................................19

15 U.S.C. § 78t(a) (2011) ..........................................................................................................*passim*

15 U.S.C. § 78u–5(c) (2017)......................................................................................................30

Fed. R. Civ. P. 9(b) .....................................................................................................................11

Fed. R. Civ. P. 12(b)(6).............................................................................................................11

**<u>Other Authorities</u>**

Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition
   and Rules of Operation, 68 Fed. Reg. 75,056  (Dec. 29, 2003) ..................................................15

Safe Harbor for Forward Looking Statements, 59 Fed. Reg. 52723 (Oct. 19, 1994) ....................14, 15

Susan Pulliam & Rob Barry, *Directors Take Shelter In Trading Plans*, WALL ST. J. (Apr. 24, 2013)..........34

## TABLE OF ABBREVIATIONS

| **Term** | **Definition** |
| --- | --- |
| ¶ | Paragraph of Amended Complaint. |
| 2016 Annual Report | Annual Report of CBS on Form 10-K for the period ended December 31, 2015, filed with the SEC on February 12, 2016.  (*See* ¶ 95.) |
| 2017 Annual Report | Annual Report of CBS on Form 10-K for the period ended December 31, 2016, filed with the SEC on February 17, 2017.  (*See* ¶ 115.) |
| 2018 Annual Report | Annual Report of CBS on Form 10-K for the period ended December 31, 2017, filed with the SEC on February 20, 2018.  (*See* ¶ 127; Ex. 4.) |
| 2016 Proxy Statement | Proxy Statement of CBS on Schedule 14A, dated April 15, 2016 and filed with the SEC on April 15, 2016.  (*See* ¶ 99.) |
| 2017 Proxy Statement | Proxy Statement of CBS on Schedule 14A, dated April 7, 2017 and filed with the SEC on April 7, 2017.  (*See* ¶ 118.) |
| 2018 Proxy Statement | Proxy Statement of CBS on Schedule 14A, dated April 6, 2018 and filed with the SEC on April 6, 2018.  (*See* ¶ 132; Ex. 11.) |
| A.C. | Amended Complaint. |
| Amended Complaint | Amended Complaint for Violations of The Federal Securities Laws, dated February 11, 2019. |
| August 1 Board Statement | Statement from CBS Board of Directors issued by the CBS Board of Directors on August 1, 2018.  (Ex. 25.) |
| August 2017 Quarterly Report | Quarterly Report of CBS on Form 10-Q for the period ended June 30, 2017, dated August 7, 2017 and filed with the SEC on August 7, 2017.  (*See* ¶ 117; Ex. 6.) |
| BCS | CBS's Business Conduct Statement, which is available at cbscorporation.com.  (*See* ¶ 100; Ex. 12.) |

| **Term** | **Definition** |
| --- | --- |
| CBS | CBS Corporation. |
| CBS Board | The Board of Directors of CBS. |
| CBS Directors | Members of the CBS Board of Directors. |
| CBS News Investigation | Investigation into allegations against Charlie Rose and the culture at CBS News generally, which was conducted by Proskauer. |
| CBS News Statement | Statement by CBS News as quoted in an article entitled "Charlie Rose's Misconduct was Widespread at CBS and Three Managers Were Warned, Investigation Finds" that was published by *The Washington Post* on or about May 3, 2018.  (Ex. 19.) |
| Challenged Statements | The statements contained in the Key Personnel Disclosures, Critical Link Disclosures, Legal Proceedings Disclosure, Financial Results Press Release, Corporate Governance Systems Disclosure, Website Disclosures, Management Statements, and CBS News Statement, collectively, which Plaintiff alleges are false and/or misleading. |
| Company | CBS. |
| Corporate Governance Systems Disclosures | The statements contained in CBS's Proxy Statements regarding CBS's corporate governance practices, which Plaintiff alleges are false and/or misleading.  (*See* ¶ 133.) |
| Covington | Covington & Burling LLP. |
| Critical Link Disclosures | The statements contained in CBS's Proxy Statements that "Mr. Moonves provides a critical link to management's perspective in Board discussions," which Plaintiff alleges are false and/or misleading.  (*See* ¶¶ 99, 118, 132.) |
| Debevoise | Debevoise & Plimpton LLP. |

| Term | Definition |
|------|-----------|
| December 4 New York Times Article | Article entitled "'Transactional' Sex and a Secret Resignation Letter:  Takeaways From a Report on Les Moonves" that was published by *The New York Times* on or about December 4, 2018.  (*See* ¶¶ 19–20, 82, 154.) |
| December 17 Board Statement | Current Report of CBS on Form 8-K, Exhibit 99, dated December 17, 2018 and filed with the SEC on December 18, 2018.  (*See* ¶ 18; Ex. 10.) |
| Defendants | CBS, Joseph R. Ianniello, Lawrence Liding, David Rhodes, David R. Andelman, Joseph A. Califano, Jr., William S. Cohen, Gary L. Countryman, Charles K. Gifford, Leonard Goldberg, Bruce S. Gordon, Linda M. Griego, Robert N. Klieger, Martha L. Minow, Doug Morris, and Shari E. Redstone.  As used herein, Defendants excludes Leslie Moonves. |
| Director Defendants | David R. Andelman, Joseph A. Califano, Jr., William S. Cohen, Gary L. Countryman, Charles K. Gifford, Leonard Goldberg, Bruce S. Gordon, Linda M. Griego, Robert N. Klieger, Martha L. Minow, Doug Morris, and Shari E. Redstone. |
| Eaton Declaration | Declaration of Mary Eaton, dated April 12, 2019, submitted in support of The Motion of CBS Corporation And Certain Individual Defendants To Dismiss Lead Plaintiff's Amended Complaint. |
| Employee Defendants | Joseph R. Ianniello, Lawrence Liding, and David Rhodes. |
| Ethics Code | CBS's Supplemental Code of Ethics for Senior Financial Officers, which is available at cbscorporation.com.  (*See* ¶ 105, 121, 136; Ex. 13.) |
| Ex. or Exhibit | Exhibit to the Eaton Declaration. |

| Term | Definition |
|------|-----------|
| Financial Results Press Release | Current Report of CBS on Form 8-K, Exhibit 99, dated February 15, 2018 and filed with the SEC on February 15, 2018, which Plaintiff alleges was false and/or misleading.  (*See* ¶ 126; Ex. 7.) |
| Independent Directors | Joseph A. Califano, Jr., William S. Cohen, Gary L. Countryman, Charles K. Gifford, Leonard Goldberg, Bruce S. Gordon, Linda M. Griego, Doug Morris, and Martha L. Minow. |
| Individual Defendants | Joseph R. Ianniello, Lawrence Liding, David Rhodes, David Andelman, Joseph A. Califano, Jr., William S. Cohen, Gary L. Countryman, Charles K. Gifford, Leonard Goldberg, Bruce S. Gordon, Linda M. Griego, Robert N. Klieger, Martha L. Minow, Doug Morris, and Shari E. Redstone.  As used herein, Individual Defendants excludes Leslie Moonves. |
| Internal Investigation | Investigation into the allegations against Mr. Moonves, CBS News, and cultural issues at all levels of CBS conducted by Covington and Debevoise, as described in the August 1 Board Statement. |
| Investigators | Covington and Debevoise. |
| July 19 Hollywood Reporter Article | Article entitled "CBS News Chief:  It's 'Regrettable' Media Doesn't Separate Important From Interesting in Trump Era" that was published by *The Hollywood Reporter* on or about July 19, 2018.  (*See* ¶¶ 141–43; Ex. 20.) |
| July 27 New York Times Article | Article entitled "Les Moonves, CBS Chief, Faces Inquiry Over Misconduct Allegations" that was published by *The New York Times* on or about July 27, 2018.  (*See* ¶ 49; Ex. 21.) |
| July 27 New Yorker Article | Article entitled "Les Moonves and CBS Face Allegations of Sexual Misconduct" that was published by *The New Yorker* on or about July 27, 2018 and republished in print on August 6, 2018.  (*See* ¶¶ 11, 13, 49, 50–53, 63, 65–67, 70–71, 84, 86–87.) |

| **Term** | **Definition** |
| --- | --- |
| July 27 Statement of CBS Independent Directors | Statement From CBS Independent Directors Regarding *The New Yorker*, issued by the Independent Directors of CBS on July 27, 2018.  (*See* ¶ 145; Ex. 22.) |
| July 29 New York Times Article | Article entitled "CBS Board to Meet on Les Moonves's Role After Misconduct Allegations" that was published by *The New York Times* on or about July 29, 2018.  (*See* ¶ 147; Ex. 23.) |
| July 30 Current Report | Current Report of CBS on Form 8-K dated July 30, 2018 and filed with the SEC on July 30, 2018.  (Ex. 8.) |
| July 31 New York Times Article | Article entitled "Key Question For Les Moonves of CBS:  What Were You Thinking?" that was published by *The New York Times* on or about July 31, 2018.  (*See* ¶¶ 15, 76–77, 93; Ex. 24.) |
| Key Personnel Disclosures | The statement contained in CBS's Annual Reports that the "Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees," which Plaintiff alleges was false and/or misleading.  (*See* ¶¶ 95, 113, 127.) |
| Legal Proceedings Disclosure | The statement contained in CBS's Annual Reports that disclosed lawsuits, proceedings, and investigations, which Plaintiff alleges was false and/or misleading.  (*See* ¶ 128.) |
| MD&A | Management Discussion and Analysis. |
| Management Statements | The remarks attributed to Mr. Moonves and Mr. Rhodes, which Plaintiff alleges are false and/or misleading.  (*See* ¶¶ 8, 125, 130–31, 141–43.) |
| May 3 Washington Post Article | Article entitled "Charlie Rose's Misconduct was Widespread at CBS and Three Managers Were Warned, Investigation Finds" that was published by *The Washington Post* on or about May 3, 2018.  (*See* ¶¶ 130–31, 138; Ex. 19.) |

| **Term** | **Definition** |
| --- | --- |
| May 2016 Quarterly Report | Quarterly Report of CBS filed on Form 10-Q for the period ended March 31, 2016, dated May 4, 2016 and filed with the SEC on May 4, 2016.  (*See* ¶ 96; Ex. 5.) |
| Moonves Letter | Letter regarding the 2016 Business Conduct Statement signed by Mr. Moonves.  (*See* ¶ 102.) |
| Motion | The Motion Of CBS Corporation And Certain Individual Defendants To Dismiss The Amended Complaint. |
| Moving Defendants | CBS, Joseph R. Ianniello, Lawrence Liding, David Rhodes, David R. Andelman, Joseph A. Califano, Jr., William S. Cohen, Gary L. Countryman, Charles K. Gifford, Leonard Goldberg, Bruce S. Gordon, Linda M. Griego, Robert Klieger, Martha L. Minow, Doug Morris, and Shari E. Redstone.  As used herein, Moving Defendants excludes Mr. Moonves. |
| N&G Committee | Nominating & Governance Committee of the CBS Board. |
| NAI | National Amusements, Inc. |
| NAI-Affiliated Directors | Shari E. Redstone, David R. Andelman, and Robert N. Klieger. |
| New Yorker Articles | The July 27 New Yorker Article and the September 9 New Yorker Article, collectively. |
| November 20 Washington Post Article | Article entitled "Eight Women Say Charlie Rose Sexually Harassed Them—With Nudity, Groping, and Lewd Calls" that was published by *The Washington Post* on or about November 20, 2017.  (*See* ¶ 68; Ex. 14.) |
| November 21 CBS News Statement | Statement attributed to Mr. Rhodes in an article entitled "Charlie Rose Fired by CBS and PBS After Harassment Allegations" published by *The New York Times* on or about November 21, 2017.  (*See* ¶ 68; Ex. 15.) |

| Term | Definition |
|---|---|
| **Term** | **Definition** |
| November 28 New York Times Article | Article entitled "'If Bobbie Talks, I'm Finished':  How Les Moonves Tried to Silence an Accuser" that was published by *The New York Times* on or about November 28, 2018. (*See* ¶¶ 57–58, 80; Ex. 29.) |
| Pension Trust | Construction Laborers Pension Trust for Southern California. |
| Plaintiff | Construction Laborers Pension Trust for Southern California. |
| Proskauer | Proskauer Rose LLP. |
| PSLRA | The Private Securities Litigation Reform Act. |
| Putative Class Period | September 26, 2016 through December 4, 2018. |
| SEC | Securities and Exchange Commission. |
| September 9 Current Report | Current Report of CBS on Form 8-K dated September 9, 2018 and filed with the SEC on September 10, 2018.  (*See* ¶ 150; Ex. 9.) |
| September 9 New Yorker Article | Article entitled "As Leslie Moonves Negotiates His Exit From CBS, Six Women Raise New Assault And Harassment Claims" that was published by *The New Yorker* on or about September 9, 2018.  (*See* ¶¶ 12, 54–56, 72; Ex. 26.) |
| September 10 Wall Street Journal Article | Article entitled "CBS's Handling of Les Moonves Accusations Hampered by Battle for Control" that was published by *The Wall Street Journal* on or about September 10, 2018. (*See* ¶¶ 43, 63, 78; Ex. 27.) |
| September 12 New York Times Article | Article entitled "Threats and Deception:  Why CBS's Board Turned Against Leslie Moonves" that was published by *The New York Times* on or about September 12, 2018.  (*See* ¶¶ 14, 79, 88; Ex. 28.) |

| Term | Definition |
| --- | --- |
| Sexual Misconduct Allegations | Sexual misconduct allegations detailed in the July 27 New Yorker Article and other subsequent news reports.  (*See* ¶¶ 49–53.) |
| Website Disclosures | BCS, the Ethics Code, and the Moonves Letter, collectively. |
| Weil | Weil, Gotshal & Manges LLP. |

## PRELIMINARY STATEMENT[1]

In this putative class action for securities fraud, Plaintiff seeks to hold CBS and certain current and former CBS officers and directors liable for failing to disclose allegations of sexual misconduct against CBS's former CEO, Leslie Moonves, all of which concerned conduct that pre-dated the Putative Class Period by ten years or more.  According to Plaintiff, Defendants were duty-bound to disclose those allegations before they learned about them on July 27, 2018—when *The New Yorker* published an article revealing those allegations for the first time—because there had been unspecified public rumors that Mr. Moonves was about to experience a "#MeToo moment," and Mr. Moonves was "important" to the Company's success.  Plaintiff further alleges that Defendants knew but failed to disclose that sexual harassment problems at CBS were "pervasive" at the time, even though an independent investigation commissioned by the CBS Board found exactly the opposite:  that "harassment and retaliation are *not* pervasive at CBS."  How these alleged statements and omissions could amount to securities fraud is nowhere explained in the Amended Complaint and with good reason:  because under fundamental principles of securities law, they do not.

<u>First</u>, there can be no liability without a material misstatement or omission, which is wholly absent here.  For one thing, Plaintiff's allegations of "company-wide" harassment issues are too conclusory to be credited and are undercut by the very documents on which its Amended Complaint is based.  For another, the public rumors concerning Mr. Moonves cited in the Amended Complaint were vague and undetailed and contained no concrete allegations against him.  As such, there was nothing for Defendants to disclose since the federal securities laws require the disclosure of material facts, not mere innuendo.  In any event, even assuming that specific allegations against Mr. Moonves detailed in *The New Yorker* were known by Defendants beforehand—which the Amended Complaint nowhere alleges—the result would be the same.  There is no statute or regulation expressly requiring

---

[1] Capitalized terms have the meaning ascribed to them in the Table of Abbreviations.  (*See supra* at *xii–xix*.)

the disclosures that Plaintiff claims Defendants were obligated to make, and the disclosure rules Plaintiff seeks to invoke here (such as Item 303) do not provide otherwise.  Nor is there any freestanding legal duty to disclose uncharged, unadjudicated wrongdoing, violations of internal ethical codes, or corporate mismanagement, no matter how newsworthy such information might be. What is more, Plaintiff has not alleged (because it cannot) that the failure to disclose unknown allegations against Mr. Moonves or others rendered any of the disclosures challenged in the Amended Complaint—including the Company's Annual and Quarterly Reports, Proxy Statements, and Website Disclosures[2]—inaccurate, incomplete, or misleading in any way.  Those disclosures have nothing to do with any alleged sexual misconduct, are accurate and correct as stated, pre-date the public allegations against Mr. Moonves by months, if not years, and in the case of the Website Disclosures, are too general and aspirational to invite reasonable reliance for securities law purposes and are thus immaterial as a matter of law.

Second, the Amended Complaint fails to plead the essential element of scienter, either adequately or at all, which alone dooms Plaintiff's claims.  There is no plausible allegation that any of the Defendants had a motive to defraud.  The most Plaintiff can muster is that certain Employee Defendants sold stock during the Putative Class Period, but that is not enough to establish scienter absent particularized allegations that the timing and amount of such sales were "unusual" or "suspicious," which Plaintiff never alleges.  There is likewise no allegation that *any* of the Defendants had contemporaneous knowledge of the sexual misconduct allegations against Mr. Moonves. Indeed, the Amended Complaint is entirely silent on that point.  Nor is there *any* plausible allegation that the Defendants were reckless in any way, presumably because Plaintiff knows the opposite is true.  No reference is made to most of the Individual Defendants beyond the caption and the parties section of the Amended Complaint.  While three of the Individual Defendants are alleged to have

---

[2]  The full text of each of the Challenged Statements is set forth in Exhibit 1.

been aware of the unsubstantiated public rumors regarding Mr. Moonves, the Amended Complaint itself and the articles it cites dispel any notion that they turned a blind eye.  According to the articles, two, who sat on the Board committee responsible for considering such issues, engaged legal counsel to investigate, who—according to a *New York Times* article quoted by Plaintiff—advised them that there was "nothing to worry about with Mr. Moonves."  As alleged in other articles cited in the Amended Complaint, the third individual, who did not sit on the relevant Board committee, both confronted Mr. Moonves (who denied the rumors) and also asked members of the relevant Board committee to investigate; she was later told by members of the committee the results of the investigation.  Second Circuit law precludes any inference of scienter based on such facts expressly acknowledged in the Amended Complaint.

Third, Plaintiff's theory of loss causation fails as well, as neither the July 27 New Yorker Article nor the December 4 New York Times Article on which Plaintiff relies qualifies as a "corrective disclosure" under the law.

In sum, Plaintiff's attenuated theory of liability appears to be that Defendants committed securities fraud by failing to warn investors that, *if* sexual misconduct allegations were one day leveled against Mr. Moonves and *if* those allegations proved to be true, Mr. Moonves *might* be forced to leave the Company, which could damage its prospects for success.  But nothing in the federal securities laws requires such disclosures.  The Amended Complaint should therefore be dismissed with prejudice because Plaintiff has not stated and cannot state a viable claim.

## THE PARTIES

Plaintiff Pension Trust is an institutional investor that strategically acquired and sold shares of CBS Class B stock during the Putative Class Period.  (A.C. Schedule A.)

Defendant CBS is a mass media company that creates and distributes content across a variety of platforms to audiences around the world.  (*See* 2018 Annual Report (Ex. 4) at I-1.)  CBS

has issued two classes of common stock—voting Class A stock and non-voting Class B stock—both of which are listed and traded on the New York Stock Exchange.  (*Id.* at II-1.)

Defendant Leslie Moonves began serving as President and CEO of CBS in January 2006. (¶ 41.)[3]  Mr. Moonves separated from CBS on September 9, 2018, and was terminated for cause on December 17, 2018.  (¶¶ 18, 29.)

The Employee Defendants were all employed by CBS or one of its many subsidiaries during the Putative Class Period.  Defendant Joseph R. Ianniello has served as CBS's President and Acting CEO since September 9, 2018, and previously served as CBS's Chief Operating Officer.  (¶ 30.) Defendant Lawrence Liding served as CBS's Executive Vice President, Controller and Chief Accounting Officer.  (¶ 31.)  Defendant David Rhodes served as President of CBS News.  (¶ 32.)

The Director Defendants were all members of the CBS Board at different points during the Putative Class Period,[4] and are either (i) directors affiliated with NAI, which is the beneficial owner of a majority of CBS's Class A stock (*i.e.*, the NAI-Affiliated Directors), or (ii) Independent Directors.  (*See* ¶¶ 28–29, 33.)  All of the Director Defendants are highly accomplished individuals, with exemplary records in business, academia, law, and government.  (*See, e.g.*, 2018 Proxy Statement (Ex. 11) at 19–24.)

## THE ALLEGATIONS OF THE AMENDED COMPLAINT[5]

---

[3]   Paragraph 41 of the Amended Complaint correctly states that Mr. Moonves began serving as CBS's CEO in 2006. (2016 Annual Report at I-29.)  To the extent other paragraphs state that Mr. Moonves's tenure as CEO began earlier, they are incorrect.  (*See, e.g.*, ¶ 150.)

[4]   The names and dates of service of each Director Defendant are set forth in Exhibit 2.  The composition of the CBS Board changed during the Putative Class Period due to, among other things, the settlement of the litigation described *infra* at n.27.  In addition, the Amended Complaint asserts claims against some individuals who were not members of the CBS Board at the time certain of the Challenged Statements were made.

[5]   The background set forth herein is drawn from the non-conclusory allegations of the Amended Complaint, which are accepted as true solely for the purpose of this Motion.  *See Barrett v. PJT Partners Inc.*, No. 16-cv-2841, 2017 WL 3995606, at *3 (S.D.N.Y. Sept. 8, 2017).  The background is also drawn from "(1) . . . documents . . . incorporated in [the Amended Complaint] by reference, (2) documents 'integral' to the [Amended Complaint] and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [D]efendant[s]' motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the [Amended Complaint], (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission,

A.        **CBS Terminates Charlie Rose Amidst Allegations of Sexual Impropriety.**

On November 20, 2017, shortly after *The New Yorker* published its exposé of the film producer Harvey Weinstein, *The Washington Post* published an article detailing alleged sexual misconduct by Charlie Rose against eight women who worked on the *Charlie Rose* show.[6]  (¶¶ 7, 68.) The November 20 Washington Post Article noted that, while Mr. Rose was a contributing correspondent for CBS News's *60 Minutes* and co-host of *CBS This Morning*, none of the women who made accusations against Mr. Rose worked for CBS, and CBS "[had] no records of sexual harassment complaints about Charlie Rose."  (Nov. 20 Wash. Post Article (Ex. 14) at 4.) Nevertheless, CBS News "fired Rose shortly after the report ran."  (¶ 68.)

Following Mr. Rose's termination, the head of CBS News (Mr. Rhodes) issued a statement to employees emphasizing the importance of maintaining a harassment-free workplace (Nov. 21 CBS News Statement (Ex. 15) at 3), and CBS News hired Proskauer, a highly regarded law firm with expertise in sexual harassment matters, to conduct an internal investigation of the allegations against Mr. Rose and the culture at CBS News more generally (July 27 N.Y. Times Article (Ex. 21) at 3).

---

and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence."  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 352 n.1 (S.D.N.Y. 2008) (citation omitted).  To the extent such materials are inconsistent with the allegations of the Amended Complaint, the Court should not accept the Amended Complaint's allegations as true or draw any inferences in Plaintiff's favor.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001) (noting dismissal was appropriate where "conflicting pleadings [] make no sense, or [] would render a claim incoherent, or [] are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice").  Defendants vigorously deny the claims asserted in the Amended Complaint and specifically reserve the right to challenge the Amended Complaint's allegations in the event the Court denies this Motion.  In addition, although this memorandum presents background drawn from certain news reports cited, referenced, or incorporated in the Amended Complaint, Defendants do not concede that those reports are accurate or complete.  Defendants reserve the right to challenge the accuracy and completeness of all such reports in connection with this Action.  Also, to the extent that the Amended Complaint and/or documents cited, referenced, or incorporated therein reflect or contain information that is or may be subject to the attorney-client privilege, the attorney work product doctrine, or any other privilege, any reference to such information in this memorandum is simply a recitation of the facts alleged by Plaintiff and is not intended to waive any privilege or other legal protection.

[6]      The *Charlie Rose* show, which aired on PBS, was a production of Charlie Rose Inc. and was filmed at Bloomberg studios, neither of which were affiliated with CBS.  (*See* Nov. 20 Wash. Post Article (Ex. 14) at 3, 5.)

While the CBS News Investigation was ongoing, *The Washington Post* published a second article regarding allegations of sexual misconduct against Mr. Rose, this time including allegations from CBS personnel.  (¶ 69.)  In response to a request for comment, CBS News issued a statement indicating (among other things) that it was "work[ing] to strengthen existing systems to ensure a safe environment where everyone can do their best work" and that its efforts in that regard were ongoing.  (May 3 Wash. Post Article (Ex. 19) at 2.)[7]

### B.   Unsubstantiated Public Rumors Begin To Surface That Mr. Moonves Is About To Experience A "#MeToo Moment."

Around January 2018, unspecified public rumors[8] began to circulate that Mr. Moonves was about to have a "#MeToo moment" and that allegations regarding his purported sexual misconduct were about to break in the press.  (¶¶ 15, 78.)  The Amended Complaint is silent on the substance and source of these rumors.  (*See id.*)

Upon hearing such rumors, Ms. Redstone promptly informed two CBS Directors who sat on the N&G Committee, Mr. Gordon and Ms. Minow, and asked the N&G Committee to "investigate Mr. Moonves's past."[9]  (¶¶ 78–79.)  Ms. Redstone also confronted Mr. Moonves and "point-blank" asked whether there was any truth to the rumors.  (¶ 78; July 31 N.Y. Times Article (Ex. 24) at 1.)  Mr. Moonves explicitly denied any wrongdoing during his discussion with Ms. Redstone.  (Sept. 10 Wall St. J. Article (Ex. 27) at 1 ("She phoned Mr. Moonves, and he told her the same ['there was nothing to it'].").)

---

[7]   Mr. Rhodes, who was quoted as having denied prior knowledge of Mr. Rose's sexual misconduct (May 3 Wash. Post Article (Ex. 19) at 3), is also quoted in the Amended Complaint as having made statements that are supportive of efforts to eradicate sexual harassment in the workplace (¶ 130).

[8]   *See, e.g.*, Exs. 16–18.

[9]   The N&G Committee, which is comprised solely of certain Independent Directors, is responsible for, among other things, "crisis management" at the Company.  (*See* 2018 Proxy Statement (Ex. 11) at 5, 11–12.)  Ms. Redstone is not and was not a member of the N&G Committee.  (*See id.* at 9; 2017 Proxy Statement at 9; 2016 Proxy Statement at 10.)

The N&G Committee promptly engaged Weil, another well-respected law firm, to investigate the public rumors regarding Mr. Moonves.  (¶ 79.)  As part of its investigation, Weil interviewed Mr. Moonves in January 2018.  (*Id.*)  According to a *New York Times* article cited in the Amended Complaint, once its work concluded, Weil informed representatives of the N&G Committee, that, while Mr. Moonves had disclosed that "there might have been a few incidents before he came to CBS, there was no cause for concern now."  (Sept. 12 N.Y. Times Article (Ex. 28) at 3.)  According to another *New York Times* article cited in the Amended Complaint, Weil then counseled that there was "nothing to worry about with Mr. Moonves."  (Nov. 28 N.Y. Times Article (Ex. 29) at 5–6.)  According to a *Wall Street Journal* article cited in the Amended Complaint, in turn, Ms. Redstone was advised by members of the N&G Committee of the results of Weil's investigation.  (*See* Sept. 10 Wall St. J. Article (Ex. 27) at 1 (Ms. Redstone was told "[t]here was nothing to it")).

In April 2018, additional unspecified, public rumors about Mr. Moonves briefly arose again (¶ 78), but the Amended Complaint does not allege that these rumors were substantiated, that further allegations concerning Mr. Moonves came to the CBS Board's attention, or that any complaints against Mr. Moonves were lodged with the Company.

## C.    The Board Investigates The Sexual Misconduct Allegations Against Mr. Moonves.

On Friday, July 27, 2018, various news outlets reported that investigative journalist Ronan Farrow would soon publish an article in *The New Yorker* regarding sexual misconduct allegations against Mr. Moonves.  (¶ 49.)  Later that day, *The New Yorker* published an article by Mr. Farrow detailing allegations by six women of sexual misconduct by Mr. Moonves that allegedly occurred "between the nineteen-eighties and the late aughts," with the most recent incident allegedly occurring in 2006—*ten years* before the Putative Class Period began.  (¶ 11.)  The July 27 New Yorker Article also reported that, "[a]ccording to CBS, there have been no misconduct claims and

no settlements against Mr. Moonves during his twenty-four years at the network." (July 27 New Yorker Article at 3.)

The Independent Directors immediately issued a statement that "[a]ll allegations of personal misconduct are to be taken seriously" and that "[they] have committed to investigating claims that violate the Company's clear policies in that regard." (July 27 Statement of CBS Independent Directors (Ex. 22) at 1.)[10]

On Monday, July 30, 2018 (the next business day), the CBS Board announced its intention to engage outside counsel to conduct an independent investigation. (July 30 Current Report (Ex. 8) at Ex. 99.) On Wednesday, August 1, 2018, the CBS Board announced that it had hired Debevoise (led by Mary Jo White, former U.S. Attorney for the Southern District of New York and former Chair of the SEC) and Covington (led by former federal prosecutor Nancy Kestenbaum) to "conduct a full investigation of the allegations in recent press reports about Chairman and CEO Leslie Moonves, CBS News and cultural issues at all levels of CBS." (¶ 59; Aug. 1 Board Statement (Ex. 25) at 1.)[11]

### D.      Mr. Moonves Separates From CBS.

On September 9, 2018, while the privileged and confidential Internal Investigation was underway, *The New Yorker* published a second article containing additional sexual misconduct allegations against Mr. Moonves by six more women. (¶¶ 54, 72.) Like the July 27 New Yorker Article, the allegations in the September 9 New Yorker Article dated from the "nineteen-eighties and

---

[10]   Because Ms. Redstone was not included in the Independent Directors' statement, she separately made a statement that same day, expressing her "hope[] that the investigation of these allegations is thorough, open and transparent." (July 29 N.Y. Times Article (Ex. 23) at 2.)

[11]   Since the CBS News Investigation was not yet complete at the time the July 27 New Yorker Article was published, the CBS Board determined to consolidate it into the Internal Investigation. (*See* Sept. 10 Wall St. J. Article (Ex. 27) at 3.)

the early two-thousands," long before the start of the Putative Class Period.  (Sept. 9 New Yorker Article (Ex. 26) at 1.)[12]

Following the publication of the September 9 New Yorker Article, "CBS announced that Mr. Moonves would be stepping down as the Company's Chairman and CEO."[13]  (¶ 12.)

### E.    The CBS Board Terminates Mr. Moonves For Cause.

On December 17, 2018, the CBS Board issued a statement announcing that "its investigation of former Chairman and CEO Leslie Moonves, CBS News and cultural issues at CBS" had been "completed."  (Dec. 17 Board Statement (Ex. 10) at 1.)  With respect to Mr. Moonves, the CBS Board determined that "there are grounds to terminate for cause, including his willful and material misfeasance, violation of Company policies and breach of his employment contract, as well as his willful failure to cooperate fully" with the Internal Investigation.  (*Id.*)  Accordingly, the CBS Board determined that "Mr. Moonves will not receive any severance payment from the Company."  (*Id.*)

With respect to cultural issues, the CBS Board announced that the Investigators had concluded that "*harassment and retaliation are not pervasive at CBS*," although there had been "incidents of improper and unprofessional conduct" in the past, and instances where employees believed "HR and the Company did not hold high performers accountable for their conduct and protect employees from retaliation."  (*Id.* (emphasis added).)  In order to minimize the risk of such incidents going forward, the CBS Board also announced that, together with the "Company's new management," it had "already begun to take robust steps to improve the working environment for all employees."  (*Id.*)[14]

---

[12]   The New Yorker Articles also contained allegations of sexual misconduct against other personnel at CBS News and discussed accusations of a "broader culture of sexual harassment" more generally.  (*See* ¶¶ 63, 72.)

[13]   The terms of Mr. Moonves's separation are set forth in a written separation agreement, which the Company publicly filed with the SEC.  (Sept. 9 Current Report (Ex. 9) at Ex. 10(b).)

[14]   Among other things, the Company had "appointed a new Chief People Officer," was "actively engaged in ways to enhance and reimagine the Human Resources function," and had "retained outside expert advisors to develop other

F.      **The Challenged Statements.**

Plaintiff does not identify any false or misleading statements upon which it relied in purchasing CBS stock.  Instead, the crux of the Amended Complaint is that Defendants "failed to disclose" information concerning the Sexual Misconduct Allegations against Mr. Moonves revealed in the July 27 New Yorker Article and other subsequent news articles, and the concomitant risk that Mr. Moonves "would be forced to leave the Company" as a result.  (¶¶ 2, 6, 19, 98.)  According to Plaintiff, Defendants should have disclosed the Sexual Misconduct Allegations *prior to July 2018*—before the Internal Investigation had even begun—and by "failing" to do so, rendered certain prior statements and disclosures made by the Company and/or its personnel (*i.e.*, the Challenged Statements) false and misleading when made.  Plaintiff further alleges that, as a result of those omissions and alleged misstatements, the price of CBS stock declined on July 27, 2018, when the first of the two New Yorker Articles was published, and on December 4, 2018, when *The New York Times* purported to publish excerpts of an alleged "draft report" prepared in connection with the privileged and confidential Internal Investigation.  (¶¶ 19–21, 154–56.)

The Challenged Statements generally fall into three categories.  (*See* Ex. 1.)  <u>First</u>, Plaintiff challenges disclosures contained in various SEC filings on topics unrelated to Mr. Moonves's alleged sexual misconduct or CBS's culture.  These include the risk factor disclosure in CBS's Annual Reports headed "The Loss of Key Personnel, Including Talent, Could Disrupt the Management or Operations of the Company's Business and Adversely Affect Its Revenue" (*i.e.*, the Key Personnel Disclosures), a similar disclosure in the Company's Proxy Statements (*i.e.*, the Critical Link Disclosures), as well as a description of the Company's governance structure more generally (*i.e.*, the Corporate Governance Systems Disclosures).  <u>Second</u>, Plaintiff attacks certain statements made in

---

initiatives for promoting a workplace culture of dignity, transparency, respect and inclusion."  (Dec. 17 Board Statement (Ex. 10) at 1.)

the Company's BCS and Ethics Code and in the Moonves Letter (*i.e.*, the Website Disclosures), all of which publicly appear only on the Company's website, as well as a brief description of the two codes of conduct in the Company's Proxy Statements.  <u>Third</u>, Plaintiff challenges certain public statements made by Mr. Moonves, Mr. Rhodes, and CBS News, including remarks on the #MeToo Movement and the discharge of Mr. Rose.

## LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiff must "plead enough facts to state a claim to relief that is plausible on its face."  *Progressive Credit Union v. City of New York*, 889 F.3d 40, 48 (2d Cir. 2018) (citation omitted).  A complaint cannot rest on "conclusory allegations or legal conclusions couched as factual [conclusions]," *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citations omitted), nor are "threadbare recitals of the elements of a cause of action" sufficient to withstand a motion to dismiss, *Cox v. Perfect Bldg. Maint. Corp.*, No. 16-cv-7474, 2017 WL 3049547, at *2 (S.D.N.Y. July 18, 2017); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In addition, where Section 10(b) claims are asserted, a plaintiff must also satisfy the heightened pleading standards under the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure.  *See Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 37 (2d Cir. 2018).  A complaint that fails to satisfy these exacting pleading standards must be dismissed.  *See, e.g.*, *Barrett v. PJT Partners Inc.*, No. 16-cv-2841, 2017 WL 3995606, *3 (S.D.N.Y. Sept. 8, 2017).

## ARGUMENT

## I.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR VIOLATION OF SECTION 10(b) AND RULE 10(b)–5.

To state an actionable claim under Section 10(b) of the Securities Exchange Act and Rule 10(b)–5 thereunder, a complaint must allege, *inter alia*, (1) "a material misrepresentation or omission by the defendant," (2) "scienter," and (3) "loss causation."  *Stoneridge Inv. Partners, LLC v.*

*Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citation omitted).  Because the Amended Complaint

fails to allege these three essential elements—either adequately or at all—dismissal is required.

A.    **Defendants Were Not All "Makers" Of The Challenged Statements.**

As a preliminary matter, only the "maker" of a false or misleading statement is liable under

Rule 10b–5(b), with a "maker" being "the person or entity with ultimate authority over the

statement, including its content and whether and how to communicate it."  *Janus Capital Grp., Inc. v.

First Derivative Traders*, 564 U.S. 135, 142 (2011).[15]  Ignoring *Janus*, the Amended Complaint broadly

alleges that "Defendants" are responsible for the 18 Challenged Statements identified in the

Amended Complaint (¶¶195–96) as if each Defendant signed, certified, or uttered each of those

statements or had ultimate authority over their contents.[16]  But that is obviously not the case.[17]  For

example, the Director Defendants are alleged to have made only those Challenged Statements in the

Company's Annual Reports.  Only those Defendants who expressly made the challenged oral

statements or signed or certified the documents containing the challenged written disclosures or

statements can be legally liable for their contents under Rule 10b–5(b).  Thus, claims against

Defendants who were not "makers" under *Janus* should be dismissed.

B.    **Plaintiff Fails To Adequately Plead A Material Misstatement Or Omission.**

The Amended Complaint alleges that the 18 Challenged Statements were false and

misleading all for the same ostensible reason:  because they did not disclose the rumors and

allegations concerning sexual misconduct by Mr. Moonves and others affiliated with certain CBS

subsidiaries.  (*See* ¶¶ 98, 106–11, 123–24, 129, 140, 144.)  The Amended Complaint fails to

---

[15]  Aside from a handful of boilerplate allegations that Defendants "engaged in a scheme to deceive the market" (¶ 176), the Amended Complaint focuses exclusively on Defendants' supposed misstatements and omissions, pursuing a fraud theory under Rule 10b–5(b).

[16]  Plaintiff's use of group pleading (*see, e.g.*, ¶ 196) does not alter the result because the "group-pleading/group-published documents doctrine is insufficient to meet the requirements of *Janus* . . . ."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 640–41 (S.D.N.Y. 2017).

[17]  A chart detailing which Defendants made each of the Challenged Statements is attached as Exhibit 3.

adequately plead an actionable misstatement or omission, however, because (i) it improperly uses puzzle pleading, (ii) CBS had no duty to disclose the Sexual Misconduct Allegations, and (iii) CBS's non-disclosure of the Sexual Misconduct Allegations did not render the Challenged Statements materially false or misleading as a matter of law.

### 1.   *Plaintiff Improperly Deploys "Puzzle Pleading."*

The Amended Complaint fails at the threshold because it improperly relies on puzzle pleading—*i.e.*, the practice of offering lengthy block quotes, sometimes pages long and sometimes with random words or sentences bolded and italicized, followed by a lengthy list of known or disregarded information that is repeatedly referenced with no explanation of the basis for the plaintiff's claim. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012). As numerous courts in this Circuit have held, puzzle pleading does not satisfy the requirements of the PSLRA or Rule 9(b) because it fails to "demonstrate with specificity why and how each statement is materially false or misleading." *Id.* at 38 (citation omitted).

Yet, "puzzle pleading" is all that the Amended Complaint offers. (*See, e.g.*, Key Personnel Disclosures cited at ¶¶ 95–97, 114–17, 122, 127, 139; Critical Link Disclosures cited at ¶¶ 99, 118, 132; BCS cited at ¶¶ 100–04, 119–20, 134–35.) Dismissal of the Amended Complaint is warranted on this basis alone. *See, e.g., In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16-cv-3495, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017) (dismissing puzzle pleading complaint), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (same).

### 2.   *Non-Disclosure Of The Sexual Misconduct Allegations Is Not Actionable.*

Omissions are not "actionable under the securities laws" absent "a duty to disclose" the omitted information. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100–01 (2d Cir. 2015) (citation omitted); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988); *Ong v. Chipotle Mexican Grill, Inc.*,

No. 16-cv-141, 2017 WL 933108, at *8 (S.D.N.Y. Mar. 8, 2017).  The relevant question here, therefore, is not whether "a reasonable investor would very much like to [have] know[n]" about the Sexual Misconduct Allegations at an earlier point in time.  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993); *see also Holbrook v. Trivago N.V.*, No. 17-cv-8348, 2019 WL 948809, at *16 (S.D.N.Y. Feb. 26, 2019) ("[A] duty to disclose does not spring solely from plaintiffs' interest in that omitted fact.").  Rather, the question is whether CBS had a duty to disclose the Sexual Misconduct Allegations that it breached by failing to do so.

To make out such a duty, a plaintiff must either (i) identify "a statute or regulation [that] requir[ed] disclosure" of the omission, or (ii) show that, absent the omission, a statement was rendered "inaccurate, incomplete, or misleading."  *Stratte-McClure*, 776 F.3d at 101 (citation omitted).  Plaintiff does neither.

### a.      *Item 303 Of Regulation S-K Does Not Apply.*

Apparently conceding that no law, rule, or regulation expressly requires the disclosure of allegations that Company personnel have engaged in sexual harassment in the workplace or other sexual misconduct, Plaintiff points to Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303 (2019) (cited at ¶¶ 159–67), which sets forth certain disclosures that must be included in the MD&A section of a registrant's Form 10-K.  Among other things, Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  *Id.* § 229.303(a)(3)(ii).  Item 303 has no bearing here for at least the following three reasons.

First, Item 303 has no application to the types of disclosures at issue in this case.  It does not apply to the Website Disclosures, Management Statements, or the CBS News Statement, as they were not contained in any SEC filing.  *See* Safe Harbor for Forward Looking Statements, 59 Fed.

Reg. 52723 (Oct. 19, 1994) ("MD&A requirements [are] applicable to the Form 10-K and other required filings[.]").  Nor does Item 303 apply to the Challenged Statements in CBS's Proxy Statements and the Financial Results Press Release.  (*See id.*)  It does not even apply to the Challenged Statements in the Company's Annual Reports because those statements did not appear in the MD&A section and, in any event, were governed by different regulations.[18]

 Second, alleged sexual misconduct is not the type of information that must be disclosed under Item 303 in an MD&A section in any event.  As SEC guidance makes clear, Item 303 mandates the disclosure of the registrant's financial information or, if used to manage the business, non-financial information concerning relevant extrinsic factors, such as "external or macro-economic matters" or "industry-specific measures" used to compare registrants within the industry.  *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, 68 Fed. Reg. 75,056 (Dec. 29, 2003).  Consistent with the SEC's guidance, courts have declined to apply Item 303 where the information at issue falls outside those two categories.  *See, e.g.*, *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1211 (S.D.N.Y. 1996) (disclosure of marketing strategies and plans not required under Item 303).  Indeed, prior attempts to characterize sexual misconduct information as the type of information requiring disclosure under Item 303 have failed.  In *Lopez v. CTPartners Executive Search Inc.*, for example, the court rejected the argument that Item 303 required the defendant company to disclose sexual misconduct allegations against its executive before those allegations became public in an article published by *The New York Post*, explaining that:

 CTPartners did not have an affirmative obligation, under Item 303, to disclose its allegedly coarse and unsavory work environment.  However hostile CTPartners' workspace may have been to women—and treating the facts alleged as true, the environment at the Company could potentially have qualified as hostile under federal,

---

[18] For instance, the Key Personnel Disclosures appeared in the "Item 1A Risk Factors" section, and thus were governed by 17 C.F.R. § 229.503(c) (2019).  Similarly, the Legal Proceedings Disclosure appeared in the "Item 3 Legal Proceedings" section and was governed by 17 C.F.R. § 229.103 (2019).

state, and/or local anti-discrimination laws—such matters are outside the scope of what Item 303 requires be disclosed. . . .   [T]he offensive behavior of certain CTPartners' executives . . . does not pertain to the Company's operational results or financial condition.

173 F. Supp. 3d 12, at 33–34 (S.D.N.Y. 2016).

Third, Item 303 does not apply unless there is a trend that is "presently known," *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013), to have a "material[] impact [on] the company's financial condition," *In re Coty Inc. Sec. Litig.*, No. 14-cv-919, 2016 WL 1271065, at *5 (S.D.N.Y. Mar. 29, 2016) (citation omitted).   It is not enough that the trend or uncertainty is "reasonably possible," *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 583–84, or that the registrant "should have known" of the existing trend, event, or uncertainty, *In re Deutsche Bank AG Sec. Litig.*, No. 09-cv-1714, 2016 WL 4083429, at *26 (S.D.N.Y. July 25, 2016) (citation omitted). Nor is the duty to disclose triggered where the impact on the registrant's operations and revenues is unknown.   *See, e.g.*, *Lopez*, 173 F. Supp. 3d at 37 (holding that Item 303 did not require disclosure of sexual misconduct allegations because defendant "had no basis for assessing" the impact "on its operations and revenues").[19]   None of those requirements are adequately alleged to have been met here.  (*See* ¶¶ 165–67.)   Among other reasons, there is no allegation that CBS had a basis, at the time the Challenged Disclosures were made, to assess what impact disclosure of the Sexual Misconduct Allegations might have on net sales or revenues or on income from continuing operations.  (*See id.*)

b.     *CBS Had No Duty To Disclose Rumors Or Allegations Of Sexual Misconduct.*

The Amended Complaint also appears to suggest that CBS had some obligation to voluntarily disclose the Sexual Misconduct Allegations given the nature of the underlying allegations. (*See, e.g.*, ¶¶ 98(a), 123(a).)  But no such duty exists.

---

[19]   *See also In re Hi–Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557, 2013 WL 6233561, at *11 (S.D.N.Y. Dec. 2, 2013) (holding no duty to disclose adverse trends or uncertainties regarding business relationship with another company because, among other reasons, "Item 303 imposed no duty . . . to anticipate" problems that could arise in the future).

For one thing, a corporation has no duty to disclose mere allegations of wrongdoing. *See, e.g., Gruber v. Gilbertson*, No. 16-cv-9727, 2018 WL 1418188, at *10 (S.D.N.Y. Mar. 20, 2018) (no duty to disclose "potentially negative information" that company has not had an opportunity to evaluate). Nor is a corporation "require[d] . . . to accuse itself of wrongdoing," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 77 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006) (citation omitted), or otherwise engage in the "rite of confession." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 808 (S.D.N.Y. 2018) (citation omitted).

For another, even if they had been substantiated, the Sexual Misconduct Allegations would not give rise to a disclosure obligation.  Indeed, to impose such an obligation would be antithetical to the Supreme Court's clear directive that the federal securities laws do "not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) (citation omitted).  Applying *Santa Fe*, courts have regularly held that a corporation has no affirmative duty to "disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies." *In re UBS AG Sec. Litig.*, No. 07-cv-11225, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) (citations omitted); *see also Boca Raton*, 506 F. App'x at 36 ("Section 10(b) . . . does not reach mere 'instances of corporate mismanagement.'" (citation omitted)); *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) ("[S]ection 10(b) was not designed to regulate corporate mismanagement." (citation omitted)).

Application of these time-honored precepts does not turn on the *type* of internal misconduct or mismanagement alleged, or the *degree* of social opprobrium such misconduct or mismanagement might attract or warrant:  there is no "freestanding legal duty" to disclose internal misconduct "no matter how unseemly the scandal was and no matter how significant the scandal would have been to the market." *Das*, 332 F. Supp. 3d at 808 (citation omitted).  Were it otherwise, a corporation would

have a higher duty to disclose allegations that its CEO was guilty of sexual misconduct than allegations that its CEO was involved in an unlawful bribery scheme, which plainly is not the law. *See id.* As with other forms of alleged internal corporate mismanagement, ethical violations, or breaches of law, therefore, there is no duty to disclose allegations of sexual harassment or other forms of alleged sexual misconduct, whether against company policy or not. *See, e.g.*, *Retail Wholesale, & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (no duty to disclose CEO's violation of company's ethics code and alleged sexual harassment); *Lopez*, 173 F. Supp. 3d at 38 (no duty to disclose "CEO['s] or other executives' inappropriate behavior or allegations regarding the Company's allegedly toxic culture").

>            c.       *Non-Disclosure Of The Sexual Misconduct Allegations Did Not Render The Challenged Statements False Or Misleading.*

Having failed to demonstrate that CBS had an affirmative obligation to disclose the Sexual Misconduct Allegations, Plaintiff's only alternative is to show that CBS's failure to disclose rendered the Company's affirmative disclosures and statements "inaccurate, incomplete, or misleading." *Stratte-McClure*, 776 F.3d at 101 (citation omitted). The Amended Complaint fails to do so.

>            i.       SEC Filings.

Settled law forecloses Plaintiff's securities-fraud theory based on CBS's SEC filings. To render a disclosure misleading, an alleged omission must be "sufficiently connected" to the disclosure. *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012). Critically, that threshold cannot be satisfied unless the existing disclosure "suggest[s] that the undisclosed improper activity alleged by Plaintiff was not occurring." *Id.* Plaintiff's allegations regarding the Annual Report Disclosures, the Quarterly Report Disclosures, the Proxy Statement Disclosures, and the Current Report Disclosure all fail as a matter of law under this standard. None of these disclosures was even remotely connected to the topic of sexual misconduct, nor do they convey any information regarding the occurrence (or non-occurrence) of

sexual harassment within the Company.  As such, Plaintiff's implausible attempt to tie the Sexual

Misconduct Allegations to these disclosures cannot make out a claim under Section 10(b).

**_Key Personnel and Critical Link Disclosures._**[20]  Plaintiff claims it was false and

misleading for CBS to disclose that Mr. Moonves was a "key" executive whose "loss . . . could have

a material adverse effect" without disclosing the Sexual Misconduct Allegations against

Mr. Moonves or at least the possibility that Mr. Moonves would leave the Company soon.  (¶¶ 95,

98, 114, 123, 127, 129.)  As a preliminary matter, no aspect of these disclosures is alleged to be false.

The Amended Complaint effectively concedes that these disclosures were accurate by repeatedly

acknowledging and asserting that Mr. Moonves was important to the Company.  (*See, e.g.*, ¶¶ 3, 38–

42, 98, 123, 148, 153, 165.)  Nor can it be said that these disclosures were inaccurate for failing to

disclose a known risk since it is undisputed that Mr. Moonves did not separate from the Company

until months (or even years) after these disclosures were made, and there is no allegation that, at the

time of the disclosures, Mr. Moonves's separation was contemplated.

Nothing about these disclosures makes them misleading either.  The plain language of these

disclosures makes no guarantee or other factual representation regarding whether Mr. Moonves had

ever engaged in or was even presently engaged in any sexual misconduct.  Nothing about these

disclosures implies anything about the possibility that Mr. Moonves would leave the Company.

Thus these disclosures are not "sufficiently connected to [the Sexual Misconduct Allegations] to

make [them] misleading," regardless of Mr. Moonves's importance to the Company or the serious

---

[20]   None of the Quarterly Reports mentions the Key Personnel Disclosures and some do not include a risk factor
section at all.  (*See, e.g.*, May 2016 Quarterly Report (Ex. 5); Aug. 2017 Quarterly Report (Ex. 6).)  Nevertheless, Plaintiff
alleges that CBS incorporated the Key Personnel Disclosures into its Quarterly Reports for the first quarter of 2016
through the first quarter of 2018.  (*See* ¶¶ 96–97, 114, 116–17, 122, 139.)  That is incorrect.  CBS never attached its
Annual Report to any of the Quarterly Reports or expressly stated that its Annual Report was incorporated by reference
into any of the Quarterly Reports, both of which are legal requirements to incorporate any information or document by
reference into an SEC filing.  *See* 17 C.F.R. § 240.12b–23(a)–(b) (2018); *see also Markewich v. Adikes*, 422 F. Supp. 1144,
1147 (E.D.N.Y. 1976) ("Absent a specific declaration of incorporation, a mere mention of the annual report does not
incorporate it by reference.").

nature of the allegations against him.  *In re ITT Educ. Servs., Inc.*, 859 F. Supp. 2d at 579 (citation omitted).  Indeed, in analogous cases involving allegations of sexual and other misconduct by senior executives, courts have held that such "key personnel" disclosures are not actionable.  *See, e.g.*, *Retail Wholesale*, 845 F.3d at 1273, 1278 (affirming grant of dismissal of Section 10(b) claims where plaintiff alleged that company failed to disclose CEO's sexual harassment, despite the fact that the company's SEC filings warned that "loss of executives and key employees could have significant impact on our operations"); *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 718–19 (S.D.N.Y. 2018) (holding that failure to disclose that CEO was engaged in misconduct did not render inaccurate prior statements about how important he was to the company).[21]

**Legal Proceedings Disclosure.**  Plaintiff further alleges that it was false and misleading for CBS to disclose certain legal proceedings in its SEC filings but to omit any mention of the Sexual Misconduct Allegations in those disclosures.  (*See* ¶¶ 128–29.)  But this argument is contrary to the law.  The disclosure of a legal proceeding is governed by Item 103, which requires only the disclosure of "pending legal proceedings" and only to the extent that the amount involved in such proceeding "exceed[s] 10 percent of the current assets of the registrant."  17 C.F.R. § 229.103 (2019).  The Amended Complaint, however, nowhere identifies a single litigation or other legal proceeding *pending* against CBS *at the time of this disclosure* that should have been disclosed.  It simply alleges that there were a "plethora of lawsuits" and various "settlements" (¶ 85) without providing any information necessary to satisfy Item 103's disclosure requirements.[22]

---

[21]  The fact that the risk ultimately materialized *after* the disclosure was made (*i.e.*, Mr. Moonves's separation) also does not render the disclosure misleading, as that would constitute impermissible "fraud by hindsight."  *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) ("An earlier statement is not somehow made misleading simply because it failed to foretell a . . . problem which later materialized.").

[22]  To the extent that the Amended Complaint contends that the non-disclosure here implied that there was no litigation risk stemming from sexual misconduct allegations, CBS "was not required to make disclosures predicting . . . litigation," and thus "Defendants' failure to disclose all possible future litigation is not actionable under [S]ection 10(b)."  *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d at 377–78 (citation omitted); *accord In re Lions Gate Enter. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016).

***Current Report Disclosure.***  The Amended Complaint also alleges that the Financial Results Press Release was false and misleading because it omitted any mention of the Sexual Misconduct Allegations.  (*See* ¶ 126.)  But that press release, including the statement attributed to Mr. Moonves, is focused entirely on CBS's financial results.  It says nothing about CBS's culture or sexual misconduct allegations.  As such, these statements are not "sufficiently connected to [the Sexual Misconduct Allegations] to make [them] misleading."  *In re ITT Educ. Servs., Inc.*, 859 F. Supp. 2d at 579 (citation omitted).  In any event, "[a]ccurately reported financial statements . . . cannot become actionable simply because companies do not simultaneously disclose some wrongdoing that may have contributed to the company's financial performance."  *Fogel v. Vega*, No. 18-650-cv, 2018 WL 6753799, at *4 (2d Cir. Dec. 26, 2018).

***Corporate Governance Systems Disclosure.***  The Amended Complaint further alleges that it was misleading for CBS to describe the policies governing the CBS Board's oversight of the business in its Proxy Statements without disclosing the Sexual Misconduct Allegations or what Plaintiff contends were apparent oversight failures that allowed the alleged conduct underlying the Sexual Misconduct Allegations to occur.  (*See* ¶¶ 133, 137.)  Any such contention is belied by the factual allegations in the Amended Complaint itself:  no Individual Defendant is alleged to have known of ongoing sexual misconduct on the part of Mr. Moonves or other CBS personnel at the time these disclosures were made.  Furthermore, as detailed above, promptly upon learning of rumors alleging that Mr. Moonves had engaged in sexual misconduct and, later, of news articles reporting on such allegations, the members of the CBS Board took immediate steps to investigate the rumors and allegations and/or to take appropriate action once the facts were known.  (*See supra* at 6–7.)  In any case, there was nothing untrue about the fact that the Company had oversight policies in place, which is all that the disclosures provide.  Nothing about these disclosures suggests that these governance systems were foolproof or that unlawful or unethical conduct could not occur

despite them.  For these reasons and the reasons that follow, the Proxy Statement Disclosures

cannot form the basis of a viable Section 10(b) claim.

     ***Statements Regarding the BCS and Ethics Code.***  The Proxy Statements make a number

of references to the existence of the BCS and the Ethics Code and to what those documents state or

provide, including that (i) "[t]he BCS provides numerous avenues for employees to report

violations," (ii) "[t]he BCS also provides that the Company will protect anyone who makes a good

faith report of a violation of the BCS and that retaliation against an employee who makes a good

faith report will not be tolerated," and (iii) the Ethics Code "addresse[s] . . . a general obligation to

promote honest and ethical conduct within the Company."  (*See, e.g.*, ¶¶ 100–01, 103–05.)  The

Amended Complaint does not allege that the Proxy Statements misrepresented what either the BCS

or the Ethics Code provides, which it must for this claim to survive.  Plaintiff's real complaint

appears to be that the contents of the BCS and Ethics Code are themselves false and misleading.

That is not the case for the reasons set forth below.  (*See infra* at 22–26.)[23]

ii.     Website Disclosures.

     It is well understood that "[t]he fact that a code of conduct prohibits certain conduct by

employees" or prescribes certain policies and procedures in furtherance of certain ethical norms "is

*not* a factual representation that those policies will always be followed . . . or that they are 100%

effective."  *Barrett*, 2017 WL 3995606, at *6 n.6 (emphasis added) (citation omitted).  As such,

statements within codes of conduct and ethical codes are rarely actionable because their terms are

almost invariably "explicitly aspirational," *id.* at *5, or too general or vague to cause a reasonable

---

[23]   Plaintiff's assertion that the BCS and Ethics Code are "incorporated by reference" into the Proxy Statements
(¶¶ 100, 119, 124, 134) is incorrect as a matter of law for the same reasons described above (*see supra* n.20)—namely, CBS
never attached the BCS or the Ethics Code to any of its Proxy Statements or expressly stated that the BCS and Ethics
Code were incorporated by reference into any of the Proxy Statements.

investor to rely upon them, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).[24]

The Second Circuit recently affirmed these principles in *Singh v. Cigna Corp.*, 918 F.3d 57 (2d. Cir. 2019), holding that general statements in a corporate code of conduct "do not invite reasonable reliance" and "are not, therefore, *materially* misleading" as a matter of law. *Id.* at 60. In *Singh*, the plaintiff argued that statements in Cigna Corporation's ("Cigna") code of ethics, such as (i) Cigna had "established policies and procedures to comply with applicable requirements," (ii) "it's . . . important for every [Cigna] employee . . . to handle, maintain, and report on [Cigna's financial] information in compliance with all laws and regulations," and (iii) "[Cigna] ha[s] a responsibility to act with integrity in all [it] do[es]," were misleading due to the revelation of significant, longstanding violations of those policies. *Id.* at 61 (alterations in original) (citation omitted). The Second Circuit dismissed these statements as "textbook example[s] of 'puffery,'" reasoning that they were "tentative and generic" and "too general to cause a reasonable investor to rely upon them." *Id.* at 63–64 (citation omitted). The plaintiff's complaint, the Second Circuit concluded, was merely an "attempt to recast corporate mismanagement as securities fraud." *Id.* at 59–60.

The Challenged Statements contained in the BCS, the Moonves Letter, and the Ethics Code are no different as a matter of securities law from the types of statements at issue in *Singh* and should be dismissed for the same reasons. These general statements set forth the Company's expectations with regard to the conduct of its personnel and lay out procedures to be followed in the event of alleged violations. That much is clear from some of the very provisions Plaintiff attacks, whose language is expressly aspirational:

---

[24] *See also In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755–56 (S.D.N.Y. 2017) ("Because a code of ethics is inherently aspirational[,] it simply cannot be that every time a violation of that code occurs, a company is liable under federal law for having chosen to adopt the code at all." (alteration in original) (citation omitted)); *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15-cv-2106, 2017 WL 1169629, at *11 (S.D.N.Y. Mar. 28, 2017) (holding that a company's "mere adoption of a code of ethics, without statements assuring investors that its employees are in fact in compliance with the code, is not misleading" despite the fact that the CEO and CFO were alleged violators).

- "[w]e are **committed** to maintaining the highest standards in everything we do";

- **"[g]uiding our Company** is a strong and established ethical code" and "**we all have a responsibility** to uphold the highest standards of ethical and appropriate business actions"; and

- "CBS also **believes** in an environment that is free from workplace bullying and abusive conduct."

(¶¶ 102–03 (emphases added).)  None of these provisions nor anything else in the BCS, the Moonves Letter, or the Ethics Code could be reasonably read as an assurance that no violations had occurred or were occurring.  Indeed, these documents are entirely bereft of any "specific factual representation[s]" or guarantees. *Barrett*, 2017 WL 3995606, at *6; *see also In re PetroChina Co. Sec. Litig.*, 120 F. Supp. 3d 340, 360 (S.D.N.Y. 2015), *aff'd*, 15-cv-2528 (2d Cir. Mar. 21, 2016) (holding that the company's codes of ethics could not support securities claim because "they d[id] not claim that [the Company's] officers [were] abiding by them").

The other language in the BCS challenged by Plaintiff fares no better.  For example, Plaintiff cites various provisions of the BCS wherein CBS expresses its "'zero tolerance' policy for sexual harassment," its commitment to "take all steps necessary and appropriate to stop such acts of harassment or discrimination of which it becomes aware," its prohibition against "retaliation," and its commitment to a thorough investigatory process for responding to complaints.  (¶¶ 103–04.) According to Plaintiff, these statements were false and misleading because CBS executives (including Mr. Moonves) allegedly engaged in and fostered a company-wide pattern and practice of sexual harassment, creating a "culture of fear" and hostile work environment at the Company and because the CBS Board's own investigation confirmed the existence of "improper and unprofessional conduct," among other issues.  (¶ 107.)  Plaintiff is incorrect, however, for at least three reasons.

First, these general statements contain no promises and are certainly not a guarantee that harassment never took place or that no one at CBS had ever violated these policies.  *See, e.g., Fogel*,

2018 WL 6753799, at *2, *4 (statements that company "ha[s] maintained strict compliance" with antibribery laws were not actionable even when company failed to disclose that company's employees had previously bribed Mexican officials); *Villella*, 2017 WL 1169629, at *11 (holding that "mere adoption of a code of ethics, without statements assuring investors that its employees are in fact in compliance," is not misleading despite the fact that the CEO and CFO were engaged in alleged violations); *Reese v. McGraw-Hill Cos.*, 293 F.R.D. 617, 619 (S.D.N.Y. 2013), *aff'd*, 574 F. App'x 21 (2d Cir. 2014) (statement that S&P has "institutional safeguards in place to ensure the independence and integrity of [its ratings] opinions" was not actionable (alteration in original)).

Second, Plaintiff's allegations about "company-wide" and "pervasive" harassment are entirely conclusory, unsupported by any particularized facts, and expressly contradicted by one of the principal documents upon which Plaintiff relies: the December 17 Board Statement. Plaintiff cannot challenge the statements in the Website Disclosures as false when the proof it cites says exactly the opposite. (*See* Dec. 17 Board Statement (Ex. 10) at 1 (stating that the Investigation found that "*harassment and retaliation are not pervasive at CBS*") (emphasis added).)

Third, none of the other investigatory findings cited in the December 17 Board Statement supports Plaintiff's falsity argument either. The December 17 Board Statement is clear that the Internal Investigation's findings relate to "*past incidents*" of improper conduct uncovered by the Investigators or reported by employees or issues with the Company's "*historical* policies, practices and structures." (*Id.* (emphasis added).) Nothing about those statements can be reasonably read to suggest that these "past incidents" took place during the Putative Class Period or were so frequent and regular as to suggest that the Company's statements about its non-tolerance of sexual harassment were untrue. In short, nothing about the December 17 Board Statement suggests that the statements in the BCS were false when made, as required. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("A statement believed to be true when made, but later shown to

be false, is insufficient. . . .  [W]ithout *contemporaneous* falsity, there can be no fraud." (internal

citations omitted)).

This case is indistinguishable from other unsuccessful securities fraud cases predicated on

violations of corporate codes of conduct prohibiting sexual harassment and misconduct and, like

those cases, should be dismissed.  *See, e.g.*, *Retail Wholesale*, 845 F.3d at 1276 (affirming dismissal of

Section 10(b) claims because statements in company's "Standards of Business Conduct" regarding

the company "refusing to tolerate harassment" and "reporting misconduct" were inactionable);

*Lopez*, 173 F. Supp. 3d at 28–29 (dismissing Section 10(b) claims because statements in the

company's Code of Business Conduct and Ethics that it was taking gender discrimination allegations

"very seriously" and noting its "promot[ion of] an inclusive and positive working environment"

were "too hazy and general for any reasonable investor to have relied upon them" (alteration in

original)).[25]

iii.  Management Statements.

***Mr. Moonves's Remarks.***  The Amended Complaint points to statements made by

Mr. Moonves about the #MeToo Movement generally, suggesting that they must have been false

and misleading because it is alleged that Mr. Moonves was later found to have engaged in sexual

misconduct and, after the close of the Putative Class Period, was fired for cause.  (*See* ¶¶ 125, 129,

157.)  In particular, Plaintiff quotes a statement made by Mr. Moonves at the *Variety* Innovate

Summit on November 29, 2017, when, in response to a question about the #MeToo Movement and

its potential impact on CBS, Mr. Moonves allegedly responded:  "It's a watershed moment . . . .  It's

---

[25]   The recent decision of *In re Signet Jewelers Limited Securities Litigation*, No. 16-cv-6728, 2018 WL 6167889, at *17
(S.D.N.Y. Nov. 26, 2018), is not to the contrary because (among other reasons) the statements contained in the code of
conduct involved affirmative representations and were directly at odds with the particularized facts alleged in the
complaint regarding the treatment of women employees in the defendant's workforce.

important that a company's culture will not allow for this.  And that's the thing that's far reaching.  There's a lot we're learning.  There's a lot we didn't know."  (¶¶ 8, 125.)

Mr. Moonves's statements comprise exactly the kind of "general declarations" that cannot give rise to securities fraud liability, as the Second Circuit has clearly held.  *See, e.g.*, *Singh*, 918 F.3d at 63 (describing "general declarations about the importance of acting lawfully and with integrity" as a "textbook example of 'puffery'").[26]  Even if the law were otherwise (and it is not), there is no allegation that Mr. Moonves's statements were false at the time they were made or that Mr. Moonves did not hold the opinions he expressed.  To the contrary, according to the Amended Complaint, the sexual misconduct of which Mr. Moonves stands accused took place more than ten years before he uttered the words in question.  (*See* ¶¶ 12, 52, 55–57, 78.)  Under such circumstances, no claim for securities fraud can lie.  *See, e.g.*, *Fogel*, 2018 WL 6753799, at *2, *4 (holding that statements about company's internal controls were not rendered false or misleading by allegations that bribery had occurred many years before).

Plaintiff seems to believe it can avoid the limits of well-established law because Mr. Moonves was later implicated in the Sexual Misconduct Allegations.  But Section 10(b) prohibits securities fraud, not hypocrisy.  Courts faced with similar statements by executives accused of engaging in (or failing to prevent) sexual misconduct have rejected precisely this argument.  *See, e.g.*, *Retail Wholesale*, 845 F.3d at 1276, 1278 (finding statement by CEO accused of sexual misconduct that company's ethical conduct was important was "inherently aspirational" and not a "warrant" that the CEO "had been personally compliant or that he personally would comply" with the company's ethical code (citation omitted)); *Lopez*, 173 F. Supp. 3d at 28 (company's statements that it was taking gender

---

[26]  *See also IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015) ("Statements of general corporate optimism . . . do not give rise to securities violations."); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) ("Courts widely recognize that generalized statements of corporate aspiration and optimism are inactionable puffery.").

discrimination allegations "very seriously" and "promot[ing] an inclusive and positive working

environment" were "too hazy and general for any reasonable investor to have relied upon them").

  ***Mr. Rhodes's Remarks.*** Plaintiff's allegations with respect to Mr. Rhodes's statements

suffer from many of these same shortcomings. For instance, the Amended Complaint points to

statements made by Mr. Rhodes about CBS News's response to the Charlie Rose allegations and the

#MeToo Movement generally, alleging that these statements must have been false and misleading

because a subsequent investigation later revealed incidents of sexual misconduct at CBS News

beyond those involving Mr. Rose. (*See* ¶¶ 130–31, 141–44.) Specifically, Plaintiff quotes statements

in the May 3 Washington Post Article made by Mr. Rhodes in March 2018 about the "process" of

"[t]aking out the misconduct and harassment" (¶ 130) and that he was "not aware of harassment by

Charlie Rose at CBS" (*id.*), along with statements attributed to Mr. Rhodes in the July 19 Hollywood

Reporter Article about the Charlie Rose allegations "forc[ing] CBS News to confront a widespread

retrograde culture where misconduct was whispered about for years but tolerated," (¶¶ 141–42).

These statements are inactionable for multiple reasons.

  <u>First</u>, they are textbook examples of puffery and cannot form the basis of a plausible

Section 10(b) claim. *See, e.g.*, *Retail Wholesale*, 845 F.3d at 1276, 1278; *Lopez*, 173 F. Supp. 3d at 28.

<u>Second</u>, to the extent Mr. Rhodes's statements are statements of fact, nothing in the Amended

Complaint alleges how they are false or in what respects they are misleading. Indeed, nothing in the

Amended Complaint suggests that Mr. Rhodes held a different opinion than what he expressed, that

he did in fact know about issues with respect to Mr. Rose's conduct at CBS before the November 20

Washington Post Article was published, or that CBS News had not engaged in efforts to improve its

work environment at that time. <u>Third</u>, Mr. Rhodes's July 19 statement was made *after* Plaintiff's last

purchase of CBS stock (*see* A.C. Schedule A), and thus Plaintiff could not have relied upon it in

making its investment decisions. *See Zucker v. Sasaki*, 963 F. Supp. 301, 306 (S.D.N.Y. 1997)

(holding that lead plaintiff could not rely on report issued after she purchased the stock to support claim).  Fourth, Mr. Rhodes did not even make some of the alleged misstatements in the July 19 Hollywood Reporter Article, which were made by the reporter instead.  (*Compare* ¶ 141, *with* Ex. 20 at 2.)  Fifth, and perhaps more importantly, Mr. Rhodes's comments make clear that CBS News intended to address any past instances of sexual misconduct, and thus his statements could not have been reasonably taken to be a representation that such conduct had never existed.

iv.     CBS News Statement.

Finally, Plaintiff's contention that the CBS News Statement was false and misleading without the disclosure of the Sexual Misconduct Allegations should likewise fail.  (*See* ¶ 138.)  The statement, which was made in a response to a request for comment from *The Washington Post* before the May 3 Washington Post Article regarding Mr. Rose was published, unsurprisingly focused on what CBS News was doing in the wake of revelations about Mr. Rose's conduct.  Given this context, the notion that CBS News should have disclosed other alleged incidents of misconduct occurring at its corporate parent or at other CBS subsidiaries makes no sense.  In any event, CBS News's response to that request for comment is not actionable because nothing in the Amended Complaint casts doubt upon the correctness of any facts set forth in the CBS News Statement, and any remaining language in the statement is too vague, aspirational, or generic to give rise to a claim for fraud. (*See, e.g.*, May 3 Wash. Post Article (Ex. 19) at 2 ("We continue to look for ways to improve our workplace . . . .  We are not done with this process.").)

**3.     CBS Had No Obligation To "Correct" The Challenged Statements.**

With respect to a few alleged "misstatements" made prior to the Putative Class Period— namely, the Key Personnel Disclosures, Critical Link Disclosures, BCS, and Ethics Code—the

-29-

Amended Complaint alleges that CBS had a duty to "correct" these statements by disclosing the Sexual Misconduct Allegations.  (*See* ¶ 112.)  The law requires no such thing.

The duty to correct applies only "when 'a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not.'"  *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15-cv-5999, 2017 WL 4403314, at *15 (S.D.N.Y. Sept. 30, 2017) (quoting *In re IBM Corp. Sec. Litig.*, 163 F. 3d 102, 109 (2d Cir. 1998)).  It does not apply where the statement in question is not historical, but rather aspirational, vague, or forward-looking.  *See* 15 U.S.C. § 78u–5(c) (2017); *Slayton v. Am. Express Co.*, 604 F.3d 758, 762 (2d Cir. 2010).  Nor does it apply when the historical statement was "not misleading when made," *In re IBM Corp. Sec. Litig.*, 163 F.3d at 109; *see also In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 562 (S.D.N.Y. 2011), or if the speaker does not learn the prior statement was misleading, *In re IBM Corp. Sec. Litig.*, 163 F.3d at 109.

These principles are dispositive here.  Several of these statements were forward-looking (*e.g.*, the Key Personnel Disclosures).  Others are expressly aspirational, such as the BCS, the Moonves Letter, and the Ethics Code.  CBS could not have updated the disclosures during the Putative Class Period in any event because the Amended Complaint nowhere alleges that Defendants even knew enough information to make a judgment about the truth of the Sexual Misconduct Allegations before the Putative Class Period expired.  (*See infra* Section I(C)(1)(b)(i).)

To be sure, the Amended Complaint repeatedly alleges that these statements were misleading based on information detailed in the July 27 New Yorker Article.  (*See* ¶¶ 98, 106–11, 123, 129, 140.)  But the information contained in that article comprised allegations, which at the time were unproven, and therefore cannot give rise to a duty to correct.  *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 (no duty to voluntarily disclose "uncharged, unadjudicated wrongdoings").  To the contrary, CBS and the Director Defendants were fully entitled to investigate those allegations before

-30-

disclosing anything.  *See State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 850 (2d Cir. 1981) ("A company has no duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company." (citation omitted)).  That is precisely what the Amended Complaint alleges that Defendants responsibly did when rumors and accusations against Mr. Moonves surfaced—first, by engaging Weil in January 2018, and then, by engaging the Investigators in August 2018.  (¶¶ 59, 79.)  As a matter of law, CBS could not have had a duty to disclose information in the July 27 New Yorker Article—or to correct prior disclosures on the basis of that information—until the Company had had sufficient time to investigate the truth of the article's allegations.  *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 479 (S.D.N.Y. 2017) (granting motion to dismiss in part on the ground that defendant reasonably waited to make disclosure until it had conducted an investigation, and holding that "a party is . . . entitled to investigate potentially negative information before making statements to the market").  According to Plaintiff's own allegations, that did not occur until December 17, 2018, at the earliest, when (i) the Internal Investigation commissioned by the CBS Board on August 1, 2018 concluded, and (ii) the CBS Board formed a view as to the Internal Investigation's findings.  *See In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008) ("Defendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises."); *see also Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful.  Managers . . . are entitled to investigate for a reasonable time, until they have a full story to reveal.").  By that point, the Putative Class Period had already closed.

## C.  Plaintiff Fails To Plead Particularized Facts Giving Rise To A Strong Inference Of Scienter.

The Amended Complaint fails to state a Section 10(b) claim for the independent reason that it does not plead "particularized facts" that "giv[e] rise to a *strong* inference that the [D]efendant[s] acted with" scienter.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (emphasis

added); *accord In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015); *Barrett*, 2017 WL 3995606, at \*4. A "strong inference" requires that the Amended Complaint's allegations establish a "cogent" theory that Defendants acted with an "intent to deceive, manipulate, or defraud" investors. *In re Advanced Battery Techs., Inc.*, 781 F.3d at 644 (quoting *Tellabs*, 551 U.S. at 319); *Barrett*, 2017 WL 3995606, at \*4. It is "not enough" to allege a theory that "could" be true; Plaintiff's theory must be "at least as compelling as any opposing inference" of non-fraudulent intent. *In re Advanced Battery Techs., Inc.*, 781 F.3d at 644 (quoting *Tellabs*, 551 U.S. at 324); *Barrett*, 2017 WL 3995606, at \*4, \*7 ("The inference must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations.").

Under the law of this Circuit, scienter may be sufficiently alleged in one of two ways: (i) by pleading particularized facts sufficient to show a defendant's "motive and opportunity" to commit fraud, or (ii) by pleading particularized facts demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *Barrett*, 2017 WL 3995606, at \*7. The Amended Complaint purports to assert both, alleging that certain CBS personnel possessed "substantial motives" to defraud, evidenced by their sales of CBS stock during the Putative Class Period (¶ 171), and "Defendants acted with scienter" because Defendants knew of or recklessly disregarded "widespread [mis]conduct" at CBS, including by Mr. Moonves and other senior executives (¶¶ 168–69). Both theories fail.

### 1. Scienter As To The Individual Defendants Has Not Been Adequately Pled.

#### a. Plaintiff Fails To Plead, Either Adequately Or At All, That The Individual Defendants Had Any Motive To Defraud.

##### i. Director Defendants.

The Amended Complaint makes no attempt to allege motive on the part of any Director Defendant. Nor does it attempt to identify a single benefit, such as a profit from a stock sale, that

inured to any Director Defendant from his or her alleged participation in concealing the Sexual

Misconduct Allegations.  In fact, most of the Director Defendants are not mentioned in the

Amended Complaint outside of its caption and the generic description of the parties section.  *See*

*Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most

corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal

benefit to the individual defendants resulting from the fraud." (citation omitted)).  Indeed, the only

Challenged Statements that the Director Defendants made or signed (*i.e.*, the Key Personnel

Disclosure and the Legal Proceedings Disclosure) appear in those Annual Reports, yet the Amended

Complaint fails to identify a single reason why the Director Defendants would have attempted to

deceive the public by making those statements.[27]

The Amended Complaint's silence on these points is telling.  The Director Defendants are

all highly accomplished individuals with long and esteemed track records in business, government,

law, and/or academia, who had absolutely nothing to gain by participating in the alleged fraud.  (*See*

2018 Proxy Statement at 19–24.)

ii.      Employee Defendants.

**Mr. Ianniello.**  The allegations in the Amended Complaint do not support an inference of

improper motive as to Mr. Ianniello.  According to Plaintiff, Mr. Ianniello sold 471,194 shares of

CBS stock during the period from January 17, 2017 through June 18, 2018, allegedly in an effort to

profit from CBS's failure to disclose its alleged sexual harassment problems to the market.  (¶ 91.)

But "the mere fact that insider stock sales occurred does not suffice to establish scienter."  *In re*

*Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009).  "Rather, to satisfy this

---

[27]   Further, with respect to the NAI-Affiliated Directors, the Amended Complaint's recognition that NAI and
Ms. Redstone were in "contentious litigation" against CBS and Mr. Moonves (¶ 19)—which litigation was filed in May
2018 by CBS (then led by Mr. Moonves) and certain members of its Board in connection with a proposed stock
dividend that would have had the effect of reducing NAI's voting control of CBS from approximately 80% to
approximately 20% (*see generally* Sept. 9 Current Report (Ex. 9))—precludes any inference of motive on those directors'
part to conceal his conduct.

element, [a plaintiff] must establish that the sales were 'unusual' or 'suspicious.'"  *Id.*; *accord Patel v. L-3 Comm'ns Holdings, Inc.*, 14-cv-6038, 2016 WL 1629325, at *11 (S.D.N.Y. Apr. 21, 2016).

Of the thirteen transactions identified in the Amended Complaint (*see* ¶ 91), twelve transactions—representing 92% of the trades by number of transactions, over 90% of the trades by number of shares sold, and over 90% of the total proceeds from all sales—were made pursuant to a 10b5–1 plan.[28]  "Trades made pursuant to a Rule 10b5–1 trading plan do not give rise to a strong inference of scienter" and thus provide no basis to state a claim against Mr. Ianniello.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 585; *accord In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013).

The single sale that took place outside of Mr. Ianniello's 10b5–1 plan—which occurred on June 18, 2018—is not unusual or suspicious in any way, and does not support an inference of scienter for at least the following reasons:[29]

> (1)     The Amended Complaint nowhere alleges that Mr. Ianniello made any profit from the sale.  (¶ 91 (alleging proceeds not profit).)  Stock sales do not give rise to a reasonable inference of scienter absent allegations that the seller profited from the transactions.  *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d at 381 ("[Plaintiffs] must allege . . . the defendants' net profits rather than their gross proceeds"); *In re eSpeed Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 (S.D.N.Y. 2006) (pleading "gross proceeds" neglected whether defendant "made any profit" and did not establish scienter).

> (2)     The sale constituted only 12.6% of his total holdings at that time, which is far below the threshold courts have required for scienter to be adequately pled.  *See, e.g.*, *Patel*, 2016 WL 1629325, at * 11 (16% insufficient); *In re Travelzoo Inc. Sec. Litig.*, No. 11-cv-5531, 2013 WL 1287342, at *10 (S.D.N.Y. Mar. 29, 2013) (22% insufficient); *In re*

---

[28]  A 10b5–1 plan is a "trading plan[], which lay[s] out future stock trades at set prices or on set dates."  Susan Pulliam & Rob Barry, *Directors Take Shelter In Trading Plans*, WALL ST. J. (Apr. 24, 2013); *In re IAC/InteractiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) (10b5–1 plans are "periodic divestment plan[s]").  All 10b5–1 sales by Messrs. Ianniello, Moonves, and Schwartz are a matter of public record.  (*See* Exs. 30, 32–33.)

[29]  In considering whether stock sales can support an inference of intent, courts typically consider a number of factors, including "(1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; [and] (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk."  *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 493 (S.D.N.Y. 2018).

*Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 276 (S.D.N.Y. 2008) (20% insufficient).

(3)     There is no allegation that the sale "deviated from [Mr. Ianniello's] patterns of sales before and after the [Putative Class Period]," information that is critical to evaluating this particular sale. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 445 (S.D.N.Y. 2005); *see, e.g.*, *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 586 (sales not suspicious because they comported with defendant's "established practice"); *Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 221 (E.D.N.Y. 2013) (sale not "dramatically out of line with prior trading practices'" insufficient).

(4)     The Amended Complaint alleges that only three of the sixteen individuals named as defendants sold CBS stock during the Putative Class Period, which "undermines [the] claim" of scienter. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *see, e.g.*, *Russo v. Bruce*, 777 F. Supp. 2d 505, 517 (S.D.N.Y. 2011) (the fact that, "out of multiple defendants, only a single outside director" sold stock "counsels against" scienter); *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96-cv-8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) (absence of sales by most defendants suggests that "trading by [other] defendants does not give rise to a strong inference of scienter").

(5)     The sale was made six weeks after the closest Challenged Statement and over a month before the truth was supposedly revealed, and thus was not timed to "closely coincide" with the alleged false statements or "shortly before" the purported corrective disclosures. *See Fishbaum v. Liz Claiborne, Inc.*, No. 98-cv-9396, 1999 WL 568023, at *4 (2d Cir. 1999); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 444.

**Mr. Liding.**    The allegations in the Amended Complaint do not support an inference of improper motive on Mr. Liding's part either.    The Amended Complaint identifies two transactions through which Mr. Liding allegedly sold a total of 34,773 shares, generating $2,341,544 in total proceeds.    (¶ 91.)    But the Amended Complaint fails to allege the amount of Mr. Liding's profits, that the sales deviated from his normal trading practices, or that all or the majority of Defendants also engaged in alleged insider sales.    In addition, Mr. Liding's sales are not alleged to be inconsistent with his sales in other timeframes or closely timed to benefit from the Challenged Statements or the purported corrective disclosures.    The Amended Complaint has not adequately alleged that these transactions are unusual or suspicious.[30]

---

[30]    The Amended Complaint also alleges that Gil Schwartz (CBS's former Chief Communications Officer) sold 263,781 shares during the Putative Class Period.    (¶ 91.)    But Mr. Schwartz is not a defendant in this case, and regardless, his trades hardly qualify as "unusual" or "suspicious."    Three of these transactions were made pursuant to a 10b5–1 plan.

**Mr. Rhodes.**  With respect to Mr. Rhodes, the Amended Complaint is utterly silent as to his alleged motive.  As a result, Plaintiff's Section 10(b) claims against Mr. Rhodes cannot survive.

> b.      *Plaintiff Fails To Plead, Either Adequately Or At All, That The Individual Defendants Knew The Alleged Misstatements Were False Or That They Acted Recklessly.*

To allege that a defendant acted with recklessness,[31] a plaintiff must allege facts sufficient to show that the defendant's non-disclosure of the omitted information was "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  An allegation that a defendant "knew or . . . should have known that [he/she was] misrepresenting material facts" must be supported by "strong circumstantial evidence"—not "vague and speculative allegations"—that the defendant "understood that the[] public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility."  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  And where motive is not alleged properly or at all—as is the case here (*see supra* at 32–36)—"the strength of the circumstantial allegations must be correspondingly greater."  *Das*, 332 F. Supp. 3d at 813 (quoting *Kalnit*, 264 F.3d at 142).  The Amended Complaint falls far short of this standard.

> i.      <u>No Contemporaneous Knowledge Of The Alleged Fraud.</u>

Plaintiff ignores a critical predicate to any showing of intent:  knowledge.  *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018) ("Absent concrete allegations as to defendants' knowledge, the [Amended Complaint] cannot generate a strong inference of scienter.");  *Patel*, 2016 WL 1629325, at *12 (dismissing complaint as to individual defendants because Plaintiff failed to plead with particularity "who[]" knew "what" and "when");  *Ross v. Lloyds*

---

(Ex. 33.)  As to the rest, the Amended Complaint fails to plead facts to support its insider trading allegations against Mr. Schwartz for the same reasons its other insider trading allegations fail.

[31]   The Amended Complaint does not allege that any Individual Defendant acted with conscious misbehavior.  (¶ 168.)

*Banking Grp., PLC*, No. 11-cv-8530, 2012 WL 4891759, at *10 (S.D.N.Y. Oct. 16, 2012), *aff'd*, 546 F. App'x 5 (2d Cir. 2013) (no scienter where plaintiff failed to allege "how, when and to what extent the defendants received information . . . contrary to public disclosures").

Plaintiff does not allege that *any* of the Individual Defendants knew of the information they supposedly were obligated to disclose before that information was publicized in July 2018. For instance, Plaintiff maintains that a "company-wide pattern and practice of sexual harassment" prevailed at CBS during the Putative Class Period (¶¶ 2, 5, 106–08, 165), but the Amended Complaint does not allege when the Individual Defendants supposedly became aware of this issue, how they purportedly gained that knowledge, who allegedly informed them, or what they supposedly learned (*see* ¶ 2). Plaintiff similarly fails to allege with particularity that the Individual Defendants were aware, before the disclosure of the Sexual Misconduct Allegations in July 2018, of specific allegations against Mr. Moonves. Plaintiff alleges only that some of the Individual Defendants learned of unspecified public "rumors," which were equally available to others in the market and about which they promptly inquired.[32] *See Monroe Cty. Emps' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 366, 349 n.70 (S.D.N.Y. 2014). Those failings foreclose a scienter finding.

Having failed to plead particularized facts reflecting the Individual Defendants' knowledge of the Sexual Misconduct Allegations, Plaintiff falls back on group pleading and "[t]hreadbare recitals of the elements of [its] cause of action." *Ashcroft*, 556 U.S. at 678. For instance, the Amended Complaint lumps the Individual Defendants together *en masse*, alleging in sweeping terms their knowledge of the alleged fraud. (*See, e.g.*, ¶ 165 (alleging that "Defendants knew"); ¶¶ 15, 77 (alleging that "CBS's board knew").) Such allegations run counter to the foundational requirement that "[s]cienter must be separately pled and individually supportable as to each defendant." *C.D.T.S. v. UBS AG*, No. 12-cv-4924, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom.*

---

[32] *See supra* n.8.

*Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015) (summary order) ("[S]cienter is not amenable to group pleading."); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 472 (S.D.N.Y. 2008) (same).  Dismissal is warranted in circumstances like these.  *See, e.g.*, *In re Supercom Inc. Sec. Litig.*, 15-cv-9650, 2018 WL 4926442, at *28 (S.D.N.Y. Oct. 10, 2018) (dismissing Section 10(b) claims against individual defendants "for failure to plead scienter individually as to them"); *Kinra v. Chi. Bridge & Iron Co.*, No. 17-cv-4251, 2018 WL 2371030, at *6–7 (S.D.N.Y. May 24, 2018) (same); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10-cv-0975, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012) (same).

The Amended Complaint also includes the entirely vague allegations that the Individual Defendants "were in possession of confidential, proprietary information concerning the Company," and thus "knew or recklessly disregarded that the adverse facts specified [in the Amended Complaint] had not been disclosed to, and were being concealed from, the investing public."  (¶¶ 35, 168.)  Such conclusory assertions cannot state a claim.  *See Ashcroft*, 556 U.S. at 678.

The same rule precludes Plaintiff's attempt to bolster its scienter allegations by parroting generic statements made in news articles regarding the CBS Board's supposed knowledge of misconduct.  (*See* ¶ 77) (reciting assertion in *The New York Times* that "CBS's board knew – or should have known – about potential problems" involving Mr. Moonves in October 2017); ¶ 15 (reciting assertion in *The Los Angeles Times* that "CBS board members were aware late last year that multiple news organizations were looking into Mr. Moonves' conduct").  These assertions are no less conclusory than Plaintiff's own allegations and thus cannot support an inference of scienter.  *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."); *accord City of Brockton Ret. Sys. v. Avon Prods. Inc.*, No. 11-cv-4665, 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014) (granting motion to dismiss Section 10(b) claim, in part on the ground

that citation to press report making generalized assertions of defendant's knowledge was insufficient to plead scienter); *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2000) (same).

        ii.      <u>The Director Defendants Were Not Reckless.</u>

**Ms. Griego and Messrs. Andelman, Califano, Cohen, Countryman, Goldberg, Klieger, and Morris.**  The Amended Complaint never mentions CBS Directors Ms. Griego, Mr. Andelman, Mr. Cohen, Mr. Califano, Mr. Countryman, Mr. Goldberg, Mr. Klieger, or Mr. Morris, except in the caption and in the description of the parties at the outset of the Amended Complaint.  (*See* ¶¶ 28, 33.)  Plaintiff's silence as to these Defendants and their alleged scienter is fatal to its claims against them.  *See, e.g.*, *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *28 (dismissing claims for failure to plead "individualized allegations of scienter"); *Kinra*, 2018 WL 2371030, at *6–7 (dismissing claim where allegations "[n]owhere . . . allege[d] who knew what material facts that had not been disclosed to the market"); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 220 (S.D.N.Y. 1999) (dismissing claims where "not once in the paragraphs of the [c]omplaint describing the fraud are any of the [o]utside [d]irectors mentioned by name").

    **Ms. Redstone.**  With respect to Ms. Redstone, there are likewise no particularized allegations that give rise to any plausible inference, let alone a strong inference, that she acted with a culpable state of mind.  To the contrary, the facts pleaded in the Amended Complaint *preclude* any such inference.  As an initial matter, the only information Ms. Redstone is alleged to have had was public rumors about Mr. Moonves.  (*See supra* at 6–7.)  It is well established that "where information is equally available to both parties, a defendant should not be held liable to the plaintiff under securities laws for failure to disclose." *Monroe Cty. Employees' Ret. Sys.*, 15 F. Supp. 3d at 349 n.70 (citation omitted); *see also Bettis v. Aixtron SE*, No. 16-cv-00025, 2016 WL 7468194, at *13 (S.D.N.Y.

Dec. 20, 2016) (dismissing claim where there was no allegation that defendant had "greater access to information" than plaintiff).  This principle by itself defeats any claim against Ms. Redstone.

To the extent Ms. Redstone had a duty to take any action in response to the public rumors, the Amended Complaint concedes that she fulfilled it by promptly alerting two directors on the N&G Committee—consistent with CBS's BCS (*see* Ex. 12 at 24)—and asking them to conduct an investigation.  (*See* ¶ 78.)  Further, according to articles cited in the Amended Complaint, Ms. Redstone was then told by N&G Committee members the results of the investigation by Weil (*see* Sept. 10 Wall St. J. Article at 1), which had concluded that there was "nothing to worry about with Mr. Moonves" (Nov. 28 N.Y. Times Article (Ex. 29) at 5–6).  Likewise, the Amended Complaint concedes that Ms. Redstone separately and directly confronted Mr. Moonves, who flatly denied the allegations.  (*See* ¶ 78; July 31 N.Y. Times Article (Ex. 24) at 1; Sept. 10 Wall St. J. Article (Ex. 27) at 1).[33]

These facts, as alleged by Plaintiff, by themselves defeat any inference—let alone a strong inference—that Ms. Redstone acted with the requisite intent or recklessness to commit securities fraud.  To the contrary, as the Second Circuit has held, "engaging in a good faith process to inform [oneself]" compels an inference of "non-fraudulent intent."  *Slayton*, 604 F.3d at 776–77; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (no recklessness where alleged facts did not support

---

[33]  The Amended Complaint further acknowledges, through its incorporation of particular news articles, both that (i) Ms. Redstone "wasn't alerted about" a Los Angeles Police Department criminal complaint lodged against Mr. Moonves arising from an assault allegedly committed in the 1980s (Sept. 10 Wall St. J. Article (Ex. 27) at 3), and (ii) after litigation began in May 2018 between CBS (then led by Mr. Moonves) and Ms. Redstone, she was not included in meetings or provided information concerning new allegations that were raised about Mr. Moonves in July 2018 (*see* July 31 N.Y. Times Article (Ex. 24); Sept. 12 N.Y. Times Article (Ex. 28) at 4.)  The Amended Complaint's contradictory conclusory allegation that Ms. Redstone was aware of the police complaint (¶ 15) cannot be considered, both because it fails to cite *any* factual basis or source (as it is untrue), and because it is contradicted by later allegations and press reports incorporated in the Amended Complaint.  *See Luck v. Westchester Med. Ctr.*, No. 17-cv-9110, 2019 WL 416333, at *5 (S.D.N.Y. Feb. 1, 2019) ("If the allegations in the complaint are contradicted by attached documents, the court need not accept the truth of the allegations.") (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).  Thus as alleged in the Amended Complaint, Ms. Redstone—who is alleged to have signed only CBS's Annual Reports, along with all other CBS Directors—had no personal knowledge whatsoever of Mr. Moonves's alleged conduct.

inference that defendant "egregious[ly] refus[ed] to see the obvious, or to investigate the doubtful" (internal citation omitted)).

**Ms. Minow and Messrs. Gifford and Gordon.** Far from pleading recklessness, Plaintiff's scant allegations against these three members of the N&G Committee likewise *preclude* any inference of scienter.

As set forth above, Plaintiff alleges that, in January of 2018, Ms. Redstone informed Ms. Minow and Mr. Gordon of public rumors of sexual misconduct by Mr. Moonves. According to Plaintiff, Ms. Minow and Mr. Gordon, along with the rest of the N&G Committee, promptly retained Weil to investigate. (*See* ¶ 79.) As reported in a *New York Times* article cited in the Amended Complaint, as part of its investigation, Weil interviewed Mr. Moonves and then told the N&G Committee that "there was no cause for concern now" regarding rumors about Mr. Moonves. (Sept. 12 N.Y. Times Article (Ex. 28) at 3.) As alleged in another *New York Times* article cited in the Amended Complaint, Weil subsequently informed the N&G Committee that, based upon its investigation, "there was nothing to worry about with Mr. Moonves." (*See* Nov. 28 N.Y. Times Article (Ex. 29) at 5–6.)

As a matter of law, these allegations do not give rise to an inference of scienter. Courts in the Second Circuit have held repeatedly that the same measures alleged to have been taken by the N&G Committee—including hiring a respected firm to investigate and relying on the result of that investigation—are not "reckless" under Section 10(b). *See, e.g., City of Brockton*, 2014 WL 4832321, at *24 (granting motion to dismiss Section 10(b) claims and finding that commencement of internal investigation undermined scienter showing). If anything, these facts (which the Amended Complaint affirmatively alleges) preclude liability with respect to these Defendants. *In re Tremont Sec. Law, State Law & Ins. Litig.*, No. 08-cv-11117, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) (no recklessness where "complaint shows that [defendant] did investigate the risks" (citation omitted));

*see also Higginbotham*, 495 F.3d at 761 ("Taking the time necessary to get things right is both proper

and lawful.  Managers . . . are entitled to investigate for a reasonable time, until they have a full story

to reveal."); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d at 217 ("Defendants are permitted a

reasonable amount of time to evaluate potentially negative information and to consider appropriate

responses before a duty to disclose arises.").

This is so particularly given that Plaintiff does not allege that Ms. Minow, Mr. Gifford, or

Mr. Gordon had personal knowledge of the sexual misconduct allegations against Mr. Moonves

revealed in the July 27 New Yorker Article.[34]  Based on the pleaded allegations, from the N&G

Committee's perspective, Mr. Moonves had had a long and successful career at CBS, and no

allegation of sexual misconduct had ever before been raised with the CBS Board.  Against that

backdrop, the notion that these CBS Directors should have jumped the gun and disclosed to the

market rumors or unsubstantiated allegations turns the notion of "recklessness" on its head.

Plaintiff's failure to allege recklessness against these Defendants reflects their lack of

involvement in the events giving rise to this action.  In particular, Ms. Minow (a distinguished

scholar and former dean of Harvard Law School) did not join the CBS Board until May 2017, after

seven of the 18 Challenged Statements had already been made.  (*See* 2018 Proxy Statement at 22, 26.)

The claims against Ms. Minow plainly cannot stand as to those statements.[35]  And at bottom, with

respect to all of these Defendants, the Amended Complaint alleges nothing more than that they

diligently inquired into vague, unproven rumors of misconduct.  Those efforts—which Plaintiff

---

[34]  Although the Amended Complaint alleges that "some members" of the N&G Committee were informed about the
criminal complaint, that allegation is contradicted by a *New York Times* article cited in the Amended Complaint and need
not be credited.  (*See supra* n.33; Sept. 12 N.Y. Times Article (Ex. 28) at 5 ("Mr. Moonves was aware of [the Los Angeles
Police Department criminal] complaint at the time of Mr. Aiello's interview, but it wasn't mentioned in his report to
Mr. Gordon and Ms. Minow.").)

[35]  Consistent with her brief tenure, Ms. Minow is alleged to have made, signed, or authorized only a single Challenged
Statement:  the 2018 Annual Report.  (*See* Ex. 3.)

tellingly does not criticize—cannot give rise to securities fraud liability.  *See In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d at 479; *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d at 217.

### iii.   Employee Defendants Were Not Reckless.

The Amended Complaint similarly fails to plead facts supporting a strong inference of recklessness or conscious misbehavior on the part of Messrs. Ianniello, Liding, or Rhodes—indeed, Plaintiff proffers no such facts, let alone facts specific to any of these individuals.  Plaintiff's improper resort to generalized allegations about what these individuals knew based on their positions as executive officers or access to internal (but unspecified) reports and information (*see* ¶ 35) has long been rejected as inadequate to plead scienter.  *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) ("Scienter . . . cannot be inferred solely from the fact that, due to defendants' . . . executive managerial position, they had access to the company's internal documentation as well as any adverse information."); *In re Ferrellgas Partners L.P., Sec. Litig.*, No. 16-cv-7840, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) (finding generalized allegations that reports "at some point" contained information contradicting public statements were insufficient to plead recklessness where plaintiff failed to specify which reports revealed contradictory information and what information those reports contained).  Similarly deficient are broad references to "widespread knowledge" or matters supposedly "known throughout the Company."  (¶¶ 15, 75).  *See Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 557 (S.D.N.Y. 2010) ("[F]ailure to link any particular [d]efendant with the factual background from which [p]laintiff alleges all [d]efendants' scienter can be inferred contravenes Rule 9(b)."); *In re Rockwell Med. Inc. Sec. Litig.*, No. 16-cv-1691, 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018) (finding reliance on "analyses" and "red flags" is insufficient to plead recklessness when "[t]here is simply no allegation . . . that Defendants were confronted with any of [it]").

Finally, the mere fact that two of these individuals signed Sarbanes-Oxley certifications does not, absent specific facts pleaded concerning what these individuals knew and when, sufficiently plead scienter.  *See Patel*, 2016 WL 1629325, at *10 ("A Sarbanes-Oxley certification is probative of scienter only if the complaint alleges specific contrary information, such as glaring accounting irregularities or other red flags, of which the certifying defendant had reason to know."); *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 565 (S.D.N.Y. 2018) ("[A]n inference of scienter does not follow from the mere fact of non-disclosure of relevant information" or based on the signing of a certification.).

### 2.        Scienter As To CBS Has Not Been Adequately Pled.

To state a claim for securities fraud against a corporate defendant, a plaintiff must adequately allege scienter on the part of a corporate officer or director whose intent can be imputed to the company.  *See Sfiraiala*, 729 F. App'x at 58 ("[T]he pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." (citation omitted)); *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988) ("[I]t does not follow that the corporation may be deemed to have a culpable state of mind when that state of mind is possessed by no single employee."), *aff'd*, 869 F.2d 175 (2d Cir. 1989).  That rule is outcome-determinative here.  Having failed to plead scienter as to any of the Individual Defendants, former Board member Arnold Kopelson, or other agent of the Company,[36] and given that the allegations of Mr. Moonves's scienter (which he separately addresses)[37] cannot be

---

[36]   *See, e.g.*, NLRB v. *Local Union 46, Metallic Lathers & Reinforcing Iron Workers*, 727 F.2d 234, 237 (2d Cir. 1984) (holding that under common-law principles of agency, "knowledge which an agent receives for which his principal is to be charged must be such as is received *while acting for the principal*") (emphasis added).

[37]   Defendants adopt the legal arguments in the memorandum of law filed on behalf of Mr. Moonves in this case as to why Plaintiff has failed to plead scienter as to Mr. Moonves, including because all of the supposedly "unusual and suspicious" sales were effected through a 10b5–1 plan.  (*See* Ex. 32.)

imputed to CBS,[38] Plaintiff has also failed to plead scienter as to CBS.  The claim against the Company for violation of Section 10(b) should therefore be dismissed.

> ### D.     Plaintiff Fails To Adequately Plead Loss Causation.

A third independent basis to dismiss the Amended Complaint is its failure to plead loss causation—*i.e.*, "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  Plaintiff purports to allege loss causation on the basis that "the price of CBS common stock fell" once the "falsity of Defendants' statements began to be revealed to investors."  (¶ 176.)  In particular, the Amended Complaint points to two dates when the "truth" was allegedly revealed and CBS's stock price allegedly declined as a result:  (i) July 27, 2018, when *The New Yorker* published the first of two articles regarding sexual misconduct allegations against Mr. Moonves; and (ii) December 4, 2018, when *The New York Times* published an article concerning a purported "draft report" that allegedly had been prepared for (but not yet presented to) the CBS Board as part of its Internal Investigation. (¶¶ 19, 145–46, 154–56; *supra* at 10–11.)

However, "[a]lleging that the market reacted negatively to new information about a publicly-traded company, without more, is insufficient to plead loss causation."  *Harris*, 135 F. Supp. 3d at 173.  To qualify as a corrective disclosure, the new information must "reveal to the market the falsity of" the prior statements.  *Lentell*, 396 F.3d at 175 n.4.  Neither the July 27 New Yorker Article nor the December 4 New York Times Article meets this standard because neither "reveal[ed] to the market any misstatements in [CBS's] prior" representations.  *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 245 (S.D.N.Y. 2006).

---

[38]  Even if the Court determines that the Amended Complaint sufficiently alleges scienter as to Mr. Moonves—which it does not—the Amended Complaint still fails to establish scienter as to CBS because Mr. Moonves's intent cannot be imputed to the Company.  Indeed, the law is settled that "the bad acts of [the] agent" cannot be "impute[d] to a corporation . . . when the [bad acts were] committed for personal benefit"—that is, "if the officer acted entirely in his own interests and adversely to the interests of the corporation."  *Barrett*, 2017 WL 3995606, at *8 (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 64 (2d Cir. 2013)).

For example, the Amended Complaint alleges that "[t]he first widely-publicized allegations tying a high-profile individual at CBS to the #MeToo Movement came in November 2017, when CBS . . . fire[d] . . . Charlie Rose." (¶ 7.)  It also alleges that, on November 20, 2017, *The Washington Post* published an article reporting on Mr. Rose and the culture at CBS News and that, on May 3, 2018, the same news outlet reported even more detailed allegations of sexual misconduct.  (*See* ¶¶ 68, 130–31, 138.)  Other instances of alleged sexual misconduct and/or harassment at CBS were also a matter of public record well before July 27, 2018.  At no time, as the Amended Complaint concedes, did CBS ever claim that the organization was free of such issues.  (*See, e.g.*, ¶¶ 125, 130, 138, 141–42.)

In light of this, there can be no plausible argument that investors were misled into believing that CBS maintained a workplace that was completely harassment-free or that it, unlike the scores of other companies that have been swept up in #MeToo controversies, would not and could not be the subject of #MeToo claims.  Rather, the only "new" information contained in the July 27 New Yorker Article was that Mr. Moonves was identified as the alleged wrongdoer.  But that was not a fact that revealed the falsity of the Challenged Statements that are the subject of Plaintiff's claims because none of them could reasonably be read to make any representations about Mr. Moonves's conduct.

The December 4 New York Times Article does not qualify as a corrective disclosure either. Over and above the fact that the December 4 New York Times Article reflected the unauthorized disclosure of privileged information and should be disregarded on that basis alone, it did not reveal any new information concerning the alleged "fraud" that was not otherwise already in the public domain as a result of the July 27 New Yorker Article and other media reports on Mr. Moonves's alleged wrongdoing.[39]

---

[39]   *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 104 (S.D.N.Y. 2011) (holding that "[i]n order to qualify as a corrective

Accordingly, the Amended Complaint's failure to identify a corrective disclosure constitutes a fatal deficiency that compels dismissal of the Section 10(b) claim. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortgage Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (affirming motion to dismiss and finding that defendant failed to plead loss causation because third party news articles that were purported corrective disclosures failed to reveal information that was not already known to the public); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 487 (S.D.N.Y. 2011) (holding that senator's comment that ratings agencies should shoulder some responsibility for subprime mortgage crisis was not a corrective disclosure in part because other members of Congress had previously expressed the same concern and therefore the senator's comments revealed no new information to the market).

## II.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF SECTION 20(a).

A claim for control person liability under Section 20(a) is "necessarily predicated on a primary violation of securities law." *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004); *accord ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase, Co.*, 553 F.3d 187, 206–07 (2d Cir. 2009).  In addition, no claim for violation of Section 20(a) is stated unless a plaintiff pleads (i) control of the primary violator by each individual defendant, and (ii) that each individual defendant was, "in some meaningful sense, a culpable participant" in the alleged fraud. *ATSI Commc'ns., Inc.*, 493 F. 3d at 108.  Because the Amended Complaint does not adequately plead any of

---

disclosure for loss causation purposes, an alleged disclosure must reveal the falsity of an alleged misstatement" and rejecting plaintiff's argument that additional disclosures qualified because those disclosures did not "reveal any new information that relate[d] to the alleged fraud"); *DoubleLine Capital LP v. Odebrecht Fin. Ltd.*, 323 F. Supp. 3d 393, 458–59 (S.D.N.Y. 2018) (finding "subsequent news reports [that] further disclosed additional details of Defendants' involvement in the bribery scheme" that plaintiff alleged led to even greater decline in note values "merely confirmed what the market already knew" and thus could not be considered corrective disclosures).

these essential elements, Plaintiff's Section 20(a) claim against the Individual Defendants should be dismissed.[40]

First, for the reasons stated above (*see supra* Section I), the Amended Complaint does not plead a primary violation of Section 10(b) against CBS or the Individual Defendants.  Dismissal of Plaintiff's Section 20(a) claim thus is required as a matter of law.  *See, e.g.*, *Barrett*, 2017 WL 3995606, at *10 (dismissing Section 20(a) claim due to plaintiff's failure to state a primary violation claim against defendant); *Harris*, 135 F. Supp. 3d at 177–78 (same).

Second, the Amended Complaint fails to adequately allege that the Individual Defendants exercised control over the Challenged Statements.  Control for the purposes of Section 20(a) requires that the defendant "actually possess[ed], in fact, rather than in theory, the ability to direct [the company's] actions" *and* that the defendant exercised "actual control over the [alleged 'misstatements']."  *In re Alstom SA*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (collecting cases); *see also In re Veon Ltd. Sec. Litig.*, 15-cv-08672, 2018 WL 4168958, at *20 (S.D.N.Y. Aug. 30, 2018) ("[T]he Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the transaction in question.").  The allegations of the Amended Complaint do not meet this standard.

Nowhere, for example, does the Amended Complaint allege that the Employee Defendants had any role in the alleged "misstatements" made by CBS or, in the instance of Mr. Rhodes, that he was even sufficiently senior to direct CBS Corporation.  (*See supra* Section I(A).)  Nor does the Amended Complaint plead that the Director Defendants had the power to control the contents of the alleged "misstatements"—*e.g.*, by drafting or dictating the content of the BCS, the Moonves

---

[40]   Any Section 20(a) claim against CBS itself is misplaced.  Regardless, any such claim fails given Plaintiff's failure to plead a primary violation, that CBS controlled any other Defendant, or that CBS was a culpable participant in the alleged fraud.  *ATSI Commc'ns, Inc.*, 493 F.3d at 108 (affirming dismissal of Section 20(a) claim against investment firm because plaintiff "fail[ed] to allege any primary violation; thus, it cannot establish control person liability").

Letter, or Ethics Code, preparing the Proxy Statements or dictating their contents, or ghost writing the challenged Management Statements.  Instead, Plaintiff falls back on the tired refrain that Defendants exercised control "[b]y reason of their positions with the Company[] and their ownership of CBS stock."  (¶ 206.)  Leaving aside that it is impermissible to plead "control" by lumping defendants together,[41] the law is clear that one's status as an officer or director, or mere ownership of stock, is insufficient to establish "control" for purposes of Section 20(a).  *See, e.g.*, *In re Global Crossing, Ltd. Sec. Litig.*, No. 02-cv-910, 2005 WL 1907005, at *12 (S.D.N.Y. 2005) ("officer or director status alone does not constitute control."); *accord In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 254 (S.D.N.Y. 2018); *Furlong Fund LLC v. VBI Vaccines, Inc.*, No. 14-cv-9435, 2016 WL 1181710, at *6–7 (S.D.N.Y. Mar. 25, 2016); *Primavera Familienstiftung v. Askin*, No. 95-cv-8905, 1996 WL 494904, at *10 (S.D.N.Y. Aug. 30, 1996) ("[T]o allege merely, for example, that one is a stockholder of a corporate wrongdoer is insufficient.").[42]

_Third_, to plead culpable participation, a plaintiff must allege facts "indicating that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct."  *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014).  Culpable participation thus requires a showing that the controlling persons "knew, were reckless in not knowing, or were in any way connected to the [alleged] fraud" with "the same particularity" required to plead scienter.  *Patel*, 2016

---

[41]   *See, e.g., In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 497 (S.D.N.Y. 2018) (holding that a "determination of § 20(a) liability requires an individualized determination of a defendant's control of the primary violator as well as a defendant's particular culpability") (quoting *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998)).

[42]   Likewise, the fact that NAI owns approximately 80% of the voting control of CBS does not mean that the NAI-Affiliated Directors controlled the Challenged Statements.  To the contrary, the Amended Complaint is devoid of a single allegation that any NAI-Affiliated Director exercised control over the Challenged Statements.  Indeed, apart from the Annual Reports that were signed by those directors (for the periods they served on the CBS Board), there is no allegation that any NAI-Affiliated Director had anything whatsoever to do with any of them.  *Cf. DoubleLine Capital LP*, 323 F. Supp. 3d at 460 (holding that "status as a corporate parent . . . says nothing regarding the control that [the parent] actually exerts over [the subsidiary's] operations and, in particular, its preparation of its financial disclosures"); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002) (finding no controller liability despite controlling shareholder "hav[ing] the power to elect two-thirds of the directors" because plaintiff did not plead any "indicia of the *exercise* of control").

WL 1629325, at *17; *see also Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 246 (S.D.N.Y. 2006).  For the same reasons Plaintiff has failed to plead scienter (*see supra* Section I(C)), it also has failed to plead culpable participation because the Amended Complaint does not adequately allege that each Individual Defendant was "in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

Plaintiff's Section 20(a) claim should therefore be dismissed.[43]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint in its entirety, with prejudice, and grant Defendants such other and further relief as this Court deems just and proper.

Dated:  April 12, 2019

Respectfully Submitted,

**WILLKIE FARR & GALLAGHER LLP**

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

*/s/ Mary Eaton*
Mary Eaton
Tariq Mundiya
Alexander L. Cheney
Zeh S. Ekono
787 Seventh Avenue
New York, NY 10019
Telephone:  (212) 728-8000
Email:   meaton@willkie.com
     tmundiya@willkie.com
     acheney@willkie.com
     zekono@willkie.com

*Attorneys for Defendants CBS Corporation, Gary L. Countryman, Linda M. Griego, Joseph R. Ianniello, Lawrence Liding, Doug Morris, and David Rhodes*

*/s/ Meredith Kotler*
Meredith Kotler
Rahul Mukhi
Russell A. Mawn, Jr.
One Liberty Plaza
New York, NY 10006
Telephone:  (212) 225-2000
Email:   mkotler@cgsh.com
     rmukhi@cgsh.com
     rmawn@cgsh.com

*Attorneys for David R. Andelman, Robert N. Klieger, and Shari E. Redstone*

---

[43]   *See, e.g., Patel*, 2016 WL 1629325, at *17 (dismissing Section 20(a) claim because plaintiffs failed to allege particularized facts showing CEO and CFO knew, should have known, or were in any way connected to alleged accounting fraud taking place at company that formed basis of claim); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d at 255–56; *Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 758 (S.D.N.Y. 2018), *aff'd*, 752 F. App'x 56 (2d Cir. 2018).

**DLA PIPER LLP**

*/s/ Richard F. Hans*
Richard F. Hans
Jessica A. Masella
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 335-4500
Email:  richard.hans@dlapiper.com
          jessica.masella@dlapiper.com

*Attorneys for William S. Cohen*

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Scott A. Edelman*
Scott A. Edelman (*pro hac vice*)
Ilissa Samplin
2029 Century Park East, Suite 4000
Los Angeles, CA 90067
Telephone:  (310) 557-8061
Email:  sedelman@gibsondunn.com
          isamplin@gibsondunn.com

*Attorneys for Leonard Goldberg*

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

*/s/ Daniel J. Kramer*
Daniel J. Kramer
David W. Brown
Audra J. Soloway
Brad D. Feldman
1285 Avenue of the Americas
New York, NY 10019
Telephone:  (212) 373-3000
Email:  dkramer@paulweiss.com
          dbrown@paulweiss.com
          asoloway@paulweiss.com
          bfeldman@paulweiss.com

*Attorneys for Bruce S. Gordon*

**RICHARDS KIBBE & ORBE LLP**

*/s/ Lee S. Richards III*
Lee S. Richards III
Matthew M. Riccardi
Andrew Podolin
200 Liberty Street
New York, NY 10281
Telephone:  (212) 530-1800
Email:  lrichards@rkollp.com
          mriccardi@rkollp.com
          apodolin@rkollp.com

*Attorneys for Charles K. Gifford*

**SULLIVAN & CROMWELL LLP**

*/s/ Sharon L. Nelles*
Sharon L. Nelles
Beth D. Newton
125 Broad Street
New York, NY 10004
Telephone:  (212) 558-4000
Email:  nelless@sullcrom.com
          newtonb@sullcrom.com

*Attorneys for Martha L. Minow*

**WILLIAMS & CONNOLLY LLP**

*/s/ Brendan V. Sullivan Jr.*
Brendan V. Sullivan Jr.
Jonathan B. Pitt
Steven M. Cady
725 Twelfth Street NW
Washington, D.C. 20005
Telephone:  (202) 434-5000
Email:  bsullivan@wc.com
          jpitt@wc.com
          scady@wc.com

*Attorneys for Joseph A. Califano, Jr.*