UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

CONSTRUCTION LABORERS PENSION    :
TRUST FOR SOUTHERN CALIFORNIA,    :
GENE SAMIT and JOHN LANTZ, individually    :
and on behalf of all others similarly situated,    :
   :
                   Plaintiffs,    :
   :
          -against-    :
   :
CBS CORPORATION et al.,    :
   :
           Defendants.    :

18-CV-7796 (VEC)

OPINION AND ORDER

------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      This is a putative securities class action against CBS Corporation ("CBS" or "the Company") and several of its officers and employees, including former CEO and Chairman of the Board Leslie Moonves.  Plaintiffs bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and related regulations.

      The Amended Complaint alleges that Moonves—the architect of the Company's success—concealed a dark history of sexual misconduct and fostered a hostile workplace culture that posed material business risks to the Company.  Am. Compl. (Dkt. 59) ¶¶ 2–3, 5.  Defendants allegedly failed to disclose the risk that journalists would uncover and expose Moonves's misconduct and force Moonves out, all the while paying lip service to the Company's purported anti-harassment ethical standards.  *Id.* ¶¶ 4, 6.

      The putative class includes purchasers of CBS stock from September 26, 2016, to December 4, 2018 (the "Class Period") and hinges on two corrective disclosures—Ronan Farrow's initial exposé on Moonves and CBS that was published in the *New Yorker* on July 27, 2018, and three articles that were published on December 4, 2018, by the *New York Times*

disclosing new details about Moonves's misconduct that the reporters drew from an independent investigation that had been commissioned by CBS and then leaked to the press. *Id.* ¶¶ 1, 19.

CBS and all individual Defendants except Moonves made a joint motion to dismiss, and Moonves made a separate motion to dismiss. Dkts. 76–77. Both argue that the Amended Complaint fails to state a claim and must be dismissed under Federal Rule of Civil Procedure 12(b)(6). The Court grants in part and denies in part both motions.

## BACKGROUND[1]

CBS is a mass media, entertainment, and publishing company. Am. Compl. ¶ 28. It operates various businesses spanning these industries, including the CBS Television Network, cable networks, content production and distribution, television stations, internet-based businesses, and consumer publishing. *Id.* ¶ 2. Individual Defendants include Moonves, his former co-Board member and CBS's controlling shareholder Shari Redstone, other Board members from the Class Period, and three executive employees: former COO Joseph Ianniello, former Executive VP Lawrence Liding, and President of CBS News David Rhodes. *Id.* ¶¶ 28–29, 30–33. The facts in this case center on Moonves's allegedly unique value to the Company and on accusations of sexual misconduct made against Moonves and other non-defendant executives at CBS that were reported by the *New Yorker* and other news organizations.

---

[1] On this motion to dismiss, the Court accepts all factual allegations in the pleadings as true and draws all reasonable inferences in the light most favorable to Plaintiffs. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). The Court may also "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the [Securities and Exchange Commission], and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

# I.     Moonves's Leadership Was Instrumental to CBS's Success

Moonves led CBS for over two decades in varying roles, including President, CEO, and Chairman of the Board. *Id.* ¶¶ 38–41. He stepped down on September 9, 2018, and was terminated for cause on December 17, 2018. *Id.* ¶¶ 18, 29. During his tenure, CBS's stock rose from $5 per share to $70. *Id.* ¶ 39. Analysts lauded his leadership, stating, for example, that Moonves was the "secret weapon" and "key to" CBS's success. *Id.* ¶ 40. Analysts placed an "unquantifiable premium" on Moonves's creative input, network, and successful strategic track record. *Id.* ¶ 41. The Company's proxy statements attributed record-setting revenues in 2016 and 2017 to Moonves's leadership. *Id.* ¶¶ 40, 42.

# II.    Moonves and CBS Face a #MeToo Reckoning

Several events portended what has become known as the #MeToo movement—a wave of victim- and journalist-driven revelations of sexual assault perpetrated by media and entertainment power brokers. In late 2016, Fox News came under scrutiny when it settled several sexual harassment claims against top executives and media figures, including Bill O'Reilly and Roger Ailes. *Id.* ¶ 44. These and past settlements came to light due to investigative reporting, leading to O'Reilly's termination. *Id.* A ground swell of solidarity from victims of sexual harassment and assault trended on Twitter as hashtag MeToo, rattling the industries as new accusations against executives rolled out from what came to be characterized as a "movement." *Id.* ¶¶ 44–45. The most significant report, credited with officially kicking off the #MeToo movement, was Ronan Farrow's exposé published in the *New Yorker* in October 2017 of film producer Harvey Weinstein, describing in lurid detail a long history of sexual misconduct. *Id.* ¶¶ 7, 46.

Before and after the *New Yorker* article about Weinstein, CBS had its own issues with workplace sexual harassment. Producer Brad Kern, executive producer Andrew Kreisberg, vice

president Vincent Favale, and other senior level managers were accused of sexual harassment; CBS terminated or suspended some of them and settled several related lawsuits. *Id.* ¶¶ 13, 66, 70–73, 84. There were also allegations of retaliation against victims by those managers. *Id.* ¶¶ 70, 74, 87. On November 20, 2017, the *Washington Post* published an article detailing alleged sexual misconduct by Charlie Rose—a contributing correspondent for CBS News's *60 Minutes* and co-host of *CBS This Morning*—involving multiple women who worked with him. *Id.* ¶ 7. CBS News fired Rose shortly after the report ran. *Id.* ¶ 68.

Around November 2017, Moonves learned of a criminal complaint that had been filed with the Los Angeles Police Department ("LAPD") "accusing Moonves of physically restraining [the complainant] and forcing her to perform oral sex on him, and of exposing himself to her and violently throwing her against a wall in later incidents." *Id.* ¶¶ 15, 55. Law enforcement sources later reported that they found the complainant's allegations "credible and consistent but prosecutors declined to pursue charges because the statutes of limitations for the crimes had expired." *Id.* ¶ 55.

In early December 2017, on the heels of learning about the LAPD complaint, Moonves was contacted by Marv Dauer, the former manager of actress Bobbie Phillips, about the possibility that Phillips would publicly reveal incidents of sexual assault by Moonves that occurred at the beginning of her career. *Id.* ¶¶ 16, 57–58. Moonves acknowledged to Dauer that he believed that an article about him and Phillips would be published shortly. *Id.* ¶ 80. Through Dauer, Moonves offered Phillips work at CBS, stating privately to Dauer that he believed he would be "done" if Phillips talked to the media. *Id.* ¶¶ 58, 80.

In January 2018, Redstone heard rumors that Moonves would soon face accusations of sexual misconduct and have a "#MeToo moment" in the press. *Id.* ¶ 78. At her direction, CBS

engaged a law firm to investigate the rumor. *Id.* ¶ 79. In late January, the law firm reported that "Moonves had told [them] that while there might have been a few incidents before he came to CBS, there was no cause for concern now." Sept. 12, 2018, *N.Y. Times* Article (Dkt. 80, Ex. 28) at 3. The law firm told CBS that "there was nothing to worry about." Nov. 28, 2018, *N.Y. Times* Article (Dkt. 80, Ex. 29) at 6–7. Also in early 2018, Moonves informed some members of the nomination and governance ("N&G") committee of the CBS Board about the complaint that had been filed with the LAPD; in April 2018, the CBS Board called an emergency meeting to discuss a course of action if a rumored-of report should publicly emerge regarding Moonves. Am. Compl. ¶ 78. The Board cancelled the meeting when it discovered that Moonves was not the subject of the soon-to-be-published article about which they had heard rumors. *Id.*

A few months later, on July 27, 2018, the *New Yorker* published an exposé detailing accusations from six women who claimed Moonves had sexually assaulted them "between the nineteen-eighties and the late aughts," with the most recent incident allegedly occurring in 2006. *Id.* ¶¶ 9, 49, 52, 145, 149; *see* July 27, 2018, *N.Y. Times* Article (Dkt. 80, Ex. 21). The accusations included "forcible touching or kissing during business meetings, in what they said appeared to be a practiced routine," and two women stated that "Moonves physically intimidated them or threatened to derail their careers." *Id.* ¶¶ 49–53. A second *New Yorker* article, published on September 9, 2018, detailed accusations from six other women, including allegations of forced oral sex. *Id.* ¶¶ 54–56. Moonves also allegedly retaliated against his accusers. *Id.* In addition, these articles and others from outlets such as the *Wall Street Journal* described incidents of sexual harassment at CBS that went beyond Moonves, including with "60 Minutes" chief Jeff Fager. *Id.* ¶¶ 65–67.

Shortly after first *New Yorker* article broke in July 2018, the CBS Board announced that it would engage outside counsel to independently investigate the allegations against Moonves and CBS. *Id.* ¶¶ 18, 59. The day of the second article's publication, CBS reported that Moonves would step down as the Company's Chairman and CEO. *Id.* ¶ 12.

## III.  A Draft Report Leaks from CBS's Independent Investigation of Moonves

On December 4, 2018, the *New York Times* published the details of a fifty-nine page draft report from CBS's independent investigation into Moonves, describing previously unreported acts of sexual misconduct by Moonves. *Id.* ¶¶ 19–20, 154–55. The draft report highlighted that Moonves had "repeatedly lied to investigators about his behavior" and "destroyed evidence and misled investigators in an attempt to preserve his reputation and save a lucrative severance deal." *Id.* ¶ 155. In investigating CBS's workplace culture more generally, the draft report described "past incidents of improper and unprofessional conduct" by other senior CBS employees. *Id.* ¶¶ 19, 89. The draft report concluded that Moonves's behavior "arguably constitutes willful misfeasance and violation of the company's sexual harassment policy," and "the Company's historical policies, practices and structures have not reflected a high institutional priority on preventing harassment and retaliation." *Id.* ¶¶ 60, 89.

After reviewing the findings of the investigation, which included interviews with approximately 350 people, CBS's Board decided to terminate Moonves for cause due to his "willful misfeasance" and lack of cooperation with the investigation. *Id.* ¶¶ 150, 157.

## IV.  Defendants' Public Statements

From 2016 to 2018, CBS's proxy statements incorporated the Company's Business Conduct Statement ("BCS"), which "sets forth the Company's standards for ethical conduct that are expected of all directors and employees of the Company." *Id.* ¶ 100. The proxies stated that the BCS was designed to address "[t]he Company's commitment to providing . . . a bias-free and

harassment-free workplace environment." *Id.* The BCS itself contained a section stating that "CBS has a 'zero tolerance' policy for sexual harassment," and that CBS would "take all steps necessary and appropriate to stop such acts of harassment or discrimination of which it becomes aware." *Id.* ¶ 103.

The proxies from 2016 to 2018 also discussed CBS's Supplemental Code of Ethics for Senior Financial Officers (the "Ethics Code"). *Id.* ¶ 105. The proxies stated that the Ethics Code was "applicable to the Company's Chief Executive Officer," and required the CEO to disclose any information regarding a violation of the BCS to CBS's Chief Legal Officer. *Id.*

Finally, the proxies described Moonves as being a "critical link to management's perspective" and as having a "unique institutional knowledge of the Company." *Id.* ¶ 99. Additionally, CBS—in its annual and quarterly reports during the class period—disclosed potential risks to "the Company's business" and revenues if CBS were to lose its "chief executive officer" or other "key employees." *Id.* ¶ 95.

On November 29, 2017, shortly after Charlie Rose was fired, Moonves told an audience at *Variety* magazine's Innovate Summit—where he was the keynote presenter and interviewee— that the #MeToo movement was "a watershed moment" and that "it's important that a company's culture will not allow for this. . . . There's a lot we're learning. There's a lot we didn't know." *Id.* ¶ 8; Keynote Presentation Video (Dkt. 95, Ex. 36).

In March 2018, Rhodes, President of CBS News, made a series of statements regarding the allegations of sexual misconduct against Rose. Specifically, Rhodes denied having any knowledge of Rose's misconduct during Rose's time at CBS News and spoke of the need to take seriously the imperative of removing "misconduct and harassment" from the workplace while "drawing out the truth—revealing, not concealing." Am. Compl. ¶ 130. A representative of

CBS News similarly stated in May 2018 that "[CBS News] take[s] swift action when we learn of unacceptable behavior." *Id.* ¶ 138. Finally, in an interview with *Hollywood Reporter* on July 19, 2018, Rhodes stated that Moonves was "really good" at managing the oversight of sexual harassment claims. *Id.* ¶ 143.[2]

## V.      CBS's Stock Fluctuation and Trading Activity by Executives

Following the July 27, 2018, publication of sexual assault allegations involving Moonves, CBS Class A and Class B stock prices fell about six percent, from $57.85 to $54.27 per share and $57.53 to $54.01 per share, respectively. *Id.* ¶¶ 10, 146. By the next trading day, the stock prices had each fallen about ten percent total. *Id.* The stock price recovered slightly, but following the December 2018 *New York Times* article regarding the draft report from the independent investigation, CBS's stock prices again declined approximately 4%. *Id.* ¶ 21.

Before sexual harassment allegations against CBS executives became public, Moonves and other CBS executives collectively sold approximately 3.4 million shares of CBS stock. *Id.* ¶ 91. Moonves sold around $155 million worth between June 2017 and May 2018. *Id.* Ianniello sold around $30 million worth between January 2017 and June 2018. *Id.* Liding sold around $2 million worth between February and March 2017, and non-defendant Gil Schwartz (head of communications at CBS) sold around $15 million worth between February 2017 and June 2018. *Id.* ¶¶ 20, 91.

---

[2]       The Amended Complaint references a handful of other statements from before and during the Class Period, but the Court has summarized here only those statements most relevant to this Opinion.

**DISCUSSION**

# I.      Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted). The Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to the plaintiff. *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013). The Court, though, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

# II.      Motions to Dismiss Plaintiffs' Section 10(b) Claim

## A.      The Elements of the Claim

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b–5, makes it unlawful to "make any untrue statement of a material fact" or "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

To state a claim under these provisions, a plaintiff must plead six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Because claims under Section 10(b) and Rule 10b–5 sound in fraud, a heightened pleading requirement applies. Pursuant to Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)); *see also* 15 U.S.C. § 78u–4(b)(1)(B).

## B. The Amended Complaint Does Not "Puzzle Plead"

CBS first argues that the Amended Complaint should be dismissed in its entirety because it does not explain why and how each particular statement is false or misleading. That sort of "puzzle pleading"—marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false—fails to state a claim because it is insufficiently particular under the PSLRA. *See Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012). But CBS's characterization of the Amended Complaint is inaccurate. Although the Amended Complaint is not a model of clarity, it identifies statements and omissions, describes relevant predicate events, and alleges how those events make the statements and omissions false or misleading. In doing so, the Amended Complaint describes "what portion of each quotation constitutes a false representation" and avoids "placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005). The Amended

Complaint is far from the 280-page complaint in *Bahash* where the lengthy quotations and canned allegations made any analysis a Sisyphean task.[3]

### C. The Amended Complaint Adequately Alleges One Misleading Statement of Material Fact

A single theory of securities fraud underpins the Amended Complaint. Plaintiffs allege that Moonves and other managers and officers sexually harassed and threatened female employees behind the scenes for years, fostering a crude and hostile workplace culture. This behavior and culture created a risk that CBS would lose Moonves, its star executive, should his dirty laundry come to light. Plaintiffs' securities fraud theory is that, with the advent of the #MeToo movement, the risk of losing Moonves to sexual scandal increased, and yet Defendants failed to disclose the risk even as they touted CBS's ethical culture and Moonves's importance to the Company's financial performance. *See* Am. Compl. ¶¶ 2, 16, 98, 106–11, 123–24, 129, 140, 144.

The Amended Complaint includes numerous alleged misstatements that fall broadly into six categories: (1) the BCS, Ethics Code, and various related statements,[4] *id.* ¶¶ 100–05, 119–21, 134–36; (2) disclosures about the importance to CBS of key personnel and Moonves in particular, *id.* ¶¶ 95–97, 99, 114, 116–18, 122, 127, 132, 139; (3) management statements to news media made by Moonves, Rhodes, and CBS News, *id.* ¶¶ 125, 130–31, 138, 141–43; (4) disclosures about legal proceedings, *id.* ¶ 128; (5) disclosures contained in a press release announcing CBS's financial results, *id.* ¶ 126; and (6) disclosures about CBS's corporate governance, *id.* ¶ 137.

---

[3]  CBS's own detailed and targeted motion to dismiss betrays this point.

[4]  The parties dispute whether the BCS and Ethics Code were incorporated by reference into CBS's proxy statements. That issue is irrelevant to the conclusions of this Opinion, so the Court does not address it.

As to the last three categories, Plaintiffs did not respond to Defendants' arguments that these statements were neither material nor misleading. Thus, Plaintiffs abandoned their claims as to the statements contained in categories four, five, and six. *See In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926, 2018 WL 1595985, at *14 n.9 (S.D.N.Y. Mar. 28, 2018).

As to the first three categories, the statement by Moonves to the *Variety* audience is materially misleading, but the remaining statements are either immaterial or not adequately alleged to be false or misleading.

### 1.    Legal Principles

To support a claim of securities fraud, the stated or omitted fact must be material. A fact is material if it "would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quotation omitted). Put differently, "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) (quotation omitted). Statements that are too vague or general to be relied upon— puffery—are, by definition, not material. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).

An alleged statement or omission must also be false or misleading. Whether a statement is false or misleading is "evaluated not only by 'literal truth,' but by 'context and manner of presentation.'" *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (quoting *Operating Local*, 595 F.3d at 92). To base a claim on an omission—such as failing to disclose a material business

risk—a plaintiff must also plead that the defendant had a duty to disclose the omitted fact. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

Section 10(b) and Rule 10b–5, alone, "do not create an affirmative duty to disclose any and all material information," but a duty to disclose may arise, as pertinent here, in two circumstances. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). A duty to disclose exists if, first, a statement would otherwise be "inaccurate, incomplete, or misleading" without the omitted fact. *Stratte-McClure*, 776 F.3d at 101 (quoting *Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992)). Thus, there is generally no duty to disclose internal misconduct unless disclosure is "necessary to prevent the corporation's *other* statements from being misleading." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752 (S.D.N.Y. 2017) (collecting cases). This inquiry, unlike other duty-to-disclose scenarios, merges with the question of whether the omitted fact is material. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). The second circumstance in which there is a duty to disclose exists if a statute or regulation requires disclosure. *Stratte-McClure*, 776 F.3d at 101.

### 2. The Business Conduct Statement, Ethics Code, and Related Statements Are Neither Material nor False or Misleading

Corporate codes of conduct tend to be "general statements about reputation, integrity, and compliance with ethical norms [that] are inactionable puffery"—as opposed to being statements of facts—and are, therefore, generally incapable of forming the basis for a Section 10(b) claim. *Singh*, 918 F.3d at 63 (quotation omitted). This includes statements that are "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014). That said, materiality is inherently fact-specific. *Basic*, 485 U.S. at 236. Thus, although it is rare for a code

of conduct to include statements of fact, let alone material facts, it is not the case that all statements in a code of conduct are categorically immaterial puffery.

In rare circumstances courts have allowed statements in a code of conduct to survive a motion to dismiss, holding that under the unique circumstances of the case, the statements could be viewed as material statements of fact. Examples of such rare circumstances include a company wielding its code of conduct to reassure investors that nothing was amiss when faced with suspicions of internal malfeasance;[5] statements that were detailed and sufficiently concrete that a reasonable investor could rely upon them;[6] and statements that were so anathema to the alleged internal wrongdoing that, even if general or aspirational, they were materially false.[7]

---

[5]    *See, e.g.*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (holding that aspirational statements about a code of conduct in this context were material because "they were made in an effort to reassure the investing public about the Company's integrity, specifically with respect to bribery, during a time of concern"); *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15-CV-2106, 2017 WL 1169629, at *11 (S.D.N.Y. Mar. 28, 2017) (holding that a company's "mere adoption of a code of ethics, without statements assuring investors that its employees are in fact in compliance with the code, is not misleading"); *In re Petrobras*, 116 F. Supp. 3d at 381 ("When . . . statements were made repeatedly in an effort to reassure the investing public about the [c]ompany's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the [c]ompany."); *cf. Retail Wholesale, & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (holding that a code of conduct is "inherently aspirational but stating, in dictum, that "[t]he analysis would likely be different if [the company] had continued the conduct that gave rise to the 2006 scandal while claiming that it had learned a valuable lesson in ethics.").

[6]    *See, e.g.*, *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-CV-4665, 2014 WL 4832321, at *16 (S.D.N.Y. Sept. 29, 2014) (holding that the statement that the company had "a comprehensive and well-documented set of internal controls that provides reasonable assurance that its financial transactions are recorded accurately and completely, and its assets are safeguarded," was a statement of fact because it guaranteed "concrete steps" the company had taken to comply).

[7]    *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-CV-6728, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (holding that statements about basing decisions on merit, availability of reporting mechanisms, and disciplining those who violate ethical standards were material and false because they were "directly at odds" with allegations of egregious company-wide sexual harassment). On November 20, 2019, the Second Circuit granted a Rule 23(f) petition for interlocutory appeal in *Signet*, which may resolve the question, among others, whether a securities fraud case can be predicated on the code-of-conduct statements in that case, as Judge McMahon held. *See* 19-2268, Dkts. 1-1, 82. Because the Court does not rely on *Signet*, and the Rule 23(f) petition primarily concerns issues of class certification, any ruling on the Rule 23(f) petition would likely be irrelevant to this Opinion. *See also In re Banco Bradesco*, 277 F. Supp. 3d at 660 (holding that aspirational statements were material and false also because the plaintiffs had alleged "that no such aspirations were at play"); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508 (S.D.N.Y.), *opinion corrected on denial of reconsideration*, 612 F. Supp. 2d 397 (S.D.N.Y. 2009) (holding that statements touting a rating agency's independence were material and false where the complaint alleged that the agency's clients held influence over it).

Although it is, therefore, conceivable that a statement in a code of conduct could be factual and material, most of the statements in CBS's BCS are far too general and aspirational to invite reasonable reliance. The BCS states that CBS "*believes* in an environment that is free from workplace bullying"; "CBS has a '*zero tolerance*' *policy* for sexual harassment"; "[CBS] *will not tolerate* retaliation against any person who makes a good faith report of misconduct"; and "[w]e will take reports of violation or suspected violation of these policies *very seriously*." Am. Compl. ¶¶ 103–04 (emphases added). Similarly, Moonves's letter attached to the BCS states that "[w]e are *committed* to maintaining the highest standards in everything we do"; "we all have a *responsibility to uphold* the highest standards of ethical and appropriate business actions"; and "[g]*uiding* our Company is a strong and established ethical code." *Id.* ¶ 102 (emphases added). These statements were not made to reassure investors that no CBS executive, or its CEO specifically, was susceptible to being the target of accusations of sexual harassment. Nor do they describe concrete steps taken by the Company to ensure compliance with internal policy or the law. Nor is the alleged misconduct, although reprehensible, alleged to be so pervasive that the Amended Complaint has plausibly alleged that CBS, in fact, held none of its asserted aspirations. In short, most statements in the BCS are mere puffery. *See, e.g.*, *Retail Wholesale, & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (affirming dismissal of Section 10(b) claims based on statements in a code of conduct that the company "refus[ed] to tolerate harassment" and "report[ed] misconduct"); *Lopez v. CTPartners Executive Search Inc.*, 173 F. Supp. 3d 12, 28–29 (S.D.N.Y. 2016) (dismissing Section 10(b) claims based on statements in a code of conduct that the company was taking gender discrimination allegations "very seriously" and "promot[ing] an inclusive and positive working environment").

Two sets of statements in the BCS come close to being statements of fact; but they are nonetheless too general and disconnected from Plaintiffs' central theory of securities fraud to be material. First, CBS represented that it "will" take "all steps" and "remedial action" to stop "sexual harassment" and "protect the workplace environment."[8] Am. Compl. ¶ 103. Second, CBS represented that there "are several different methods for making an anonymous report"; that CBS "will promptly and thoroughly investigate" allegations of sexual harassment; and that those who report sexual harassment "will not be retaliated against."[9] *Id.* ¶¶ 103–04. No reasonable investor would rely on these statements as assurance that CBS had no high-level executive who was vulnerable to a "#MeToo moment." *Id.* ¶¶ 15, 78. The statements alleged in the Amended Complaint to be false do not guarantee compliance or make any commitment to take concrete steps to address sexual harassment complaints. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 658 (S.D.N.Y. 2017) ("A code of conduct is not a guarantee that a corporation will adhere to everything set forth in its code of conduct." (quoting *Bondali v. YumA Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015)). They in fact describe no specific steps or controls at all, failing entirely to elaborate on what exactly the Company would do to prevent or respond to workplace sexual harassment.

---

[8]     The complete statements are: "Discriminatory treatment, including sexual harassment and harassment based on a person's race, age or other protected status, is strictly prohibited. CBS will take all steps necessary and appropriate to stop such acts of harassment or discrimination of which it becomes aware"; "If a consenting romantic or sexual relationship between a supervisor and a direct or indirect subordinate should develop, CBS requires the supervisor to disclose this information to his or her Company's Human Resources Department. . . . Upon being informed or learning of the existence of such a relationship, CBS will take steps that it deems appropriate to protect the workplace environment"; "If it is determined that harassment or retaliation has occurred, effective remedial action will be taken." Am. Compl. ¶ 103.

[9]     The complete statements are: "CBS fairly, completely and timely investigates all complaints about conduct that violates this harassment-free workplace environment policy"; "There are several different methods for making an anonymous report"; "CBS will promptly and thoroughly investigate any allegation of conduct that may violate the policies in this Statement"; "You will not be retaliated against because of a good faith report or because you cooperate with an investigation of a suspected violation." *Id*. ¶¶ 103–04.

CBS's descriptions of its BCS and Ethics Code contained in its proxies underscore the generic and aspirational nature of the statements contained within them. The proxies make clear that the BCS "sets forth the Company's *standards* for ethical conduct," that "the BCS addresses, among other things, topics such as the Company's *commitment* to providing equal employment opportunities and a bias-free and harassment-free workplace environment," and that "[the Ethics Code addresses] a *general obligation to promote* honest and ethical conduct within the Company." Am. Compl. ¶¶ 100, 105, 119, 121, 134, 136 (emphases added).

The Amended Complaint does not allege that any of these statements were made to reassure investors or suggest that allegations of sexual misconduct would not damage the Company. The Company first made its BCS statements years before #MeToo, then incorporated them in the years leading up to #MeToo through boilerplate proxy statements unrelated to any accusation against any CBS executive. There is no allegation that the Company highlighted its BCS in the wake of revelations about workplace sexual harassment to reassure investors that CBS would not be rocked by similar allegations against its executives. And the Amended Complaint does not allege that the Company misled investors into believing that Moonves would remain at the Company indefinitely or that he personally was beyond reproach vis-à-vis his workplace conduct. Although corporations may have "a duty to update opinions and projections . . . if the original opinions or projections have become misleading as the result of intervening events," for such a duty to exist, the opinion or projection must express more than the generic "hope[s]" and aspirations expressed in the BCS here. *In re Time Warner*, 9 F.3d at 267. Put differently, no reasonable investor would have relied on the BCS statements to reassure him or

herself that the Company was immune to losing key executives due to accusations of sexual misconduct.[10]

Moreover, even if the complained-of statements were material statements of fact, the Amended Complaint does not allege that they were false or misleading. To the contrary, the Amended Complaint contains several allegations that the Company acted as the BCS said it would. *See* Am. Compl. ¶¶ 70 (alleging that Kern was ousted in October 1, 2018, after a third investigation), 73 (alleging that Favale was placed on administrative leave in October 2018), 106 (alleging that the Company investigated allegations of sexual harassment). Moreover, the statements made no representations of when, how soon, in what manner, or to what extent the Company would act. If the Company took no action at all in the face of blatant and pervasive violations of its BCS, then these statements might be materially false or misleading. Such were the allegations in *Signet Jewelers*, upon which Plaintiffs rely heavily, but they are not the allegations here. *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-CV-6728, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018). The allegation that sexual harassment was pervasive and widespread at CBS during the Class Period, Am. Compl. ¶ 73, is conclusory. That allegation is supported by only a handful of examples from a company with over 12,000 employees.[11] *Id.* ¶¶ 69–71, 73–74; 2018 Annual Report (Dkt. 80, Ex. 4) at I-16.

The Amended Complaint also does not allege that the statements in the Ethics Code were false or misleading. The Ethics Code requires senior executives to report material information that affects previous disclosures in public filings, concerns about deficiencies in internal controls

---

[10]     To the extent the alleged proxy statements mimic the BCS and Ethics Code, they are also not material. *See id.* ¶¶ 100–01, 105, 119–21, 134–36.

[11]     It is also contrary to the conclusion drawn by CBS's internal investigation, as the Board stated that "harassment and retaliation are not pervasive at CBS." Form 8-K, Dec. 17, 2018, (Dkt. 80, Ex. 10) at Exhibit 99.

over financial reporting, and "any information he or she may have concerning any violation of CBS's Business Conduct Statement." Am. Compl. ¶ 105. In addition to failing to explain why those requirements, other than the last, are even relevant, the Amended Complaint does not allege that those requirements were not in place. Nor does it allege that the Company guaranteed full compliance with the requirements contained in the Ethics Code.

Lastly, the Amended Complaint points to several proxy statements, from 2016 to 2018, that contained statements about the BCS and Ethics Code, but it does not allege that those statements were false or misleading. *See id.* ¶¶ 100–01, 105, 119–21, 134–36. In fact, it alleges the opposite—that the proxy statements accurately summarized the BCS and Ethics Code. The proxy statements represented that employees are "required to certify as to their compliance with the BCS" and must "disclose any potential conflicts of interest"; the Amended Complaint does not allege that those statements are false. *See id.* ¶¶ 100, 119, 134. If employees failed to certify compliance or failed to disclose conflicts of interest, that would be a compliance issue; it would not be relevant to a securities fraud claim, however, because no complained-of statement represented that CBS's employees fully complied with all such requirements.

### 3. The Key Personnel and Critical Link Disclosures Were Not Misleading

The Amended Complaint alleges that a number of statements regarding Moonves's importance to the Company (the "Risk Disclosures") were misleading. The "Key Personnel Disclosure" stated that the "Company's business depends upon the continued efforts, abilities and expertise of its chief executive officer and other key employees. . . . [T]he loss of its executive officers could have a material adverse effect on the Company." *Id.* ¶¶ 95, 114, 127. The "Critical Link Disclosure" stated that, "[a]s the Company's Chairman of the Board, President and Chief Executive Officer, Mr. Moonves provides a critical link to management's

perspective in Board discussions regarding the businesses and strategic direction of the Company." *Id.* ¶¶ 99, 118, 132. The Company made these disclosures in various 10-K annual reports and 10-Q quarterly reports beginning with the 10-K for the 2015 fiscal year; the last disclosure occurred in the first quarter 10-Q for 2018 (filed in May) incorporating the above-stated risk factors from the 2017 10-K.[12] *Id.* ¶¶ 95, 139.

Under Rule 10b–5, it is unlawful to, *inter alia*, "omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5(b). Thus, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). "[S]o-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) (quotation omitted) ("The rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation, according to which a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue."). Risk disclosures are actionable half-truths when the company warns about a risk that could have an impact on its business when, in fact, that risk has already materialized. *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013); *see also Plumbers And Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, No. 17-CV-5753, 2019 WL 2360942, at *4 (S.D.N.Y. Mar. 4, 2019) (holding that risk disclosures were misleading where "the company was already experiencing

---

[12]    The parties dispute whether the key personnel and critical link disclosures were incorporated by reference into the quarterly reports, *see* CBS's Joint Mot. to Dismiss (Dkt. 79) at 19 n.20; the Court does not have to resolve that issue to resolve the motions to dismiss.

significant setbacks [from the disclosed risk] . . . at the time the 10-K was issued" without also disclosing that the setback had occurred).

The Amended Complaint asserts, and Plaintiffs argue, that the Risk Disclosures were misleading because the Company failed to disclose the risk that Moonves would be ousted due to accusations of sexual misconduct. Am. Compl. ¶¶ 98, 106, 123, 129, 140; Pls.' Opp. to CBS's Joint Mot. to Dismiss ("Opp. to CBS's Mot.") (Dkt. 82) at 30–31. The Court disagrees.

The Amended Complaint does not allege that Defendants knew that the risk of Moonves's termination for sexual misconduct had "already materialized" at the time the Company made the risk disclosures about which Plaintiffs complain. According to the Amended Complaint, the first hint that CBS had that Moonves *might* have "a #MeToo problem" came in January 2018 when Redstone allegedly heard rumors that allegations against Moonves might surface. Am. Compl. ¶¶ 15, 78–79. Consistent with the BCS and Ethics Code, Redstone instigated an internal investigation. That investigation concluded, apparently in error, that there was no cause for concern. Even Moonves himself, who stated to Dauer in December 2017 that he believed an article about him "would be published imminently," still said he thought he would "be ok." *Id.* ¶ 80. Moonves did not resign until September 9, 2018, four months after the last alleged Risk Disclosure in early May. *Id.* ¶¶ 149–50. And the Company did not decide to fire Moonves for cause until three months after that. *Id.* ¶¶ 18, 88. Given the chronology as alleged by Plaintiffs, even resolving all inferences in favor of Plaintiffs, the Court cannot conclude that the statements regarding the importance of Moonves to the Company were misleading for failing to reveal the risk that, despite his importance to the Company, he would be ousted over sexual misconduct allegations. It is well-established that "[a]n earlier statement is not somehow made

misleading simply because it failed to foretell a . . . problem which later materialized." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008).

Plaintiffs' argument that Moonves's departure was "imminent" at least by May 2018, and thus that the risk had materialized before the May 2018 10-Q was filed, is entirely speculative. *See* Opp. to CBS's Mot. at 32. First, the *New Yorker* did not publish its exposé of Moonves until July 27, 2018. Am. Compl. ¶ 49. Second, according to the Amended Complaint, all that was known by the persons empowered to fire Moonves—the CBS Board of Directors—before July 2018 were "rumors" that he was going to have a "#MeToo moment."[13] *See id.* ¶¶ 15, 78. And third, the Board did not initiate its independent investigation into Moonves until after the July 27 *New Yorker* article was published. *Id.* ¶ 18. That investigation did not conclude until December 17, 2018, *id.*, and the Amended Complaint does not allege that CBS dragged its feet initiating or conducting the investigation. It would have been strange—and irresponsible—for CBS to publicly predict the outcome of its independent investigation into Moonves before the investigation was complete or to disclose that Moonves was at risk of being ousted for having engaged in sexual misconduct based solely on rumors. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."). It is implausible to assert that Moonves's departure was known to be imminent as early as May 2018.[14] *Cf. Lopez*, 173 F. Supp. 3d at 34–35 ("Except

---

[13]     Although Moonves himself obviously knew facts that were unknown to the Board, the Amended Complaint does not allege that even he knew as early as May 2018 (when the last 10-Q relied upon by Plaintiffs was filed) that his days were numbered.

[14]     The Court also notes that the May 4, 2018, Form 10-Q was signed only by Ianniello and Liding. *See* Am. Compl. ¶ 139. The last alleged Risk Disclosure signed by other individual Defendants was signed several months earlier as part of the February 20, 2018, Form 10-K. *Id.* ¶ 127. The theory that they misled investors with the Risk

with the benefit of hindsight, th[e] scenario [that executives' boorish behavior would ultimately impact the bottom line as a result of being scandalously revealed] was speculative and conjectural.").

In any event, a conclusory allegation that Moonves's departure was "imminent" is insufficient to render the Risk Disclosures misleading. Plaintiffs concede as much: "Defendants knew or reasonably should have known about Moonves's misconduct and the *increased risk* he would be ousted given those allegations were likely to be disclosed." Opp. to CBS's Mot. at 31 (emphasis added). Even if the risk of Moonves's departure increased as #MeToo allegations gained steam, the Risk Disclosures were not misleading because they never quantified the likelihood that Moonves would depart, whether under a cloud or voluntarily. An increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies the risk would be misleading. *See In re Facebook*, 986 F. Supp. 2d at 516. It cannot be that every time a risk increases or decreases, a company must precisely quantify the increase or decrease in its disclosures identifying that risk. The Risk Disclosures merely "warn[ed] of the possible consequences of his termination"; they did not discuss in any way the likelihood that he would be terminated. *Harborview Master Fund, LP v. Lightpath Techs., Inc.*, 601 F. Supp. 2d 537, 545 (S.D.N.Y. 2009).

In and of themselves, the Risk Disclosures were not misleading. The Risk Disclosures stated simply that Moonves was important to CBS. They have nothing to do with Moonves's alleged misconduct. They did not state or suggest that Moonves had always behaved appropriately, nor did they purport to assess the likelihood that he would leave the Company or

---

Disclosures is consequently even less plausible; Moonves's departure would not occur for another eight or nine months, and there had been no public discussion of his misconduct in February 2018.

be implicated in accusations of misconduct.  In short, they neither stated nor implied anything that was untrue.  *See, e.g.*, *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (holding that statements were "not misleading because they [did] not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring."); *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 718–19 (S.D.N.Y. 2018) (holding that an omission that the company's CEO was engaged in misconduct did not render inaccurate prior statements about his importance).

> **4.      Rhodes's and CBS News's Statements to the News Media Were Neither Material nor Misleading, But Moonves's Statement to the *Variety* Audience Was Both**

The Amended Complaint alleges that Rhodes, CBS News, and Moonves misstated material facts to various news outlets.  Those statements commented on the #MeToo movement and on CBS News's and CBS's efforts to address workplace sexual misconduct in the wake of Charlie Rose's departure.  *See* Am. Compl. ¶¶ 125, 130–31, 138, 141–43.

> **a.      Rhodes's and CBS News's Statements**

On March 9 and May 3, 2018, Rhodes and CBS News described steps CBS News was taking to prevent workplace sexual harassment after it terminated Rose.  *Id.* ¶¶ 130, 138.  Rhodes stated that "[s]ome of the changes that you are seeing borne out in our workplaces, in standards of behavior, in more modern management, is a natural result of including more voices. . . . Our prescriptions as management will not be the same in every case and will sometimes not be popular."  *Id.* ¶ 130.  CBS News stated: "[s]ince we terminated Charlie Rose, we've worked to strengthen existing systems to ensure a safe environment where everyone can do their best work. . . . We offer employees discretion and fairness, and we take swift action when we learn of unacceptable behavior."  *Id.* ¶ 138.

These statements were generic puffery. They do not state or imply that Moonves, or any other executive, had not engaged in misconduct or would not be swept up in the #MeToo movement. Rhodes and CBS News's discussions of "prescriptions," "changes" being "borne out," "work[] to strengthen existing systems," and "swift action" were little more than a pep talk.[15] In addition, the Amended Complaint does not allege that any of these statements were false or misleading. There are no allegations that CBS News did not address workplace sexual harassment after Rose's termination. And even if Rhodes and CBS News had turned a blind eye to misbehavior that occurred in the past, the statements at issue did not deny such a history.

On May 3, 2018, Rhodes also denied that he or CBS News had prior knowledge of Rose's sexual misconduct. *Id.* ¶¶ 130–31. That statement is not alleged to be false and misleading; the Amended Complaint nowhere alleges that Rhodes or CBS News had any prior knowledge of Rose's misconduct. In any event, Rose's misconduct—or knowledge *vel non* of it—is not material given Plaintiffs' theory of securities fraud. The Amended Complaint does not allege that nondisclosure of Rose's misconduct had any relevance to investors. The story the Amended Complaint tells is about the "substantial risk that Moonves would be forced to leave the Company and that the Company would suffer declining advertising revenue should [Moonves's] conduct come to light." *Id.* ¶¶ 98(e), 123(e). As alleged, disclosures and omissions

---

[15] The Amended Complaint also alleges that Rhodes made similar statements on July 19, 2018, to *Hollywood Reporter*, but those statements post-date the last purchase of CBS's stock alleged in the Amended Complaint, and the Amended Complaint only alleges injury from purchases of CBS stock at artificially inflated prices. *See* Am. Compl. ¶¶ 141–43, 182, Schedule A. Thus, as to the statements to the *Hollywood Reporter*, Plaintiffs fail to plead the fourth element of securities fraud because Plaintiffs could not have relied on these statements in making their alleged purchases. *See Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7, 9 (2d Cir. 2012) ("[Plaintiffs] have not established the 'requisite proximate relationship' between [the alleged] statements and Plaintiffs' purchases of . . . stock." (quoting *Stoneridge*, 552 U.S. at 158)); *Zucker v. Sasaki*, 963 F. Supp. 301, 306 (S.D.N.Y. 1997) ("Allegedly false statements made after the named plaintiff's last stock purchase are not actionable because the plaintiff could not possibly have relied on such statements in purchasing the stock" (citing *Denny v. Barber*, 576 F.2d 465, 468 (2d Cir. 1978))). In any event, these statements are indistinguishable from Rhodes's other benign statements discussing CBS News's efforts to combat workplace sexual harassment.

about Rose and other managers are material only insofar as they somehow tend to prove that Defendants knew about Moonves's similar bad conduct. *See id.* ¶¶ 98, 123. The Amended Complaint does not allege that prior knowledge of the misconduct of other men—which might constitute "instances of corporate mismanagement"—was material to investors standing alone. *Bahash*, 506 F. App'x at 36 (quotation omitted); *see also Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) ("[S]ection 10(b) was not designed to regulate corporate mismanagement.").

### b. Moonves's Statement

On November 29, 2017, Moonves stated at an industry event hosted by *Variety* that "[#MeToo] is a watershed moment. . . . It's important that a company's culture will not allow for this. And that's the thing that's far-reaching. There's a lot we're learning. There's a lot we didn't know." Am. Compl. ¶ 125. The Amended Complaint, read in the light most favorable to Plaintiffs, adequately—though barely—alleges that this was a misleading statement of material fact.

The Amended Complaint adequately alleges that Moonves's statement was misleading. Although it is a very close case, it is barely plausible that a reasonable investor would construe his statement as implicitly representing that he was just learning of problems with workplace sexual harassment at CBS. His statement implied that he had not known of these problems previously, even though, in truth, he was at that time actively seeking to conceal his own past sexual misconduct from CBS and the public. *See id.* ¶¶ 3, 10, 14, 16, 20, 37–43, 79–80, 98, 123, 148. Moonves, although aware of undisclosed facts that undermined the implications that could be drawn from his statement, suggested one thing "when, in fact, [he] purportedly had little reason to believe [it]." *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 239–40 (S.D.N.Y. 2006). The Amended Complaint thus adequately alleges that Moonves's statement

falsely implied that he was not personally at risk of a forced resignation or ouster based on accusations of sexual harassment being leveled against him. *See* Am. Compl. ¶¶ 3, 10, 14, 16, 20, 37–43, 79–80, 98, 123, 148.

The misleading aspect of Moonves's statement is also adequately alleged to be material. The Court's inquiry is "whether defendants' representations . . . taken together and in context, would have misled a reasonable investor about the nature of the securities." *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (quotation omitted). The Court is mindful that the issue of materiality "requires delicate assessment of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). The Court thus heeds the principle that "[m]ateriality is a fact-intensive inquiry more appropriate for summary judgment or trial." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. Mar. 19, 2019). Stated at an industry summit, Moonves's statement could be construed as a representation that he had personally engaged in no sexual misconduct that could be a liability "during a time of concern" when media executives were being scrutinized. *In re Banco Bradesco*, 277 F. Supp. 3d at 660. A reasonable investor could have understood Moonves's statement to mean that he did not have exposure to sexual misconduct allegations, thus providing reassurance that Moonves, the one executive that the Company and analysts viewed as crucial to CBS's continued success, would not be compromised by the #MeToo Movement. *See* Am. Compl. ¶¶ 3, 10, 14, 16, 20, 37–43, 79–80, 98, 123, 148, 153. Thus, a reasonable investor could rely upon his statement as reflecting Moonves's own—and thus CBS's—lack of high-level exposure to the #MeToo movement.

**5.** **Item 303 of SEC Regulation S–K Did Not Impose on CBS an Affirmative Duty to Disclose Executives' Sexual Misconduct**

Plaintiffs argue that SEC regulations created a duty to disclose risks to the Company created by CBS's failure to follow its BCS and by Moonves's and other executives' allegedly imminent departures. Opp. to CBS's Mot. at 34. According to Plaintiffs, Item 303 of Regulation S–K ("Item 303"), commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), required disclosure of those risks in the Company's Forms 10-Q and 10-K filed during the Class Period. Am. Compl. ¶ 166; *see* 17 C.F.R. § 229.303. Although Item 303 creates a duty to disclose that can support a Section 10(b) claim, *Stratte-McClure*, 776 F.3d at 102, it created no pertinent duty here.

Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that [it] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Disclosure is necessary "where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Stratte-McClure*, 776 F.3d at 101 (quoting MD&A, Exchange Act Release No. 6835, 43 S.E.C. Docket 1330, 1989 WL 1092885, at *4 (May 18, 1989) ("Release No. 6835")). In addition, "only those trends, events, or uncertainties that [a registrant] actually knows of when it files the relevant report with the SEC must be disclosed." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016).

Disclosures required by Item 303 will most often relate to issues in the realm of micro and macroeconomics; for example, a "reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." Release No. 6835, at *4. For it is "[t]he aim of Item 303 [to] explain irregularities in

offering documents and prevent a company's last reported financial results from misleading potential investors." *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08-CV-9203, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010); *see also In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1210–11 (S.D.N.Y. 1996) ("There is a significant difference between events and trends affecting 'operations,' such as the closure of a plant or the increase in costs of raw materials, and competitive marketing strategies and plans."). The Second Circuit's decisions in *Christine Asia Company v. Ma* and *Stratte-McClure* are instructive. In *Christine Asia*, the court held that Alibaba was required to disclose the Chinese government's ultimatum that it must either pay enormous repeating fines or terminate a profitable portion of its website that sold counterfeit goods. 718 F. App'x 20, 23 (2d Cir. 2017). Similarly in *Stratte-McClure*, the court held that Morgan Stanley was required to disclose that the deteriorating subprime mortgage market was likely to cause trading losses that would affect the company's financial condition, given its large exposure to that market. 776 F.3d at 104. This feature of Item 303—required disclosure of issues with a direct impact on a company's financial condition—is salient throughout the decisions of this circuit. *See, e.g.*, *SAIC, Inc.*, 818 F.3d at 96 (holding that the complaint adequately alleged that a multi-million dollar exposure to fraud was required to be disclosed under Item 303); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (holding that the complaint adequately alleged that defects in a company's semiconductor chips sold to its largest customers "constituted a known trend or uncertainty that Ikanos reasonably expected would have a material unfavorable impact on revenues or income from continuing operations"); *In re Facebook*, 986 F. Supp. 2d at 511–12 (requiring disclosure of the impact on advertising revenue caused by members' increased mobile usage).

This is not to suggest that information about workplace sexual misconduct is categorically exempt from Item 303's disclosure requirements—the rule that Defendants press. *See* CBS's Joint Mot. to Dismiss (Dkt. 79) at 15. Item 303 is "intentionally general, reflecting the Commission's view that a flexible approach elicits more meaningful disclosure and avoids boilerplate discussions." Release No. 6835, at *1. And disclosure requirements are sensitive to historical context. *Olkey*, 98 F.3d at 5. Negative revelations about key executives could have just as great an impact as an erosion of market share on a company's "financial condition, liquidity and capital resources, changes in financial condition and results of operations." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Release Nos. 33–8350, 34–48960, 68 Fed. Reg. 75056, 75057 (Dec. 29, 2003). As developments like #MeToo reshape the landscape of risk to a company of retaining an executive who engaged in past sexual misconduct, so too "will the analysis of a company's business as seen through the eyes of those who manage that business." *Id.* at 75056. Under such conditions, Item 303 might require disclosure because "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of [the known uncertainty]." *Stratte-McClure*, 776 F.3d at 102.

Turning those principles to the present case, CBS had no duty under Item 303 to disclose either the Company's alleged hostile culture towards women or percolating #MeToo accusations against Moonves. The Amended Complaint does not allege that Moonves's or other executives' uncertain futures were "reasonably likely" to have an impact on the Company's financial performance. *Id.* at 101. The chain of causation between the alleged Moonves-driven "culture of sexual harassment" and CBS's future financial performance is far too tenuous. *See* Am. Compl. ¶¶ 165–66. To infer that the Company's hostile culture or Moonves's behavior was

likely to have a material impact on the Company's bottom line—the condition precedent for disclosure required by Item 303—Plaintiffs must plausibly allege facts to support two premises: (1) that the Company knew its opprobrious workplace culture or Moonves's misconduct would likely lead to the loss of executives, and (2) that it was likely those personnel losses would materially affect the Company's financial performance.

But the Amended Complaint alleges only that losing Moonves and an effect on financial performance were possible. According to the Amended Complaint, the Company's hostile culture "increased the likelihood" that it would suffer reputational harm that "*could* negatively impact its advertising revenue*.*" *Id*. ¶ 165 (emphasis added). There are no allegations, let alone particularized allegations, that this increase in risk amounted to anything close to a known reasonable likelihood of a material impact on financial performance. Similarly, according to the Amended Complaint, Moonves's misconduct "increased" the risk that Moonves and other executives would be forced to leave the Company, which would reduce revenue by disrupting operations. *Id.* ¶¶ 165–66. Ignoring its conclusory nature, that chain of possibilities falls far short of a known risk, disclosure of which Item 303 would mandate. The basis for this allegation—Defendants' disclosure that the "loss of key personnel, including Moonves, *could* 'disrupt the management of operations of the Company's business and adversely affect its revenues'"—shows the extent of Plaintiffs' logical leap. Opp. to CBS's Mot. at 34 (quoting Am. Compl. ¶¶ 95, 114, 127) (emphasis added). Based on this disclosure, Plaintiffs argue that "it was entirely foreseeable that Moonves's loss *could* impact CBS's earnings or revenue." *Id.* at 35 (emphasis added). That may be true, but Item 303 only requires disclosure of uncertainties that are more than foreseeable or possible. *See Stratte-McClure*, 776 F.3d at 101. A threshold for disclosure as low as that advocated by Plaintiffs would require a company to disclose in its

MD&A every possible risk that the company faces. Such a rule runs entirely counter to the central purpose of MD&A—and federal securities law—to provide the investing public with meaningful, digestible information. Plaintiffs' proposed standard would "bury the shareholders in an avalanche of trivial information." *Basic*, 485 U.S. at 231.

### D. The Amended Complaint Pleads Scienter as to Moonves and CBS

To plead scienter, Plaintiffs rely upon allegations that Defendants: (1) disregarded open and pervasive sexual harassment at the Company, including Moonves's problematic past; (2) sold stock during the putative Class Period; and, (3) with respect to Moonves only, engaged in sexual harassment and assault. Opp. to CBS's Mot. at 37, 41; Pls.' Opp. to Moonves's Mot. to Dismiss ("Opp. to Moonves's Mot.") (Dkt. 83) at 16–17, 21; *see* Am. Compl. ¶¶ 91–94, 168–75.

### 1. Legal Principles

Section 10(b) requires plaintiffs to prove scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quotation omitted). Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference" that the defendant acted with this state of mind. 15 U.S.C. § 78u–4(b)(2)(A). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. To apply this standard, the Court must "take into account plausible opposing inferences" and must consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. The inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324.

As to individuals, "the scienter requirement is met where the complaint alleges facts showing either: (1) a motive and opportunity to commit the fraud; or (2) strong circumstantial

evidence of conscious misbehavior or recklessness." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quotation omitted). A motive and opportunity to defraud may be inferred from "insider trading activity," *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (quotation omitted), but "the mere fact that insider stock sales occurred does not suffice to establish scienter," *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (quotation omitted). For trades to be evidence of scienter, the plaintiffs must allege "that the sales were 'unusual' or 'suspicious.'" *Id.* To plead an individual's scienter through circumstantial evidence, a complaint may allege facts showing that the defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (quoting *ECA*, 553 F.3d at 199). "Where motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quotation omitted).

In order to allege that a corporation acted with scienter, a plaintiff must plead with particularity facts giving rise to a strong inference that "someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "Courts in this district have not developed a bright-line rule" to determine which employees' scienter may be imputed to a corporation, *Barrett v. PJT Partners Inc.*, No. 16-CV-2841, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017), but courts have held that "management level" employees are, ordinarily, sufficiently senior to "serve as proxies" for the corporation's mental state, *Thomas v. Shiloh*

*Indus., Inc.*, No. 15-CV-7449, 2017 WL 2937620, at \*3 & n.1 (S.D.N.Y. July 7, 2017) (collecting cases).

### 2. Motive to Defraud

Plaintiffs assert only that Defendants Moonves, Ianniello, and Liding, as well as non-defendant Schwartz, had a motive to defraud. Plaintiffs' sole argument is that those men concealed CBS's sexual harassment problems so that they could sell shares before the problems surfaced.[16] *See* Opp. to CBS's Mot. at 41; Opp. to Moonves's Mot. at 21. The Court finds that their stock trades do not give rise to a strong inference of scienter.

The Amended Complaint alleges that, during the class period, Moonves sold 2,640,000 shares ($155,300,316), Ianniello sold 471,194 shares ($28,861,611), Liding sold 34,773 shares ($2,341,554), and Schwartz sold 263,781 shares ($15,184,523). Am. Compl. ¶ 91.

Moonves and Ianniello (with one exception) made all of their alleged trades pursuant to public, periodic, and pre-set 10b5–1 trading plans. *See* Moonves Form 4s (Dkt. 80, Ex. 32); Ianniello Form 4s (Dkt. 80, Ex. 30). These sorts of trades "do not give rise to a strong inference of scienter." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). Although "the existence of a Rule 10b5–1 Trading Plan is an

---

[16] As to most Defendants, Plaintiffs do not even attempt to respond to Defendants' argument that they lacked a motive to defraud. Instead, Plaintiffs rely on a recklessness theory, discussed *infra*. Plaintiffs have thus abandoned the Amended Complaint's allegation that Defendants other than Moonves, Ianniello, and Liding had a motive to defraud. *See* Am. Compl. ¶ 171. Even if Plaintiffs had not abandoned their motive argument, such a theory would fail. The Amended Complaint contains no allegations against the other Defendants, outside of mentioning that they are members of the Board or signatories to various disclosures. To plead a motive to defraud, Plaintiffs "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139. "Motives that are generally possessed by most corporate directors and officers do not suffice." *Id.* As such, the Amended Complaint fails to plead a motive to defraud as to Defendants Andelman, Califano, Jr., Cohen, Countryman, Goldberg, Griego, Klieger, and Morris. Although the Amended Complaint contains a few allegations about Defendants Gifford, Gordon, Minow, Redstone, and Rhodes, none of these demonstrates any personal gain those Defendants could have received from concealing Moonves's conduct or other sexual harassment issues but rather portray a Board and executive that took action by firing an offending employee and initiating two investigations of Moonves when they learned of risks to the Company. *See* Am. Compl. ¶¶ 68, 78–79, 83.

affirmative defense that must be pled and proved," *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200–01 (S.D.N.Y. 2010) (quotation omitted), the Court may nonetheless take judicial notice of such plans and consider them on a motion to dismiss, *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 593 n.14 (S.D.N.Y. 2011). Here, the Amended Complaint fails to plead that any of the trades under these plans, or the plans themselves (having been adopted before June 30, 2017, and January 17, 2017),[17] were suspicious. In short, all the trades were put in motion before any alleged motive to exploit non-public information relating to Moonves's sexual misconduct could possibly have arisen.

Plaintiffs argue that 10b5–1 trading plans adopted during a class period are not "a cognizable defense to scienter allegations," citing *Freudenberg*, 712 F. Supp. 2d at 201. But Plaintiffs still have the burden to plead scienter, and they have neither pled that these plans were adopted during the class period nor that the decision to adopt a trading plan (assuming it was adopted during the class period) was suspiciously strategic "so as to capitalize on insider knowledge." *In re Lululemon*, 14 F. Supp. 3d at 585. The plans were adopted months before the *New Yorker* article about Harvey Weinstein, and trading volumes followed a consistent pattern from early 2017 through early 2018. Under Plaintiffs' theory—that the #MeToo movement raised the risk of losing critical executives and brought that risk into focus—one would expect the Defendants' trading to depart from pre-#MeToo patterns after the *New Yorker* article sparked the movement in October 2017. *See* Am. Compl. ¶ 7. But the Amended Complaint does not allege that the trading plans were altered or adopted after the *New Yorker* article was published.[18]

---

[17]   The parties do not disclose the exact date the trading plans were adopted, but the Court can infer from the earliest 10b5–1 trades alleged that the plans were not adopted after these dates. *See id.* ¶ 91.

[18]   Plaintiffs apparently cannot allege that the plans were adopted after the *New Yorker* article because the earliest 10b5–1 trade predates publication of the article.

And Defendants' alleged knowledge of non-public information that Moonves would be the next major executive to fall also post-dates adoption of their 10b5–1 plans.  *See id.* ¶ 78.

Setting aside the fact that most of the trades on which Plaintiffs rely were made pursuant to 10b5–1 trading plans, the Amended Complaint is still sorely deficient in alleging that any trades—by Moonves, Ianniello, or Liding—were suspicious.  "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001).  Using the one trade Ianniello placed outside of his 10b5–1 trading plan in June 2018 as a representative example: all factors cut against an inference of scienter.[19]  The Amended Complaint does not allege that he made any profit from the trade.  Nor does it allege that the trade departed from an established practice.  The Amended Complaint also does not allege that the trade closely coincided with allegedly false statements.  Rather, the trade accounted for only 12.6% of Ianniello's holdings—much lower than what other courts in this circuit have viewed as not suspicious.  *See Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-CV-6038, 2016 WL 1629325, at *11 (S.D.N.Y. Apr. 21, 2016) (collecting cases).  As to the last factor, only three of the sixteen individual Defendants are alleged to have traded CBS stock during the class period.[20]  *See Acito v. IMCERA Grp., Inc.*, 47

---

[19]    Defendants' other alleged trades are no different than Ianniello's June 2018 trade.  As such, the Court also finds that Liding's alleged trades in February and March 2017 do not support an inference of scienter.  None is alleged to be tethered to any sort of fraud, to constitute a significant portion of his holdings, to deviate from his regular trading practice, or to coincide with any of the relevant #MeToo events or mounting rumors.

[20]    The trades of Gil Schwartz (head of CBS communications) are irrelevant to the others' scienter because he is not a defendant in this case.  Plaintiffs offer no reason why his trading would be relevant, let alone why it supports an inference of scienter as to Defendants.  *See Scholastic Corp.*, 252 F.3d at 75 ("Whether [non-defendants] sold their stock prior to the February 20, 1997 press release is not only unknown, but, as to [defendant's] possible liability, is also irrelevant, since in that regard motive is considered with respect to [defendant] alone."); *see also Wyche v. Advanced Drainage Sys., Inc.*, No. 15-CV-5955, 2017 WL 971805, at *13 (S.D.N.Y. Mar. 10, 2017), *aff'd*, 710 F. App'x 471 (2d Cir. 2017) (collecting cases).

F.3d 47, 54 (2d Cir. 1995) ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit." (quotation omitted)).

### 3. Conscious Misbehavior or Recklessness

Plaintiffs argue that individual Defendants knew, or should have known, that their alleged misstatements were false and misleading, relying on a theory that alleged circumstantial evidence shows that individual Defendants "knew facts or had access to information suggesting that their public statements were not accurate." Opp. to CBS's Mot. at 26–37 (quoting *Blanford*, 794 F.3d at 306). This recklessness theory fails as to all individual Defendants except Moonves.

### a. Andelman, Califano, Jr., Cohen, Countryman, Goldberg, Griego, Klieger, and Morris

As to Defendants Andelman, Califano, Jr., Cohen, Countryman, Goldberg, Griego, Klieger, and Morris, the Amended Complaint contains no individual allegations other than identifying them as members of the Board or signatories to a disclosure. To establish their scienter, Plaintiffs' lean on various news articles stating that the Board "knew" or "should have known" about Moonves' misconduct. *See* Opp. to CBS's Mot. at 39; Am. Compl. ¶ 77. Plaintiffs also point to an emergency Board meeting called in April 2018 (and then cancelled) to create a contingency plan in the event an article about Moonves was published that was "serious enough to merit suspending him." *See* Opp. to CBS's Mot. at 39; Am. Compl. ¶ 78.

These allegations fail to plead recklessness. "Absent concrete allegations as to defendants' knowledge, the [Amended Complaint] cannot generate a strong inference of scienter." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018). Whether the assertion comes from Plaintiffs or a news article, "conclusory statements that defendants 'were aware' of certain information" or "'would have' or 'should have' had such

knowledge" cannot support a strong inference of scienter. *Glaser*, 772 F. Supp. 2d at 591; *see also In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 563 (S.D.N.Y. 2004) (holding that "conclusory allegations" from "newspaper and magazine articles" fail to adequately plead scienter). And the alleged emergency Board meeting—in addition to failing to establish with any particularity what the Board knew—more plausibly evinces that the Board was being circumspect and cautious in the face of *uncertainty* about what the future held for Moonves, as opposed to being evidence that the Board had concrete knowledge that a scathing and accurate report was forthcoming.

### b. Gifford, Gordon, Minow, and Redstone[21]

The additional scienter allegations against the remaining Board Defendants—Gifford, Gordon, Minow, and Redstone—do not fare any better. Redstone allegedly confronted Moonves, who denied rumors of misconduct, and "urged CBS directors and [Gordon and Minow] to investigate Moonves" after she had heard rumors that reporters might be digging into his past. Am. Compl. ¶¶ 78–79; July 31, 2018, *N.Y. Times* Article (Dkt. 80, Ex. 24) at 1. Gordon and Minow then retained a law firm to investigate; Gordon and Gifford told Moonves that there would be an investigation; the investigation concluded that "there was nothing to worry about with Mr. Moonves."[22] *See* Am. Compl. ¶¶ 20, 79; Nov. 28, 2018, *N.Y. Times* Article at 6. Rather than suggest an "intent to deceive, manipulate, or defraud," *Tellabs*, 551

---

[21] Plaintiffs have moved to strike three exhibits attached to CBS's motion of stories from gossip websites and a gossip site's tweet. *See* Dkt. 96. In its motion, CBS asserts that these exhibits demonstrate that the rumors Redstone heard of reporters' investigations into Moonves were already public, precluding liability for securities fraud for failing to disclose Moonves's misconduct. *See* CBS's Joint Mot. to Dismiss at 39. Because the Court finds both that the Amended Complaint fails to allege that Redstone made a material misstatement and fails to allege that she acted with scienter, even assuming the rumors she allegedly heard were non-public, the Court will deny this motion as moot.

[22] The investigators may have reached this conclusion, in part, because Moonves was not truthful about his past. *See* Am. Compl. ¶ 35.

U.S. at 319, these allegations suggest "a prudent course of action that weakens rather than strengthens an inference of scienter," *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (quotation omitted); *see also In re Tremont Sec. Law, State Law & Ins. Litig.*, No. 08-CV-11117, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) (holding that the complaint failed to allege recklessness where it showed that the defendant "did investigate the risks").

### c.    Ianniello, Rhodes, and Liding

The Amended Complaint also fails to allege that Ianniello, Rhodes, and Liding were reckless. Allegations repeating reports that "CBS executives had been told that reporters . . . were asking about sexual-harassment allegations involving Mr. Moonves" are conclusory, and they do not support a strong inference of scienter. *See* Am. Compl. ¶¶ 15, 76, 93, 173; *see also* Opp. to CBS's Mot. at 37. Similarly conclusory are the allegations of "widespread knowledge" and matters "known throughout the Company." Am. Compl. ¶¶ 15, 75. Failing "to link any particular [d]efendant with the factual background from which [p]laintiff alleges all [d]efendants' scienter can be inferred contravenes Rule 9(b)." *Tamar v. Mind C.T.I., Ltd.*, 723 F. Supp. 2d 546, 557 (S.D.N.Y. 2010).

The general allegations that sexual harassment complaints had been made to human resources and that harassment lawsuits had been settled do not save the Amended Complaint. *See* Am. Compl. ¶¶ 69–75, 85–87. The Amended Complaint fails to "specifically identify the reports or statements that are contradictory to the statements made" or to "provide specific instances in which Defendants received information that was contrary to their public declarations." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (quoting *Novak*, 216 F.3d at 309). "Scienter . . . cannot be inferred solely from the fact that, due to defendants' . . . executive managerial position, they had access to the company's internal documentation as well as any

adverse information." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016). Plaintiffs argue that the allegations here are similar to those in *Signet Jewelers*. *See* Opp. to CBS's Mot. at 38. The Court disagrees. In *Signet Jewelers*, the defendants had specifically been informed of the related employment-discrimination litigation and been given copies of the numerous employee declarations attesting to widespread abuses. *See* Fifth Amended Complaint, *In re Signet Jewelers* (Dkt. 95, Ex. 34) ¶¶ 300–02. In contrast, here Plaintiffs allege a handful of unspecified sexual harassment settlements, instances of sexual harassment by several managers in disparate corners of a large company—some of which resulted in the manager being disciplined—and conclusory allegations that sexual harassment was "widespread."

Setting that aside, an alleged widespread culture of sexual harassment is barely connected to the risk of Moonves's ouster. The Court does not see how allegations that Rhodes oversaw a lewd culture at CBS News, even if those allegations showed with particularity that Rhodes knew of that culture, relate to the Amended Complaint's theory of fraud. *See* Am. Compl. ¶¶ 63, 65, 69, 71–73. And, even assuming that the Amended Complaint adequately alleges that these Defendants knew of *Moonves's* misconduct that had triggered reporters' investigations, it still does not allege that they had scienter. For that information, as the Court has found, was not "contradictory" or "contrary" to any alleged statement (other than Moonves's statement at the *Variety* event). *Plumbers & Steamfitters*, 694 F. Supp. 2d at 299. Although Plaintiffs could still allege scienter by alleging "facts indicating a clear duty to disclose" the journalistic inquiries or Moonves's misconduct, they have not done so. *Kalnit*, 264 F.3d at 144.

### d. Moonves

The Amended Complaint does adequately—though, again, only barely—allege that Moonves was consciously reckless when he made his statement at the *Variety* Innovate Summit on November 29, 2017. Moonves allegedly "knew facts or had access to information suggesting

that [his] public statement[ was] not accurate." *In re Banco Bradesco*, 277 F. Supp. 3d at 666

(quoting *ECA*, 553 F.3d at 199)). The Amended Complaint includes extensive and specific

allegations that Moonves sexually harassed and assaulted employees and non-employees—

precisely the sort of behavior that #MeToo reporting was ferreting out and precisely the conduct

that his *Variety* statement impliedly distanced himself from. *See* Am. Compl. ¶¶ 20, 49–61.

Moonves knew of his own prior misconduct and knew that it left him in a precarious position in

a post-#MeToo world; nonetheless, he impliedly disclaimed knowledge and sought to fortify his

position by stating to the *Variety* audience: "There's a lot we're learning. There's a lot we didn't

know." *Id.* ¶¶ 8, 125.

The context of #MeToo, contrary to Moonves's argument, *see* Moonves's Mot. to

Dismiss (Dkt. 76) at 14, is pertinent because it explains why Moonves would have known that

his statement was misleading and significant. #MeToo, over a relatively short period of time,

changed the risks to a company of having a CEO with an unsavory past. The Amended

Complaint alleges that Moonves, acutely aware of those risks and his own personal exposure,

tried to buy silence from potential accusers. Am. Compl. ¶¶ 14, 57–58. At around the same time

as he denied knowledge of past misconduct at the *Variety*-sponsored event, Moonves allegedly

told Dauer that he "believed that an article about him would be published imminently" and said

"if Bobbie talks, I'm done." *Id.* ¶¶ 16, 80. At least as early as January 2018, Moonves knew of

the LAPD's criminal sexual assault investigation of him based on a credible complaint filed in

November 2017. *Id.* ¶¶ 12, 55, 78–79. Moonves's subsequent effort to obstruct the internal

investigation is circumstantial evidence of scienter.[23] He allegedly stonewalled and lied to

---

[23] Reasonable minds can differ over the persuasiveness of evidence that significantly post-dates Moonves's statement at the *Variety* event to prove Moonves's scienter at that event. Nevertheless, at the motion to dismiss stage, Plaintiffs have sufficiently alleged that he acted with scienter.

CBS's investigators by, for example, deleting text messages between himself and Dauer, asking Dauer to do the same, minimizing and lying about the extent of his sexual misconduct, and giving his son's iPad to investigators instead of his own. *Id.* ¶¶ 20, 79–80, 83, 154–55.[24]

All considered, these allegations give rise to a strong inference that Moonves knew at the time he made his statement at the *Variety*-sponsored event that his statement and its implications were not truthful or that, at a minimum, he was "highly unreasonable in failing to appreciate that possibility." *In re Sanofi*, 87 F. Supp. 3d at 534. Plaintiffs have thus adequately pled a strong inference of scienter as to Moonves.

### 4.        Corporate Scienter

The Court's inquiry into CBS's scienter need only focus on whether Moonves's state of mind is attributable to the Company.[25] The Court finds that Plaintiffs have adequately pled corporate scienter. Moonves was CEO and Chairman of the Board of CBS, which is more than sufficient to impute his scienter to the Company. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 (S.D.N.Y. 2014) ("[S]cienter may be imputed to [the company] by virtue of [the individual defendants'] positions of authority . . . ."). Although part of the evidence of Moonves's scienter is that he tried to frustrate the Company's internal investigations to protect himself, and bad acts cannot be imputed when "committed for personal benefit," that is "a narrow exception that applies only 'where the fraud is committed against a corporation rather than on its behalf.'" *Barrett*, 2017 WL 3995606, at *8 (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54,

---

[24]        Moonves argues that allegations based on news articles and a leaked internal investigation reported by a news organization cannot form the basis for a strong inference of scienter. *See* Moonves's Mot. to Dismiss at 13. But the source of those allegations is of no moment. The Court must accept non-conclusory allegations in the Amended Complaint as true, regardless of their alleged source. *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013).

[25]        The Court has already found that the other individual Defendants did not have an intent to defraud; thus, there is no scienter on their part to impute to the Company.

64 (2d Cir. 2013)). Thus, the apparent contradiction between Moonves's and CBS's states of mind is resolved by considering whether, when Moonves made his misstatement at the *Variety* event, he was committing fraud against CBS.

The Amended Complaint adequately alleges facts from which the Court can conclude that, when he spoke at the *Variety*-sponsored event, Moonves was acting as CBS's agent under its control and within the scope of his authority. Moonves allegedly spoke on behalf of CBS as its CEO and Chairman to articulate the Company's stance on the #MeToo movement. *See Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217, 225 (S.D.N.Y. 2013) ("Agency reflects mutual consent: 'the agent must consent to act subject to the principal's direction and control, and the principal must consent to exercising control over the agent.'" (quoting *Global Entm't, Inc. v. N.Y. Tel. Co.*, No. 00-CV-2959, 2000 WL 1672327, at *6 (S.D.N.Y. Nov. 6, 2000))). Because that was not a fraud against CBS, Moonves's scienter can be imputed to CBS.

### E.     Loss Causation

CBS contests whether Plaintiffs have alleged loss causation. *See* CBS's Joint Mot. to Dismiss at 45. The Amended Complaint alleges two corrective disclosures—the July 27 *New Yorker* article and the December 4 *New York Times* article. *See* Am. Compl. ¶ 19. To plead loss causation, a plaintiff must allege "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). In other words, "the risk that caused the loss" must be "within the zone of risk concealed by the misrepresentation." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). And the alleged disclosures must "reveal to the market the falsity of" the prior statements. *Id.* at 175 n.4. This pleading burden is not heavy, as "the complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged

misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (quoting *Dura Pharm.*, 544 U.S. at 347).

Although the Court has to wonder whether Plaintiffs will be able to prove it, they have adequately pled loss causation. CBS's stock declined immediately after each of the alleged corrective disclosures, evincing (at least for purposes of deciding a motion to dismiss) that new information in the disclosures caused the decline. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233–34 (2d Cir. 2014) (finding that a negative market reaction to an alleged corrective disclosure supported sufficiency of loss causation pleadings). These disclosures about Moonves's past were arguably connected to Moonves's alleged misleading statements about what he and the Company knew about sexual harassment at CBS and his own exposure to such allegations. With his *Variety* statement, Moonves allegedly misled investors about the risk he would have a "#MeToo moment." Am. Compl. ¶¶ 78, 125, 129. The July 27 *New Yorker* article, at least, represents that risk becoming reality. Pleading, as Plaintiffs have done here, "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement" is sufficient. *ATSI Commc'ns*, 493 F.3d at 107; *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 399 (S.D.N.Y. 2012) (holding that plaintiff pled loss causation from allegedly misleading assurances that the company was "safe and secure" from exposure to non-investment grade borrowers).

The thrust of Defendants' argument is that none of the information alleged in the Amended Complaint was new to the public. But Defendants concede that the fact that harassment allegations had been made against Mr. Moonves was "'new' information in the July 27 New Yorker Article." CBS's Joint Mot. to Dismiss at 46; CBS's Joint Reply (Dkt. 91) at 19 n.35. To show the allegations against Moonves were nonetheless not "new" for purposes of the

securities laws, Defendants quote an analyst's report, dated July 30, 2018, in which the analyst stated that he "believe[ed] investors [had] contemplated the possibility of sexual harassment allegations" against Moonves before the alleged disclosures. CBS's Joint Reply (Dkt. 91) at 19 n.35. Although a court need not accept as true allegations in pleadings that are contradicted by documents upon which its pleadings rely, the analyst's reported belief about what investors contemplated at the time does not contradict Plaintiffs' allegations. Even if investors had contemplated the possibility that Moonves would not go unscathed, Plaintiffs need only establish facts that raise a "reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 162 (2d Cir. 2012). Drawing all inferences in Plaintiffs' favor, even accepting the analyst's hypothesis as true, investors' pre-disclosure contemplations of a possibility, which they could have believed was remote, would have remarkably less impact on the stock price than the event actually happening.

III.     **Motion to Dismiss Plaintiffs' Section 20(a) Claim**

The Amended Complaint states a Section 20(a) claim against CBS; therefore, CBS's motion to dismiss this claim is denied. *See* CBS's Joint Mot. to Dismiss at 47. To state a *prima facie* claim for control person liability, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108. "[A]llegations of control . . . need satisfy only the less stringent requirements of [Rule] 8." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 310 (S.D.N.Y. 2013). Although a split among district courts in this Circuit persists over whether culpable participation must, like scienter, be pled with particularity, the Court need not weigh in here because the Court has found that Plaintiffs have pled scienter. *See Special*

*Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) (discussing the split and collecting cases).

Because CBS and Moonves stood in a principal-agent relationship, concluding that all three elements have been pled is a straightforward analysis. The first element is pled because the Court has found that the Amended Complaint states a Section 10(b) claim against Moonves. The second element, control, is also adequately pled because the Court has already found that the Amended Complaint alleges that Moonves was acting as CBS's agent under its control when he made his misleading statement to the audience at the *Variety* event. *See also In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451 (S.D.N.Y. 2009) ("The element of control often is deemed the essential characteristic of the principal-agent relationship.").

The Amended Complaint has also pled the third element, culpable participation, because when the primary violator is an agent, that element collapses into the second. To plead culpable participation, a plaintiff must allege facts "indicating that the controlling person knew or should have known that the primary violator . . . was engaging in fraudulent conduct." *Special Situations*, 33 F. Supp. 3d at 438 (quotation omitted). In a principal-agent relationship, knowledge of an agent acting within the scope of his agency is generally "imputed to his principal." *N.Y. Univ. v. First Fin. Ins. Co.*, 322 F.3d 750, 753 n.2 (2d Cir. 2003) (quoting *Center v. Hampton Affiliates*, 66 N.Y.2d 782, 784 (1985)). "A plaintiff, therefore, need only plead an agency relationship with the primary violator acting in the normal course of his or her duties in connection with the alleged fraud to adequately plead control person liability." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). Because Plaintiffs have

pled that Moonves was acting as CBS's agent at the *Variety* event, Moonves's knowledge is imputed to CBS, and Plaintiffs have pled the third element.[26]

IV.     **Leave to Amend**

Plaintiffs have requested leave to amend if the Court grants either motion to dismiss, even in part. *See* Opp. to CBS's Mot. at 50 n.40; Opp. to Moonves's Mot. at 25 n.25. Under Rule 15(a)(2), a court "should freely give leave" to a party to amend its pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). This rule is a "permissive standard," *Loreley*, 797 F.3d at 190 (quotation omitted), and "complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend," *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) (quotation omitted). That said, leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quotation omitted); *see also Loreley*, 797 F.3d at 190 (noting that leave to amend can properly be denied "where the request gives no clue as to how the complaint's defects would be cured" (quotation omitted)).

Plaintiffs indicate that they could add additional allegations of scienter, but even if they could, such allegations will not salvage their Amended Complaint. The Court is skeptical that any amendment can resolve the materiality problems with the vast majority of the alleged misstatements or somehow render the Risk Disclosures false or misleading, inasmuch as Plaintiffs are not able to allege that a decision had been made that Moonves would leave the Company at the time of the complained-of disclosures. Consequently, because the Court believes that an amendment would be futile, the Court does not grant Plaintiffs' request. The

---

[26]     The Amended Complaint does not allege that any other Defendant controlled Moonves or directed his actions at the *Variety* event.

Court will, however, allow Plaintiffs to move for leave to amend to further explain how an amendment will cure these defects.

## CONCLUSION

CBS's and Moonves's motions to dismiss are each GRANTED in part and DENIED in part.[27]  Plaintiffs' motion to strike is DENIED as moot.  All claims against Defendants, except Plaintiffs' Section 10(b) and 20(a) claims against CBS and Moonves based on the misleading statement alleged in the Amended Complaint ¶ 125 are dismissed.  Plaintiffs' request for leave to amend is DENIED without prejudice.  Plaintiffs may renew their motion for leave to amend no later than **January 29, 2020**.  Any such motion must include their proposed Second Amended Complaint, redlined to show changes from the Amended Complaint.  The stay of discovery remains in place.  If Plaintiffs elect not to renew their motion for leave to amend, then on **February 21, 2020, at 10:00 a.m.**, the remaining parties must appear for an initial pretrial conference to set a discovery schedule, and the parties must file a joint preconference letter according to the Court's Individual Rules no later than **February 13, 2020**.

The Clerk of Court is respectfully directed to close the open motions on Dkts. 76 and 77.

**SO ORDERED.**

Date:  **January 15, 2020**　　　　　　　　　　　**VALERIE CAPRONI**
　　　　**New York, New York**　　　　　　　　**United States District Judge**

---

[27]　　To the extent the Court did not address specific arguments made by the parties, the Court found those arguments meritless.