# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

April 17, 2020

**VIA ECF**

The Honorable Valerie E. Caproni
U.S. District Court, Southern District Of New York
Thurgood Marshall Courthouse
40 Foley Square, Room 240
New York, NY 10007

Re:   *Construction Laborers Pension Trust for Southern California v. CBS Corporation, et al.*,
      No. 1:18-cv-07796-VEC

Dear Judge Caproni:

Defendants CBS Corporation (n/k/a ViacomCBS Inc.) ("CBS") and Leslie Moonves (together, the "Defendants") respectfully submit this joint letter in opposition to Lead Plaintiff's April 8, 2020 application for expanded class certification discovery. (ECF 131.) For the reasons described below, Defendants submit that the discovery topics on which the parties have already agreed are sufficient (*see* ECF 128), and that the additional discovery sought by Lead Plaintiff strays impermissibly into the merits, is not relevant to the issue of whether class treatment is warranted, and would pose unnecessary burdens.[1]

Defendants expect that one issue in dispute at the class certification stage will be whether common issues predominate under Federal Rule of Civil Procedure 23(b)(3), particularly with respect to reliance. To establish that common issues of reliance predominate, Lead Plaintiff has invoked the presumption of market-wide reliance (ECF 59, ¶¶ 181-182), established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). The *Basic* presumption is premised on the idea that the "market price of shares traded on well-developed markets *reflects all publicly available information*, and, hence, any material misrepresentations." *Id.* at 246 (emphasis added). "[W]ithout the benefit of the *Basic* presumption, investors would have to prove reliance on an individual basis, meaning that individual issues would predominate over common ones." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 265-66 (2014) (*Halliburton II*).

To successfully invoke the *Basic* presumption, Lead Plaintiff must "establish certain prerequisites—namely, that *defendants' misstatements were publicly known*, their shares traded in an efficient market, and plaintiffs purchased the shares at the market price after the misstatements were made but before the truth was revealed." *Arkansas Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.* 879 F.3d 474, 481 (2d Cir. 2018) (*Goldman I*) (emphasis added). Once a plaintiff invokes the *Basic* presumption, defendants may "defeat the presumption at the class certification stage through evidence that the misrepresentation did not *in fact* affect the stock

---

[1] Defendants focus primarily on the documents whose production would be required under Lead Plaintiff's discovery proposal. It is unclear if Lead Plaintiff intends to use the production of these documents to then seek to take depositions of numerous deponents on these subjects. Defendants reserve their right to oppose such depositions in the event that Lead Plaintiff's application is granted.

The Honorable Valerie E. Caproni
April 17, 2020
Page 2

price." *Halliburton II*, 573 U.S. at 279.

The *Basic* presumption, and the ability of Defendants to defeat the presumption through a showing of no price impact, assumes that the market price of a company's stock trading on an efficient market reflects all *publicly available information*. *See Halliburton II* at 283 ("[P]ublicity and market efficiency are nothing more than prerequisites for an indirect showing of price impact."). The issue of price impact is typically the province of economic experts who conduct event studies, which are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent *publicly reported* events." *Id.* at 280 (emphasis added).

Whether the *Basic* presumption applies will therefore depend on expert analyses of publicly-available information. Despite that, Lead Plaintiff seeks discovery of a host of communications having no bearing on the issue of price impact, including communications that are entirely internal to CBS or otherwise non-public, and pre-date the publication of the so-called "corrective" disclosures by many weeks:

> **Internal** and external communications that discuss the **potential** or actual impact of any disclosures on CBS's stock price on July 27 and July 30, 2017[2], and December 4, 2018. CBS will search only the emails and **text messages** of Chief Executive Officer ("CEO") Leslie Moonves, and the emails of Adam Townsend (Executive Vice President ("EVP"), Investor Relations), David Bank (EVP, Investor Relations), Annette Hogan (Director, CBS Shareholder Relations); and communications to and from InvestorRelations@cbs.com. The time periods will be limited to July 12, 2018-August 2, 2018 and November 20, 2018-December 7, 2018, **two weeks prior to the corrective disclosure dates**, and three days after the dates. (ECF 131 at 1-2 (emphases added).)[3]

Lead Plaintiff's application to take discovery on this proposed topic should be denied for at least the following three reasons.

*First*, through this request, Lead Plaintiff plainly seeks to conduct merits discovery. Lead Plaintiff previously agreed, and this Court ordered, that discovery into the "impact (if any) of the Variety Statement on the price of CBS stock" was permissible, but that discovery "as to any matter relating solely to the merits of Lead Plaintiff's claims" was not. (ECF 128 ¶¶ 5(b)(vi) and 5(d).) As its new proposed discovery topic makes clear, however, Lead Plaintiff seeks discovery going well beyond the price impact of the Variety Statement— the one, barely pleaded, alleged misstatement that survived Defendants' motions to dismiss—to include communications concerning "any disclosures" impacting the price of CBS stock, the fact of those disclosures themselves as well as their contents.[4] For example, Lead Plaintiff states that it wishes to take discovery of

---

[2] We presume that Lead Plaintiff intended these dates to be July 27 and July 30, 201**8**.

[3] Lead Plaintiff previously sought four categories of additional discovery (ECF 127 at 1), which the parties addressed at the April 3, 2020 conference with the Court. (ECF 132.) Your Honor characterized the third and fourth topics as a "fishing expedition," expressed concern that the relevance of the first topic was "marginal" at best and "incredibly burdensome," and suggested that Lead Plaintiff "focus" its application on trying to defend the second topic "only as to Mr. Moonves,": "[T]he impact of any disclosures between July 27 and 30, 2018, and on December 4, 2018, relating to Moonves's alleged sexual misconduct or departure from CBS, or the alleged sexual misconduct of any CBS employee, on the price of CBS stock." (Apr. 3, 2020 Tr. at 10:4-9, 19:14, and 20:3-5). Lead Plaintiff's new topic suffers from the defects the Court has already identified and, in fact, *expands* the discovery sought beyond its original requests.

[4] This case, of course, is not about "any disclosures"; it is about a single allegedly misleading statement made by CBS's then CEO at an industry conference in November of 2017 – the "Variety Statement" – and Lead Plaintiff has already conceded that discovery into those other matters is impermissible. (*See* ECF 128 ¶¶ 5(d)(i), (ii) and (iv) (precluding discovery into the truth, falsity or

The Honorable Valerie E. Caproni
April 17, 2020
Page 3

internal communications concerning Ronan Farrow's July 19, 2018 request for comment concerning the allegations in the July 27 *New Yorker* article, presumably in an effort to get at the underlying merits of the allegations it contained. (ECF 131 at 2 (seeking communications concerning "Farrow's contact" with CBS for comment about his upcoming article).) Similarly, Lead Plaintiff asserts that it should be entitled to take discovery of communications concerning the alleged "draft report" prepared by Debevoise & Plimpton LLP and Covington & Burling LLP as part of an internal investigation commissioned by CBS's Board of Directors, including (presumably) the work done by those firms and their recommendations and findings. (*Id.* (seeking discovery of communications "concerning the draft report and *Times* articles").) How communications about any of these subjects could possibly relate to the price impact of the Variety Statement is nowhere explained in Lead Plaintiff's letter. What is more, Lead Plaintiff already acknowledged that any discovery about these topics is off limits. (*See, e.g.*, ECF 128 ¶ 5(d)(vii) (precluding discovery of "the truth or falsity of each act of misconduct alleged in the Amended Consolidated Complaint"), ¶ 5(d)(ix) (precluding discovery into "the investigation into allegations against Leslie Moonves . . . conducted by Covington & Burling LLP and Debevoise & Plimpton LLP . . . including but not limited to any documents and/or communications related to that investigation that CBS asserts are protected by the attorney-client privilege or attorney work product doctrines.").)

*Second*, leaving aside the limits on discovery to which Lead Plaintiff has already agreed, many of the "communications" Lead Plaintiff seeks are *nonpublic* and therefore irrelevant and overbroad under *Basic*.[5] *See West v. Prudential Sec., Inc.*, 282 F.3d 935, 937 (7th Cir. 2002) ("*Basic* describes a mechanism by which public information affects stock prices . . . [n]o similar mechanism explains how prices would respond to non-public information."); *60223 Tr. v. Goldman, Sachs & Co.*, 540 F. Supp. 2d 449, 458 (S.D.N.Y. 2007) ("[N]on-public comments made by an analyst . . . undoubtedly would not have the same effect on the market price of a security as would public disclosures by an analyst."). Accordingly, as one court ruled in circumstances strikingly similar to those here, when class certification and merits discovery are bifurcated, production of internal company communications is inappropriate during the class-only phase. *Washtenaw Cty Emps. Ret. Sys. v. Walgreen Co.*, No. 15-cv-3187, 2017 WL 1545764, at *2 (N.D. Ill. Apr. 28, 2017) ("[T]he only documents relevant to the class certification decision involve information that was *publicly* available in the market. The *internal* Walgreens documents requested . . . will not assist the Court in determining when Defendants' alleged fraud was alive in the market.") (emphases in original).[6]

Disallowing discovery about a defendant's internal correspondence makes perfect sense in light of the general principles established by *Basic* and its progeny. For instance, internal emails and text messages among

---

materiality of any alleged misstatements or omissions set forth in the Amended Consolidated Complaint that did not survive dismissal).)

[5] To the extent that Lead Plaintiff seeks communications that are publicly available, it is in the same position as Defendants to seek out those documents, and Defendants should not bear the costs of such discovery. *See Krause v. Buffalo & Erie Cty. Workforce Dev. Consortium, Inc.*, 425 F. Supp. 352, 375 (W.D.N.Y. 2006) ("it is well-established that discovery need not be required of documents of public record which are equally accessible to all parties") (quoting *SEC v. Samuel H. Sloan & Co.*, 369 F. Supp. 994, 995 (S.D.N.Y.1973)).

[6] Although Plaintiff asserts that Mr. Moonves "participated in . . . non-public discussions with analysts and investors," the sources it cites do not corroborate that assertion. (ECF 131 at 2 n.1.) The two analyst reports Lead Plaintiff cites (*id.* at 4) both date from September 2018, well beyond the date range Lead Plaintiff has proposed, and only one refers to remarks Mr. Moonves made publicly. (*See* Ex. A attached hereto.) The other source Lead Plaintiff relies upon comprises a CBS employee's LinkedIn page. (ECF 131 at 2 n.1.) It establishes nothing more than that employees in the CBS investor relations department interfaced with investors and later reported to Moonves and others.

The Honorable Valerie E. Caproni
April 17, 2020
Page 4

CBS's employees about the Company's stock price by definition were never publicly known to the market, could not have impacted CBS's stock price, and thus have no bearing on class-wide reliance. The same is also true of Lead Plaintiff's request for discovery of CBS's external communications, which as written could seek to capture communications between the purported custodians and **any other person**, not just those with investors or the market. Indeed, even a more narrow reading of Lead Plaintiff's proposed topic shows its overbreadth. Suppose, for example, that CBS did communicate with select investors about the Variety Statement. While those individual investors may have relied upon those statements in making purchase decisions, that has no relevance under *Basic* to the question presented here. In fact, any investor who relied on nonpublic information it learned from CBS could not be part of the putative class because such an investor would be subject to the unique defense that it did not rely on the integrity of CBS's stock price. *Blank v. Jacobs*, No. 03–cv–2111, 2009 WL 3233037, at *5-6 (E.D.N.Y. 2009) (holding that lead plaintiffs were atypical because they "received inside information from conversations with the President and Chief Financial Officer" of the Company, and thus "did not rely on the price of the stock as a reflection of the value of that stock."); *In re Ind. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 481 (S.D.N.Y. 2002) ("where plaintiffs are privy to non-public information not available to other investors, they may be subject to unique reliance defenses making them atypical and inadequate class representatives.").

*Third*, communications concerning the "*potential*" impact of the Variety Statement on the price of CBS stock before the allegedly "corrective" disclosures were even published would not assist the Court in resolving Lead Plaintiff's forthcoming motion, and Lead Plaintiff does not attempt to argue that they would. The issue under *Halliburton II* is whether "the [alleged] misrepresentation [did or] did not *in fact* affect the stock price," *Halliburton II*, 573 U.S. at 279 (emphasis added), not whether it *might* have. The discovery Lead Plaintiff requests is not only irrelevant, but also overbroad and has no bearing on what information was actually available to the public at the time the allegedly corrective disclosures were made, which is fundamental to the presumption of reliance on which Lead Plaintiff relies. *See Basic*, 485 U.S. at 246.

The cases that Lead Plaintiff cites in its letter do not hold that the discovery it seeks is appropriate. As an initial matter, unlike the bifurcated discovery ordered in this case, all of those cases proceeded with parallel merits and class discovery. Any suggestion that such discovery was affirmatively granted in connection with the litigation of class certification issues is thus groundless. *See In re Chicago Bridge & Iron Co., N.V. Sec. Litig.*, No. 17-cv-01580, Dkt. 115 (Civil Case Management Plan & Scheduling Order) (S.D.N.Y. June 21, 2018); *In re Virtus Inves. Partners, Inc. Sec. Litig.*, No. 15-cv-01249, Dkt. 76 (Scheduling Order) (S.D.N.Y. Aug. 17, 2016); *Grae v. Corrs. Corp. of Am.*, No. 16-cv-02267, Dkt. 88 (Initial Case Management Order) (M.D. Tenn. Feb. 15, 2018). To the contrary, as mentioned above, the only decision cited by either party that addresses the issue in dispute here—*i.e.*, whether a defendant's nonpublic communications are relevant to bifurcated *class certification* discovery—held that such documents are irrelevant and "w[ould] not assist the Court" in deciding the plaintiff's motion to certify the class. *See Washtenaw Cty Emps. Ret. Sys.*, 2017 WL 1545764, at *2.

The cases that Lead Plaintiff cites also primarily involve nonpublic communications that were relevant to how investors reacted **after** the alleged corrective disclosure became public. *See In re Chicago Bridge & Iron Co., N.V. Sec. Litig.*, 17 Civ. 01580, 2019 WL 5287980, at *26-27 (S.D.N.Y. Oct. 18, 2019) (alleged corrective disclosure published on June 11, 2014 and internal communications dated June 12, 2014); *adopted in part* 2020 WL 1329354, at *8 (Mar. 23, 2020) (noting that "Plaintiffs' expert cites communications the day after the [corrective disclosure] was published"); *Grae v. Corr. Corp. of Am.* 330 F.R.D. 481, 500 (M.D. Tenn. 2019) (referencing internal company communications that were relevant to how the alleged corrective disclosure was perceived in the market); *In re Virtus Inves. Partners*, No. 15-cv-1249, 2017 WL 2062985, at *5 (S.D.N.Y.

The Honorable Valerie E. Caproni
April 17, 2020
Page 5

May 15, 2017) (referencing communications from after Wells Notice, which constituted the first partial corrective disclosure, was made public). Lead Plaintiff, by contrast, mostly seeks internal and external communications from before the alleged corrective disclosures were made. (*See* ECF 131 at 4 (seeking communications that occurred "two weeks prior to and a few days after" each alleged corrective disclosure).) And Lead Plaintiff's proposed category by its own terms would be broad enough to include not only how the market in fact responded to the alleged disclosures but also unreliable "musing" by CBS personnel about how the market would respond to information that the personnel believed might someday be disclosed. (Apr. 3, 2020 Tr. at 15:20.) Those internal, speculative, communications are irrelevant to whether CBS's stock price was inflated as a result of the Variety Statement because, as Your Honor previously recognized, such communications do not indicate whether the information was in the market and impacted CBS's stock price. (Feb. 21, 2020 Tr. at 4:10-15 (THE COURT: "Well, why is it their view of whether or not it was out there? It seems to me that's irrelevant. The question is whether it was out there. They could either have their head in the sand or they could be conspiracy nuts and think everything is out there. So their view on whether it's in the market or not is irrelevant.").)

Should the Court deny Lead Plaintiff's application, Defendants are prepared to stipulate that they will not use any communications that fall within Lead Plaintiff's proposed topic in their opposition to Lead Plaintiff's motion for class certification. *See Washtenaw Cty Emps. Ret. Sys.*, 2017 WL 1545764, at *1-2 (denying plaintiff's motion to compel discovery of internal company documents in securities class action where class and merits discovery was bifurcated and defendants stipulated that they would not use such internal documents to oppose plaintiff's motion for class discovery).[7]

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP                DECHERT LLP


_____*/s/Mary Eaton*_____                    _____*/s/Andrew J. Levander*_____
                                             (signed electronically with the consent of counsel)

---

[7] To the extent that Your Honor finds that nonpublic internal or external communications relating to the alleged "corrective disclosures" are relevant to class certification, without waiving objections, Defendants respectfully suggest that Plaintiff's request should be narrowed to no more than the following:

> Emails between CBS stockholders (except current or former CBS employees, officers, and directors) and securities analysts, on the one hand, and Adam Townsend, David Bank, Annette Hogan, or the email address InvestorRelations@cbs.com, on the other hand, concerning the actual impact of any of the following statements or publications on the price of CBS stock: the Variety Statement; the July 27, 2018 *New Yorker* article; and the three December 4, 2018 *New York Times* articles. The time period for such communications shall be limited to July 27, 2018-August 2, 2018 and December 4-December 7, 2018, inclusively.

So worded, the request: (i) relates to the "actual impact" of the disclosures; (ii) primarily involves nonpublic communications with the market (and not discussions with *anyone* relating to these issues that were never sent to market participants); and (iii) captures the relevant time period, *i.e.*, the time period *after* the purported "corrective disclosures" were made.