UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

CONSTRUCTION LABORERS PENSION
TRUST FOR SOUTHERN CALIFORNIA,
GENE SAMIT and JOHN LANTZ,
Individually and on Behalf of All Others
Similarly Situated,

                             Plaintiffs,

    vs.

CBS CORPORATION and LESLIE
MOONVES,

                           Defendants.

———————————————————————— x

: Civil Action No. 1:18-cv-07796-VEC
: **(Consolidated)**
:
: <u>CLASS ACTION</u>
:
: MEMORANDUM OF LAW IN SUPPORT
: OF LEAD PLAINTIFF'S MOTION FOR
: CLASS CERTIFICATION
:
:
:
:
:
:
:
:

4814-0548-6533.v1

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..........................................................................................................1

II. STATEMENT OF FACTS COMMON TO THE CLASS .................................................3

III. THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS
CERTIFICATION UNDER RULE 23 ...........................................................................6

    A. The Class Members Are so Numerous that Joinder of All Members Is
Impracticable...........................................................................................................7

    B. Common Questions of Law and Fact Exist ............................................................8

    C. Lead Plaintiff's Claims Are Typical of the Class .................................................10

    D. Lead Plaintiff and Lead Counsel Will Continue to Adequately Represent
the Interests of the Class ......................................................................................11

    E. The Proposed Class Meets the Requirements of Rule 23(b)(3)............................12

        1. Common Questions of Law and Fact Predominate .................................13

            a. Reliance Is Presumed for All Class Members Under the
Fraud-on-the-Market Theory ......................................................14

                (1) CBS Stock Experienced a High Weekly Trading
Volume...............................................................................17

                (2) Numerous Financial Analysts Covered CBS During
the Class Period.................................................................17

                (3) CBS Had Significant Institutional Holdings.....................18

                (4) CBS Was Eligible to File Form S-3 During the
Class Period ......................................................................18

                (5) The Price of CBS Stock Reacted to New Company-
Specific Information During the Class Period ..................19

                (6) CBS Had a High Market Capitalization During the
Class Period ......................................................................20

                (7) CBS Stock Was Subject to a Narrow Bid-Ask
Spread During the Class Period .........................................20

**Page**

(8)    A High Percentage of CBS Stock Was Held by Public Investors During the Class Period ..........................21

b.    Damages Will Be Calculated on a Class-Wide Basis ...................22

2.    A Class Action Is Superior to Other Methods of Adjudication ................23

F.    Robbins Geller Should Be Appointed as Class Counsel ......................................24

IV.    CONCLUSION .............................................................................................25

4814-0548-6533.v1

# TABLE OF AUTHORITIES

Page

## CASES

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)......................................................................................1, 6, 13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)....................................................................................13, 15, 22

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    955 F.3d 254 (2d Cir. 2020)................................................................... *passim*

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).................................................................................. *passim*

*Billhofer v. Flamel Techs., S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) ...................................................................16, 18

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ...................................................16, 17, 19, 21

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ..................................................................12, 18, 25

*Cent. States Se. & Sw. Areas Health & Welfare Fund v.*
*Merck-Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007)................................................................................7

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
    270 F.R.D. 247 (D.S.C. 2010) .........................................................................18

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
    2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017)...........................................8, 11, 13

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)........................................................................................14, 22

*Constr. Laborers Pension Tr. v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020)..........................................................3, 4, 6

*Daniels v. City of New York*,
    198 F.R.D. 409 (S.D.N.Y. 2001) ........................................................................4

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)...........................................................................................1

- iii -

Page

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).............................................................................................13, 14, 22

*Fogarazzo v. Lehman Bros.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) ....................................................................................9

*Fogarazzo v. Lehman Bros.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ......................................................................................7

*Gruber v. Gilbertson*,
    2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019)............................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)..........................................................................................2, 14, 15

*In re Allstate Corp. Sec. Litig.*,
    2020 WL 4013360 (7th Cir. July 16, 2020)...................................................................20

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) ..................................................................................18

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) .........................................................................11, 12, 22

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ......................................................................................8

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ...........................................................1, 7

*In re DVI Inc. Sec. Litig.*,
    249 F.R.D. 196 (E.D. Pa. 2008)
    *aff'd*, 639 F.3d 623 (3d Cir. 2011) ...............................................................................18

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011)..........................................................................................16

*In re Facebook, Inc.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) .................................................................................6, 7

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)........................................................................................10, 12

4814-0548-6533.v1

**Page**

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)..............................................................................7

*In re JPMorgan Chase & Co. Sec. Litig.*,
   2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015).....................................7, 13, 16, 22

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
   209 F.R.D. 323 (S.D.N.Y. 2002) .....................................................................4

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
   310 F.R.D. 230 (S.D.N.Y. 2015) ....................................................................23

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) .......................................................................8

*In re Petrobras Sec. Litig.*,
   862 F.3d 250 (2d Cir. 2017),
   *cert. denied*, __ U.S. __, 140 S. Ct. 338 (2019)............................................6, 15

*In re SCOR Holding (Switz.) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008)...............................................................24

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084 (S.D.N.Y. July 10, 2019) ................................................ *passim*

*In re SunEdison, Inc.*,
   329 F.R.D. 124 (S.D.N.Y. 2019) ....................................................................13

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   2017 WL 2062985 (S.D.N.Y. May 15, 2017) .......................................................9

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)............................................................................7

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)...........................................................................20

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) .......................................................................9

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ............................................................17, 18, 19

4814-0548-6533.v1

**Page**

*Katz v. Image Innovations Holdings, Inc.*,
  2010 WL 2926196 (S.D.N.Y. July 22, 2010) ....................................................................8, 13

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) .....................................................................16, 17, 19, 21

*Lapin v. Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) ......................................................................................24

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) .............................................................................17, 20

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ........................................................................................19

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
  772 F.3d 111 (2d Cir. 2014) ...............................................................................................8

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ........................................................................................................23

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
  277 F.R.D. 97 (S.D.N.Y. 2011) .........................................................................................10

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)...................................................................................13, 14, 22

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016)
  *aff'd sub. nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ...............................16

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015)................................................................................................22

*Tyson Foods, Inc. v. Bouaphakeo*,
  __ U.S. __, 136 S. Ct. 1036 (2016)....................................................................................8

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017),
  *cert denied*, __ U.S. __, 138 S. Ct. 1702 (2018).......................................................... *passim*

*Wallace v. IntraLinks*,
  302 F.R.D. 310 (S.D.N.Y. 2014) .......................................................................................23

4814-0548-6533.v1

Page

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b)................................................................................................... *passim*
    §78t(a)...................................................................................................1, 10, 13

Federal Rules of Civil Procedure
    Rule 23 .............................................................................................1, 6, 7, 13
    Rule 23(a)............................................................................................. *passim*
    Rule 23(a)(1).................................................................................................7
    Rule 23(a)(3)...............................................................................................10
    Rule 23(a)(4).........................................................................................11, 12
    Rule 23(b) ................................................................................................6, 7
    Rule 23(b)(3)....................................................................................... *passim*
    Rule 23(g) ..................................................................................................25
    Rule 23(g)(1)...............................................................................................24
    Rule 23(g)(1)(A)(i)-(iv)...............................................................................24

17 C.F.R.
    §239.13.......................................................................................................19
    §240.10b-5 ...........................................................................................10, 14

4814-0548-6533.v1

Lead Plaintiff Construction Laborers Pension Trust for Southern California ("Lead Plaintiff" or the "Fund") respectfully submits this memorandum of law in support of Lead Plaintiff's Motion for Class Certification and requests that, pursuant to Federal Rule of Civil Procedure ("Rule") 23, the Court: (a) certify this case as a class action; (b) appoint Lead Plaintiff as Class Representative; and (c) appoint Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel") as Class Counsel.

## I.    INTRODUCTION

Courts in this District have "'***consistently*** held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification.'" [1]   *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020) (collecting cases).   This securities fraud action is particularly well-suited for class certification as common issues predominate and a class action is the superior method for redressing the common injury inflicted upon Class members by Defendants'[2] fraudulent course of conduct.   Indeed, the Supreme Court has held that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud."   *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).   "And the Second Circuit instructs district courts 'to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to both private parties and to the public provided by class actions.'"   *Gruber v. Gilbertson*, 2019 WL 4439415, at *2 (S.D.N.Y. Sept. 17, 2019).   The benefits of Rule 23 in this case further the goals of the securities laws, which "seek to maintain public confidence in the marketplace . . . by deterring fraud, in part, through the availability of private securities fraud actions."   *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

The requirements of Rule 23(a) are readily met in this case.   As shown below: (i) the class

---

[1]     All citations and footnotes are omitted and emphasis is added, unless otherwise noted.

[2]     "Defendants" are CBS Corporation ("CBS" or the "Company") and its former Chief Executive Officer ("CEO"), President, and Chairman Leslie Moonves ("Moonves").

members are so numerous that joinder would be impracticable; (ii) there exist "questions of law or fact common to the class"; (iii) as a proposed class representative, Lead Plaintiff's claims and defenses are typical of those of the class; and (iv) Lead Plaintiff is more than adequate to serve as a class representative. Fed. R. Civ. P. 23(a). Likewise, the Rule 23(b)(3) requirements are also easily satisfied in that common questions predominate over any individual questions and the class action mechanism is the superior way to adjudicate the claims. Fed. R. Civ. P. 23(b)(3). Notably, all elements of Lead Plaintiff's §10(b) claim are subject to common proof and predominate over individual issues, including the issue of reliance, which may be presumed under the fraud-on-the-market presumption of reliance. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Once the fraud-on-the-market presumption is established, reliance is presumptively satisfied and may only be rebutted upon a "showing, by a preponderance of the evidence, that the ***entire price decline*** on the corrective-disclosure dates was due to something other than its alleged misstatements." *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 (2d Cir. 2020); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279-80 (2014) ("*Halliburton II*") (to rebut the *Basic* presumption, Defendants must prove the "asserted misrepresentation (or its correction) did ***not*** affect the market price of the . . . stock"). Here, given that CBS's common stock[3] – which was traded on the New York Stock Exchange ("NYSE") – traded in an efficient market, Defendants' misstatements were publicly known, and Lead Plaintiff purchased CBS stock during the Class Period,[4] Lead Plaintiff is entitled to the fraud-on-the-market presumption of reliance under *Basic*. *Id.*

  The crux of Lead Plaintiff's allegations is that Defendants misled and concealed from CBS investors the risk to CBS from the revelation of allegations of serious sexual misconduct by the

---

[3]    All references to CBS "common stock" or "stock" are to CBS's non-voting Class B common stock.
[4]    "Class Period" refers to November 29, 2017 through July 27, 2018.

4814-0548-6533.v1

Company's former long-time leader, Moonves.  At the beginning of the Class Period – during the pinnacle of the #MeToo movement and following similar revelations about Harvey Weinstein and "CBS This Morning" host Charlie Rose – Moonves made misleading statements and omitted material information about Defendants' exposure to #MeToo liability at an industry event.  When the truth was revealed at the end of the Class Period, media reports specifically linked the newly-disclosed allegations about Moonves's misconduct to both the precipitous decline in CBS's stock price and Moonves's earlier #MeToo-related misstatements and omissions.  Against this backdrop, coupled with Lead Plaintiff's expert report concluding that the market for CBS's stock was efficient during the Class Period, the evidence plainly demonstrates that the corrective disclosures of the misstatements impacted the price of CBS stock.  Thus, Defendants will be unable to establish, by a preponderance of the evidence, a complete absence of price impact from the disclosures necessary to rebut the presumption of reliance.

Accordingly, Lead Plaintiff respectfully requests that the Court appoint Lead Plaintiff to serve as Class Representative and Robbins Geller to serve as Class Counsel for a Class consisting of:

> All persons and entities who purchased or otherwise acquired CBS Class B common stock during the period from November 29, 2017 through July 27, 2018, and were damaged thereby.  Excluded from the Class are Defendants and their immediate families, the Company's officers and directors at all relevant times, as well as their immediate families, Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

## II.   STATEMENT OF FACTS COMMON TO THE CLASS

This is a federal securities class action against CBS and its former CEO, President and Chairman, Moonves.  During the Class Period, Defendants made material misrepresentations and omissions about their knowledge of Moonves's exposure to the then-surging #MeToo movement. *Constr. Laborers Pension Tr. v. CBS Corp.*, 433 F. Supp. 3d 515, 539-40 (S.D.N.Y. 2020); ¶¶8, 123,

125, 129.[5]  On November 29, 2017, appearing as a keynote speaker and interviewee at *Variety*

magazine's Innovate Summit, Moonves described the #MeToo movement as a "watershed moment"

and stressed the importance of having a company culture that does not tolerate harassment and

encourages victims to come forward with complaints.  *CBS*, 433 F. Supp. 3d at 529; ¶¶8, 125; ECF

No. 95-3.  Notably, CBS had announced eight days earlier that Charlie Rose had been fired

following allegations that he had sexually harassed several women.  In this context, responding to a

question from *Variety's* managing editor of TV, Cynthia Littleton, about operating in the #MeToo

climate, Moonves stated:

> [I]t's obviously affected our business.  It's affected Silicon Valley.  It's affected
> Washington greatly . . . it's a watershed moment.  I know that's become a cliche and
> a lot of people have spoken about it over the last short period of time . . . [I]t's
> important that companies educate – have an ability to have a dialogue to know
> what's going on.  I think we've been surprised by things that we've seen.  But I think
> it's important that a company's culture will not allow for this.  And that's the thing
> that's far-reaching.  There's a lot we're learning.  There's a lot we didn't know.  But
> there are a lot of things we're doing as well in terms of education and making people
> have the ability to be able to come forward.  It's a tough one, it's affecting all of us.

ECF No. 95-3.  Answering a follow-up question, Moonves added that there was "no question" the

movement was affecting policy and practices within CBS.  *Id.*

Variety posted a video clip of Moonves's comments to its official *Twitter* feed that same day,

with the following caption: "Leslie Moonves calls the sexual harassment situation unfolding in

Hollywood a 'watershed moment.'" Ex. 1.[6]  Later that evening, *Variety* published an article entitled,

"Top 10 Takeaways From Variety's Innovate Summit,"  describing the number two "takeaway[]"

---

[5]    All references to "¶__" or "¶¶__" are to the Amended Complaint for Violations of the Federal Securities Laws (ECF No. 59) (the "Amended Complaint") unless otherwise noted. The allegations of the Amended Complaint are to be accepted as true for purposes of this motion.  *See Gruber*, 2019 WL 4439415, at *1 ("When considering a class certification motion, courts accept the allegations in the complaint as true.").

[6]    All references to "Ex.__" are to the Declaration of Vincent M. Serra in Support of Lead Plaintiff's Motion for Class Certification, filed concurrently herewith.  On a motion for class certification, the Court can consider additional related details about, *e.g.*, the misstatements and corrective disclosures, not specifically detailed in the Amended Complaint.  *See Daniels v. City of New York*, 198 F.R.D. 409, 413 n.5 (S.D.N.Y. 2001) (recognizing that court need not rely on bare allegations in complaint but may "consider the range of proof necessary to support class certification"); *see also In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002) (same).

from the summit as "[s]exual harassment must not be tolerated," and explaining that Moonves "said that the recent firestorm of sexual harassment allegations in media has affected his company's policies and practices in hopes of making the workplace feel safer."  Ex. 2.

The truth concerning Defendants' previously undisclosed #MeToo exposure became public through a series of disclosures from July 27-30, 2018, and resulted in significant harm to Class members.  ¶¶9-10, 145-147.  *The Hollywood Reporter* was the first to report, in an article published at 11:45 a.m. EST on July 27, 2018, that *The New Yorker* would soon publish an exposé by Ronan Farrow ("Farrow") describing accusations against Moonves of sexual misconduct and assault.  Ex. 3; ¶¶9, 145.  Shortly thereafter, media outlets began reporting similar stories that referenced the significant decline in CBS stock resulting from the unexpected news and Moonves' related and contradictory comments at the November 29, 2017 *Variety* Innovate Summit.  *See, e.g.*, Ex. 4 (12:14 p.m. EST *Variety* article entitled, "CBS Stock Tumbles on Reports of Sexual-Harassment Allegations Against CEO Leslie Moonves"); Ex. 5 (1:01 p.m. EST *CNBC* video report captioned, "CBS's Moonves in 2017: 'Me Too' is watershed moment," containing headline, "CBS Stock Plunges on Reported Moonves Accusations," and playing video clip of Moonves's November 2017 statements); ECF No. 95-3; Ex. 6 (Expert Report of John D. Finnerty, Ph.D. in Support of Lead Plaintiff's Motion for Class Certification ("Finnerty Rpt.")), ¶80.  On this news, CBS's stock price plummeted over 6% on July 27, 2020.  *See* ¶¶10, 146; Finnerty Rpt., ¶85.

On the evening of July 27, 2018, *The New Yorker* published the exposé, "Les Moonves and CBS Face Allegations of Sexual Misconduct," in which Farrow revealed for the first time the detailed accounts of six women who alleged Moonves sexually harassed them and explained how, based on interviews with 30 current and former employees, such behavior extended to important parts of the Company, including CBS News and the network's flagship program, "60 Minutes."

¶¶49-53; ECF No. 19-3. Reports continued to surface over the weekend and on Monday, July 30, with further details about Moonves's previously concealed conduct and the Company's response to it, including headlines that the CBS board would be meeting on July 30 to discuss Moonves's fate. ¶147; Finnerty Rpt., ¶86. Following these disclosures, CBS's stock price fell another 5% on July 30, 2018, for a total two-day decline of over 11%. ¶¶10, 146; Finnerty Rpt., ¶89.[7]

## III.   THE PROPOSED CLASS SATISFIES THE STANDARDS FOR CLASS CERTIFICATION UNDER RULE 23

To certify a class action under the procedure set forth in Rule 23, the proposed class must satisfy each prerequisite of Rule 23(a), as well as one of the requirements under Rule 23(b) – here, Rule 23(b)(3). *See* Fed. R. Civ. P. 23; *Amchem*, 521 U.S. at 615. Rule 23(a) requires a plaintiff to demonstrate that: (1) the class is so numerous that joinder of all members is impractical; (2) at least one questions of law or fact is common to the class; (3) the class representatives' claims are typical of the class' claims; and (4) the class representatives will be able to fairly and adequately protect the interests of the class. *Goldman*, 955 F.3d at 260 (citing Fed. R. Civ. P. 23(a)).[8]

"The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions," and has noted that, "'[i]f there is to be an error made, let it be in favor and not against the maintenance of the class

---

[7]      Later reports and other evidence uncovered in Lead Plaintiff's investigation further revealed the extent of Moonves's misconduct and his efforts to cover-up and conceal it. For example, reports surfaced that Moonves was aware of a criminal assault investigation arising out of a complaint lodged with the Los Angeles Police Department in November 2017. *See CBS*, 433 F. Supp. 3d at 527; ¶¶14-15, 55. Further, a draft report from CBS's investigation of Moonves highlighted that he had "repeatedly lied to investigators about his behavior" and "'destroyed evidence and misled investigators in an attempt to preserve his reputation and save a lucrative severance deal.'" *CBS*, 433 F. Supp. 3d at 527-28; *see also* ¶¶83, 154-55; ECF No. 131-5. Moonves also tried to silence an actress upon learning that an article about his past sexual misconduct was likely to be published. *CBS*, 433 F. Supp. 3d at 527; ¶¶58, 80; ECF No. 131-2.

[8]      In addition to these explicit elements of Rule 23, the implied "ascertainability" requirement requires only that a class be "defined using objective criteria that establish membership with definite boundaries." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 264 (2d Cir. 2017), *cert. denied*, __ U.S. __, 140 S. Ct. 338 (2019). This requirement is satisfied here. The class definition is ascertainable as it delineates the Class' boundaries by the dates of their transactions in CBS stock, and ascertaining members of the Class will be easily administrable by reference to investor records. *See, e.g., In re Facebook, Inc.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) (ascertainability requirement met where members "may be ascertained with reference to investor records").

action, for it is always subject to modification should later developments during the course of the trial so require.'" *Chi. Bridge*, 2020 WL 1329354, at *2; *Gruber*, 2019 WL 4439415, at *2 (same); *Facebook*, 312 F.R.D. at 340 (same); *see also In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *2 (S.D.N.Y. Sept. 29, 2015) ("The Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification.").  The Second Circuit also instructs district judges to "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met," but has cautioned that district courts must "avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial portions of the underlying litigation." *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006); *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001) ("The question for the district court at the class certification stage is whether plaintiffs' . . . evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive.").  As recently explained by the Second Circuit, "Rule 23 is not a weed whacker for merits problems." *Goldman*, 955 F.3d at 268.

Here, the proposed Class meets all of the applicable requirements of Rule 23 (a) and (b).

## A.     The Class Members Are so Numerous that Joinder of All Members Is Impracticable

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009) (citing *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007)).  "'In securities fraud class actions relating to publicly owned and

- 7 -

nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'" *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019). "Numerosity is presumed for classes larger than forty members." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). In demonstrating that numerosity is satisfied, plaintiffs may rely on reasonable inferences drawn from available facts to estimate a proposed class size. *See In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999).

Here, the Class is so numerous that joinder would be impractical. Throughout the Class Period, approximately 641 million shares of CBS stock – which were listed on the NYSE – were traded with weekly trading volumes averaging approximately 18.7 million shares. Finnerty Rpt., ¶¶24-25. Based on the frequency of stock transactions in which investors buy and sell shares, one can infer that there are millions of Class members who purchased stock during the Class Period. Thus, the Class is likely comprised of millions of geographically dispersed persons or entities, making joinder highly problematic and inefficient.

### B.     Common Questions of Law and Fact Exist

Commonality is "'met if plaintiffs' grievances share a common question of law or of fact.'" *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2017 WL 3608298, at *5 (S.D.N.Y. Aug. 22, 2017). A "common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 136 S. Ct. 1036, 1045 (2016). "'Commonality does not mandate that all class members make identical claims and arguments.'" *Katz v. Image Innovations Holdings, Inc.*, 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010). Rather, "'[e]ven a single common legal or factual question will suffice.'" *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55,

70 (S.D.N.Y. 2009).  Establishing commonality, therefore, has been described as a "low hurdle." *Gruber*, 2019 WL 4439415, at *3.  Generally, "where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).  "The commonality requirement has been applied permissively in securities fraud litigation." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007); *see also Signet*, 2019 WL 3001084, at *8 (commonality satisfied "as is typical of most securities fraud . . . class actions").

Here, virtually all of the questions of law and fact raised in this case are common to the Class.  These questions include, *inter alia*, whether: (1) Defendants' conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"); (2) Defendants publicly misrepresented material facts or omitted material facts they were required to disclose; (3) Defendants knowingly or recklessly disregarded that the alleged misstatements and omissions were false and/or misleading; and (4) investors suffered damages as a result of Defendants' wrongful conduct.  The answers to these common questions are likewise common and susceptible to generalized class-wide proof.  Accordingly, this case satisfies the commonality requirement.  *See, e.g.*, *Signet*, 2019 WL 3001084, at *8 (finding commonality in securities fraud case where common questions included "whether (i) statements disseminated to the Class by Defendants during the Class Period misrepresented or omitted material facts; (ii) the alleged fraud was material to the putative Class; and (iii) Defendants acted knowingly or recklessly"); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) ("Courts in this Circuit find commonality satisfied where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages.").

### C.      Lead Plaintiff's Claims Are Typical of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  To satisfy the typicality requirement a plaintiff must show that "'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  "'In a securities class action, when "plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims," the claims and nature of evidence "are generally considered sufficient to satisfy the typicality requirement."'"  *Signet*, 2019 WL 3001084, at *8; *see also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 109 (S.D.N.Y. 2011) ("'As long as plaintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish [the] necessary typicality.'") (alteration in original).

Here, the claims asserted by Lead Plaintiff are typical of the claims of absent Class members. Lead Plaintiff alleges that Defendants violated §§10(b) and 20(a) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder, by issuing public statements that misrepresented or omitted material facts to all Class members.  ¶¶8, 123, 125, 129.  Lead Plaintiff also alleges that, like the other members of the Class, it purchased shares of CBS stock at artificially inflated prices during the Class Period as a result of the Defendants' material misrepresentations and omissions.  ¶27.  When Defendants' fraudulent conduct was disclosed and became apparent to the market, Class members were damaged as artificial inflation came out of the stock price.  ¶¶9-10, 145-147.  Thus, Lead Plaintiff suffered harm typical of that of the Class.  Accordingly, typicality is satisfied.

- 10 -

### D.     Lead Plaintiff and Lead Counsel Will Continue to Adequately Represent the Interests of the Class

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied where, as here: (1) the class representative's interest is to vigorously pursue the claims of the class and is not "'antagonistic to the interests of other class members'"; and (2) the proposed class counsel "'are qualified, experienced and able to conduct the litigation.'" *In re Barrick Gold Sec. Litig*., 314 F.R.D. 91, 99 (S.D.N.Y. 2016); *MetLife*, 2017 WL 3608298, at *7.

Since the Fund's appointment as Lead Plaintiff (*see* ECF No. 43), the Fund has demonstrated its willingness to serve as a class representative and its ability to fairly and adequately protect the interests of the Class. Lead Plaintiff has followed through with its commitment to actively direct the litigation and oversee Lead Counsel's efforts, by, among other things: (i) supervising and monitoring the progress of the case; (ii) reviewing pleadings and other case documents; (iii) participating in discussions with Lead Counsel regarding significant developments in the litigation; and (iv) collecting documents for production to Defendants. *See* Ex. 7 (Declaration of Robert O. Glaza in Support of Lead Plaintiff's Motion for Class Certification), ¶6. In addition, Lead Plaintiff intends to continue working with Robbins Geller to vigorously prosecute this action and maximize the recovery for the Class. *See id.*, ¶¶7, 9.

Lead Plaintiff's interests are aligned with those of the Class and there are no conflicts of interest between Lead Plaintiff and absent Class members, nor do Lead Plaintiff or its counsel have any interests antagonistic to those of absent Class members. *See generally id.* Lead Plaintiff, like all Class members, purchased CBS stock during the Class Period and was allegedly injured by Defendants' misconduct. *See* ¶¶10, 27, 146; Ex. 7, ¶4; ECF No. 19-6 at 3. Lead Plaintiff's "substantial stake in any recovery by the putative class ensures it will vigorously advocate on the

- 11 -

class's behalf." ECF No. 43 at 4. As Lead Plaintiff proves its own claims, it will also be proving the claims of putative Class members. Thus, Lead Plaintiff's interest in establishing Defendants' liability and maximizing the recovery are aligned with the interests of absent Class members.

Additionally, Lead Plaintiff has ensured that the interests of the Class will continue to be protected by retaining counsel who are "'qualified, experienced and able to conduct the litigation.'" *Flag*, 574 F.3d at 35. "Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2015). Among other things, Robbins Geller has conducted a thorough investigation of Defendants' conduct, defeated Defendants' motions to dismiss, worked with experts on issues common to the Class, and continues to pursue Lead Plaintiff's claims with zeal and vigor. In short, Robbins Geller has diligently prosecuted Class members' claims to date, and is committed to doing so for as long as it takes to secure a successful outcome.

In sum, Lead Plaintiff is well-suited to represent the Class and, like other Class members, has been injured by Defendants' wrongful course of conduct. Lead Plaintiff and Lead Counsel are willing and able to prosecute this action on behalf of absent Class members and "will fairly and adequately protect" their interests. Fed. R. Civ. P. 23(a)(4); *see also, e.g.*, *Barrick*, 314 F.R.D. at 104 ("institutional shareholders whose interests are aligned with those of the Class," represented by lead counsel with "significant experience in bringing securities fraud suits" satisfy adequacy requirement). The adequacy requirement is, therefore, satisfied.

## E.     The Proposed Class Meets the Requirements of Rule 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), Lead Plaintiff satisfies Rule 23(b)(3)'s requirement that common questions of law or fact predominate over individual questions and that a

class action is the superior method to adjudicate this dispute.  *See Amchem*, 521 U.S. at 615.

### 1.     Common Questions of Law and Fact Predominate

"'Predominance is a test readily met in certain cases alleging . . . securities fraud.'" *JPMorgan*, 2015 WL 10433433, at *4 (quoting *Amchem*, 521 U.S. at 625); *see also Katz*, 2010 WL 2926196, at *5 (same).  "'Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)), *cert denied*, __ U.S. __, 138 S. Ct. 1702 (2018).  The predominance inquiry ultimately "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *MetLife*, 2017 WL 3608298, at *14 (quoting *Amchem*, 521 U.S. at 623).

In securities fraud cases like this one, it is well established that "materiality, falsity, and loss causation are considered 'common question[s].'" *Gruber*, 2019 WL 4439415, at *6 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 474-75 (2013)); *Goldman*, 955 F.3d at 268 ("[M]ateriality is irrelevant at the Rule 23 stage. Win or lose, the issue is common to all class members.").  For example, the Supreme Court has held that, because loss causation is a common question, plaintiffs are not required to "show loss causation as a condition of obtaining class certification." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*").  Likewise, scienter is a common question here because Defendants' state of mind did not differ with respect to individual class members. *See, e.g.*, *In re SunEdison, Inc.*, 329 F.R.D. 124, 146-47 (S.D.N.Y. 2019) (scienter is a common question).  And all of the elements of Lead Plaintiff's §20(a) claim are common as well, since they turn on Moonves's liability as a control person, which also did

not differ among Class members.  The remaining elements will likewise be established with common

proof.  For instance, reliance will be established class-wide through the "*Basic*" presumption, and

damages will be capable of measurement on a class-wide basis at the appropriate time (although not

required in this Circuit).  *See Roach*, 778 F.3d at 402 (acknowledging that *Comcast* does not require

"a finding that damages are capable of measurement on a classwide basis").

a. **Reliance Is Presumed for All Class Members Under the Fraud-on-the-Market Theory**

Lead Plaintiff is entitled to the fraud-on-the-market presumption of reliance, which is

premised on the principle that "the market price of shares traded on well-developed markets reflects

all publicly available information, and, hence, any material misrepresentations," and that investors in

such markets transact "in reliance on the integrity of that price."  *Basic*, 485 U.S. at 246-47; *see also*

*Goldman*, 955 F.3d at 261 ("The idea behind *Basic* is that investors presume that theoretically

efficient markets, such as the New York Stock Exchange or Nasdaq, incorporate all public

information – including material misstatements – into a share price.").  The Supreme Court held in

*Basic*, and reaffirmed in *Halliburton II*, 573 U.S. at 283-84, that investor-classes may, therefore

> satisfy the reliance element of the Rule 10b-5 cause of action by invoking a
> presumption that a public, material misrepresentation will distort the price of stock
> traded in an efficient market, and that anyone who purchases the stock at the market
> price may be considered to have done so in reliance on the misrepresentation.

*Id.*; s*ee also Waggoner*, 875 F.3d at 93 & nn.25-26.  To establish the *Basic* presumption, a plaintiff

must prove that "'[the] defendants' misstatements were publicly known, their shares traded in an

efficient market, and [the] plaintiffs purchased the shares at the market price after the misstatements

were made but before the truth was revealed.'"  *Goldman*, 955 F.3d at 270; *accord Halliburton I*,

563 U.S. at 811.  Once established, defendants bear the "heavy burden" of persuasion to rebut the

presumption by showing "by a preponderance of the evidence that the ***entire*** price decline on the

- 14 -

corrective-disclosure dates was due to something other than the corrective disclosures." *Goldman*, 955 F.3d at 270-72.

Here, all three *Basic* requirements are met. First, the alleged material misrepresentations and omissions were publicly made to investors.[9]  ¶¶8, 123, 125, 129. Moonves, speaking on his own behalf and on behalf of CBS as the Company's CEO, made these misrepresentations and omissions at a public summit hosted by *Variety* magazine, and his statements were quickly and widely disseminated to investors beyond those attending the summit by *Variety*'s Twitter feed and through publication of an article about the same statements. *Id*.; *supra* §II. Second, as detailed below, CBS stock traded in an efficient market throughout the Class Period. *See generally* Finnerty Rpt. Third, the market timing requirement is met because Lead Plaintiff and Class members acquired CBS stock during the Class Period and suffered losses when the truth was revealed. *See, e.g.*, ¶¶10, 27, 146.

The burden to show market efficiency "is not an onerous one." *Petrobras*, 862 F.3d at 278; *see also Waggoner*, 875 F.3d at 97. Establishing market efficiency at the class certification stage is a flexible inquiry, as the Second Circuit has "repeatedly – and recently – declined to adopt a particular test for market efficiency." *Waggoner*, 875 F.3d at 94 (citing *Petrobras*, 862 F.3d at 276). The Second Circuit has likewise declined "'to view direct and indirect evidence [of market efficiency] as distinct requirements, opting instead for a holistic analysis based on the totality of the evidence presented.'" *Id.* at 96-97. Here, based on both direct and indirect evidence, Lead Plaintiff has established that CBS stock traded in an efficient market during the Class Period, and therefore, that the *Basic* presumption of reliance applies.

Moreover, CBS stock traded at all relevant times on the NYSE, one of the largest securities exchanges in the world, on which billions of shares are traded each day – which virtually guarantees

---

[9]      "Even though materiality is a prerequisite for invoking the *Basic* presumption, [the Supreme Court has] held that it should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 282 (citing *Amgen*, 568 U.S. at 466-67).

a liquid market for the securities listed on its trading platform. The fact that CBS stock traded on the NYSE alone is strong evidence that the stock traded in an efficient market throughout the Class Period. *Billhofer v. Flamel Techs.*, *S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) ("'If . . . a security is listed on the NYSE . . . the market for that security is presumed to be efficient.'"); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) (a listing on the NYSE is a "good indicator of efficiency"), *aff'd sub nom. Waggoner*, 875 F.3d 79; *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE . . . weighs in favor of a finding of market efficiency."); *JPMorgan*, 2015 WL 10433433, at *7 (listing on NYSE weighed in favor of finding an efficient market).

In addition, when evaluating market efficiency, courts consider a non-exhaustive list of factors – the *Cammer* and *Krogman* factors. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001); *Signet*, 2019 WL 3001084, at *11 ("[T]he Court looks to the *Cammer* and *Krogman* factors, the prevailing tests for market efficiency."). The *Cammer* factors include the: (1) average weekly trading volume of the security; (2) number of securities analysts following and reporting on the company; (3) extent to which market makers traded in the security; (4) the issuer's eligibility to file a U.S. Securities and Exchange Commission ("SEC") Form S-3 registration statement; and (5) demonstration of a cause-and-effect relationship between unexpected, material disclosures and changes in the security's price. *See Waggoner*, 875 F.3d at 94. The *Krogman* factors include the: (1) market capitalization of the company; (2) bid-ask spread of the security; and (3) percentage of the security not held by insiders (*i.e.*, the public float). *Id.*

All of the *Cammer* and *Krogman* factors are satisfied here. In support of this conclusion, Lead Plaintiff offers the expert report of Dr. John D. Finnerty, Ph.D ("Dr. Finnerty"). *See generally*

Finnerty Rpt.  Dr. Finnerty is a Professor of Finance at Fordham University's Graduate School of Business Administration and an expert in the financial markets, and has rendered an opinion on market efficiency in this case.  *Id.*  Dr. Finnerty analyzed each of the *Cammer* and *Krogman* factors and concluded that the market for CBS common stock was efficient throughout the Class Period.  *See id.*, ¶¶13-100.  Additionally, while Lead Plaintiff "need not prove price impact directly" to invoke the *Basic* presumption, *Goldman*, 955 F.3d at 270, the evidence here demonstrates that the corrective disclosures in fact affected the price of CBS stock.  Finnerty Rpt., ¶¶80-90, 131-132.  A brief review of each *Cammer* and *Krommer* factor is set forth below.

### (1)   CBS Stock Experienced a High Weekly Trading Volume

The high trading volume of CBS stock creates a strong presumption of market efficiency. Courts in this District hold that "'[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one.'" *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (quoting *Cammer*, 711 F. Supp. at 1293); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013).  Here, the average weekly trading volume of CBS stock exceeded 5% – well above the benchmark level for market efficiency.  *See* Finnerty Rpt., ¶24.

### (2)   Numerous Financial Analysts Covered CBS During the Class Period

CBS stock was the subject of extensive coverage by securities analysts, which also supports a finding of market efficiency.  As set forth in Dr. Finnerty's expert report, CBS was followed and covered by approximately 50 securities analyst firms, including well-known firms such as Barclays Capital, Credit Suisse, Deutsche Bank, JPMorgan, Morgan Stanley, RBC Capital Markets, UBS Investment Bank, and Wells Fargo, who issued over 350 analyst reports covering CBS.  *See* Finnerty

Rpt., ¶27.  This level of analyst coverage is more than enough to demonstrate market efficiency. *See, e.g.*, *Winstar*, 290 F.R.D. at 446 (finding market efficient where three analysts followed security at issue); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (six analysts sufficient).

Widespread media coverage and regular press releases from the Company also support a finding of market efficiency.  *See Barclays*, 310 F.R.D. at 92 (regular issuance of press releases, press coverage, and dissemination of information through news services supported finding of market efficiency); *Billhofer*, 281 F.R.D. at 153-54 (publication of over two dozen press releases and articles supported market efficiency).  Here, in addition to CBS's own regular press releases, "CBS also received regular press coverage throughout the Class Period, and information concerning CBS was widely disseminated throughout the Class Period through national news services." *See* Finnerty Rpt., ¶29.  In conjunction with widespread analyst coverage, CBS's media coverage provides further support for the finding of market efficiency for CBS stock.  *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (three analysts with 80 analyst reports, together with news items and press releases, "favor[ed] a finding of market efficiency"), *aff'd*, 639 F.3d 623.

### (3)     CBS Had Significant Institutional Holdings

The multitude of institutional investors transacting in CBS stock provides additional evidence of market efficiency.  *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (finding institutional investors "likely acted as arbitrageurs and facilitated the efficiency of the market").  Over 850 sophisticated institutional investors, which typically employ in-house financial analysts, held CBS stock during the Class Period.  *See* Finnerty Rpt., ¶¶30-31.  Thus, this factor also supports market efficiency.

### (4)     CBS Was Eligible to File Form S-3 During the
### Class Period

4814-0548-6533.v1

CBS's eligibility to file Form S-3 further bolsters a finding of market efficiency.  A domestic company is eligible to file a Form S-3 registration statement if it has filed SEC reports for 12 consecutive months and has a public float of at least $75 million.  *See* 17 C.F.R. §239.13.  "The ability to file this form indicates that the company is easily able to issue new securities," and is evidence of market efficiency.  *Winstar*, 290 F.R.D. at 447.  CBS consistently filed SEC reports during the Class Period and maintained an average public float greater than $75 million during the Class Period.  Finnerty Rpt., ¶34.  Thus, CBS was eligible to file Form S-3 registration statements during the Class Period.  *Id.*  This factor supports a finding of market efficiency.

> **(5)   The Price of CBS Stock Reacted to New Company-Specific Information During the Class Period**

The Second Circuit has held that the fifth *Cammer* factor – "*Cammer* 5" – is not always required and that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies."  *Waggoner*, 875 F.3d at 97.  When courts do consider *Cammer* 5, they require only a *prima facie* showing that, during the Class Period, the price of an issuer's securities responded to "unexpected" company-specific news.  *See Cammer*, 711 F. Supp. at 1287.  Notably, where – as here – the seven other *Cammer* and *Krogman* factors are satisfied, "a court can dispose with *Cammer* 5 completely."  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 97 (S.D.N.Y. 2018) (citing *Waggoner*, 875 F.3d at 97-98).

While not required, *Cammer* 5 supports a finding of market efficiency here.  As detailed in his expert report, Dr. Finnerty conducted an event study, which is an empirical test of the cause and effect relationship between movements in CBS stock and CBS-specific news.  *See* Finnerty Rpt., ¶¶35-90.  The Second Circuit recognizes such event studies as "'standard operating procedure in federal securities litigation'" – used to "'disentangle[] the effects of two types of information on

stock prices – information that is specific to the firm under question . . . and information that is likely to affect stock prices marketwide.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016). Utilizing statistical analysis, Dr. Finnerty isolated the portion of CBS's stock movements following the Company's earnings announcements during the Class Period and on the corrective disclosure dates that cannot be attributed to market or sector-specific factors. *See* Finnerty Rpt., ¶¶35-90. This analysis shows that there was a consistent cause-and-effect relationship between the release of new material information about CBS and the price of CBS stock, providing further evidence of market efficiency. *See id.* And the analysis further demonstrates a negative stock price reaction to the correction of Defendants' misstatements on the corrective disclosure dates, thus showing price impact and foreclosing Defendants' ability to demonstrate a total lack of price impact necessary to rebut the presumption. *See id.*, ¶¶80-90; *see also In re Allstate Corp. Sec. Litig.*, 2020 WL 4013360, at *12 (7th Cir. July 16, 2020) (requiring district court addressing *Basic* rebuttal to consider findings of "'ex post price distortion,' or '[w]hether the stock price responds when the [alleged] fraud is revealed to the marked'" as evidence of price impact).

(6)   **CBS Had a High Market Capitalization During the Class Period**

The market capitalization of CBS stock is another factor weighing in favor of market efficiency. During the Class Period, CBS stock's average market capitalization ranged from approximately $17.7 billion to approximately $23.5 billion. *See* Finnerty Rpt., ¶92. This sizeable market capitalization supports market efficiency. *See, e.g.*, *McIntire*, 38 F. Supp. 3d at 433 (market capitalization of $292-$585 million supported market efficiency).

(7)   **CBS Stock Was Subject to a Narrow Bid-Ask Spread During the Class Period**

CBS stock was also subject to a narrow bid-ask spread, further indicating market efficiency.

- 20 -

"A bid-ask spread is the amount by which the asking price for an asset exceeds its bid price." *Signet*, 2019 WL 3001084, at \*12 n.6.  "This percentage reflects the difference between the highest price a buyer is willing to pay for an asset and the lowest price that a seller is willing to accept." *Id.*  "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478.  Here, the average and median daily bid-ask spread during the Class Period was only 0.02%, which was below the average and median bid-ask spreads for all NYSE common stock during the Class Period. *See* Finnerty Rpt., ¶98.  This narrow bid-ask spread likewise supports a finding of market efficiency. *See Signet*, 2019 WL 3001084, at \*12 (finding that an average bid-ask spread of 0.3% "strongly indicates that the stock traded in an efficient market").

### (8)      A High Percentage of CBS Stock Was Held by Public Investors During the Class Period

Public investors held the overwhelming majority of CBS stock during the Class Period. *See* Finnerty Rpt., ¶99.  When a large percentage of a company's outstanding shares are held by public investors, it "mean[s] that there was a large proportion of . . . shares that were available to non-insiders who could trade without restrictions and profit by trading on new information" – another indication of market efficiency. *Signet*, 2019 WL 3001084, at \*12.  The "public float" is calculated as the number of shares outstanding less the number of shares held by insiders divided by the number of shares outstanding.  Finnerty Rpt., ¶99.  Here, the public float of CBS was 96.6%, with a market value of $19.7 billion during the Class Period, further demonstrating market efficiency. *See id.*, ¶¶99-100; *see also Signet*, 2019 WL 3001084, at \*12 (concluding that a public float of 99.4% to 99.8[%] "weigh[ed] heavily in favor of a finding of market efficiency").

In sum, while not required, all of the *Cammer* and *Krogman* factors support a finding that the market for CBS stock was efficient during the Class Period.  Thus, class-wide reliance may be

- 21 -

presumed under the *Basic* fraud-on-the-market doctrine.

        **b.**      **Damages Will Be Calculated on a Class-Wide Basis**

Proof of loss causation or damages is not a prerequisite to class certification. *See Amgen*, 568 U.S. at 475 ("this Court has held that loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified"); *Halliburton I*, 563 U.S. at 813 (loss causation is a common question, and plaintiffs are not required to "show loss causation as a condition of obtaining class certification"). In this Circuit, moreover, certification does not require "a finding that damages are capable of measurement on a classwide basis." *Roach*, 778 F.3d at 402. Instead, "'the fact that damages may have to be ascertained on an individual basis'" is merely a factor that courts "'consider in deciding whether issues susceptible to generalized proof "outweigh" individual issues.'" *Id.* at 408; *see also Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) ("All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'"). Further, any damages model submitted at the class certification stage "'need not be exact.'" *Waggoner*, 875 F.3d at 106 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).

Nonetheless, damages here will be calculated on a class-wide basis, consistent with Lead Plaintiff's theory of the case. *See* Finnerty Rpt., ¶¶129-130. Courts in this Circuit routinely find that damages in securities fraud cases can be calculated on a class-wide basis. *See, e.g.*, *Signet*, 2019 WL 3001084, at *20 (event studies are a "generally accepted method for measuring damages in a securities fraud class action"); *Barrick*, 314 F.R.D. at 106 (§10(b) damages are "measurable on a class-wide basis" and "do[] not create individualized damages issues that defeat predominance").[10]

---

[10]    *See also JPMorgan*, 2015 WL 10433433, at *7 (accepting method to "calculate classwide, per-share damages through an event study analysis of the stock price inflation caused by Defendants' alleged misrepresentations or

Here, Dr. Finnerty has concluded that damages will be subject to measurement on a class-wide basis at the appropriate juncture.  *See* Finnerty Rpt., ¶¶129-130.  Class-wide damages can be calculated using a variety of commonly-utilized methods to measure the amount of artificial inflation caused by Defendants' omissions and false or misleading statements.  *See id.*  Under such an approach, Class members' trading activity will be used to calculate damages in a mechanical fashion.  *See id.* Nothing more is required at this stage.

### 2.    A Class Action Is Superior to Other Methods of Adjudication

Finally, Rule 23(b)(3) requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Courts have uniformly recognized that the class action device is superior to other methods of adjudication of large-scale securities class actions.  *See Gruber*, 2019 WL 4439415, at *9 ("'Generally, securities actions easily satisfy the superiority requirement because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'"); *see also In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015) (same).  As the Supreme Court has recognized, "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

Rule 23(b)(3) identifies four factors for assessing whether a class action is superior to other methods of adjudication: (1) the interests of members of the class in "individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of

---

omissions"); *Wallace v. IntraLinks*, 302 F.R.D. 310, 318 (S.D.N.Y. 2014) ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability.").

concentrating the litigation of the claims in the particular forum"; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). Each of these factors demonstrates that a class action is the superior method of adjudication here.

First, the Class consists of a large number of geographically dispersed purchasers of CBS stock whose individual damages likely are too small to make individual litigation economically worthwhile. The Class members, therefore, have little interest in asserting separate claims. *See, e.g.*, *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008) ("the amount of potential recovery per plaintiff is not so high as to ensure that each plaintiff could or would bring an action individually"). Second, Lead Plaintiff is not aware of any other securities fraud litigation commenced by any Class member regarding the alleged fraud. Third, resolving the litigation in this Court has many benefits, including eliminating the risk of inconsistent adjudication and promoting the fair and efficient use of the judicial system. Finally, Lead Plaintiff does not foresee any management difficulties that will preclude this case from being maintained as a class action. Rather, litigating each claim separately "would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008). The superiority requirement is thus readily satisfied here.

### F.      Robbins Geller Should Be Appointed as Class Counsel

Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel." Lead Plaintiff respectfully requests that the Court appoint Robbins Geller as Class Counsel. In appointing class counsel, the Court considers counsel's work "in identifying or investigating potential claims in the action," "counsel's experience in handling class actions," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Here, Robbins Geller is well qualified to prosecute this case on behalf of the Class. As a top securities fraud firm nationally, "[c]ourts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits." *Barclays*, 310 F.R.D. at 100; *see also, e.g.*, Jan. 21, 2020 Transcript at 55, *In re Am. Realty Capital Props., Inc. Litig.*, No. 1:15-mc-00040-AKH (S.D.N.Y. Feb, 13, 2020), ECF No. 1316 (Hellerstein, J.) (concerning Robbins Geller's role as sole lead counsel in recovering $1.025 billion for the class in a securities case, stating "the role of lead counsel was fulfilled in an extremely fine fashion by [Robbins Geller]. At every juncture, the representations made to me were reliable, the arguments were cogent, and the representation of their client was zealous."). Indeed, Robbins Geller has extensive securities litigation experience and has successfully prosecuted numerous securities fraud class actions on behalf of injured investors. *See* Ex. 8 (Firm Résumé of Robbins Geller). Further, as discussed above, Robbins Geller's litigation of this case thus far reflects the firm's ongoing commitment to this action. Accordingly, Lead Plaintiff requests that the Court appoint Robbins Geller to serve as Class Counsel pursuant to Rule 23(g).

## IV.   CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (a) certify this action as a class action pursuant to Rule 23(a) and Rule 23(b)(3); (b) appoint Lead Plaintiff as Class Representative; and (c) appoint Robbins Geller as Class Counsel pursuant to Rule 23(g).

DATED: July 31, 2020              ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                 SAMUEL H. RUDMAN
                                 VINCENT M. SERRA

                                      s/ VINCENT M. SERRA
                                        VINCENT M. SERRA

4814-0548-6533.v1

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
vserra@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
SPENCER A. BURKHOLZ
JONAH H. GOLDSTEIN
LAURIE L. LARGENT
LAURA ANDRACCHIO
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
jonahg@rgrdlaw.com
llargent@rgrdlaw.com
landracchio@rgrdlaw.com

Lead Counsel for Plaintiff

- 26 -

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 31, 2020, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ VINCENT M. SERRA
VINCENT M. SERRA

ROBBINS GELLER RUDMAN
    & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

E-mail:  vserra@rgrdlaw.com

## Mailing Information for a Case 1:18-cv-07796-VEC Samit v. CBS Corporation et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Laura Andracchio**
  LAndracchio@rgrdlaw.com,sarahm@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Steven J. Ballew**
  steven.j.ballew@gmail.com

- **Mary Katherine Blasy**
  mblasy@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David W. Brown**
  dbrown@paulweiss.com,Mao_fednational@paulweiss.com

- **Spencer A. Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com,kjohnson@rgrdlaw.com,scaesar@rgrdlaw.com

- **Steven M. Cady**
  scady@wc.com

- **Alexander Leonard Cheney**
  maosdny@willkie.com

- **Todd G. Cosenza**
  tcosenza@willkie.com,maosdny@willkie.com

- **Mary Jane Eaton**
  mary.eaton@freshfields.com,slipkis@willkie.com,cbrancato@willkie.com,aberkowitch@willkie.com,meaton@willkie.com,dcurtis@willkie.com,sballew@willkie.com

- **Scott A Edelman**
  sedelman@gibsondunn.com

- **Zeh Sheena Ekono**
  zekono@willkie.com

- **Brad D. Feldman**
  bfeldman@paulweiss.com,mao_fednational@paulweiss.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com

- **Hector Gonzalez**
  hector.gonzalez@dechert.com,nycmanagingclerks@dechert.com,AutoDocket@dechert.com

- **Richard Francis Hans , Jr**
  Richard.Hans@dlapiper.com,ivy.hamlin@dlapiper.com,DocketingNewYork@dlapiper.com,new-york-docketing-7871@ecf.pacerpro.com,richard-hans-7005@ecf.pacerpro.com

- **Brendan Michael Herrmann**
  brendan.herrmann@dechert.com,nycmanagingclerks@dechert.com,AutoDocket@dechert.com

- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Phillip C. Kim**
  pkim@rosenlegal.com,pkrosenlaw@ecf.courtdrive.com

- **Daniel Jonathan Kramer**
  dkramer@paulweiss.com,mao_fednational@paulweiss.com

- **Laurie L. Largent**
  llargent@rgrdlaw.com

- **Andrew J. Levander**
  andrew.levander@dechert.com,christopher.ruhland@dechert.com,nycmanagingclerks@dechert.com,AutoDocket@dechert.com,9833472420@filings.docketbird.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,ahood@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Angela M. Liu**
  angela.liu@dechert.com,nicole.ladue@dechert.com

- **Jessica Ann Masella**
  Jessica.Masella@dlapiper.com,jessica-masella-8419@ecf.pacerpro.com

- **Margaret Mortimer**
  margaret.mortimer@dechert.com

- **Rahul Mukhi**
  rmukhi@cgsh.com,maofiling@cgsh.com

- **Tariq Mundiya**
  maosdny@willkie.com,tmundiya@willkie.com

- **Sharon L. Nelles**
  NELLESS@SULLCROM.COM,s&cmanagingclerk@sullcrom.com,sharon-nelles-8045@ecf.pacerpro.com

- **Beth Deborah Newton**
  newtonb@sullcrom.com,s&cmanagingclerk@sullcrom.com,beth-newton-9897@ecf.pacerpro.com

- **Jonathan Bradley Pitt**
  jpitt@wc.com

- **Andrew R. Podolin**
  apodolin@rkollp.com,RKOManagingClerk@rkollp.com

- **Matthew McPherson Balf Riccardi**
  mriccardi@rkollp.com,RKOManagingClerk@rkollp.com,apodolin@rkollp.com

- **Lee S Richards , III**
  lrichards@rkollp.com,RKOManagingClerk@rkollp.com

- **Katharine Rodgers**
  rodgersk@sullcrom.com,katherine-rodgers-0146@ecf.pacerpro.com,s&cmanagingclerk@sullcrom.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,mblasy@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Vincent Michael Serra**
  vserra@rgrdlaw.com

- **Audra Jan Soloway**
  asoloway@paulweiss.com,mao_fednational@paulweiss.com

- **Brendan V.. Sullivan , Jr**
  bsullivan@wc.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

John Lantz
,